Everett G. RANK et al., Plaintiffs,

v.

(KRUG) UNITED STATES of America, et al., Defendants.

The STATE OF CALIFORNIA, Complainant in Intervention,

v.

Everett G. RANK et al., Defendants in Intervention.

The CITY OF FRESNO, a Municipal Corporation, Complainant in Intervention,

v.

UNITED STATES of America et al., Defendants in Intervention.

TRANQUILLITY IRRIGATION DISTRICT, a Public Corporation, Complainant in Intervention,

v.

UNITED STATES of America et al., Defendants in Intervention.

CITY OF FRESNO, a Municipal Corporation, et al., Petitioners,

v.

A. D. EDMONSTON, as State Engineer of the State of California, etc., et al., Respondents.

No. 685–ND.

United States District Court
S. D. California, Northern Division.

Feb. 7, 1956.

Supplemental Memorandum
July 11, 1956.

32

Claude L. Rowe, Fresno, Cal., for plaintiffs, and for Tranquillity Irr. Dist. plaintiffs in intervention.

Claude L. Rowe and Christian M. Ozias, Fresno, Cal., for City of Fresno.

Maddox & Abercrombie, James K. Abercrombie, Erling H. Kloster, Visalia, Cal., for various Irr. Dists.

LeRoy McCormick and John R. Locke, Jr., of Visalia, Cal., for various Irr. Dists.

Henry & Kuney, of Tulare, Cal., for various Irr. Dists.

E. I. Feenister, Lindsay, Cal., for various Irr. Dists.

Green, Green & Plumley, Denslow Green, Madera, Cal., for Chowchilla Water Dist.

David E. Peckinpah, Fresno, Cal., and Harold M. Child, Selma, Cal., for Madera Irr. Dist.

J. O. Reavis, Delano, Cal., for Southern San Joaquin Municipal Utility Dist.

Edmund G. Brown, Atty. Gen., B. Abbott Goldberg, Deputy Atty. Gen., for State of California, plaintiff in intervention.

Edmund G. Brown, Atty. Gen., B. Abbott Goldberg, Deputy Atty. Gen., Henry Holsinger, Principal Atty., Division of Water Resources, State of California, Sacramento, Cal., for respondent State Officials in Ancillary Proceedings.

J. Lee Rankin, Asst. Atty. Gen., William H. Veeder, Sp. Asst. to Atty. Gen., for defendant officials and employees of the Bureau of Reclamation.

No appearance for United States.

Edson Abel, San Francisco, Cal., as amicus curiae in behalf of California Farm Bureau Federation.

## INDEX BY TOPICS

| | | Page |
|---|---|---|
| I. | Preliminary statement | 36 |
| II. | General geographical & physical features | 39 |
| III. | History of litigation | 49 |
| IV. | The parties | 53 |
| V. | The pleadings | 54 |
| VI. | Jurisdiction of (1) subject matter (2) defendant officials (3) defendant districts | 62 |
| VII. | Jurisdiction of the State of California | 66 |
| VIII. | Jurisdiction of the United States | 69 |
| IX. | Default against United States | 85 |
| X. | Eminent domain | 89 |
| XI. | Water rights under California law—general | 104 |
| XII. | California water rights of plaintiffs | 115 |
| XIII. | California water rights of defendants | 116 |
| | (a) Purchase & exchange contracts | 117 |
| | (b) Change of point of diversion | 117 |
| | (c) Applications to appropriate held by the United States | 121 |
| | (d) Prescription | 125 |
| | (e) Laches | 128 |
| | (f) Estoppel | 128 |
| | (g) Public use | 130 |
| XIV. | Watershed and county of origin statutes | 149 |
| XV. | Class action | 154 |
| XVI. | Election of remedies—Tucker Act | 159 |
| XVII. | Inadequacy of remedy at law | 160 |
| XVIII. | Physical solution & form of judgment | 161 |
| XIX. | Injunctive relief against United States | 175 |
| XX. | Tranquillity Irrigation District | 176 |
| XXI. | City of Fresno | 178 |
| | (a) Complaint in intervention | 178 |
| | (b) Ancillary proceedings | 178 |

**36**

HALL, District Judge.

I.

Preliminary Statement.

This is a water rights case.

One phase or another of it has been considered in five reported opinions, viz.: Rank v. Krug, D.C., 90 F.Supp. 773, United States v. United States District Court, etc., 9 Cir., 206 F.2d 303, State of California v. United States District Court, etc., 9 Cir., 213 F.2d 818, Rank v. United States, D.C., 16 F.R.D. 310, and City of Fresno v. Edmonston, D.C., 131 F.Supp. 421.

In view of the number of cases considered by the court in this opinion, and the fact that many of them are cited to several propositions, and to alleviate the frustrating use of the conventional "supra" and "post," an alphabetical index of cases is attached as Appendix "A," page 187.

This opinion is long. There is repetition in it. But these things are necessitated in order to have a proper understanding of the numerous legal and factual matters involved, many of which are complex, and several are important questions of first impression.

In view of the contentions made by some of the defendants at various times throughout the trial and related proceedings, it is well to state at the outset, as a reminder to the parties that this court has neither the desire nor the power to question the *wisdom* of any of the applicable Acts of Congress or of the laws of the State of California relating to the Central Valley plan or project or any unit of it, and that this suit is but an invocation of the powers confided by the Constitution and laws to the judicial department of the government to interpret and apply the applicable law to the issues raised by the pleadings and the evidence. Such relief in the form of a judgment as may be found necessary is but the usual exercise of the judicial power, though it may thereby restrict the conduct of the government and its officers to that which is judicially determined to be lawful and within its or their respective powers. If government officials were the sole judges of their powers and their conduct, then the courts would not be necessary.

*This is not* a suit wherein the plaintiffs seek to establish for each of them their separate rights *inter sese* to a given quantity of water as between themselves or as against one another, but *it is* a suit to establish a *common right* to a *common source* of water. It is a type of suit familiar, for many years, to the arid West wherein parties seek the adjudication and enforcement by a court of equity of claimed common rights to the use of water, which rights are asserted to be interfered with or taken by the acts of the defendants contrary to applicable laws.

It is impossible to make any short and comprehensive statement of the issues. They will be dealt with in detail hereinafter.

Stated as simply as possible, the controversy may be described as follows: The plaintiffs do not seek to prevent the construction or operation of the Central Valley Plan or any unit or project thereof, but contend that the lawful operation of the Plan and units involved compels recognition and enforcement of their rights to water, as tested by applicable Federal and California laws. The defendants at one stage or another have recognized that the plaintiffs do have rights to water. The dispute throughout the trial has largely been over the extent and enforceability of those rights, the area having the San Joaquin river as its common source, the quantity of water required to fulfill those rights, and the most reasonable and economic method of doing so.

The plaintiffs and their class are riparian and overlying owners of land along the San Joaquin river and on its alluvial cone, below Friant dam and above Mendota Pool, 59 miles below Friant. They formerly had the full flow of the river in its natural channel to satisfy their direct and underground supply,

The average annual flow for the period 1897–1944 was 1,797,260 acre-feet,[1] and the average flow was at the rate of 2,463 second-feet [2] measured at Friant.

The government (as that term is used, it applies to the Bureau officials and the United States unless it otherwise appears in the context of the opinion hereinafter) by its submitted plan of physical solution proposes to release only a sufficient amount of water into the natural channel of the river as will produce a flow of five second-feet past the lowest downstream lands (in the vicinity of Gravelly Ford, 36 plus miles downstream from Friant.).

While the prayer of plaintiffs' complaint asked the full flow of the river, their counsel has insisted throughout the trial, and the case was tried on the basis, that the plaintiffs seek only that reasonable amount of water which they insist they are entitled to have for reasonable present and prospective uses by reasonable methods of diversion under the applicable Federal and California laws in the form of a judgment requiring a "physical solution." In relation to the full flow of the river and the amount impounded and diverted at Friant, the amount thus sought is small.

All parties serving pleadings prayed that the court impose a reasonable physical solution as that term has been applied by the courts of California. Plans of physical solution were submitted before the commencement of the trial.

Prior to the commencement of the trial the court suggested that the entire matter be referred to the California Department of Public Works, Division of Water Resources, as special master or referee under the provisions of the California Water Code, Sections 2075–2076. This proposal was rejected by all parties, and the court felt it had no discretion to direct the reference, in view of the fact that government officials who were defendants had had the case removed from the State court to the Federal court.

The trial has been protracted and bitter.[3]

By far, the greater portion of the evidence has dealt with the source, course and direction of underground waters. And while the defendant officials on the original Motion to Dismiss contended the plaintiffs had no rights at all, they, as well as all other answering defendants, admitted in their answers that the plaintiffs do have rights to water. The real difference as it has finally developed is the claim that the United States has taken the entire flow of the San Joaquin river by the exercise of its power of eminent domain, and that whatever rights the plaintiffs have to water to be released from Friant is solely in the discretion and determination of government officials. The question is, therefore, whether the plaintiffs are entitled to uncertain releases as a matter of mere grace in the amounts determined from time to time by government officials, or to releases of water as a matter of adjudicated right by virtue of their status as downstream and overlying owners with vested rights under applicable Federal statutes and the California law.

The lands of the class of landowners represented by the plaintiffs comprise approximately 300,000 acres which for many years have been highly cultivated

1. An acre-foot is that quantity of water which is sufficient to cover one acre of land with water one foot deep.

2. A second-foot is one cubic foot of water going by a given point in one second.

3. Twice during the trial the conduct of counsel compelled the court to declare a recess and threaten to vacate the trial to be reset later.

Approximately 30,000 pages of transcript accumulated during the trial. Over 70 witnesses testified on the merits; many of the experts covering weeks or months. Over 800 exhibits were admitted in evidence, many of them consisting of hundreds of pages of scientific and engineering data, as well as hundreds of sheets of maps, charts, graphs and tables.

The court interrogated all witnesses to the end that the court might understand the particular exhibit under discussion, or understand the testimony of the witness and its relation to the issues of the case.

with ample water supply. The San Joaquin river filled some plaintiffs' needs fully and others partially, which will be discussed later. These lands lie in what may be roughly described as an equilateral triangle with the apex at Friant, and overlay the alluvial cone of the San Joaquin river westerly from Friant. In the Central Valley Plan no provision is made for bringing additional water to these lands, but their supply was to continue by releases from Friant.

It was not until long after the trial started that the definitive quantity of water to be released downstream from Friant to supply the lands of plaintiffs and their class was announced to be approximately only 48,000 acre-feet of water annually.

The first declaration by the Secretary of the Interior of the United States as to just how water was to be supplied to plaintiffs and their class was not made until March 30, 1953. And it is indefinite, as it leaves to the government officials the determination of "all valid legal requirements for the reasonable and beneficial use of water, both surface and underground, by reasonable methods of diversion and reasonable methods of use in that area."

The determination of those things are judicial questions, Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 22 P.2d 5, and to have them declared and enforced by judicial process is, in a word, the purpose of this suit.

## II.

## General Facts, and Geographical and Physical Features.[3a]

for adjoining area see next page

3a. A map has been compiled from various exhibits introduced in the case. The map covers all of the area involved. It shows the names and location of the rivers; the dams which are built and ultimately proposed; the lands of the defendant districts; the area of plaintiffs' lands; the lands which were involved in the Gerlach

for adjoining area see preceding page

for adjoining area see next page

case hereinafter mentioned; the Friant-Kern canal; the Madera canal; the Delta-Mendota canal; Tulare lake; Buena Vista lake; the principal cities; and, the 500 foot surface contour elevation on the east side of the valley and on the west side of the valley. The map is reduced from a larger map drawn to scale.

for adjoining area see preceding page

EXPLANATION

Defendant Districts

Tranquillity I.D.

Lands Within Cone Line

Lands in Gerlach Case

PHYSICAL FEATURES OF THE
SAN JOAQUIN RIVER WATERSHED
FROM VARIOUS EXHIBITS IN RANK v. KRUG,
U.S.D.C., S.D. CALIFORNIA, NO. 685 N.D.

SCALE OF MILES

In the Opinion of this Court, filed April 13, 1950, 90 F.Supp. 773, a brief description of the Central Valley Plan, as well as its history, legislative and otherwise, was set forth.

It is felt, however, that some general facts and a description of certain geographical features of the valley, as well as a brief description of the physical works immediately involved in this case, will be helpful.

Many voluminous bulletins, reports, and the like, both California and United States, were admitted in evidence as exhibits, and carefully examined by the Court. By reference to such exhibits, or any other reference to them or any other exhibits, the Court does not adopt, or find as true, any statement in any of said exhibits which is contrary to, or inconsistent with, the conclusions expressed in this Opinion. Many of the reports, bulletins and publications contain factual matter concerning the surface and underground waters in issue in this case. The statements in the reports concerning many phases of the Project are merely the opinions of the authors, expressed without any challenge to them, which challenge has occurred in this adversary proceeding, where all the experts were submitted to extensive examination and cross-examination, not only on their opinions, but the factual bases for them. Many of the statements of fact and opinion in such documents are contradictory and conflicting with one another, and were not borne out by the evidence in this case, and are contrary to it.

It would serve no useful purpose to attempt to analyze the voluminous evidence in the case. All of the statements of fact contained in this Opinion are found by the Court to be true from a preponderance of the evidence in the whole case, after carefully weighing it and giving due consideration to all the factors required by the trier of facts to be taken into consideration in making a decision on the facts.

The Central Valley of California is an inland valley having only one outlet to the ocean at San Francisco Bay. It is commonly called the Sacramento-San Joaquin Valley. It is in the shape of an elongated bowl, having mountains on all sides except where the water passes into the sea at San Francisco Bay, and even there, its debouchment to the ocean is through a narrow pass called the Carquinez Straits. The valley, between the foothills, is approximately 400 miles long from the Grape Vine grade on the south to Red Bluff on the north, and at its widest point is approximately 100 miles wide.

The trough of the valley is not in the center of the valley floor, but lies westerly of the center so that only about one-third of the valley lies westerly of the trough.

The Sacramento River basin, with its separate tributary river systems, drains the northern half of the valley. The San Joaquin River basin, with its separate tributary river systems, drains the southern half of the valley.

The tributary river systems of the two basins gather their waters from the separate watersheds of each tributary river system in the mountains on the westerly and easterly sides of the valley, then flow easterly or westerly, as the case may be, to the central trough of the valley where they join the main drainage channels of each basin. After reaching the trough of the valley, they flow toward each other (i. e., the Sacramento southerly, and the San Joaquin northerly), until they meet in the so-called Delta area in the vicinity of Stockton, where they turn again and flow westerly through Carquinez straits into the San Francisco Bay, and thence into the Pacific Ocean.

The estimated mean average *seasonal* run-off of the combined rivers for the 53-year period 1894–1947 was 33,646,000 acre-feet. Of this, the Sacramento Basin accounted for 22,390,000 acre-feet, and the San Joaquin Basin for 11,246,000 acre-feet. (Ex. Cal.-M-1, p. 39).

This case is not concerned with the Sacramento river or any of its tributary river systems.

In the southern part of the valley there is a negligible contribution of water from the mountains which lie on the west side of the valley. Rainfall on the floor of the valley varies from less than six inches to about twelve inches per annum and likewise, is negligible in contributing to river flow. The economic life of the valley does not depend on rainfall, but depends on the water gathered from the rivers which rise in the Sierra Nevada Mountains easterly of the valley and flows from them on to the floor of the valley, for direct diversion into irrigation ditches, or for replenishment of the groundwater for wells. Practically all of the water in the southern or San Joaquin part of the valley comes from streams which have their origin in separate mountain watersheds on the east side of the valley. The water from those rivers then flows westerly to the trough of the valley where it either joins the main San Joaquin drainage channel and flows northerly, or flows southerly into the sinks of Tulare Lake or Buena Vista Lake.

The lands of both plaintiffs and defendant districts which are concerned in this case are in the southern portion of the southern half of the Central Valley, and lie in what is referred to in Exhibit 136 (p. 84, Plate 1) as the "East side Upper (southern) San Joaquin Valley." Such lands are in the counties of Madera, Fresno, Tulare and Kern.

That area lies easterly of the trough of the valley. On the south it is bounded by the Tehachapai Mountains, and on the north by a line slightly north of the Chowchilla River. Seven river systems in that area arise in their separate mountain watersheds in the Sierra Nevada Mountains to the east, from whence each flows westerly across the valley to its trough. The total average seasonal natural run-off for the 53-year period 1894–1947 for these seven river systems, measured at the point of debouchment into the valley, was 5,017,300 acre-feet per year. That of each of them respectively (beginning at the south end of the valley and going northerly), was as follows: Kern River—736,000 acre-feet; Tule River—140,000 acre-feet; Kaweah River—416,000 acre-feet; Kings River—1,715,000 acre-feet; San Joaquin River—1,816,000 acre-feet; Fresno River—103,000 acre-feet; and Chowchilla River—91,300 acre-feet. (Exhibit Cal-M-1, pp. 410–411). There are a number of creeks rising in the foothills in the same area, but their contribution is slight compared to the above-named rivers. All of them fluctuate greatly, not only in different years, but in different seasons of each year.

The mean seasonal amount of water contributed by nature to the area of defendant districts other than to the lands of plaintiffs, is thus 3,201,300 acre-feet annually, *without any contribution from the San Joaquin river.*

*All of the defendant Irrigation Districts, prior to the building of the Madera and Friant-Kern canals, were traversed by, or secured their water supply from, one or the other of these various river systems by wells or surface diversion. Thus, while water-hungry lands, they are not water-starved lands. Friant dam is calculated to give them a supplemental supply of water.*

Each of the above-named river systems has a separate well-defined watershed area in the mountains, separate and well-defined points of debouchment from the mountains, and each has an alluvial cone.[4] Each is a separate river and river system, and has been historically known as such. And each has been concerned in much litigation about water

4. All parties introduced Tolman on "Groundwater." It is plaintiffs' Exhibit 68, Defendants' "P Districts N," California "Q". It defines an alluvial cone to be "A body of alluvial material deposited by a stream debouching from the region undergoing erosion above the apex of the cone." It is usually of a general triangular shape. The apex of the cone in this instance is Friant. Where rivers debouch from the same mountains close to each other, their cones sometimes more or less overlap.

rights. All of them, by the undisputed evidence, at one time in the geological past, emptied into an inland sea, the only remnants of which are now called Tulare Lake and Buena Vista Lake.

Buena Vista Lake is the sink for the Kern River, and Tulare Lake is the sink for all the others, including the San Joaquin in flood time, except the Fresno and Chowchilla rivers whose contributions of water are minor. In times of extreme flood, the Buena Vista Lake empties north across the floor of the valley to Tulare Lake, and when that reaches a sufficient height, the water flows across the low ridge in the vicinity of Mendota and joins the San Joaquin at the place where it turns in the vicinity of Mendota to flow north after flowing westerly.

We are concerned here only with the waters of the San Joaquin river as they flow southwesterly from the mountains to Mendota.

The ultimate plan of development of the Central Valley, as stated in some of the bulletins and reports, calls for dams and reservoirs on each of the rivers as follows: Millerton (Friant Dam) on the San Joaquin River; Pine Flat on the Kings River; Terminus on the Kaweah River; Success on the Tule River; and Isabella on the Kern River. (Plate opposite p. 60, Ex. 136). Of these, the dams on the three large rivers of the area have been completed, viz.: Friant dam on the San Joaquin at Friant; Pine Flat (by the Corps of Army Engineers, and not by the Reclamation Bureau) on the Kings at Piedra since this suit was filed; and Isabella in the mountains on the Kern River since this suit was filed. Terminus dam on the Kaweah River and Success dam on the Tule river were authorized as Flood Control Projects by the Act of December 22, 1944, 58 Stat. 887 at page 901. The ultimate plan is only a plan, and only a few of its many units have been authorized and built.

The Central Valley Plan is a comprehensive and colossal undertaking. It is integrated in the sense that upon completion of all of the units envisioned by it, the very wise object will be accomplished of preventing the waste of millions of acre-feet of water into the sea.

As heretofore indicated, this case is not concerned with the whole Central Valley Plan. It is concerned primarily with Friant dam and the Madera and Friant-Kern canals, and, secondarily, with the Delta-Mendota canal. While each has relation to the objectives of the over-all plan of the Central Valley Plan, each is a complete unit, is physically operated as such, and has been, and is, regarded as such by the Congressional Appropriation Acts and the reports to Congress. They were so regarded and described in the Central Valley Project Act of 1933 of the State of California, Water Code, § 11100 et seq., and in the Feasibility Report approved by the President on December 2, 1935. Reference to the applicable Acts of Congress and the text of the Feasibility Report are found in 90 F.Supp. 773, and will not be repeated here, or hereafter alluded to, unless it is necessary to give point to the matter under discussion.

The San Joaquin river gathers its waters in its mountain drainage basin of 1,633 square miles in the Sierra Nevadas, and debouches from the mountains at Friant. It flows slightly west of south for 14 miles, then more southwesterly 45 miles to a place called Mendota (59 miles below Friant), whence it abruptly turns and flows northerly. The direction of flow is an important factor in connection with the extent of its alluvial cone and the groundwater therein.

Friant dam is built at Friant. The body of water impounded back of it is called Millerton Lake. Construction was started on Friant dam on November 3, 1939. A very small quantity of water was impounded during construction in October, 1941, below the valves which are the outlet to the San Joaquin river. The valves to the river bed were partially closed, and the first diversion of water to the Madera canal was made in 1944. The first diversion to Friant-Kern canal was made in 1949. The date of the com-

pletion of the dam is uncertain. It was not completed prior to the filing of the within suit in September, 1947.

Madera canal is 37 miles long, runs northerly from Friant along the easterly side of the valley, and serves the Madera and the Chowchilla Irrigation Districts. Friant-Kern canal, completed after this suit was filed, is 153 miles long, runs southerly along the Sierra-Nevada foothills on the easterly side of the valley, and terminates in the Kern river near Bakersfield, and serves the remaining 13 defendant Irrigation Districts. The take-off valve for the outlet to the Madera canal is lower than the take-off valve to the Friant-Kern canal. Thus, to serve the Friant-Kern canal, waters impounded back of Friant must be above the elevation of that take-off valve; and waters to serve the Madera canal must be above the elevation of the take-off valve to that canal.

The Delta-Mendota canal is on the westerly side of the valley, and begins in the vicinity of Tracy and goes southerly along the westerly side of the valley to Mendota 59 miles below Friant. It is 120 miles long. It is a different physical works than the San Joaquin River Pumping System, which is described in the Federal Feasibility Report of 1935 and the California Central Valley Project Act of 1933. When the change of plan or authority for it occurred, is not clear. It takes water out of the Sacramento river which, after being lifted by the pumping station at Tracy, flows southerly and enters the Mendota Pool where it is re-distributed and flows northerly through the old river bed of the San Joaquin or a system of canals, in the same direction as the San Joaquin river originally flowed at that point, and furnishes water to substantially the same lands (about 200,000 acres) which were supplied by the San Joaquin river either by diversion into canals at Mendota Pool or by the bed of the river, before the building of the Delta-Mendota canal. The Delta-Mendota canal is not directly involved in this lawsuit

except as it may be necessary to refer to it. It was not completed until 1951.

It is well at this point to refer to a popular misconception of the function of the Delta-Mendota canal, which easily could be received from the various official publications of both the State of California and the Federal government. That misconception is that the Delta-Mendota canal *physically* takes water wasting into the ocean from the Sacramento river system, and by the canal *physically brings those waters to Millerton lake back of Friant dam, and from thence to the lands throughout the whole southern end of the valley, including the lands of the plaintiffs.* That is not the case at all. Not one drop of water from the Sacramento river by way of Delta-Mendota canal, or otherwise, is impounded back of Friant dam or is put upon any of the lands of plaintiffs or of defendant Irrigation Districts, except a small amount temporarily from time to time on lands in the immediate vicinity of the Mendota Pool.

Prior to the inception of the Central Valley Project, Miller & Lux, Inc. and its subsidiary Canal Companies had various rights to the use of water of the San Joaquin river, which rights are complicated to describe in detail, but which may be generally classified as either riparian or appropriative, some of the latter of which had been acquired by prescription. The total quantity of water which such rights covered is not clear but seems to be in the neighborhood of 1,500,000 acre-feet per year. Some of the water was diverted by Miller and Lux canals above Mendota, such as Gravelly Ford, but most of it was gathered back of a comparatively small dam at Mendota in what is known as the Mendota Pool, and from that pool distributed to the lands to be served, either by way of the river bed or by way of various canals. Except for water diverted at Gravelly Ford by canals, all of the water for the Miller & Lux water rights, flowed past the lands of plaintiffs and their class to Mendota, and was used by the

plaintiffs and their class, both for direct diversion and for supplying and replenishing the underground.

The United States purchased some of the Miller and Lux rights by the so-called *Purchase contract*, and paid $2,450,000 therefor. At the same time, and as part of the same transaction it agreed, by contract called the Miller and Lux *Exchange contract*, to provide water for substantially the same lands theretofor served from the Mendota Pool or by the Miller & Lux Canal Companies, which water was to be taken from the Sacramento river by way of the Delta-Mendota canal to Mendota Pool. From there, the water would be distributed by a system of canals to the lands formerly served by Mendota Pool so that there would be in effect little or no loss of usable water by the Miller and Lux lands, or the lands served by them or their subsidiaries below Mendota because of either the Purchase or Exchange contracts.

Thus, the water taken from the Sacramento river into the Delta-Mendota canal in effect, flows in a circle, beginning at the intake in the Delta in the vicinity of Tracy, thence south to Mendota Pool, thence north again to the Delta, without at any time coming into contact with, or being able to serve, the lands of plaintiffs and their class. And the plaintiffs and their class receive no benefit from the Delta-Mendota canal.

 It appears that the San Joaquin river has debouched at or near Friant for more than a million years;[5] it has flowed in its present channel and degraded its bed between the present bluffs during the past 100 or 150 thousand years; prior to that time and during the period of building its alluvial cone, it flowed in other channels, some of them as deep as the present channel, and deposited therein boulders, cobbles, gravel, sand and other alluvial material in the bed of its previous channels, the heavier and coarser material being deposited first and the fines last; water will flow underground through such coarse material more readily than through finer material; those channels changed from geologic time to geologic time[6] because of the tremendous quantities of water and detritus being brought from the mountain watershed on to the valley plain, which, when dropped in the channel, caused obstacles and forced a change in the direction of the flow; after those channels were changed,[7] finer alluvial material from the river, winds of unbelievable velocities carrying dust of extreme fineness, and other action of the elements filled the channels over which form what is known as aquifers,[8] through which water flows more freely underground than in the surrounding material; the aquifers are confined[9] in the sense that they are overlaid or encased in clayish material which is not wholly impervious, but is sufficiently so that water does not percolate freely through it; such aquifers are in contact with the present bed of the San Joaquin river,[10] and branch out from it much as the branches of a bush or tree all stem from the main trunk of the tree;[11] such aquifers are buried and are at different depths;[12] the depth from the surface to the basement rock in the alluvial cone of the San Joaquin river

---

5. One government witness said two million years; others suggest as long as four million years.

6. There is evidence that the river at one time had its main channel as far east as Sanger, and at another flowed directly through the area which is now the City of Fresno, and at another time as far north as the Fresno River.

7. See Figure 139—Tolman on "Groundwater," Exhibit 68.

8. Defined by Tolman on "Groundwater" as "A geologic formation or structure that transmits water in sufficient quantity to supply pumping wells or springs."

9. Figures 49, 11, and 13—Tolman on "Groundwater," Exhibit 68.

10. Figure 49—Tolman on "Groundwater," Exhibit 68.

11. Figure 139—Exhibit 68.

12. Figures 142, 143, 145—Tolman on "Groundwater," Exhibit 68.

varies from a few hundred feet at Friant to several thousand feet in the vicinity of Biola, and the river in earlier geologic times had a steeper grade than at present so that the deeper the aquifer, the steeper the grade; all of the material from the basement rock to the surface of the ground in the alluvial cone has been filled in by the actions of the San Joaquin river, except for some contribution from the Kings river and for some comparatively shallow alluvial deposits overlying the main cone of the San Joaquin river made by ephemeral small creeks such as Dry Creek, Little Dry Creek, Dog Creek and Fancher Creek; in the natural flow of the San Joaquin river its aquifers receive their supply and replenishment of water from the San Joaquin river; the aquifers, being the former beds of the river at different depths and of different ages, are not straight or regular in course or direction, but are winding and sinuous,[13] as is the present bed of the river, and follow the same general direction as the present bed of the river; some of said aquifers may cross and recross underneath, or at the present level of, the bed of the river; before the construction of Friant dam a great deal of cobbles, boulders, rock, sand and gravel and finer material was washed down from the mountains into the bed of the river, but with the building of the dam and the release of clear water therefrom, the water will tend to degrade the bottom of the San Joaquin river, which will put some aquifers out of contact with whatever flow is in the river; the area where the river formerly flowed and upon which it deposited the detritus and has built up the material, is the area of the alluvial cone; the alluvial cone of the San Joaquin river embraces all of the land within the exterior boundary lines of what has been referred to throughout the trial as the "Lee" lines; the water-bearing strata in the alluvial cone has been supplied and replenished from time immemorial in a substantial part by water percolating from the San Joaquin river; the San Joaquin river is a common source of supply for those pumping directly from the river and those in the alluvial cone taking water by wells; there is no adversity of interest in this case, in maintaining that common source of supply, between any of the plaintiffs or between plaintiffs and any riparian or overlying owner within the boundaries of the alluvial cone; within the limits of the alluvial cone lies a portion of the City of Fresno, other towns and villages, and several water districts, each of which takes water from wells which have been in the past supplied in whole or in part by percolation from the San Joaquin river, and which water is used for the inhabitants and water users for domestic and municipal purposes; all of the water taken either directly from the river, either by means of wells so supplied or replenished by the San Joaquin river by the plaintiffs and by all of the persons within the alluvial cone area, is now, and has been for many years since the first settlement of the area, put to reasonable and beneficial uses by reasonable methods of diversion for agricultural purposes, for stock and poultry raising, and for domestic and municipal uses; the San Joaquin river flowing in its natural state, in addition to providing water for pumping directly from the river and supplying and replenishing the underground aquifers in the alluvial cone of the San Joaquin river, also supplied water by percolation into portions of the area of the alluvial cone immediately adjacent to the river, which water by capillary attraction and by forces of nature unknown to man, was taken by the roots of plants and other vegetation planted as crops upon said land in an amount sufficient to maintain, in the bottom lands between the bluffs, certain crops and vegetation without the necessity of surface irrigation, or by virtue of which a minimum of surface irrigation was required; a great portion of the area of the San Joaquin river alluvial cone south of the river is within the area of the

13. Figure 49—Tolman on "Groundwater," Exhibit 68.

48

Fresno Irrigation District, and is served water for irrigation by the Fresno Irrigation District which receives its water supply from the Kings river; the water so applied to surface irrigation which is not used by transpiration by plants or evaporation, or which does not run off as excess, seeps and percolates into the ground as a partial source of supply to shallow wells drilled in the area, but the nature of the soil is such that water does not percolate in any substantial quantity to, or penetrate to, the deeper lying aquifers formed by the San Joaquin river as it flowed in the geologic past, which aquifers supply water to the deep wells in the area, such as the City of Fresno wells and the deep wells in, and in the area of, the Tranquillity Irrigation District, and are confined and receive their principal supply and replenishment from the San Joaquin river; since the alteration of the regime of the natural flow of the river by the Friant project, the water level in the wells in the alluvial cone of the San Joaquin river has lowered more than can be ascribed to overpumping; such lowering of water levels is substantially caused by the alteration of the natural regime of the flow of the river as a result of the operation of the Friant project; the shallower water level in wells lying north of the City of Fresno and slightly west forms a groundwater mound,[14] or a perched water table,[15] receiving its supply largely but not wholly from the surface applications of waters by users in the Fresno Irrigation District; that the Fresno Irrigation District spills the excess runoff water into the bed of the San Joaquin river at several places, and as a result thereof, and of rainfall, there have been times when more water flowed in the river below Whitehouse gauging station than flowed from Friant; but such periods were short and varied, and such gain in flow does not indicate that water did not percolate into the aquifers between Friant and the several points of spill to the river from the Fresno Irrigation District.

■ At all times after the passage of the Central Valley Project Act by the State of California, and after the passage of the Acts of Congress authorizing the construction of Friant dam and its appurtenant works, and during the construction thereof, the plaintiffs and the members of their class were assured by repeated public statements made by the officials of the Department of the Interior, not only to the public generally, but in all reports to Congress, that all of the land lying between Friant dam and Mendota, therefore receiving water in whole or in part by direct pumping or by replenishment of groundwater from the San Joaquin river, would continue to receive the supply of water they had previously received, and that in fact their supply of water would be increased and equated throughout the year, and thus the use thereof increased; that in fact in seasons of the year prior to the filing of the within suit, and after the commencement of the construction of Friant dam, increased quantities of water were released past Friant dam to flow in the channel of the San Joaquin river past the lands of plaintiffs and their class. On July 15, 1947, Richard L. Boke, Regional Director, Region 2, Bureau of Reclamation, wrote a letter, as Regional Director (Exhibit 162), which was the first indication that the plaintiffs and the members of their class would, by impoundment and diversion at Friant, be deprived of the rights which they had theretofore enjoyed to the use of water of the San Joaquin river as it flowed between Friant and Mendota; that after the receipt of such letter, the plaintiffs promptly, on behalf of themselves and all riparian and overlying owners similarly situated in the area of the alluvial cone of the San Joaquin river, commenced the within suit by filing it on September 25, 1947, in the Superior Court of the State of California, which

14. Figure 75—Tolman on "Groundwater," Exhibit 68.

15. Figure 76—Tolman on "Groundwater," Exhibit 68.

action was thereafter removed to this court.

The natural flow of the San Joaquin river below Friant is, and from year to year and season to season has been, variable and includes all of the flood flow of the river prior to the development in 1928 of power dams upstream from Friant on the San Joaquin river, and since five years after 1928 the natural flow of the river was all of the water, including flood waters flowing past Friant as affected by said power dams.

■ The operation of the Friant project as conducted since this suit was filed and as threatened by the United States and defendant officials will result in insufficient water flowing in the bed of the San Joaquin river either to replenish and supply the underground as theretofore done, or to permit the pumping of water directly from the river for irrigation, domestic and other useful and beneficial purposes, as theretofore done, all as alleged in plaintiffs' complaint. Unless the plaintiffs and the members of their class receive water, they will be compelled to abandon their farms and homes, and the City of Fresno and others supplying water for domestic and municipal purposes will be unable to supply water, all of which will result in great immediate and irreparable injury, as alleged in plaintiffs' complaint as amended and supplemented.

### III.

### History of Litigation.

On April 13, 1950, this Court filed its Opinion, 90 F.Supp. 773, denying Motions to dismiss, and also denying the plaintiffs' then pending Application for Temporary Restraining Order, as well as acting upon other motions not concerned here.

The opinions and conclusions therein expressed, as well as those expressed in 16 F.R.D. 310, and 131 F.Supp. 421, will be adhered to unless inconsistent with the opinions and conclusions herein expressed.

The suit was first filed in the State court on September 25, 1947, as a class suit, by certain named plaintiffs on behalf of themselves and all others similarly situated. The class and area involved are described above. The named defendants at that time were certain then officials of the United States (substitutions have since been lawfully made), and two Irrigation Districts which had made, or were about to make, contracts to take water from Friant dam by way of the Madera canal or by way of the Friant-Kern canal. Upon motion by the United States attorney, on behalf of the defendants who were officers of the United States, the case was removed to this Court on October 6, 1947. No motion to remand has ever been made.

In 90 F.Supp. 773 it was held that the Complaint, on its face, stated a claim for relief as a class action on behalf of the named plaintiffs and all those similarly situated, both as to those pumping water for agricultural and domestic uses, directly from the San Joaquin river, and as to those pumping water from the underground, claimed to be replenished by the water from the San Joaquin river as it flowed between Friant and Mendota prior to the building of Friant dam.

The Court held that the Complaint did not state a claim for relief as a class suit for rights of use of the water of the San Joaquin river for other purposes than agricultural, domestic, and municipal uses, including specifically, the right of use of the water for replenishing gravel beds, for spawning and fishing of salmon for both recreational and commercial purposes. In connection with the latter contention, it was pointed out that the responsibility for maintaining the flow in the river for the use of spawning and fishing of salmon and other fish lay with the officials of the State of California.

The State of California was not named as a defendant, but came into the case *voluntarily* by intervention.

Thereafter, on May 3, 1950, the State of California filed a Complaint in Intervention asserting the right to have the release of a sufficient amount of water

from Friant dam which would permit a continuous flow of 250 second-feet to reach the mouth of the Merced river (approximately 50 miles downstream from Mendota and about 100 miles below Friant), for the maintenance of fish life until the end of the 1950 spring salmon run. An application by the State of California for an injunction *pendente lite* was noticed, brought on for hearing, and heard extensively on May 15, 16, and 17, 1950, on oral evidence and voluminous affidavits. During the course of the hearings an agreement was reached between the defendant officials of the United States and the State of California allowing the release of a certain quantity of water for the maintenance of fish life and the building of a fish ladder in the vicinity of the mouth of the Merced river. The Application for Temporary Injunction was then withdrawn.

Thereafter, on August 11, 1951, the State of California filed a Motion for leave to file an Amended Complaint in Intervention, which motion, after hearing, was granted. In the Amended Complaint the State abandoned its claim of right to have water released from Friant dam for the maintenance of fish life.

 Both the City of Fresno and Tranquillity Irrigation District are partially within the boundaries of the alluvial cone lines of the San Joaquin river. The City of Fresno gets its water supply from wells, and distributes it through an integrated system commingling water from all its wells. Both the City of Fresno and Tranquillity Irrigation District claim that their wells are supplied and replenished by the San Joaquin river, and being legal entities, were permitted to be added as named plaintiffs as members of the class, in order to prevent any future contention that as such legal entities they would be only partially bound by any judgment in this case as members of the class.

The total acreage of plaintiffs and their class is approximately 300,000 acres.

The asserted rights of the City of Fresno and the Tranquillity Irrigation District, as named plaintiffs and members of the class of overlying owners entitled to underground supply and replenishment from the San Joaquin river, are not to be confused with the asserted rights of each of them under the second cause of action of each of their Complaints in Intervention, which will be dealt with later.

All of the Irrigation Districts having contracts with the Bureau of Reclamation to release water from Friant dam, either by way of the Friant-Kern canal or by way of the Madera canal, were either joined as defendants, or came in voluntarily as Doe defendants, and filed answers to plaintiffs' Complaint. There are 15 such Irrigation Districts having within them a total acreage of approximately 620,452 acres.

The defendant officials of the United States filed answers to plaintiffs' Complaint as then amended on October 15, 1951.

After hearing, temporary restraining orders were made in August, 1951,[16] and August, 1952, with the consent of all parties. These orders restrained the impounding of water by defendants to an extent not necessary to detail here, and were complied with.

A pre-trial hearing was had, and a pre-trial order was made in January, 1952. The trial of the case commenced in Fresno on January 29, 1952. It continued with interruptions until the close of the evidence on December 31, 1954, a few days short of three years after the trial commenced.

Two extraordinary writ proceedings were had in the course of the trial—one in 1953 as a result of a temporary restraining order made on April 24, 1953,

---

16. This order also required the installation of automatic water level recorders on 25 or more wells in the alluvial cone, the location of which were to be selected by agreement among the experts of the parties. This was done, and the results were introduced in evidence.

with the specific consent of the Attorney General of the United States and the Secretary of the Interior, 9 Cir., 206 F. 2d 303, and the other in 1954, 9 Cir., 213 F.2d 818, as the result of an order dated January 30, 1954, denying a motion to dismiss the United States as a party after an order which joined the United States as a party defendant under the Act of July 10, 1952, 43 U.S.C.A. § 666.[17] No writs were issued in either proceeding.[18] And no stays were ordered but out of respect to the appellate court, this Court took no action during either of the writ proceedings.

Motions of Tranquillity Irrigation District and the City of Fresno to file separate complaints in intervention were first put off calendar, but, on renewal during the trial, were granted as to the second cause of action of each.

After the decision by the Appellate Court in August, 1954, in the second writ proceeding, the plaintiffs, the intervenor City of Fresno, and the intervenor Tranquillity Irrigation District, each on order after notice and motion, filed two separate documents, a "Supplemental Complaint"[19] and an "Amendment and Supplement to Complaint." After due and regular service thereof, and upon due and regular notice, the Court on November 18, 1954, made its order reopening the trial and setting a date therefor. D.C., 16 F.R.D. 310. The Order, among other things, provided that the trial of the above-entitled action be reopened not only to allow any party to introduce evidence discovered since July 3, 1953, but also for the purpose of introducing evidence theretofore introduced for or against the United States of America and/or any of the then parties. A further pre-trial conference on December 3, 1954, was devoted largely to the evidence proposed to be introduced on the trial as reopened, and no further written pre-trial order was made.

The defendant officials were ably represented throughout the trial and other proceedings in this court until July, 1953, by Special Assistant to the Attorney General, Joseph F. McPherson. He also appeared for their substituted successors and for the United States on the Motion to Dismiss filed in December, 1953, after the United States was joined as a party. He did not appear or participate in either of the writ proceedings had in the United States Court of Appeals. He continued to appear on various matters in the case until July 12, 1954, when he advised the Court that by direction of the Attorney General of the United States he would no longer be connected with the case. At that time, Harold Weise, Assistant United States Attorney for the Northern District of California, was presented to the Court with the idea expressed that he "will take over the defense of the case insofar as it affects the defendant officials of the Bureau of Reclamation and the Government of the United States." Mr. Weise stated, however, that he was there that day just to

17. The motion to join the United States was granted on September 18, 1954. Summons was duly issued and it and the complaints, intervention and otherwise, were duly served on the United States as required by Section 666 of Title 43, United States Code Annotated, and the Federal Rules of Civil Procedure, 28 U.S.C. Since then, all pleadings and notices have been so served on the United States.

18. The Order of April 24, 1953, required that releases should not be made below 400 second-feet at Friant. After the Appellate Court refused the writ, releases were raised to more than twice that amount in a few days. The Court appointed an agent to supervise the flow, at the request of the government and the agreement to pay him, but payment was later refused by the government.

19. The "Supplemental" Complaints of all three alleged the making of certain contracts by the defendant officials; but by denial of the motions, or by disclaimer, or by severance, they become immaterial to the issues here, and will not be further adverted to. The defendant officials answered the "Supplemental Complaints" but filed no answer or other responsive pleading or motion to dismiss to the "Amendment and Supplement to the Complaints."

"see how the case is shaping up." He has not since appeared, either in court or on the pleadings. The matter then on for hearing was continued to August 16, 1954.

*Since July 12, 1954, astonishingly, no appearance has been made by the United States Attorney, any Assistant United States Attorney, the Attorney General of the United States, or any Assistant or Special Assistant Attorney General of the United States at any proceeding or hearing or trial on behalf of either the defendant officials or the United States of America.*[20] Long after due, answers were tendered by the substituted officials, to the Supplemental Complaints filed August 10, 1954, of the plaintiffs and those of Tranquillity and of the City of Fresno. A motion was made by plaintiffs to strike them, on the ground that they were too late, but the motion was denied. No answer or motion to dismiss was ever filed by the defendant officials or the United States to the *Amendment and Supplement to the Complaint,* filed separately by each, the plaintiffs, the intervenor City of Fresno, and the intervenor Tranquillity, which separately state as a cause of action a claim for declaratory relief under Section 2201 of Title 28 United States Code. The trial as reopened, was set for, and resumed, on December 7, 1954.

Motions were made for default of the United States and the defendant officials in compliance with the Federal Rules of Civil Procedure, so that the trial proceeded on its reopening against all the defendants, whether represented by counsel or not, and all the evidence previously introduced was introduced and admitted against the United States and the substituted defendant officials. It should be noted here that after joinder of the United States, the Court was careful to require notice of all matters and proceedings to be served, not only on the United States Attorney for this District, but also on the Attorney General of the United States.

When the trial closed, dates were fixed for filing briefs, to expire on April 11, 1955, at which time the matter would be finally submitted for decision on the merits—at least that was the hope.

But on the day the trial closed—December 31, 1954—the State set April 5, 1955 (before the briefs were due or filed), as the date to commence administrative hearings under the California Water Code, Sections 1200–1801, on the various applications to appropriate water, which applications had been introduced in evidence, and some of which were relied on by defendants, in part, as supporting the right to impound and take the water in derogation of the plaintiffs' claimed rights. Said applications had laid dormant without action by the State, not only during the seven years since this suit had been filed, but they had been pending from 38 to 16 years without any hearings being called, noticed, or set by the State. The plaintiffs, after a few days of hearing over their objection, then filed an ancillary proceeding in the within suit to restrain further hearings on such applications. This matter was heard on April 27, 28, and 29, 1955, and on May 7, 1955, this Court, by its Memorandum Opinion, directed that the injunction *pendente lite* be granted. This was followed by for-

---

20. At a hearing on October 4, 1954, no appearance was made on behalf of the United States or any of the defendant officials. At that time the Court read into the record the text of Section 507 of Title 28 United States Code, relating to the duties of United States attorneys, and transmitted a copy of the transcript to the United States Attorney. Thereafter, on November 24, 1954, by letter, the Court again advised the United States Attorney for this District of a pre-trial hearing, and again called attention to the provision of the Statutes relating to the duties of United States Attorneys and the Attorney General. On December 29, 1954, there was filed in the case a copy of a teletype from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, to the United States Attorney of this District, advising that on September 7 he had been relieved in connection with the within case.

mal order to that effect on May 24, 1955. Reference is made to the Opinion of May 7th for further details of that proceeding, which Opinion is published in D.C., 131 F.Supp. 421.

While a Notice of Appeal has been filed from that Order, the main case on the merits is now nevertheless finally postured for decision.

### IV.

### The Parties.

A further brief word should be said about the parties.

Three of the four Complaints in the action are Complaints in Intervention. For that reason, the plaintiffs, named in and as added to, the original Complaint, will be, and have been hereinbefore, referred to as the "plaintiffs." They are, as the action has stood since the addition of other named plaintiffs in the early stages of the trial, 14 individuals, one private corporation, the City of Fresno, a municipal corporation, and the Tranquillity Irrigation District, a public corporation. They sue, not only on behalf of themselves, but as representatives and members of a class owning rights to the use of water from a *common source of supply*, viz.: the San Joaquin river as it flowed between Friant and Mendota prior to the Friant Project.

Generally speaking, there are two methods of taking water, viz.: pumping directly from the river, and pumping from wells which receive their underground supply from the San Joaquin river. All those who pump water directly from the river also take water either for domestic or irrigation purposes by wells. Such of the plaintiffs who take directly from the river own lands bordering on the river. Some of the plaintiffs, notably the City of Fresno, do not own land bordering the river, but get water from wells asserted to be supplied in whole or in part by water flowing underground from the San Joaquin river.

Those who pump directly from the river may sometimes hereafter be referred to as riparian owners or riparians, and those taking by wells from the underground, as overlying owners or overlying properties.

The State of California is the plaintiff in a separate Complaint in Intervention. The Tranquillity Irrigation District and the City of Fresno are complainants in separate Complaints in Intervention, as well as being named plaintiffs in the original Complaint.

The original Complaint named as defendants certain officials of the United States, two Irrigation Districts and their officers, and various Does. Substitutions of the official defendants who appeared have since been lawfully made, and parties added, so that now the parties defendant to the original Complaint, as amended and supplemented, and to the Complaints in Intervention of the City of Fresno and Tranquillity Irrigation District, as amended and supplemented, are: the United States of America, Clyde Spencer, Martin Blote, and Edwin F. Sullivan, (officials of the United State Bureau of Reclamation having to do with the operation of Friant dam and other works directly involved in this proceeding) and 15 Irrigation Districts, 13 of which take water from the Friant-Kern canal, and two of which take water from the Madera canal.[21] Plaintiffs' counsel states in his brief that the State of California is a party defendant. But the State was not named originally, and no order has ever been made permitting it to be joined as a defendant.

The parties defendant in the original Complaint in Intervention of the State of California were those named in the plaintiffs' original Complaint. In its Amended Complaint in Intervention, no

---

21. The Pacific Gas & Electric Company and Consolidated Irrigation District are also named as parties, but Consolidated has filed a disclaimer, and the trial has been severed as to the Pacific Gas & Electric Company. The State of California is named as a defendant in the "Amendment and Supplement to Complaint" filed August 10, 1954. Whether it may be so joined without an order is disposed of under the heading "State of California."

amendment of parties was made. Thus, the defendants to the State's Complaint in Intervention are all of the defendants designated in plaintiffs' original Complaint. It was assumed that the State of California had issued summons, and served all the defendants, but after many months of trial, during all of which the State participated, it was discovered in late 1953 that no summons had been issued on the State's Complaint in Intervention, and that service of the Complaint had not been made, although an answer thereto had been filed by the original plaintiffs and by one Irrigation District. Thereupon, the Court ordered summons to issue and be served, as well as the State's Amended Complaint in Intervention, upon all parties as they then existed, including the United States. Thereafter all parties answered the State's Complaint in Intervention, except the United States and the officials of the Bureau of Reclamation.

### V.

#### The Pleadings.

This phase of the discussion will deal with the original plaintiffs' Complaint and amendments thereto and supplements, and the Complaint in Intervention of the State of California, as well as the Answers to both sets of pleadings. It will not deal with the Complaints in Intervention of the City of Fresno or Tranquillity, except incidentally.

While the case was tried on the issues described in the pretrial order (set out in full in Appendix B), it is nevertheless necessary to refer to the pleadings in view of contradictory positions taken by various defendants and by the State of California in pleadings and briefs.

The Complaint of the original plaintiffs, as it stood at the time of the ruling on the Motion to Dismiss in April, 1950, insofar as the material portions are set out in D.C., 90 F.Supp. 773, will not be repeated in full.

Paragraph X of the original Complaint contained a count for declaratory relief, not, however, stated as a separate cause of action. Several clarifying amendments were made before and after the April, 1950, ruling, 90 F.Supp. 773, but they are not of particular consequence except the Amendment and Supplement to the Complaint filed on August 10, 1954, after the United States was made a party. By that amendment and supplement, a cause of action for declaratory relief was separately stated.

Summons and copies of all pleadings, as well as Notices of all proceedings, have been duly and regularly served on the defendant officials and on the United States in accordance with 43 U.S.C.A. § 666 and the Federal Rules of Civil Procedure.

*No motion to dismiss that Amendment or Supplement has ever been made by the United States or the defendant officials of the United States. No answer has been filed by the United States or the defendant officials of the United States to that Amendment and Supplement, and no answer or responsive pleading at all, other than the Motion to Dismiss, which was denied by the Court in January, 1954, has ever been filed in the name of the United States to any pleading.*

In brief, the original Complaint, as amended and supplemented, alleges the ownership of the land of the plaintiffs and their class; the natural flow of the water of the San Joaquin river from time immemorial in its channel between Friant and Mendota prior to Friant dam; the claim of the plaintiffs to that flow of water needed for surface pumping and to restore and supply in whole or in part the underground water supply for the natural sub-irrigation of crops, and for wells of the overlying land owners; the reasonable present and prospective beneficial uses of the water so taken for more than 60 years; that the plaintiffs are members of, and representatives of, a class of landowners taking water directly from the river and from the underground by sub-irrigation of crops, capillary attraction, and by wells; the positions and capacities of the defendant officials; the building of Friant dam and the Madera and Friant-Kern canals;

and the continuous open and public representations by all officials of the United States and the State of California assuring the plaintiffs and members of their class that their supply of water or their water rights would not be taken, but that the supply would be improved. Attached to the Complaint is a letter of July 15, 1947, from the then Regional Director of the Bureau of Reclamation, whereby plaintiffs allegedly learned for the first time that such was not the case. The Complaint further alleges the making of contracts between the United States and the defendant Irrigation Districts, the threat of the defendant officials to take and destroy their water supply, and impound and divert water at Friant dam, allegedly contrary to the laws of the United States and of the State of California applicable thereto and contrary to the representations above made. By the amendment and supplement of the Complaint, the claim for declaratory relief originally set forth in Paragraph X of the original Complaint is stated as a separate cause of action against all defendants.

The plaintiffs pray, among other things, for a "physical solution," as that term is used in the decisions of the courts of California, in the event the injunction they ask for is denied; they also pray for a declaration of invalidity of the contracts with the Irrigation Districts, and for other relief.[22]

While the plaintiffs ask for the full natural flow of the river in their prayer, *plaintiffs, from the inception, have repeatedly stated that what they desire is a reasonable amount of water in accordance with their vested rights under the Federal Reclamation Act and California law, and the case was tried throughout on that basis.*

The defendant officials' Answer to plaintiffs' Complaint raises, as separate defenses, the failure to state a cause of action; that this is an action against the United States; that the United

States and the Secretary of the Interior are each an indispensable party, and have not consented to be sued; that the plaintiffs have a plain, adequate, and complete remedy at law; and that the plaintiffs seek by indirection to manage, operate, and control property of the United States over which this Court does not have jurisdiction. It denies that the defendant officials are acting unlawfully. It admits that the San Joaquin river flowing between Friant dam and Mendota Pool supplies underground and percolating water, but denies that it does so to the extent claimed by the plaintiffs; the defendant officials say that they are without knowledge or information sufficient to form a belief as to the truth of the allegations of the Complaint as to the supplying of the underground by percolation, et cetera, "but demand strict and proper proof thereof." The defendant officials deny the allegations of the Complaint as to the use to which the waters are put, with the qualification that they admit that certain of the lands described in the Complaint, as amended, have and are making beneficial use of small quantities of water diverted from the San Joaquin river. The defendant officials further deny that the plaintiffs have or will require all or even a substantial portion of the flow of the San Joaquin river in order to furnish them, and each of them, as may be lawfully entitled thereto, a sufficient quantity of water for beneficial use for surface irrigation and domestic use upon their lands, and to supply and maintain the underground percolating water strata. The defendant officials further state in their answer that the plan of the Central Valley Project, approved by Congress as it affects the San Joaquin river between Friant dam and Gravelly Ford—

*"requires the Bureau of Reclamation to, and it will, recognize and respect existing water rights of all riparian owners, including such of the plaintiffs, if any, as are riparian*

22. In the event injunctive relief and physical solution are denied, plaintiffs ask for inverse condemnation, but the case was not tried on that basis.

*owners, on the San Joaquin river between Friant dam and Gravelly Ford, as they exist under the laws of the State of California, and which have not heretofore been acquired or adjusted by the United States. In order to accomplish this purpose,* that is to say, to give that recognition to those rights which the laws of California require, it is the plan, purpose, and intention of the Bureau of Reclamation to release at Friant dam into the bed of the river a sufficient quantity of water so as to enable said riparian owners between Friant dam and Gravelly Ford to divert from the stream and to make reasonable beneficial use by using reasonable methods of diversion and reasonable methods of use and purpose, the waters required for irrigation and domestic use and, in addition thereto, to maintain a live stream in the river of not less than five second-feet at Gravelly Ford." [23]

*It is alleged that the costs necessarily incurred in converting, altering, or adapting such of the present diversionary facilities as are reasonable to facilitate diversion from the stream as it will exist, or as the flow will be altered under the operational plan therein set forth, will be borne by the Bureau of Reclamation, either as a direct charge or by way of reimbursement to the owners, of costs necessarily incurred by them in such conversion of their presently existing facilities.*

It is further alleged that:

"These defendants are informed and believe, and so believing allege, that the costs, if any, necessarily incurred by those diverting from the *underground water table* supplied or fed by the San Joaquin River, in adapting or adjusting their facilities to meet the change, if any, in said underground water supply caused or resulting from the reduced and controlled flow of the San Joa-

quin River, will likewise be borne by the Bureau of Reclamation, but these defendants are informed and believe, and therefore allege, that the underground water supply will not be affected by the reduced and controlled flow of the San Joaquin River under the operational plan aforesaid."

The Answer further admits that the Bureau of Reclamation intends to store and divert at Friant *certain* quantities of water, without specifying the quantity, which would otherwise normally flow along and through the San Joaquin river.

Answering plaintiffs' count for declaratory relief, they—

"*Admit that an actual controversy exists between the plaintiffs on the one hand and the United States of America and certain of the defendants on the other hand, with respect to the waters, property, and property rights described in the Complaint, as amended.*"

They further state:

"and these defendants further allege that the authorized and declared plan of operation of the Central Valley Project will not deprive plaintiffs or any or either of them, or any other person, firm or entity, of their water rights as they exist under the laws of the State of California, or impair them or their exercise save and except in the manner hereinbefore alleged."

The official defendants pray for dismissal, and then that the—

"Court determine *which lands* described in plaintiffs' Complaint are *riparian* to the San Joaquin River, and are entitled to a reasonable quantity of water for irrigation and domestic use therefrom"

and *which lands*

"have their *underground water* strata charged and recharged from the San Joaquin River."

23. Emphasis throughout is supplied unless otherwise noted.

They further pray:

"4. *That this Honorable Court determine that the lands found to be riparian to the said San Joaquin River shall be entitled to a reasonable quantity of water for beneficial use thereon for irrigation and domestic purposes, and that sufficient water allowed to flow in the San Joaquin River to furnish said riparian owners with said supply of water by the use of reasonable means of diversion from the said San Joaquin River by pumps,* and further determine that channelization of the said San Joaquin River be made so as to reduce the quantity of water to be discharged from Friant dam in order to supply said riparian lands with said quantity of water.

"5. That this Honorable Court determine and adjudge that a live stream shall be maintained at all times between Friant dam and Gravelly Ford on said San Joaquin River, which said live stream shall at no time be required to be in excess of the natural flow of the San Joaquin River if Friant dam were not constructed and in operation, which said live stream shall be for the purpose of supplying the said quantity of water for use upon lands riparian to said San Joaquin River and *to supply the underground percolating* waters for lands determined to be entitled to a recharge from the San Joaquin River for said underground waters.

"6. That this Honorable Court further determine that at no time a flow of greater than five second-feet need pass the downstream boundary of the lowest riparian owner upon said river between Friant dam and Gravelly Ford.

"7. That the plaintiffs' prayer for injunction be denied.

"8. That the Court award to defendants their costs.

"9. That the Court grant such other and further relief as is meet and equitable in the premises."

As will be seen from the foregoing summary of the Answer, the defendant officials admit rights of the plaintiffs to water. *But the position taken by the Attorney General of the United States since 1953 is that plaintiffs have no rights to water at all.*

In the defendant officials' Answer to the *Supplemental* Complaint, (none having been filed to the Amendment and Supplement to the Complaint of August 10, 1954), they incorporate all of the allegations of their first answer, thus admitting that the plaintiffs have rights to water. They also again assert separately, the separate defenses set forth in their first Answer, going to jurisdiction, and in addition thereto, claim that the Secretary of the Interior and the Commissioner of the Bureau of Reclamation are each indispensable parties, and that the Court does not have jurisdiction over them, a position which was asserted on the original Motion to Dismiss, but after the ruling in D.C., 90 F.Supp. 773, was not asserted as a special defense in their first Answer. They also assert, as a special defense, that the plaintiffs are not representatives of a class. The Answer also contains admissions and denials which are not of sufficient importance to be recited here. They again assert that the United States "is the owner and operator of Friant dam and appurtenant works." They do not assert in that Answer or in their previous Answer that the United States owns the title, fee or otherwise, to the water or to the use of it.

However, confusion arises by reason of allegations contained in the Answers filed by the Bureau officials to the Complaints in Intervention of Tranquillity and the City of Fresno. In each such Answer they assert that—

"A public use in favor of the United States of America has and is attached to all rights to the use of water in the San Joaquin River,"

and that—

"The United States of America through the exercise of its power of eminent domain has taken all rights to the use of water in the San Joaquin River which are required for the operation of Friant dam and its appurtenant works, all components of the Central Valley Project, *that fee simple title to all the rights to the use of water required for the operation of the Central Valley Project has at all times since that taking resided in the United States of America.*"

*They do not allege the date or manner of such alleged "taking."*

The defendants Chowchilla Irrigation District, Madera Irrigation District, and Southern San Joaquin Municipal Utility District, each filed separate Answers. The remaining 12 Districts joined in one Answer.

Madera and Southern San Joaquin Municipal Utility District filed substantially the same answer, containing general denials, and alleging laches and lack of jurisdiction.

The Answer of the Chowchilla District raises certain special defenses and makes denials, but admits that certain land of the plaintiffs is making beneficial uses of certain water of the San Joaquin river, both in surface application and in the supply of underground water, which underground supply is unknown to the answering defendant, Chowchilla. The Answer also demands proof of the area covered and served by underground strata but specifically denies that the lands ascertained *will require all the flow* of the San Joaquin river. The Answer specifically *admits* the allegations of Paragraph X of plaintiffs' Complaint, the count for declaratory relief. The prayer of Chowchilla asks that the Court determine which lands are riparian to the San Joaquin river, and are entitled to a reasonable quantity of water for irrigation and domestic uses therefrom, and determine *which lands have their underground water strata charged and re-* *charged from the San Joaquin river,* and that the Court determine that the lands found to be riparian to, and having their underground waters recharged by, the San Joaquin river *shall be entitled to a reasonable quantity of water for beneficial use thereon, for irrigation and domestic purposes, and sufficient waters be allowed to flow in the San Joaquin river to supply said riparian and overlying owners with water by use of reasonable means of diversion from the San Joaquin river,* and further prays that certain channel authorization work be done, and a live stream at all times be required to flow between Friant dam and Whitehouse gauging station which shall at no time be greater than five second-feet past the downstream boundary of the lowest riparian owner of said river.

The remaining 12 Irrigation Districts filed a joint Answer, specifically admitting the allegations of plaintiffs' *Complaint as to Paragraph X for declaratory relief,* and alleging, inter alia, that the United States holds whatever rights it does hold in trust for the use and benefit of answering defendants, among other water users making use of the works of the Central Valley Plan and Project. They deny that the action of the defendants impounding and diverting the water is illegal or unlawful, and allege that the United States holds rights in the waters of the San Joaquin river acquired by purchase, by exchange, by appropriation, and by other means of acquisition in the amount equal to the entire flow of said San Joaquin river. The joint Answer also alleges the various applications made by the State of California, Madera Irrigation District, and others; the assignment thereof to the United States; and that by virtue of the terms of "said assignments" the State of California has become and is the trustor or grantor of an express trust; that the United States has become and is the trustee of that trust; that the landowners acquiring rights to the use of water from the works of the Central Valley Project, including the landowners of defendant districts, have become, and are,

the beneficiaries of that trust; that any and all claims or interests of the United States obtained by the "Exchange Contracts" and similar or comparable contracts, and under the assignments hereinabove referred to, are held by the United States as such trustee under said express trust and as a part of a trust fund or res, for the use and benefit of the Central Valley Project, in particular, the landowners of defendant Districts; and that the State of California, as trustor or grantor, and as *parens patriae,* is entitled to be heard, among other things, as to all matters relating to the administration and execution of said trust by said trustee and entitled to require that the trustee administer said trust according to its true intent and meaning.

The joint Answer of the defendant Districts also alleges that the plaintiffs have no right to the whole flow of the San Joaquin river, nor to any part of the *flow of the river in excess of the amounts required to meet their reasonable needs for irrigation and domestic uses,* and *that the plaintiffs* have no right to insist on the uninterrupted use of their diversion devices, and *must submit to a physical solution.*

The various Districts also answered the Amended and Supplemental pleadings of plaintiffs, in each case incorporating and re-alleging their prior Answers.

The Amended Complaint in Intervention of the State was filed August 11, 1951, by leave of the Court.

The State's Complaint contains a partial description of the Central Valley Project, a recital of some of the legislative history, and mentions what it calls the "Major Engineering features." It alleges the so-called Miller & Lux Purchase and Exchange contracts of July 27, 1939, and in connection therewith, asserts "that the United States acquired certain appropriative and prescriptive rights, contract rights and estoppels against the exercise by said companies and others of riparian and prescriptive rights claimed by them to use for irriga-

tion and other purposes, waters of the San Joaquin river and its tributaries, * * . *." It then alleges the filing by the Finance Department of the State of California of applications to appropriate water, and the assignment thereof to the United States, and alleges that by virtue of the said assignments of applications to appropriate water and of the Miller & Lux Purchase and Exchange contracts, the State of California is the trustor or grantor of an express trust; the United States has become and is the trustee of that trust; the landowners who acquire rights to the use of water from the works of the Central Valley Project, including the landowners of defendant Districts, have become and are the beneficiaries of that trust; that the State of California, as such trustor or grantor and as *parens patriae,* "is entitled to be heard, among other things, as to all matters relating to the administration and execution of said trust by said trustee and entitled to require that the trustee administer said trust according to its true intent and meaning."

It is particularly noted that the State, in its amended Complaint in Intervention, alleges: "That the plaintiffs have no right to insist on the uninterrupted use of their existing diversion devices *and must submit to a physical solution whereby their reasonable needs and uses may be supplied; that this Court has the power and duty of requiring a physical solution,"* and that " * * * *it is in the public interest of the People of the State of California that the rights, if any, of the plaintiffs be protected by such a solution if the same is physically possible and feasible."* It is further asserted by the State, on information and belief: *"that if the San Joaquin river does in fact support, supply, sustain and replenish the underground and percolating waters as described in said Paragraph II* (of plaintiffs' Complaint) *by seepage, or percolation, the defendants do not have, have not, and do not intend to materially interfere with such seepage or percolation."* The State also denies the lands of the plaintiffs contain

underground or percolating water supplied by the San Joaquin river.

The State alleges that it is informed and believes, and on the basis of such information and belief, alleges: "that the defendants do, always have, and will continue to, release sufficient quantities of water from Friant dam to make available to the plaintiffs all the water they can reasonably and beneficially use on their land, by reasonable methods of use and by reasonable methods of diversion."

The prayer of the State's Complaint is as follows:

"Wherefore, the intervenor prays:

"(1) That the rights of the plaintiffs and defendants be determined according to the laws of the State of California;

"(2) That the injunction as prayed for in the Complaint be denied and *that a physical solution, if possible, be directed;*

"(3) That the impairment, if any, of the plaintiffs' rights be declared to be for a public use, and the plaintiffs relegated to their remedy by damages."

The State also filed an Answer to plaintiffs' Complaint wherein it admitted the allegation of Paragraph X for declaratory relief, and the Answer contained many allegations to the same effect as those in the Amended Complaint in Intervention. *It is significant that it again alleges it to be the duty of the Court, and in the interests of the People of California and of the plaintiffs, to impose a physical solution, and that such a physical solution is possible and feasible* and will be offered by the State. It is of particular significance, in view of the State's contention that the plaintiffs are relegated to damages, that it alleges in that Answer: *"that in the event the Court determines that no physical solution is feasible, it is the duty of the Court to relegate the plaintiffs to their remedies, if any, by way of damages."* In the prayer to the Answer, the State again prays that the Court make a physical solution.

The plaintiffs filed an Answer to the State's Complaint in Intervention on January 23, 1952, wherein they admitted that the State of California is the technical owner of the water involved, alleging, however, that the State of California holds the water for its inhabitants and "is without power to sell or assign the same." The Answer also alleges that the assignments of applications are void, and that the Central Valley Plan, as provided for in the laws of the State of California, calls for the construction of a hydro-electric plant at Friant dam, and that the same has not been built.

The Court made its order on October 29, 1953, requiring the issuance and service of summons on the Complaint in Intervention of the State of California on all parties, including the United States and defendant officials. Such service was made. Thereafter, the City of Fresno and Tranquillity Irrigation District filed Answers generally asserting the same position they had asserted in their previous pleadings. But the 12 defendant Districts that had previously filed a joint Answer to plaintiffs' Complaint, *wherein they asserted it was the power and duty of the Court to impose a physical solution,* in their Answer to the State's Complaint in Intervention deny: "that the above entitled Court has the power and the duty of requiring a physical solution in the above entitled action." While these Answers are not responsive to plaintiffs' Complaint, as amended and supplemented, they are exactly contrary to those Answers, and create confusion as to what the real position of defendant Districts is. The defendant Districts participated throughout the trial, and offered evidence in support of the physical solution proposed by the Government.

It is seen that the Answer filed by the Bureau officials, as well as the Complaint in Intervention of the State and the Answers of the defendant Districts, recognize that the plaintiffs and their class have water rights, albeit it is denied that they have the right of the entire flow of the river. But, on the other

hand, in other pleadings not responsive to the plaintiffs' Complaint, they deny that the plaintiffs have *any* rights at all.

At this point it is well to call attention to the fact that the Order of August 29, 1951, which was made with the consent of all parties, provided in Paragraph 12 thereof, that the contending parties submit their proposed plans of physical solution, in the following language:

"12. Plaintiffs, the State of California, and the defendant officials of the Bureau of Reclamation are directed, on or before December 15, 1951, to prepare and serve upon counsel of record for each party hereto their respective plans for a physical solution of the problem of supplying water for irrigation and domestic purposes, (a) to lands heretofore supplied by pumping directly from the San Joaquin river between Friant dam and Gravelly Ford, (b) to lands heretofore supplied by pumping from wells in the San Joaquin river bottoms, and (c) to lands neighboring the river in Madera County and Fresno County, together with such explanatory matter as may in their respective views be necessary for comprehension of such plans."

Thereafter, in December, 1951, before the pre-trial hearing and in compliance with the above-mentioned Order, the plaintiffs, the Bureau officials and the State each filed their respective plans of physical solution. Each of them was later introduced in evidence.

Thereafter, on December 20, 1951, the Court required the parties to file a written statement of their position on the law and the facts. While this Order was made prior to the pre-trial conference, the statements were not filed until the date of the commencement of the trial.

All of the plans for physical solution were before the Court and the parties at the pre-trial conference, called on motion of the State and the Bureau officials, and at the extensive hearings on pre-trial on January 15, 16, and 17, 1952.

The result of the pre-trial conference was the pre-trial order of January 17, 1952. The full text of the pre-trial order is set forth as Appendix "B" (page 193 hereof), but the heart of it is contained in Paragraph 4 thereof, which reads as follows:

"4. That said trial will be limited to and relate to the issues framed by the pleadings relating to claims of plaintiffs and the class which they claim to represent, having riparian rights or surface diversion rights to take water from the main channel of the San Joaquin river only between Friant dam and Gravelly Ford, and the claims of plaintiffs and the class which they claim to represent as to underground waters received from the main channel only of the San Joaquin river above its junction with Fresno Slough by lands lying within the exterior limits of the lands described in Exhibit 'C' of the Amendment to the Complaint filed July 15, 1951, or within the limits of the so-called alluvial cone or cones shown on plaintiffs' Exhibit '1–52–1,' whichever of said limits are farthest from the main channel of the San Joaquin river."

Statements in the nature of written opening statements were filed as above mentioned by the plaintiffs on January 15, 1952, and by various defendants on January 29, 1952.

The case was tried throughout, not only in the stages before the United States was joined as a party, but thereafter, on the basis of the pre-trial order and the plans of physical solution submitted by the parties as they were modified by amendment during the trial. The pre-trial order was not modified except that the Complaints in Intervention of Tranquillity Irrigation District and the City of Fresno were permitted to be filed during the course of the trial, and the issues raised by them were tried. The case was not tried as a damage or inverse or reverse condemnation case. It was tried throughout, and was treated by all counsel participating therein, as

an equity suit for the declaration and ascertainment of the respective rights of the parties to the use of water and such means of enforcing them as would be consistent with applicable law governing present and prospective reasonable and beneficial uses by reasonable methods of diversion.

It was hoped that when briefs were filed all of the parties would attempt to meet the issues as they were framed by the pleadings, as they had been tried by the parties, and indicated by the evidence. But regretfully, the joint briefs filed by the State and certain of the Districts have been of little help, and have only added to confusion of their position. As shortly above noted, the State took the position that the plaintiffs were entitled to the use of water of the river *"substantially, but not exactly, as they have enjoyed them,"* whereas, in the final brief filed by the State, they labor the point that *All* of the water of the river was intended to be diverted at Friant, leaving the plaintiffs without any water. The brief filed on behalf of the defendant officials does not meet the issues at all, but merely argues abstractly and obliquely as to the alleged invasion by the Court of legislative and executive powers.

The foregoing statement evidences the difficulty of any precise statement of the position of the parties on the various issues.

The Court is thus compelled to distill a definition of issues from the whole case, evidence, pleadings, briefs and arguments, as well as the extraordinary writ proceedings.

The Court, in proceeding to discuss and decide the issues, has hereinbefore and will hereinafter make reference to certain facts which, as heretofore stated, from hearing all of the evidence in the case, are found to be proven by an overwhelming preponderance of evidence.

### VI.

### Jurisdiction.

While the Court in the Opinion on the Motion to Dismiss—90 F.Supp. 773—held, that from the pleadings then before it, there was jurisdiction of the subject matter and of the parties then before it, nevertheless, the defendants have raised questions of jurisdiction by answer, which they are entitled to do under the Federal Rules of Civil Procedure.

Thus, the question of jurisdiction must now be settled on the merits as a matter of law and fact from the pleadings and from all of the evidence in the case.

There are five general facets to the question of jurisdiction in this case, viz.: (1) subject matter, (2) the defendant officials, (3) the defendant districts, (4) the State of California, and (5) the United States.

Jurisdiction of:
 (1) Subject matter,
 (2) Defendant Officials, and
 (3) Defendant Districts.

Inasmuch as the question of jurisdiction as to the above-mentioned can be disposed of in one discussion, they will not be dealt with separately.

What is said in connection with jurisdiction applies with relation to the plaintiffs and their class, (members of which are the City of Fresno and Tranquillity Irrigation District), and also applies to the Complaints in Intervention of the City of Fresno and of Tranquillity Irrigation District as to their second causes of action.

The present defendant officials have been regularly and lawfully substituted as defendants under Federal Rules of Civil Procedure, Rule 25(d).

Insofar as the Opinion in D.C., 90 F. Supp. 773 went, on the Motion to Dismiss, the Court adheres to the conclusions therein expressed as a matter of law concerning jurisdiction of the defendant officials and defendant districts and subject matter.

Before discussing the applicable law further, it is now found as a matter of fact from all of the evidence in the case, that the present defendant officials have the same powers and du-

ties under the law as their predecessors had; they, or their predecessors, do now exercise and have exercised the management and control of Friant dam and its appurtenant works, and do determine and control the amount and time of the release of water to be made from Friant dam to the river bed and to the Madera canal and to the Friant-Kern canal without prior approval of such acts by either the Secretary of the Interior or the Commissioner of the Bureau of Reclamation or any other official or officials.

As heretofore noted, this case was removed from the State court by the then defendant officials upon the ground that it was an action of a civil nature arising under the laws of the United States, and that the suit was specifically directed to acts performed or to be performed under those laws by the defendant officials of the United States Bureau of Reclamation in their capacity as agents of the United States, and that the value of the matter in controversy exceeded $3,000, of which suits "the district courts of the United States are given original jurisdiction."

Section 1331 of Title 28 United States Code, is the basic statute conferring general jurisdiction of a suit, the subject matter of which is a Federal question. It provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

 As now commonly understood, a case presents a "Federal question" when it "arises under the Constitution, laws or treaties of the United States."

There has never been any question but that the matter in controversy exceeds the jurisdictional amount.

 In a case arising under the Constitution and laws of the United States, with the jurisdictional amount being present, the Court has jurisdiction of the subject matter which is the Federal question. Woods Bros. Construction Co. v. Yankton County, 8 Cir., 1931, 54 F.2d 304–306, 81 A.L.R. 300; Cooper v. Reynolds, 1870, 10 Wall. 308, 77 U.S. 308–316, 19 L.Ed. 931; United States v. Association of American Railroads, D.C. Neb.1945, 4 F.R.D. 510, at page 517.

 A United States district court has original jurisdiction, and a case arises under the laws of the United States whenever decision depends on the correct construction of such laws, United States v. "Old Settlers", 1893, 148 U.S. 427, 13 S.Ct. 650, 37 L.Ed. 509, such as when some title, right, privilege or immunity upon which a recovery depends would be defeated by one construction, or sustained by an opposite construction, of such laws. Starin v. City of New York, 1883, 115 U.S. 248, at page 257, 6 S.Ct. 28, 29 L.Ed. 388.

A case presents a Federal question when the rights of *either* party depend in whole or in part upon the construction of the Constitution or Federal statutes. Chief Justice Marshall said in Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 379, 19 U.S. 264, 379, 5 L.Ed. 257: "A case in law or equity consists of the right of one party, *as well as the other,* and may be truly said to arise under the Constitution or a law of the United States, whenever its correct construction depends on either." (Emphasis supplied). Also see: Patton v. Brady, 1902, 184 U.S. 608, at page 611, 22 S.Ct. 493, 46 L.Ed. 713, and cases there cited, as well as State of Tennessee v. Davis, 1879, 100 U.S. 257, at page 264, 25 L.Ed. 648.

In Ames v. Kansas, 1884, 111 U.S. 449, at page 462, 4 S.Ct. 437, at page 443, 28 L.Ed. 482, the Court said: " * * * to use the language of Chief Justice Marshall in Osborn v. United States Bank, 9 Wheat. [738, at page] 825 [6 L.Ed. 204], an act of congress 'is the first ingredient in the case,—is its origin,—is that from which every other part arises.' The right set up by the [defendants] will be defeated by one

construction of these acts and sustained by the opposite construction. When this is so, it has never been doubted that a case is presented which arises under the laws of the United States. Cohens v. [Commonwealth of] Virginia, 6 Wheat. [264] 379 [5 L.Ed. 257]; Gold-Washing & Water Co. v. Keyes, [1877] 96 U.S. [199] 201 [24 L.Ed. 656]; [New Orleans M. & L.] Railroad Co. v. [State of] Mississippi, [1880] 102 U.S. [135] 140 [26 L.Ed. 96]."

■ In a diversity case, the jurisdiction of the Court is founded entirely on the character of the parties; and the nature of the controversy is not contemplated—the character of the parties is everything, the nature of the case nothing. In Federal question cases, the jurisdiction is founded entirely on the character of the case, and the parties are not contemplated; the nature of the case is everything, the character of the parties nothing. Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 19 U.S. 264, at page 392, 5 L.Ed. 257.

That is to say, even though the parties to a suit are all citizens of the same State, the Court has jurisdiction if it arises under the laws or Constitution of the United States. Cummings v. City of Chicago, 1903, 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525; Stark v. Payne, D.C. Mont.1921, 271 F. 477, at page 479; Chalmers Chemical Co. v. Chadeloid Chemical Co., C.C.W.Va.1909, 175 F. 995.

■ Regardless of the source or foundation of the plaintiffs' rights, they allege in their Complaint violations of Federal laws by defendants, and the defendants rely upon various acts of Congress for their authority to impound and divert water at Friant, in derogation of plaintiffs' claimed rights. In the appendix following 90 F.Supp. 773, reference is made to some 30 different Acts of Congress having relation to the issues raised on the motion of the defendant officials to dismiss.

The physical works involved were constructed under the authority of various Acts of Congress, 43 U.S.C.A. § 372 et seq., and statutes cited in appendix to 90 F.Supp. 773. The officials operating such physical works do so under claim or color of authority of the Constitution of the United States and various Acts of Congress.

■ In a removal case, the question of jurisdiction of the subject matter is to be determined from the Complaint at the time of removal. Great Northern Railway Co. v. Alexander, 1917, 246 U.S. 276, 38 S.Ct. 237, 62 L.Ed. 713; State of Minnesota v. Northern Securities Co., 1904, 194 U.S. 48, 24 S.Ct. 598, 48 L.Ed. 870; Houston & Texas Central Railroad Co. v. State of Texas, 1889, 177 U.S. 66, 20 S.Ct. 545, 44 L.Ed. 673; Postal Telegraph Cable Co. v. State of Alabama, 1894, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231; Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962.

■ As heretofore noted, after removal by the defendant officials, they filed a Motion to Dismiss. The grounds of the Motion were that: the action was one in fact against the United States, asserted to be an indispensable party not consenting to be sued; that the Secretary of the Interior was an indispensable party of which the Court had no jurisdiction; that plaintiffs had a plain, complete, and adequate remedy at law under the Tucker Act for damages; and that the Complaint stated no claim for relief in that defendants' conduct was authorized by various Acts of Congress. In support of these contentions, it was urged that the plaintiffs had *no rights to either water or damages* on the ground that Friant dam and the attendant works had been constructed by the United States under its constitutional powers to regulate navigable rivers and control floods, by virtue of the Commerce clause. All of these were, and are, substantial questions of primary importance which were postured by the Complaint at the time of removal, requiring the interpretation and application of the Constitution of the United States and various Acts of Congress, including the Reclamation Act of 1902, as amended 43

U.S.C.A. § 372 et seq., to the state of facts set forth in plaintiffs' Complaint, which, under the doctrine of the foregoing cases, gave this Court jurisdiction of the subject matter at the time of the removal.

Nothing has occurred since to cause this Court to lose jurisdiction, and inasmuch as all of the grounds of the Motion to Dismiss are again asserted as special defenses, the Federal questions still remain in the case.

■ The Court concludes from the foregoing cases that, having jurisdiction of the subject matter, regardless of the lack of diversity of citizenship between the plaintiffs and defendant officials and defendant districts, it acquired jurisdiction over the defendant officials and the defendant districts by either service of process or by their appearance in the case.

As heretofore noted, no motion to remand has ever been made.

■ If there were any defects in the removal proceedings, they have long since been waived.

In French v. Hay, 1847, 22 Wall. 238, 89 U.S. 238, 22 L.Ed. 854, nearly three years after the case had been removed, a motion to remand was made on the ground that the motion had not complied with the statute. As to this, the Court said, 22 Wall. at page 244: "The objection made in the court below touching the removal of the case from the State court, and which objection has been renewed here, was not made in the court below until testimony was all taken, the case was ready for hearing, and nearly three years had elapsed since the transfer was made. The objection came too late. Under the circumstances it must be held to have been conclusively waived." See also Baggs v. Martin, 1900, 179 U.S. 206–209, 21 S.Ct. 109, 45 L.Ed. 155; American Fire & Cas. Co. v. Finn, 1950, 341 U.S. 6–16, 71 S.Ct. 534,

95 L.Ed. 702; Monroe v. United Carbon Co., 5 Cir., 1952, 196 F.2d 455.

Here, almost eight years have passed since the removal to this Court.[24] The defendant officials and defendant districts answered and participated in a long and extensive trial at great expense to all parties, and the case is now submitted for decision on the merits, so that any defects in the removal proceedings come clearly within the provisions of the last above-cited cases, and have been waived.

Special defenses have been raised by the defendant officials and others that this Court lacks jurisdiction on the ground (1) that the Complaint as amended and supplemented fails to state a claim for relief, (2) that the plaintiffs and the class they represent have an adequate and complete remedy at law, (3) that the United States was, and is, an indispensable party, and (4) that the Secretary of the Interior and the Commissioner of the Bureau of Reclamation were, and are, indispensable parties, and being residents of the District of Columbia, this Court could not acquire jurisdiction over them.

■ The question as to whether or not the Complaint stated a claim for relief was disposed of in D.C., 90 F.Supp. 773. The court adheres to the conclusion therein expressed, but adds that the Complaint as amended and supplemented, since that Opinion, states claims for relief against all defendants, including the United States.

The special defenses concerning the failure of the plaintiffs to represent a class will be disposed of under the discussion concerning whether or not this is a proper class action.

The question of jurisdiction of the United States, and whether or not it is an indispensable or a necessary party, will be dealt with more fully hereinafter under the heading "Jurisdiction of the United States of America."

24. The removal occurred in 1947 before the 1948 revision of the Judicial Code. The then applicable provisions of 28 U.S. C.A. § 71 for removal are substantially the same as after the 1948 revision, now 28 U.S.C.A. § 1441(a).

■ With respect to whether or not the Secretary of the Interior and the Commissioner of the Bureau of Reclamation are indispensable parties, the court adheres to the conclusions set forth in D.C., 90 F.Supp. 773, except to add that as heretofore noted, the facts show that the defendant officials are exercising control over the physical works involved, and *do make the decision, and control the release of water without prior approval or authority from either the Secretary of the Interior or the Commissioner of the Bureau of Reclamation.* All the contracts for water service, except one, were executed on behalf of the United States by the predecessor in office of the defendant, Spencer. The predecessor was then designated "Regional Director, Region 2, Bureau of Reclamation." Spencer's duties and powers are the same as his predecessor.

Neither the Secretary of the Interior nor the Commissioner of the Bureau of Reclamation are indispensable or necessary parties to the relief sought in this case as against either the defendant officials, the defendant districts, or the United States.

The defendant districts also make the point that this Court has no jurisdiction over them because there is no Federal question present. What has been said concerning the existence of the Federal question is equally applicable to the defendant districts.

Although not analytically briefed or argued, a point has been raised to the effect that when the United States was joined as a defendant, this Court lost jurisdiction of some or all of the defendants.

■ Having jurisdiction of the subject matter, that jurisdiction was not lost by joining the United States if the United States has consented to be sued. The case is still one arising under the Constitution and laws of the United States. Jurisdiction rests on the presence of a Federal question and was obtained as to the parties, without regard to the citizenship or character of the parties, by service of process or appearance in the case, and this jurisdiction obviously continued though the United States was joined.

■ The contention of the defendants that the Court lost jurisdiction of defendant officials when the United States was joined is really but another way of saying that the joinder of the United States was improper. Thus, the question is solved by the determination as to whether the United States was properly joined, which question is subsequently treated.

It is concluded on this phase that the Court has jurisdiction of the subject matter, the defendant officials, and the defendant districts.

## VII.

### Jurisdiction of the State of California.

As heretofore noted, the State of California originally intervened to compel a flow of water to sustain fish life in the river. At that time the State sought affirmative relief. Thereafter, the State abandoned its position, and withdrew its request for an injunction. Subsequently, the State of California voluntarily filed its Amended Complaint in Intervention wherein it appeared in its "sovereign, governmental and proprietary capacities in its own interest, and for the protection of its own rights; also as *parens patriae*, in the interest of and for the protection of, all its citizens, residents, landowners and water users, and its agencies, the defendant districts, and to protect the integrity and proper application of its constitution and laws respecting water and the use thereof, water rights, contracts, property and property rights; also as trustor of express trust," and also "as absolute owner of the corpus of the water."

■ It must also be pointed out, to clearly understand the status of the State in this suit, that it is not a party defendant. It is true that in the Amended and Supplemental Complaints of the plaintiffs, and the City of Fresno and

Tranquillity in their separate Complaints in Intervention filed in August, 1953, the State is designated as a party defendant. However, this occurred during the course of trial, and no motion under the Federal Rules of Civil Procedure, Rule 21, to add the State as a defendant was ever made, and leave of Court was never obtained. It follows that the State is not a party defendant, despite its sometimes designation as such in the pleadings.

■ It participated in the trial throughout and in all of the proceedings had after August 11, 1951. It produced witnesses and voluminous other evidence to support its theories, and examined and cross-examined all witnesses on a multitude of subjects over long periods of time in support of its various contentions.

The intervention for the State of California was filed by the law officer of the State generally authorized to appear in lawsuits involving the rights and interests of the State, and specifically authorized to institute an action concerning property in which the State claims an interest. People v. Birch Securities Co., 1948, 86 Cal.App.2d 703, 196 P.2d 143, certiorari denied 336 U.S. 936, 69 S.Ct. 745, 93 L.Ed. 1095; Pierce v. Superior Court, 1934, 1 Cal.2d 759, 37 P.2d 453, 460, 96 A.L.R. 1020; People v. Oakland Water Front Co., 1897, 118 Cal. 234, 50 P. 305; People of State of California v. United States, 9 Cir., 1950, 180 F.2d 596, certiorari denied 340 U.S. 826, 71 S.Ct. 61, 95 L.Ed. 607; California Constitution, art. V, Sec. 21; California Government Code, Sections 12510–12522. The appearance in intervention was not of a limited or temporary nature, but could not have been broader and more all-inclusive.

It, thus, having voluntarily come into the case, of which this Court was then vested with jurisdiction, originally seeking affirmative relief, it waived its sovereign immunity and submitted itself to the jurisdiction of the Court. Clark v. Barnard, 1883, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780; State of Puerto Rico v. Ramos, 1914, 232 U.S. 627, 34 S.Ct. 461,

58 L.Ed. 763; State of Missouri v. Fiske, 1933, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145; Gunter v. Atlantic Coast Line Railway, 1906, 200 U.S. 273, 26 S.Ct. 252, 50 L.Ed. 477; Gardner v. State of New Jersey, 1947, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504. Even in Hans v. State of Louisiana, 1890, 134 U.S. 1, 10 S.Ct. 504, 509, 33 L.Ed. 842, strongly relied on by the State, the Court held that a State consents and is subject to a judgment if it comes voluntarily into court, and stated: "To avoid misapprehension, it may be proper to add that, although the obligations of a state rest for their performance upon its honor and good faith, and cannot be made the subjects of judicial cognizance unless the state consents to be sued *or comes itself into court, * * *.*" (Emphasis supplied.)

■ It should also be stated, that the general proposition of law is well established that when an intervenor comes into a case of which the Court has jurisdiction, it accepts the proceedings as it finds them at the time of the intervention, and is considered for all intents and purposes as one of the original parties. Galbreath v. Metropolitan Trust Co., etc., 10 Cir., 1943, 134 F.2d 569; Piccard v. Sperry Corporation, D.C.N.Y. 1941, 36 F.Supp. 1006, affirmed 2 Cir., 120 F.2d 328; In re Raabe, Glissman & Co., D.C.N.Y.1947, 71 F.Supp. 678; Godfrey L. Cabot, Inc., v. Binney & Smith Co., D.C.N.J.1942, 46 F.Supp. 346. In Rector v. United States, 8 Cir., 1927, 20 F.2d 845–859, the Court said: "By that intervention she became a party to the action clothed with all the rights, burdened with all the duties and subject to to all the legal consequences inhering in such status. French v. Gapen, [1881] 105 U.S. 509, 525, 26 L.Ed. 951; Swift v. Black Panther Oil & Gas Co., [1917] 244 F. 20, 29, this court; Hamlin v. [Toledo, St. L. & K. C.] R. Co., 6 Cir., [1897] 78 F. 664, 666, 36 L.R.A. 826, Circuit Judges Taft and Lurton sitting, the opinion by Judge Lurton. One of the legal consequences was that she (as all other parties to the action) would be bound by all orders properly made there-

after in the litigation. One of the legal rights was to object and to be heard upon all matters affecting her rights and, at some time, to have reviewed on appeal any order she deemed to her prejudice."

■ Original jurisdiction of a suit wherein either a State, the United States, or both, are or may become parties is not exclusive with the Supreme Court. Congress has the power to confer jurisdiction on an inferior Court. Bors v. Preston, 1884, 111 U.S. 252, 4 S.Ct. 407, 28 L.Ed. 419; Ames v. State of Kansas, 1884, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482; State of Minnesota v. United States, 8 Cir., 1942, 125 F.2d 636, 639; United States v. State of Louisiana, 1887, 123 U.S. 32, 8 S.Ct. 17, 31 L.Ed. 69; United States v. State of California, 1936, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; People of State of California v. United States, 9 Cir., 1950, 180 F.2d 596, certiorari denied 340 U.S. 826, 71 S.Ct. 61, 95 L.Ed. 607; United States ex rel. Charley v. McGowan, D.C.Wash. 1931, 2 F.Supp. 426, affirmed 9 Cir., 62 F.2d 955, 290 U.S. 592, 54 S.Ct. 95, 78 L.Ed. 522; United States v. Gas & Oil Development Co., D.C.W.D.Wash.1954, 126 F.Supp. 840.

In Ames v. State of Kansas, supra, the State of Kansas filed suit in its courts. The case was removed to the Federal court which remanded it to the State court. The Supreme Court reversed the order of remand on the ground that there was a Federal question which gave the Federal courts jurisdiction, under what is now 28 U.S.C.A. § 1331.

■ As heretofore noted, this Court had original jurisdiction under 28 U.S.C.A. § 1331, and the case was properly removed, at the time the State intervened.

That being so, the mere joinder of the United States did not deprive this Court of jurisdiction of the State.

Whether or not the United States was properly joined under 43 U.S.C.A. § 666 is a question which will shortly be discussed.

■■ The State, in essence, contends that no relief can be given against the State because the State, while voluntarily intervening, has not consented to be sued. *The plaintiffs ask no affirmative relief against the State.* The plaintiffs do seek a declaration of the rights of the parties; so does the State, and, admitting that a dispute exists between the other parties to the action as to their respective rights to the use of water, the State asks a judicial declaration and determination of those rights. The plaintiffs seek a physical solution. The State asserts that it is the duty of the Court to impose its own physical solution in event none of the physical solutions proposed by the various parties are, in the judgment of the Court, consistent with the California requirements of reasonable use and against waste. The State contends that the plaintiffs' claim of right to the entire flow of the river would contravene the Constitutional prohibition against waste of water.

Though the State submitted a different plan of physical solution than either the plaintiffs or defendant officials, the fact that the Court might conclude that some other plan of physical solution than that submitted by the State should be adopted would not, in itself, amount to a judgment against the State. The State specifically asserted it was the *duty* of the Court to impose its own plan of physical solution, if the Court should find that those proposed by the parties was not consistent with the requirements of reasonableness of California law. For the State to now contend that the Court has no jurisdiction to impose a physical solution, other than the one it proposed, is tantamount to saying that the Court has no jurisdiction to do other than what the State wants done.

As noted, the State has prayed that the rights of the plaintiffs and defendants to the use of water be judicially declared by this Court. In making such a declaration, the Court is not giving relief for or against the State since it is not the rights of the State that are be-

ing judicially settled. The sole purpose of the amended intervention by the State was stated to be the vindication of its laws relating to the use of water, and thus to protect its natural resources by requiring compliance with the California Constitution and laws by all parties to this proceeding. It is this interest of the State which has entitled it to be heard.

When the law of the State of California is applied to the rights of the other parties to this case, and a judgment made declaring them, together with appropriate provisions for enforcing those rights, then the interest of the State is at an end. That is what is done here. The Constitution and laws of the State of California will in this manner be vindicated.

Thus, it is the conclusion of the Court that it has jurisdiction of the State on the basis of its original intervention, but that no relief for or against the State is required or is possible under the pleadings and issues which show an actual litigable controversy only among the parties other than the State.

A judgment of dismissal will be made of the State's Complaint in Intervention.

The ancillary proceedings of the City of Fresno against the State Engineer of California and others to restrain hearings on applications to appropriate water will be treated under the heading "City of Fresno."

## VIII.

### Jurisdiction of the United States.

The order joining the United States as a party was made on September 18, 1953.

Except for filing a Motion to Dismiss, which was denied on January 30, 1954, the United States has since that time boycotted the litigation. Although, as heretofore noted, a Special Assistant to the Attorney General appeared and actively participated throughout the trial and all other proceedings herein until July 12, 1953, *no Answer or other responsive pleading has been filed in the name of the United States, nor has any appearance been made at any hearing, or on the reopened trial, since July 12, 1954, either on behalf of the United States or any of the defendant officials,* despite the failure in the Prohibition proceeding of 1954 to secure vacation of the Order dated September 18, 1953, joining the United States, and of the Order of January 30, 1954, overruling the Motion of the United States to dismiss, and ordering it to answer, the vacation of which were specifically sought.[25]

No brief has been filed on behalf of the United States, and the brief filed by the Special Assistant to the Attorney General of the United States on behalf of the defendant officials makes no pretense of meeting the issues. It is of such a nature, in fact, that the Court would be warranted in striking it, and requiring a proper brief to be filed.[26] But such

---

25. In Petition for Extraordinary Writ, No. 14244, filed by the United States 9 Cir., 213 F.2d 818, the prayer asks:
"1. Commanding the Respondent Honorable Peirson M. Hall, Judge, to vacate the order dated September 18, 1953, joining the United States of America in the injunctive proceeding against the subordinate officials of the Bureau of Reclamation;"
In Petition for Extraordinary Writ filed by the State of California, No. 14243, 9 Cir., 213 F.2d 818, Paragraph 4 of the prayer asks:
"(4) Directing the Respondent Court to vacate its order of September 18, 1953, joining the United States as a party-defendant in Rank v. Krug; to vacate its

order of October 29, 1953, requiring the State to serve the United States of America as a defendant in the State's case in intervention in Rank v. Krug; and to vacate the orders of January 27, 1954, and January 30, 1954, requiring the United States of America to answer the Complaints in Intervention, including that of the State of California;"

26. The general theme of the brief is a declamation of sorts about the invasion, by the judiciary, of the constitutional executive and legislative powers. Although not making the point in so many words, one might get the idea in reading it that its author thought S. 18, 43 U.S.C.A. § 666, to be unconstitutional.

procedure would only further delay a decision in this case.

In order, therefore, to ascertain the position of the Attorney General of the United States, it is necessary to gather it from the pleadings, the memoranda and briefs heretofore filed, and from various "Suggestions", see D.C., 16 F.R.D. 310, which have been filed from time to time, as well as from briefs filed in the two Writ proceedings. Even so, the position of the Attorney General of the United States on the issues in this case is exceedingly vague.[27] The position of the State of California has changed several times, and indicates that the Attorney General of California is uncertain, either as to policy he wishes to adopt, or the stand he wishes to take as to the law.[28]

Nevertheless, it is the duty of the Court to examine the question of jurisdiction over the United States.

Involved in this question are Rules 19, 20 and 21, as well as Rule 1, of the Federal Rules of Civil Procedure, and S. 18, the Act of July 10, 1952, 43 U.S.C.A. § 666. Before discussing the provisions of the Rules, it is best to go at once to a consideration of S. 18—43 U.S.C.A. § 666, as it is under that Statute that the waiver of sovereign immunity, if it exists in this case, must be found.

The text of S. 18, the Act of July 10, 1952, in full, is as follows:

43 U.S.C.A. § 666—

"(a) Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.

27. Report of Special Subcommittee, H.R. 1952, on hearings on Central Valley Project, Oct. 29, 30, 31, 1951 ( Engle Report)—
"Findings—(a) That misleading information has been given to the Congress by the sponsors of the Central Valley project and Federal representatives regarding the supply of water necessary to operate, if present Sacramento Valley and Delta water rights claims are valid; (b) There has been an amazing lack of frankness, bordering on bad faith, in dealing with the Congress in view of the rapidly mounting uses of Sacramento River water since the construction of Shasta dam; (c) The project was apparently drifting into danger as far as water supplies are concerned, and State and Federal advocates failed to direct attention to this serious dilemma, or to take any action to halt the trend before serious difficulty was encountered.

In fact, State and Federal representatives adopted a 'drift and hope' policy with respect to project water supplies; (d) Both State of California representatives and Bureau of Reclamation employees have requested funds annually and failed to indicate to the Congress that there was any question about sufficient water to meet all needs which the initial project features were designed to serve, including uses along the Sacramento river."

28. Engle Report, supra footnote 27.
"Findings—(a) That the statements of policy with respect to the importation of surplus water from the Sacramento Valley made by the State of California, the original sponsors of the project, and subsequently repeated in a similar manner by Interior Department representatives, are certainly confusing, if not misleading."

"(b) Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.

"(c) Nothing in this Act shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream."

By statute, consent is given to join the United States in any *"suit."* There are qualifications, which will shortly be discussed.

The word "suit" has such a common and accepted meaning that it would seem unnecessary to discuss it. But one of the quondam contentions of the defendants is that the word "suit" as used in Section 666 means only administrative proceedings under various State laws. So, it is first necessary to determine what is meant in the Act of Congress by the word "suit."

Courts have been called upon many times to define a "suit."

 Said Chief Justice Marshall in Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, at page 405, 5 L.Ed. 257: "What is a suit? We understand it to be prosecution or pursuit of some claim, demand or request; in law language, it is the prosecution of some demand in a *court* of justice." Speaking also in Weston v. City Council of Charleston, 1820, 2 Pet. 449, at page 464, 7 L.Ed. 481, he said: "The term is certainly a very comprehensive one, and is understood to apply to any proceeding in a *court* of justice, by which an individual pursues that remedy in a *court* of justice which the law affords him. The modes of proceeding may be various, but if a right is litigated between parties in a *court* of justice, *the proceeding by which the decision of the court is sought, is a suit.*"

The definitions framed by Chief Justice Marshall of the word "suit" have been consistently and universally followed since. It would be supererogation to cite all the cases approving it. Upshur County v. Rich, 1890, 135 U.S. 467, at page 474, 10 S.Ct. 651, 34 L.Ed. 196, collects the authorities. State of Missouri v. Fiske, 1933, 290 U.S. 18, at page 26, 54 S.Ct. 18, 78 L.Ed. 145, quotes with approval the above definition from Cohens v. Commonwealth of Virginia, as does Federal Housing Administration, etc., v. Burr, 1940, 309 U.S. 242, at page 246, 60 S.Ct. 488, 84 L.Ed. 724. In Upshur County v. Rich, 1890, 135 U.S. 467, 10 S.Ct. 651, 34 L.Ed 196, the Court held that proceedings before executive or administrative officers or bodies are *not* suits. The word "suit" does *not* include a proceeding before a State Water Board, of so-called adjudication of water rights on a stream. In the case of In re Silvies River, D.C.Or.1912, 199 F. 495, a so-called adjudication proceeding under the laws of Oregon, similar to provisions in the law of California, was removed to the Federal court, but it was remanded on the ground that such a proceeding was not a suit. A similar situation arose, and the same holding was made by the Supreme Court, in Pacific Live Stock Co. v. Lewis, 1916, 241 U.S. 440, at page 446, 36 S.Ct. 637, 60 L.Ed. 1084, where the Court cited with approval the Silvies case, supra.

In Bowers v. New York & Albany Lighterage Co., 1927, 273 U.S. 346, 47 S.Ct. 389, 71 L.Ed. 676, the Court had under consideration provisions of a revenue Act which contained a time limitation on a "suit or proceeding." The petitioner contended that the word "proceeding" was synonymous with the word "suit." As to that the Court said, 273 U.S. at page 349, 47 S.Ct. at page 390: "There are two methods to compel payment. One is suit, a judicial proceeding; the other is distraint, *an executive proceeding.* The word 'proceeding' is aptly and commonly used to comprehend steps taken in pursuit of either. There is nothing in the language or context that indicates an intention to restrict its meaning, or to use 'suit' and 'proceeding' synonymously."

If there were any question about the meaning of the word "suit" as contained in the first clause of Section 666, it is eliminated by an examination of the rest of the section. Clause (2) of the second sentence of subdivision (a) provides that the United States "shall be subject to the *judgments, orders, and decrees of the court*". It further provides that *no judgment for costs* against the United States can be entered in any such suit. A judgment can only be entered in a judicial proceeding.

Subdivision (b) provides for service of *summons* or other *process* in any such suit. Summons is universally understood to be the process issued by a court upon the commencement of a suit, and service of it is required to give the court jurisdiction to enter a judgment, after trial, or by default, if the defendant does not appear. 72 C.J.S., Process, § 1(2). Process, while including summons also, on the other hand, may precede or follow a judgment in civil actions, such as Writ of Execution, Federal Rules of Civil Procedure, Rule 69, attachment and sequestration, Federal Rules of Civil Procedure, Rule 70, or other formal writings and commands such as injunctions, writs of habeas corpus, mandamus, and the like. In California, California Code of Civil Procedure, Section 17, subdivision 6, provides that "The word 'writ' signifies an order or precept in writing, issued in the name of the people, or of a court or judicial officer; *and the word 'process' a writ or summons issued in the course of judicial proceedings*".

The Federal Rules of Civil Procedure, by Rule 4, provide for the issuance and service of summons. It is significant that that Rule is entitled "Process."

Moreover, subdivision (c) of Section 666, Title 43 United States Code Annotated, prohibits the joining of the United States *in any suit,* or controversy, in the Supreme Court of the United States, involving the rights of States to the use of water in interstate streams. Obviously, the word "suit" in subdivision (c) has the same meaning as the word "suit" in subdivision (a). It can hardly be said that a proceeding in the Supreme Court of the United States is an administrative proceeding, or anything other than a suit.

It cannot be doubted that in this case, the plaintiffs are prosecuting their claims and demands in a court of justice for the establishment and enforcement of their rights to the use of water, and are thus pursuing such remedies as the law affords them. It is thus a "suit" as contemplated by Section 666.

 Proceeding with a further analysis of the section, it is appropriate to refer to one of the other contentions of the defendants, that inasmuch as plaintiffs seek, among other things, in personam relief by way of an injunction against defendant officials and others, no adjudication of water rights is required, and that, hence, this is not a suit contemplated by Section 666.

Does the present suit qualify as one for "the adjudication of rights to the use of water of a river system or other source"?

The nature of the relief which might ultimately be granted on a determination that the plaintiffs have rights to use water which have been invaded by the defendants is not controlling. The question is: "Does the suit require an adjudication of water rights?" Here the very essence of the suit is a claim of right to have and use water as it flowed in the San Joaquin river. That claim must be judicially determined before the matter of the relief to be granted is reached. Whatever relief can be granted—with or without the United States as a party—an adjudication of the existence *vel non* of water rights in the plaintiffs would in any event be necessary to the granting of any relief. The essential and primary ingredient in this case is the determination and adjudication of water rights. The fact that this suit may require a determination as to whether or not the impounding and diversion of water is unlawful does not make it any the less a suit for the adjudication of water rights. This, be-

cause the lawfulness of the diversion and impoundment is dependent on whether or not existing water rights are respected as required by the Federal statutes, as well as California law. The basic problem has always been the ascertainment of those rights.

Before any judgment is entered prescribing the means for the enforcement of rights, there must be an adjudication that a party has rights. For instance, in the ordinary quiet-title suit, which is an action in rem, the court adjudicates the rights of the parties to the property in question. If it quiets the title in the plaintiff, it enters a decree to that effect and it also issues an injunction which is, in effect, a decree in personam against those asserting rights contrary to the rights of the plaintiff; and, in such case, there may also be a Writ of Ejectment, which also acts in personam. While such a case is a suit in rem, at the same time, one of the means of enforcing it is a decree in personam. Moreover, in the ordinary suit for injunction, it is incumbent upon the Court to first determine the rights of the parties. If it determines that the plaintiffs have rights, either in rem or in personam which have been invaded, it makes its judgment and declaration to that effect, and may issue an injunction. The injunction operates in personam, but there is always first the adjudication that a party has a right.

In California, the rights to the use of water are part and parcel of the land to which they are appurtenant. And while this is not a quiet-title suit in the sense that an individual seeks to quiet the title to the use of a quantity of water measured in miner-inches, second-feet, or acre-feet for a specific parcel of real property, the case, nevertheless, partakes of the nature of a quiet-title suit in that the plaintiffs and their class assert a common right to a flow of water in the stream, which is asserted to be the common source of supply.

In this suit, the plaintiffs and their class assert that they have rights to the use of water of the San Joaquin river; the defendant officials assert that the plaintiffs and their class do not have the rights they claim; the districts who are defendants assert that they have certain rights; and it is asserted that the United States owns the fee title to the water. These different assertions plainly present a suit for adjudication of water rights, regardless of the form of decree enforcing those rights.

The Answer of defendant officials, the defendant districts, and the Complaint in Intervention of the State prayed for "adjudication" of those water rights.

And the Court of Appeals in the 1954 Extraordinary Writ proceedings—9 Cir., 213 F.2d 818—pointed out that basically this case was for the adjudication of water rights.

It is also contended that by the use of the words "adjudication" or "administration" in Section 666, Congress contemplated *only* administrative proceedings before State administrative bodies.

By common understanding, the word "adjudicate" means determination by a court or judge in a judicial proceeding. It requires a judgment or a decree by a court. Goldwyn v. United Artists Corp., 3 Cir., 1940, 113 F.2d 703–706. And in view of the meaning of the word "suit," the words "adjudication" or "administration" of rights in a "suit" as used in this section clearly contemplate judicial action.

Considering next, the phrase "(2) for the administration of such rights," does the term "administration" show that the section does not contemplate judicial proceedings?

In the first place, it is noted that the suit may be one for adjudication *or* administration. As set forth above, the adjudication of rights in a "suit" contemplates judicial action.

In the second place, courts of equity, to carry out a *decree of adjudication* of water rights, *have traditionally undertaken the administration* of water rights. For instance, the decree in State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed.

1815, was actually a decree not only adjudicating water rights, but also for the administration of those water rights. State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, at page 616, 65 S.Ct. 1332, 89 L.Ed. 1815; see also Union Mill & Mining Co. v. Dangberg, 9 Cir., 1897, 81 F. 73; Conrad Investment Co. v. United States, 9 Cir., 1908, 161 F. 829; Pacific Live Stock Co. v. Hanley, 9 Cir., 1912, 200 F. 468; Gila Valley Irrigation District v. United States, 9 Cir., 1941, 118 F.2d 507; Vineyard Land & Stock Co. v. Twin Falls S. R. L. & W. Co., 9 Cir., 1917, 245 F. 9.

█ Historically and traditionally, courts of equity may adjust their remedies to circumstances of cases and formulate them appropriately to safeguard and conveniently to adjudge and promptly enforce substantial rights of all parties before them.

After all, the appointment of a Watermaster by a court for the enforcement of its decrees is essentially no different than the exercise of the power of the court to appoint a receiver, such as for railroads and the like. The United States has sought and obtained such appointment. In 1930 a judgment was entered in United States v. Angle, et al., No. 30 Equity, by the United States District Court for the Northern District of California, adjudicating water rights on Stoney Creek, and appointing a Watermaster to enforce the decree. The court-appointed Watermaster is still functioning and the judgment is still open and has been modified from time to time. Contempt proceedings have been had from time to time for violation of the decree, including failure to pay the fees of the Watermaster. Other similar cases have occurred in other Districts in other States. In Montezuma Canal Co. v. Smithville Canal Co., 1910, 218 U.S. 371, 31 S.Ct. 67, 54 L.Ed. 1074, the Court approved a decree appointing a Watermaster with broad powers.

█ Thus, there is embodied in the phrase and term "administration" nothing new or inconsistent with the power of a court of equity. No inference is to be drawn that the use of the phrase "for the administration of such rights" imports exclusively the functions of an administrative body. Especially so, when the phrase is considered with the language of the whole Section. The phrase must be understood in the context of the entire statute in which it appears.

There are several reasons, other than hereinbefore set forth, for concluding that Section 666 does not contemplate that statutory administrative adjudication proceedings should be the exclusive proceedings in which the United States can be joined as a party, if the statute applies in such proceedings at all.

█ But, in any event, an examination of the California laws relating to adjudication of water rights demonstrates that the administrative procedure set up in the California Water Code is merely optional and not exclusive.

Sections 530 and 534 of the California Code of Civil Procedure have special provisions relating to *actions* for the determination of water rights and the *prevention by injunction* of diversion, diminution or increase of flow water. Furthermore, it must be remembered that California law permits suits to quiet title to either real or personal property. As heretofore seen, water rights are part and parcel of the land in California and are real property. Numerous cases have been brought in the California courts which resulted in judgments quieting title to water rights, and enjoining interference with such rights.

█ The provisions of Division 2, part 3 of the California Water Code, entitled "Determination of Water Rights", are obviously not exclusive, as Sections 2000 and 2076 relate to references to the State Division of Water Resources, Department of Public Works *"In any suit brought in any court of competent jurisdiction in this State for determination of rights to water"*. Thus, it is apparent that the "Statutory Adjudication" procedure set up in Chapter 3 of Division 2 of the California Water Code is one that

may be invoked at the option of an owner of water rights, but it is not compulsory upon anyone to invoke it before filing a suit for the determination of their rights to water. If it were compulsory and a preliminary prerequisite to a suit, then the United States, the defendant officials, defendant districts and the State should have long ago invoked it. It is clear from even a cursory examination of the California Water Code that a proceeding before the State Department of Public Works, Division of Water Resources, is not a suit.[29]

■ It is claimed that the use of the words "river system" in Section 666 further supports their contention. In the first place, Section 666 permits adjudication of rights to the use of waters of a river system "or other source". In the second place, the defendants attempt to define the San Joaquin river "system" as including not only the San Joaquin river, but also all the rivers in the Central Valley from the Delta on the north to the Grapevine on the south. They are: the Stanislaus; the Tuolumne; the Merced; the Chowchilla; the Fresno; the Kings; the Kaweah; the Tule; the Poso; and the Kern, and all intermediate creeks, streams, and flows of water. This area covers millions of acres of lands, and there are thousands of wells and diversion devices on thousands of separately owned parcels of land. It is preposterous that the so-called State administrative method is the exclusive procedure applicable to such a situation or was the exclusive procedure Congress had in mind when it passed Section 666 permitting the joinder of the United States in any suit for the adjudication or administration of water rights.

■ Furthermore, Section 666 applies throughout the United States. It is a statute of general application, in every State, whether that State has an administrative procedure for the so-called stat-

utory adjudication of water rights or not. If State administrative bodies were the exclusive forum intended by Congress in passing Section 666, a ridiculous result would occur. In States not having such administrative procedure, a party seeking adjudication of rights to the use of water under Section 666 could not join the United States, and there would, in fact, be no remedy against the United States in such States, while there would be in others.

■ There is one additional reason to support the foregoing conclusions, and that is that the judicial power of the United States courts extends under Article III, Section 2 of the United States Constitution to suits to which the United States is a party. To hold that the State administrative procedure is exclusive, would be to hold that Congress intended not only to waive sovereign immunity, but also intended to deprive the United States of the right to be sued in its own courts. In effect, such a holding would be to negate not only the statutes conferring original jurisdiction on United States courts, but also all the provisions in the statutes for removal of causes from State courts where the interests of the United States are concerned, or where it is a party, or where a Federal question is involved.

■ The next requisite for joinder of the United States is that the suit be one "where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise".

The recital of facts earlier in this Opinion should be ample to show that this requirement is met, but to dispel any doubts, the status of the United States in this regard will be briefly recapitulated.

First, the previously described applications by the United States to appro-

---

29. The recent decision of the California Supreme Court in the Temescal case, supra, raises a question as to whether the entire administrative procedure set

up by the Water Code in Chapter 3, Division 2, is contrary to the California Constitution.

priate water are surely intended to result in water rights of some character in the United States. The precise nature of any water rights which might result from the perfection of these applications under the law of California is not important at this point, but it is enough to fulfill this requirement of Section 666 that the United States is in the process of attempting to acquire water rights by applications to appropriate.

Second, the so-called Miller & Lux Purchase and Exchange contracts, previously described, have been entered into. By those contracts, the United States obtained water rights of some character; at least as against the parties with whom it contracted—regardless of any lack of rights acquired against plaintiffs herein or others. The true nature of those rights as against the plaintiffs and their class is involved in this case. Thus, if necessary, the requirement that the United States has acquired water rights of some nature on the San Joaquin river is met in this regard.

Third, the United States has impounded water. Possession may be the beginning of ownership. It is asserted that, among other things, the United States has acquired rights by prescription. Whether or not this is or can be so, and the nature of the prescriptive right and its limitations, is not important at this point. It is enough for this statute that the United States may be attempting to acquire some prescriptive right to the use of water involved in this litigation.

The requirement that the United States be the owner of, or in the process of acquiring, water rights of some nature concerned in the suit, is clearly and indisputably met in this case.

Another condition of joinder of the United States is that the United States be a "necessary" party to such suit.

■ Defendants have argued from the outset, and defendants and the United States contended in the 1954 Writ proceedings—9 Cir., 213 F.2d 818—that the United States is an indispensable party. This Court held in 90 F.Supp. 773 that the United States is not an indispensable party.[30] Thereafter, this Court proceeded in accordance with the rule laid down in Barney v. City of Baltimore, 1867, 60 Wall. 280, 73 U.S. 280–284, 18 L.Ed. 825, that when the Court does not have jurisdiction of a party who may have an interest in the lawsuit, the Court: "will proceed to administer such relief as may be in its power, between the parties before it." At that time, this Court did not have and could not secure jurisdiction over the United States because no consent to be sued had been granted by a Congressional Act.

The Court now adheres to the conclusion that the United States was not and is not an indispensable party. The Court did not, in permitting the joinder of the United States as a party under Section 666, hold that the United States was an indispensable party, but from all of the files and records and evidence in the case at the time the Motion was granted, and

30. Much is made by counsel of a statement contained in D.C., 90 F.Supp. 773, at page 801, as follows: "The defendants' counsel contend that the complaints do not state a cause of action for declaratory relief insofar as the contracts for the diversion of water are concerned. In this respect they are correct. The United States is not a party to the suit, and is not indispensable to the relief otherwise sought in the suit, as elsewhere herein appears."

This statement is misconstrued by counsel. It must be read in the context of the whole opinion on the Motion to Dismiss wherein the Court held that the

Court did have jurisdiction, and pointed out the reasons why the United States was not, on the face of the pleadings, an indispensable party.

The above-quoted statement means nothing more than that the Complaints did not state a cause of action for declaratory relief against the United States because the United States was not, on the face of the pleadings, an indispensable party to action for the relief prayed for by the plaintiffs. With the United States joined as a party, and with pleadings as amended and supplemented, a claim for relief is stated as against the United States.

in view of the then existing Congressional consent to be sued, the holding is that the United States is a necessary party in order to give complete relief among those already parties, and that the United States could be joined without ousting the Court of jurisdiction.

Whether the United States or the defendants now concede that the United States is a necessary party is not disclosed in any of the briefs or proceedings in this court, or in the two Writ proceedings in the Appellate Court. How it can be contended that the United States is an indispensable party, but at the same time, not a necessary party, is not clear, as parties who are indispensable parties are also necessary parties, but necessary parties are not always indispensable parties.

The distinction between necessary and indispensable parties has long been established.

In Shields v. Barrow, 17 How. 129, 15 L.Ed. 158, the question was fully discussed.

In State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421, at page 425, the Court said: "Classification of Parties. In Shields v. Barrow, 17 How. 129, 58 U.S. 129, 139, 15 L.Ed. 158, it is said: 'The court here points out three classes of parties to a bill in equity. They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.' "

After pointing out that it was essential to maintain these distinctions, the Court, 87 F.2d at page 427, said: "The classification, thus made, and the proper distinctions, are not always verbalized or clearly made in the cases, for an examination of the many cases shows that often the word 'necessary' is used, when the word 'indispensable' would be the proper classification under the foregoing rules. *Necessary parties under the above classification have been referred to as 'conditionally necessary' parties, and 'indispensable parties' under such classification have been referred to as 'unconditionally necessary' parties.* In using the words 'necessary' and 'indispensable' hereinafter, we mean that *'necessary' parties are those of the second class, or 'conditionally necessary,' and we mean that 'indispensable' parties are those of the third class or 'unconditionally necessary.' "*

Rule 19(b) of the Federal Rules of Civil Procedure provides, in part, as follows:

"*When* persons who are not indispensable, but *who ought to be parties if complete relief is to be accorded between those already parties,* have not been made parties and are subject to the jurisdiction of the court as to both service of process and venue and can be made parties without depriving the court of jurisdiction of the parties before it, the court shall order them summoned to appear in the action. The court in its discretion may proceed in the action without making such persons parties, if its jurisdiction over them as to either service of process or venue can be acquired only by their consent or voluntary appearance or if, though they are subject to its jurisdiction, their joinder would deprive the court of jurisdiction of the parties before it; but the judgment rendered therein

does not affect the rights or liabilities of absent persons."

While this language does not attempt to define who are necessary parties, it is manifest that it distinguishes between indispensable and necessary parties. Necessary parties, in effect, are those who are not indispensable parties, but "who ought to be parties if complete relief is to be accorded between those already parties".

Rule 20 deals with the permissive joinder of parties and provides that a plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded, and that judgment may be given against one or more defendants according to their respective liabilities.

In Barron & Holtzoff Federal Practice and Procedure, Section 511, it is said with respect to Rule 19:

"Rule 19 deals with necessary and indispensable parties.

"Indispensable parties are those without whom the action cannot proceed. They must be joined even if by such joinder the court loses jurisdiction over the controversy.

" 'Necessary parties' are those who have an interest in the controversy but whose interests are separable and will not be directly affected by a decree rendered in their absence, which does full justice between the parties before the court.

"The term 'necessary parties' is a misnomer. It does not mean 'essential parties.' Rather it means 'desirable parties' as distinguished from indispensable parties, on the one hand, and from proper parties, on the other hand. It means 'parties who should be joined, if feasible.' It has been suggested that 'conditionally necessary' may be a preferable term, and the New York Civil Practice Act, § 193, has adopted that term and classifies parties as conditionally necessary and indispensable. However, the term 'necessary parties' has acquired a definite meaning in federal law. It has been used in the decisions of the Supreme Court and other federal courts for over a century. To substitute another term, even if it be more accurate, might prove confusing, especially in connection with a reading of decided cases.

"Necessary parties must be joined if they ought to be parties in order to afford complete relief between those already parties, and if they are subject to the jurisdiction of the court both as to venue and service of process, and can be made parties without depriving the court of jurisdiction of the parties already before it. Necessary parties who are not subject to the jurisdiction or venue of the court, or cannot be served with process, or whose joinder would deprive the court of jurisdiction of the parties before it, need not be joined, and the action may proceed without them."

To the same effect see Commercial Casualty Ins. Co. v. Lawhead, 4 Cir., 1933, 62 F.2d 928, 931, certiorari denied 289 U.S. 731, 53 S.Ct. 527, 77 L.Ed. 1480; State of Minnesota v. Northern Securities Co., 1902, 184 U.S. 199, 235, 236, 22 S.Ct. 308, 46 L.Ed. 499; and the recent case of United States v. Aetna Casualty & Surety Co., 1949, 338 U.S. 366, 382, 70 S.Ct. 207, 94 L.Ed. 171, 186.

██ ██ The United States is a necessary party to the doing of complete relief, though it would not be an indispensable party to the obtaining of relief only against the defendant officials.

The contention was made on the Motion to Dismiss in 1950 that the United States had taken the water by its power to regulate navigable streams under the Commerce clause of the Federal Constitution. That contention was rejected by this Court in its ruling on the Motion to Dismiss, 90 F.Supp. 773, and was also rejected by the Supreme Court in United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231. The Court there held that the Central Valley Project and each unit of it was

undertaken and operated under the Reclamation laws, requiring the recognition of water rights measured by and existing under State law. The Answers filed by the defendant officials and by all other defendants concede that. But as the case developed, broad and unlimited claims of ownership in the government of the water and rights to its use were, nevertheless, made. Since the duty was imposed on the defendant officials, of respecting water rights vested by the Reclamation Act according to State law, it is obvious that it becomes necessary for the Court to decide, in ascertaining whether this duty had been breached, whether the plaintiffs had rights to water which were in fact superior to the rights of the government, for whom the defendant officials purported to act. In Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, the Supreme Court sustained the use of a Court's injunctive process to enforce water rights, though in doing so, it necessarily decided that the United States did not own the water, i. e., *it decided rights of the United States when it was not formally and technically a party to the suit*. In granting relief in this case against the defendant officials alone without the United States as a party, a decree would not be res judicata against the United States. Complete relief, and the settling of this question for all time, required that the United States be made a party when that became possible. The relief to be had may not be the same against the United States as against the defendant officials, though the question to be determined remains the same.

Thus, though the United States has never been an indispensable party to the injunctive relief sought on account of the alleged wrongful invasion by the defendant officials of the vested water rights of the plaintiffs, a complete settling of the basic controversy entails an adjudication of relative water rights. To this relief the United States is a necessary party.

The defendants rely in this connection upon Larson v. Domestic & Foreign Commerce Corporation, 1948, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. While that case contains a general discussion of the right to sue an agent of the sovereign, it turns solely upon the question as to whether or not the actions of the particular government officials therein involved were, in truth and in fact, the acts of the sovereign which was an *indispensable* party *and had not consented to be sued*. The action was on a contract for the sale of coal, and the Court simply held that under the terms of the contract, injunctive relief would not be granted to compel the delivery of the coal without joinder of the sovereign, and that the sovereign *had not consented to be sued,* in that instance, and *was an indispensable party*. The situation is not at all analogous to the situation in this case where Congress, by the Act of July 10, 1952, 43 U.S.C.A. § 666, consented that the United States can be sued, and has commanded for many years prior thereto that the United States and its officers recognize water rights of parties under State law.

The contention of the defendants that by joining the United States the plaintiffs concede that the impoundment and diversion of water at Friant was and is authorized, and that hence the plaintiffs' suit must fail as against both the United States and the defendant officials, is without merit. The plaintiffs seek a declaration of their substantive water rights under the Federal Reclamation statutes and California laws. To a suit for the purpose of seeking such substantive declaration, the United States has consented to be joined, and is a necessary party. The Court has jurisdiction of the United States. It likewise has jurisdiction of the persons of the defendant officials against whom an injunctive decree would be enforceable by the sanctions of contempt.

It is to be noted in this connection that by Clause (2) of the second sentence of Section 666(a) "The *United States,* when a party to any such suit * * * (2) shall be *subject* to the *judgments, orders, and decrees* of the

court having jurisdiction * * * *in the same manner and to the same extent as a private individual under like circumstances"*. If a private corporation had built Friant dam and the Madera canal and the Friant-Kern canal, it could not be gainsaid that as a matter of law such private corporation and its employees could be joined in the same suit for the adjudication and enforcement of water rights.

From all of the evidence in the case, as well as from the pleadings and records, clearly the United States ought to be a party if complete relief is to be accorded between those already parties. And, hence, it is a necessary party to the within suit.

The Court turns next to a consideration as to whether or not Section 666 and the Federal Rules of Civil Procedure permit joinder in pending suits.

Even the most conservative construction of a statute waiving sovereign immunity [31] does not permit a narrow, restricted, and technical interpretation which will defeat the purposes of that statute. Miller v. Robertson, 1924, 266 U.S. 243–248, 45 S.Ct. 73, 69 L.Ed. 265. Where broad statutory language is used in a waiver-of-immunity statute, such as is used in Section 666, it "is not to be thwarted by an unduly restrictive interpretation." Canadian Aviator v. United States, 1945, 324 U.S. 215, 222, 65 S.Ct. 639, 643, 89 L.Ed. 901. Or as stated in United States v. Aetna Casualty & Surety Co., 1949, 338 U.S. 366, at page 383, 70 S.Ct. 207, at page 216, 94 L.Ed. 171, in a quote from Judge Cardozo—"'The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced.'"

In determining whether Section 666 applies to pending suits, such as this one, it is necessary to inquire into the intent of Congress from the text of the Act, and if necessary, from the legislative history. If the statute neither creates nor abrogates vested rights, then it is remedial and procedural in character, and the general rule requiring a construction for prospective operation only, does not apply, and the statute can properly be held applicable to pending suits. Home Loan Bank Board v. Mallonee, 9 Cir., 1952, 196 F.2d 336, at page 382, certiorari denied Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374; Petition of Callanan, D.C.E.D.Mich.1931, 51 F.2d 1067; Bowles v. Strickland, 5 Cir., 1945, 151 F.2d 419; Federal Reserve Bank of Richmond v. Kalin, 4 Cir., 1935, 77 F.2d 50; Standard Accident Insurance Co. v. Miller, 7 Cir., 1948, 170 F.2d 495; Link v. Receivers of Seaboard Air Line Railway Co., 4 Cir., 1934, 73 F.2d 149; Beatty v. United States, 8 Cir., 1951, 191 F.2d 317; Dargel v. Henderson, Em.App. 1952, 200 F.2d 564; Fancher v. Clark, D.C.1954, 127 F.Supp. 452; Connett v. City of Jerseyville, 7 Cir., 1938, 96 F.2d 392.

The situation with relation to Section 666 is different than any of the other statutes wherein the United States has consented to be sued, such as the Tort Claims Act, 28 U.S.C. §§ 1346, 2671

31. The Supreme Court has said that such statutes are to be construed, "with that conservatism which is appropriate in the case of a waiver of sovereign immunity". United States v. Sherwood, 1941, 312 U.S. 584–590, 61 S.Ct. 767, 771, 85 L.Ed. 1058. The Supreme Court has also taken note of the general relaxation of the rules of waiver of sovereign immunity. Federal Housing Administration, etc. v. Burr, 1940, 309 U.S. 242, 60 S.Ct. 488, 84 L. Ed. 724; United States v. Shaw, 1940, 309 U.S. 495–501, 60 S.Ct. 659, 84 L.Ed. 888; Canadian Aviator, Ltd. v. United States, 1945, 324 U.S. 215–222, 65 S.Ct. 639, 89 L.Ed. 901. And where jurisdiction was clear, recovery has been allowed, despite procedural objections. United States v. Aetna Casualty & Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L. Ed. 171; United States v. Yellow Cab Co., 1951, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523; Dalehite v. United States, 1953, 346 U.S. 15, 31–32, 73 S.Ct. 956, 97 L.Ed. 1427.

et seq., Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and the "sue and be sued" agencies of the government. This statute must be read in light of, and construed with reference to, the previous Acts of Congress which recognized the rights of individuals against the United States under State law, and the obligation of the United States to abide the State law with reference to water rights as contained in the Reclamation Act of 1902, as amended, and others.[32]

 As conclusively settled by the Gerlach case, supra, the Central Valley Project and all the works involved in the instant suit are being undertaken and operated under the Reclamation Act. The various Acts of Congress authorizing the Central Valley Project, 50 Stat. 850, 54 Stat. 1198, 63 Stat. 852, 64 Stat. 1036, contain declarations by Congress of the recognition of substantive vested rights according to the law of the State where the project is situated, by making the Reclamation Act applicable. Section 666 does not disturb, by enlargement or restriction, the obligations of the United States or the vested substantive water rights of parties under California law, which had theretofore been specifically recognized by Congress in the Reclamation Law and other Acts of Congress.

In Keifer & Keifer v. Reconstruction Finance Corporation, 1939, 306 U.S. 381, at page 394, 59 S.Ct. 516, at page 520, 83 L.Ed. 784, the Court held with relation to the waiver-of-immunity statute concerning the Reconstruction Finance Corporation, that in ascertaining the Congressional will, the Court was not limited to the single statute, and said, to do so "is to impute to Congress a desire for incoherence in a body of affiliated enactments and for drastic legal differentiation where policy justifies none. A fair judgment of the statute in its entire setting relieves us from making such an imputation of caprice."

The difficulty has been that, through all the years since the declaration by Congress of the recognition of existing vested rights as against the United States in the Reclamation Act and others, there was no means of enforcing those rights, except by equity suits against officials of the United States, without joining the United States as a party and without having any conclusive adjudication upon the United States. *Obviously, the very purpose of this statute on its face was to provide a remedy and a procedure where these previously Congressionally recognized vested rights could be litigated as against the sovereign, and result in a judgment which would be res judicata upon the United States.*

As so aptly stated by the Senate Committee Report, No. 755, 82nd Cong., 1st Sess. Sen., on Senate Bill 18, now 43 U.S.C.A. § 666:

"Down through the years the courts of the respective states marked out the pathway whereby order was instituted in lieu of chaos. Rights were established, and all this at the expense, trial and labor of the pioneers of the West, without material aid from our United States government until a much later time when irrigation projects were initiated by Congress through the Department of the Interior, and later, the Bureau of Reclamation. Even then, Congress was most careful not to upset, in any way, the irrigation and water laws of the Western States. In 1902, Congress wrote into the Federal Reclamation

---

32. Such as the Act of July 26, 1866, 14 Stat. 251; the Act of July 9, 1870, 16 Stat. 217; the Desert Land Act of 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq.; the Timber Land Act of March 3, 1891, 26 Stat. 1101, 43 U.S.C.A. § 946; the Federal Water Power Act of 1920, as amended, 16 U.S.C.A. § 791A, etc.; The Reclamation Act of June 17, 1902, 32 Stat. 388; the so-called Central Valley Re-authorization Act of August 9, 1937, 50 Stat. 564, and of August 26, 1937, 50 Stat. 844; the Flood Control Act of October 17, 1940, 54 Stat. 1198; the Flood Control Act of December 22, 1944, 58 Stat. 887; The Raker Act of 1913, 38 Stat. 242.

Act a strict admonition to the Secretary of the Interior, * * *. It is most clear that where *water rights have been adjudicated by a court and its final decree entered, or where such rights are in the course of adjudication by a court, the court adjudicating or having adjudicated such rights is the court possessing the jurisdiction to enter its orders and decrees with respect thereto and thereafter to enforce the same by the appropriate proceedings.* * *. * Unless Congress removed such immunity by statutory enactment, the bar of immunity from suits still remains, and any judgment or decree of the State court is ineffective as to the water rights held by the United States. Congress has not removed the bar of immunity even in its own courts in suits wherein water rights acquired under State law are drawn into question. The *Bill (S. 18) was introduced for the very purpose of correcting this situation and the evils growing out of such immunity.* * * * If a water user possessing a decreed water right is immune from suit and proceedings in the courts for the enforcement of valid decrees, then the years of building the water laws of the Western States in the earnest endeavor of their proponents to effect honest, fair and equitable division of the public waters will be seriously jeopardized. If such a condition is to continue in the future, it will result in a

throw-back to the conditions that brought about the enactment of statutory water laws." [33]

Clearly, the statute was intended to be and is remedial and procedural, and provides a remedy to enforce against the United States existing substantive water rights required to be recognized for years by previous Congressional Acts.

▋ Language of the section is also peculiarly apt in indicating an intention to permit the United States to be joined in a pending suit. Consent is given to *join* the United States as a defendant *in any suit.*

In Ex parte Collett, 1949, 337 U.S. 55–58, 69 S.Ct. 944, 946, 93 L.Ed. 1207, the Court construed " 'any civil action' " in 28 U.S.C. § 1404(a) to include pending actions. In National Labor Relations Board v. Pittsburgh S. S. Co., 1951, 340 U.S. 498, at page 500, 71 S.Ct. 453, at page 455, 95 L.Ed. 479, after final board order, the reviewing power of the United States Courts of Appeal was enlarged, as to which the Court said: "that the scope of the court's reviewing power was governed by the legislation *in force at the time that power was exercised* even though the Board's order antedated such legislation." Citing United States v. Hooe, 3 Cranch. 73, 79, 2 L.Ed. 370.

The holding in United States v. Sherwood, 1941, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058, that parties could not be joined under the Tort Claims Act is not applicable here. The Tort Claims Act contains no language similar to the language here which specifically states that

---

33. All of the hearings on S. 18, as well as the Congressional Record references, have been examined. Without re-stating them at length, it is sufficient to say that they support the conclusions herein reached. Special Assistant to the Attorney General, William H. Veeder, appeared before the Senate Committee in opposition to the Bill. The Department of Justice and the Department of the Interior formally filed objections to the Bill. The Committee Report particularly noted the objections, and. concluded: "That the legislation is meritorious." One objection urged by Mr. Veeder to the Committee was that the legislation was not needed because the United States would work out an "amicable adjustment" or "settle those rights," to which the reply of Senator Watkins was: "You say that you can settle amicably these matters. Why is it they are willing to settle amicably? *Because you have them over the barrel. They can't take you anywhere else. They can't go into court and fight for their rights. They have to take what you give them.* Of course you can work out a settlement if you have a fellow who hasn't any weapons to fight with."

consent is given to "join" the United States as a defendant.

██ The holding in the Sherwood case that the Federal Rules of Civil Procedure did not enlarge the jurisdiction granted by a waiver statute cannot be challenged. Rule 82, Federal Rules of Civil Procedure, provides that the Rules shall not be construed to extend or limit the jurisdiction of United States District Courts.

██ Do the Federal Rules of Civil Procedure apply in this case? [34] Inasmuch as Section 666 from its comprehensive language and from the legislative history permits joinder of the United States in pending suits, it is clear that application of the Federal Rules of Civil Procedure relating to joinder does not limit or extend the jurisdiction conferred by Section 666. An awareness of the decisions of the Supreme Court must be imputed to Congress—Cary v. Curtis, 1845, 3 How. 236, 44 U.S. 236–239, 11 L.Ed. 576; White-Smith Music Pub. Co. v. Appollo, 1908, 209 U.S. 1–14, 28 S.Ct. 319, 52 L.Ed. 655; Shapiro v. United States, 1948, 335 U.S. 1–16, 68 S.Ct. 1375, 92 L.Ed. 1787— and in view of this imputation, it is evident that by the use of the word "join" and of the words "any suit" in Section 666, Congress intended to avoid any possible restriction on the waiver of sovereign immunity, which might derive from United States v. Sherwood, supra, and similar cases which construed waiver statutes not containing such language.

The rules do apply and provide the procedural mode and time for the exercise of that jurisdiction. They apply to all civil actions, Rule 1, except those stated in Rule 81. Rule 81 does not except suits to which the United States is a party. Rules 4, 12, 13, 25, 37, 39, 45, 54, 55, 62 and 65 expressly make provision for the situation where the United States is a party as either plaintiff or defendant. Notes of Advisory Committee—28 U.S.C.A. following Rule 81.

██ Rules 18, 19, 20 and 21 were designed for the purpose of avoiding multiple litigation and liberalizing the right to join parties.

██ By Rule 21, parties may be added or dropped by order of the court on motion of any parties or on its own initiative at any stage of the action and on such terms as are just. Rule 21 thus imposes upon the court the duty of exercising judicial discretion as to the time of joinder.

██ Testing then whether or not the joinder of the United States constituted a proper exercise of discretion in this instance, the court is at once confronted with the command of Rule 1 that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." It can be readily seen that it would have been neither speedy, nor just, nor inexpensive [35] to any of the parties to this action to have required the re-filing of this suit after the passage of Section 666, and re-litigating all the matters that were covered prior thereto. Especially is this so where, as here, the Special Assistant to the Attorney General of the United States, acting under instructions from the Attorney General of the United States, conducted the main defense to the action and was present on all proceedings prior to the joinder. The various officials and employees of the Bu-

34. United States v. Sherwood, supra, was decided in 1941, after the promulgation of the Federal Rules of Civil Procedure but before the revision of the Judicial Code in 1948.

Amendment No. 61, S.Rept. 1559, 80th Cong., 2nd Sess., which reported the 1948 revision, is significant in that it states the reason for omission of proposed Section 2676 (formerly 28 U.S.C.A. § 932) making the Federal Rules of Civil Procedure specifically applicable to Tort claims actions, on the ground that the Federal Rules of Civil Procedure "apply to all civil actions."

35. An affidavit in the case shows that plaintiffs have expended in excess of $60,000 in costs and witness fees alone. The cost to the government and States and Districts must have been equally as great, or greater.

reau of Reclamation were in attendance at all stages of the proceeding. The case had been conducted for defendant officials at the expense of and by the United States.

In Helene Curtis Industries v. Sales Affiliates, D.C.S.D.N.Y.1952, 105 F.Supp. 886, 900, 2 Cir., 199 F.2d 732, the Court stated a test of discretion in making a joinder under Rule 21 to be: "Will it prejudice the non-moving party? Will it serve to avoid multiplicity of suits?"

Clearly, the joinder does not prejudice the United States or any other party to the suit and clearly, the joinder will avoid a multiplicity of suits.

As stated by the Court of Appeals for this Circuit in the 1954 Prohibition proceedings, 9 Cir., 213 F.2d 818, at page 824: "The fact that 210 days have been spent in trial need not be considered a total loss because of the added party-defendant. Unquestionably, much statistical and expert engineering evidence already taken can be accepted as evidence in the case by the United States, not only because of the eminence and credibility of the witnesses, but because there is a close relationship between the issues appertaining to the bureau officials and the United States; and because a government attorney has been at the counsel table continuously representing the bureau officials. The United States as a named party may desire to add to testimony already taken and cross-examine the witnesses, and these matters rightfully belong to the sound discretion of the trial court under the cooperation of able and earnest counsel. *Realistically, if not technically, the basic issue that has consumed the 210 trial days has always been the claim of the plaintiffs that they have been and are being deprived by the government of the United States of the use of water to which they are legally entitled.* [Emphasis supplied.] In the beginning the case was envisioned as being much broader than a tort action against individuals, since the Secretary of the Interior and the Commissioner of the Bureau of Reclamation of the United States, among other United States government officials, were named parties defendant. We are not prepared to say that a very late order adding parties defendant may not in some circumstances affect our appellate powers, but we are prepared to say that our appellate action upon any decision in the instant case without the United States as a party would solve no basic issue involved and would be next to useless. Actually, our appellate powers over the real issue will be aided by the order of the trial judge as to which the United States is complaining."

In Mullaney v. Anderson, 1952, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458, the Supreme Court permitted the joinder of parties, even after an appeal was taken and while the case was pending before the Supreme Court.

In Lewis v. Darling, 1853, 16 How. 1–8, 14 L.Ed. 819, the Supreme Court held that even upon appeal, an order may be made for the cause to stand over, with liberty to the plaintiff to amend by adding proper parties. See also Curtis v. North American Indian, 9 Cir., 1922, 277 F. 909–912; Noonan v. Caledonia Gold Min. Co., 1887, 121 U.S. 393, 7 S. Ct. 911, 30 L.Ed. 1061.

In view of the broad language of the statute, the time taken and cost to the parties, the assertions of "title" to, and rights to the use of, water in the United States, and all of the pleadings and evidence in the case, the Court deems it would have been a gross abuse of discretion not to have joined the United States, and as such, reversible error. If the case proceeded to appeal without joinder, and were reversed on that ground, there is little doubt but that there would have been a remand to this Court to join the United States, and proceed precisely in the fashion which the Court did proceed after the order of joinder and after the dismissal of the 1954 Extraordinary Writ proceedings.

For all practical purposes, there has been no retrospective application of the statute. After the order of joinder, the United States was served with summons and the Complaint as amended and sup-

plemented to that date, under the terms of the statute—43 U.S.C.A. § 666—and the Federal Rules of Civil Procedure. The Attorney General of the United States and the United States Attorney were thereafter served with all previous pleadings of plaintiffs and with all subsequent amendments and supplements to the Complaint, and with all notices of motions or other proceedings which were thereafter had. They were served with the Motion to Re-open the trial and did not appear and did not object. They were served with the Order fixing the date of the re-opened trial. There had been present at all previous proceedings a Special Assistant to the Attorney General of the United States, duly authorized to appear in the proceedings, who participated extensively and fully in the trial and in all other matters and proceedings. By the Order to Re-open, the United States and defendant officials were given an opportunity to appear at the re-opened trial and object to the introduction against it or them of any or all of the previously admitted evidence, to examine and cross-examine any previous witnesses and to introduce new evidence. But neither the United States nor the defendant officials did so. The plaintiffs either produced or offered to produce all of the witnesses who had testified on behalf of the plaintiffs and of the plaintiffs in intervention. Thus, the proceedings had after the joinder were for all practical purposes the same as if the suit had been filed anew after the passage of the statute.

The Court concludes that the United States was properly and lawfully joined as a party defendant under the terms of 43 U.S.C.A. § 666 and the Federal Rules of Civil Procedure, and that by such joinder the Court obtained jurisdiction over the United States, and did not lose jurisdiction of the res or of the subject matter of the action, or of the defend-

ant officials, or of the defendant districts, or of the intervenor, the State of California.

The conclusions herein reached are not only in consonance with the text and legislative history of the statute, but also with the Constitution. Instead of invading the executive and legislative powers, they give due credence to the Constitutional framework which also includes the judicial power. The statute provides a forum where the rights—water rights, the basis of life in the West—as affected by the vast dislocation and changes of the monumental Central Valley Project and its units, may be determined impartially under rules of law by the judiciary with the safeguard of Appellate review, instead of by the untrammeled discretion and unreviewable decision of individual officials who assert the right to determine finally and conclusively what those rights are and how much water they will need and when they may have it. To use the expression of Senator Watkins at the Committee Hearings on S. 18 (FN 33, ante, page 75), it prevents the United States from putting the tens of thousands of owners of water rights in the State of California who are affected by the Central Valley Project "over a barrel."

## IX.

### Default Against United States.

Plaintiffs made timely motion for judgment by default against the United States. And while the defendant officials had answered previous pleadings and been present by counsel throughout the trial and all proceedings prior to July 12, 1954, plaintiffs' counsel apparently considered their failure to answer the last amendment and supplement to Complaint of August 10, 1954, and their failure to be represented by counsel after July 12, 1954,[36] as requiring a motion

36. On December 3, 1954, at the pretrial hearing and again on December 7, 1954, at the commencement of the reopened trial, B. Abbott Goldberg, Deputy Attorney General of the State of Califor-

nia, attempted to enter an appearance on behalf of the defendants who are officials of the United States. Upon inquiry (Tr. 22,973, et seq. and 23,408, et seq.) it developed he had no personal

for default against them as well, which was timely made.

In one of the "Suggestions" filed by the Attorney General of the United States, it is contended that no pleading was directed to the United States.[37] If by this assertion it is meant that the United States is not properly a party because it has not been *named* as a party, or a claim for relief is not stated against it, then the point is without merit. In the first place, the granting of the Motion *joined* the United States as a necessary party, under Section 666 of Title 43, United States Code Annotated, and Federal Rules of Civil Procedure, Rules 19 and 21. When it was *joined* as a party it was named as a party. The United States was served with Summons and Complaint as required by the Statute. As heretofore pointed out, the joinder was made in order that complete relief on the evidence and pleadings, as they then stood, might be given between those who were already parties. The Complaint, as then amended, stated a claim for relief against the defendant officials and the defendant districts, and under the then pleadings *and evidence in the case,* the United States was a necessary party to complete relief. In any event, the plaintiffs in the amendment and supplement to the Complaint filed August 10, 1954, stated a claim for relief as a separate cause of action under 28 U.S.C. § 2201, The Declaratory Relief Act, against the United States and all the other defendants; and among other allegations therein, it incorporated all of the allegations of the plaintiffs' original Complaint and the previous amendments thereto. The United States is specifically named a defendant herein in the caption of the Complaint. The last amendment and supplement to the Complaint of the plaintiffs, of August 10, 1954, sets forth the controversies concerning the respective rights of the parties. It was served as required by the Statute and by the Federal Rules of Civil Procedure, its prayer is for declaratory judgment as to the respective rights of the parties, including the United States, for imposition of plaintiffs' plan of physical solution, for the injunc-

---

authority from any of them, but was depending for such authority on a letter and a telegram from the United States Department of Justice, signed by one J. Lee Rankin, "Assistant Attorney General, Office of Legal Counsel." Upon further inquiry it developed that Mr. Goldberg, was not an Assistant United States Attorney, Assistant Attorney General of the United States, Special Assistant to the United States Attorney General, and neither an employee of the United States Department of Justice, nor an official of the United States, and was a sworn official of the State of California, and had not taken an oath as a United States official.

In light of the requirements of Title 5 U.S.C.A. §§ 8, 16, 306, 309, 312 and 315, and Title 28 U.S.C.A. §§ 502, 503, 504, 505 and 507, and the Opinion of the Attorney General of the United States, 19 Op.A.G. 219–221 (1889), the Court declined to recognize Mr. Goldberg as appearing for said parties.

The Court also based its ruling on the proposition that a lawyer cannot represent interests which are, or may be, adverse. "Even a state, when she voluntarily becomes a complainant in a court of equity, cannot claim to represent both sides of a controversy." State of Minnesota v. Northern Securities Co., 1902, 184 U.S. 199, at page 246, 22 S.Ct. 308, at page 326, 46 L.Ed. 499. In this case the assertion is made that the United States owns the fee title to the water, which is contrary to the claim of the State in its Answer, and which has, at one time or another, been asserted by the State, the Districts, and the plaintiffs to be contrary to the constitutional provisions of the State of California and the California Water Code. Mr. Goldberg contended in December, 1954, that there is no conflict of interest between the State and the United States. But it is impossible to see how one could concede that the United States holds *fee* title to the water of the State, and at the same time contend that such holding was not in conflict with the provisions of the California Constitution and laws, and was a mere trusteeship, when such trusteeship is not admitted.

37. In this connection, reference is made to a similar statement by the Court of Appeals in its Opinion in the 1954 Writ proceedings—213 F.2d 818, at page 823.

tive processes of the Court to enforce any such judgment, and for such other relief as is proper.

■ The complaint, as thus amended and supplemented, plainly and clearly stated a claim for relief against the United States and the other defendants, and plainly and clearly was directed *to* the United States and all the other defendants.

As noted, no responsive pleading was filed in the name of the United States to that (or any other) pleading. And no Answer or other responsive pleading was filed thereto by the defendant officials. No motion to strike or dismiss the same was ever filed by either the United States or the defendant officials.

In a "Suggestion" filed on December 6, 1954, by the Attorney General of the United States on behalf of the United States, the contention was made that this Court had no jurisdiction, and should enter a judgment of dismissal as to the United States, and "in the event, however, a judgment is entered, that it should be limited to the issues, if any, *set forth in the pleadings and Complaints in Intervention.*"

The same thing, in slightly different language, was contained in the Suggestion filed December 13, 1954, by the Attorney General of the United States "In regard to motion to default, the United States of America." After again objecting to jurisdiction over both the United States and the defendant officials that "Suggestion" states: "Accordingly, this Court is respectfully requested to take into consideration in any disposition which is made of the Motion to Default the

United States of America, the fact that any judgment in default must necessarily be limited to the pleadings, if any, *and the prayer for relief which are purportedly directed to and against the United States of America;* that the disposition of said Motion to Default be strictly within the Federal Rules of Civil Procedure." The United States thus concedes that the pleadings were directed "to and against the United States."

■ The provisions of Federal Rules of Civil Procedure, Rule 8(d), that averments in a pleading, not denied, are admitted, apply as well to the United States and the defendant officials as others, except that where there is a default, such as here, the provisions of Federal Rules of Civil Procedure 55(e) require that a plaintiff must establish his claim or right to relief by evidence satisfactory to the Court.

The text of Federal Rules of Civil Procedure 55(e) is as follows:

"(e) Judgment Against the United States. No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

The notes of the Advisory Committee on Rules, after calling attention to 28 U.S.C. former Section 763, has the following to say: "As this rule governs in all actions against the United States, U.S.C.A., Title 28, former § 45 * * * and similar statutes are modified in so far as they contain anything inconsistent therewith." [38]

---

38. Neither of the two cases cited to Rule 55(e)· are in point. United States v. Geisler, 7 Cir., 1949, 174 F.2d 992, certiorari denied 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 528, simply held that a motion to set aside judgment three years after the judgment had been made was not such a proceeding as was contemplated by Rule 55(e) so as to permit a judgment by default against the United States. United States v. Reynolds, 3 Cir., 1951, 192 F.2d 987, reversed 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, was a case which turned on whether or not a judgment for default against the United States was entitled to be entered upon the basis of the presumption that documents failed to be produced, would be against it when the government failed to produce the documents in question. The court simply held that such a ruling did not amount to a judgment by default on the basis required by Rule 55(e) that the claimant must establish his claim or right to relief by evidence satisfactory to the court.

■ As heretofore noted, every opportunity has been given to the United States to appear and contest any of the facts or legal positions asserted by the plaintiffs. At the re-opened trial the plaintiffs not only offered to produce all the witnesses called by plaintiffs, but did produce many who re-asserted all their previous testimony with some slight modifications, and all evidence, testimony and every exhibit theretofore admitted was re-introduced and admitted, without objection, against the United States and the defendant officials. There has thus been strict compliance with the Rules to support by satisfactory evidence any judgment which may be entered in the instant case against the United States and against the defendant officials.

■ In one of the "Suggestions" filed by the Attorney General (December 6, 1954), and in one of the Extraordinary Writ proceedings, it was stated that the United States "rejects the record" made in the case in its entirety. If the United States is properly joined as a party, as it is in this case, it becomes a judicial question as to whether or not the record applies to the United States. That question was resolved against the United States when, at the re-opened trial, all of the previous records, testimony, exhibits and other evidence were admitted against the United States and the substituted defendant officials, as well as the evidence and testimony produced and taken on the re-opened trial.

The answers filed by defendant officials were prepared by or under the authority of the Attorney General of the United States, the same law officer required by law to represent the United States. It is difficult to see how any defenses could be or could have been raised on behalf of the United States that were not raised in the Answers of the defendant officials and put in issue on the trial.[39]

No suggestion is made either as to how any other or different evidence could have been produced, or how the trial would have been conducted any differently if the Special Assistant to the Attorney General who appeared in all proceedings in this court, and so ably conducted the trial to July 1953, had been also authorized to appear for the United States as well as the defendant officials.

■ In this connection, it must be kept in mind that an appearance by the United States Attorney, the Attorney General, or Special Assistant to the Attorney General in the trial of any case to which the United States is a party, is not under the same hazard as a private lawyer who chooses to default and not to participate in a lawsuit on behalf of his client. In such case, the private individual hazards the consequences of a judgment for which he alone is responsible, and his counsel is under no public duty to represent his client, such as is required, by Statute, of the Attorney General and the United States Attorney in all civil suits in which the United States is a party. More important, no jurisdiction can be admitted to exist, in any event, over the United States by filing an Answer, or participation by the Attorney General or the United States Attorney in a lawsuit in the name of the United States—State of Minnesota v. United States, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235—as such jurisdiction can only be obtained by a waiver of sovereign immunity by Stat-

---

39. In Noonan v. Caledonia Mining Co., 1887, 121 U.S. 393, 7 S.Ct. 911, 30 L.Ed. 1061, the court held that where no Answer was filed to an amended Complaint filed after judgment, asserting new interests against a party who had participated at the trial, the defendant should have insisted upon the right to file a formal answer if he desired, and that inasmuch as he did not do so, "He was probably satisfied with the answer of his co-defendant on file, which put in issue the plaintiff's title, and set up all that he could have pleaded for himself. He had on the trial all the benefits of the most formal answer, and his connection with the case as a party sufficiently appears from the amendment filed." 121 U.S. at page 400, 7 S.Ct. at page 914.

ute such as 43 U.S.C.A. § 666. Defenses can be interposed by Answer. Complete participation in the trial can be had; and the lack of sovereign consent still be available to the United States on appeal. Failure of the United States to answer or participate in the re-opened trial could thus be interpreted only as meaning that the United States, in standing on its objection to jurisdiction, under 43 U.S.C.A. § 666 admits that it would make no other record on trial or answer than that made by the defendant officials. In short, the United States, by failure to plead and appear, is bound by the record as made and will be bound by default judgment against it inasmuch as 43 U.S.C.A. § 666 permits joinder of the United States.

It is to be kept in mind that the Statute which permits the joinder of the United States as a party places the United States in the same position as if they were a private person. And, giving every intendment to the rules of strict construction of a waiver of sovereign immunity, but at the same time having in mind the text and purposes of Section 666 of Title 43 United States Code Annotated, it is concluded that this court has the power, in this case, to enter a judgment by default against the United States in view of the failure of the United States to plead and to appear at the re-opened trial, and against the defendant officials in view of their failure to plead to the last amended and supplemental Complaint, and to appear at the trial as re-opened and tried.

Whether or not the plaintiffs' claims and rights to relief have been established by evidence satisfactory to the court is a matter which is considered separately.

## X.

### Eminent Domain.

While it is asserted that the water is impounded and diverted by the United States and its officials, as of right, either by prescription, appropriation, public use, or the "purchase and exchange," contracts of Miller & Lux, or by a combination of them, or some of them, the assertions all involve the application of substantive California law, and will be considered in connection with that subject.

The immediately following discussion concerns the all-embracing claim that the United States has taken *all* the rights of plaintiffs, whatever they are, through the exercise of its power of eminent domain. If this contention is correct, that would end the matter, and plaintiffs could only recover compensation by way of damages for such rights.

In this discussion it must always be kept in mind that the Court is here concerned with whether there has been a *lawful taking of water rights* and *not merely whether there has been a taking of physical possession* of the property in which those rights are claimed.

Nor are these plaintiffs and their class in the position of one who, by bringing suit for just compensation for that of which there has been a physical taking, thereby elects to affirm that physical taking and convert it into a taking of his rights by seeking only compensation. In United States v. Great Falls Mfg. Co., 1884, 112 U.S. 645–656, 5 S.Ct. 306, 28 L.Ed. 846, the Court held that a party may waive any objection he may be entitled to make based upon the want of formal proceedings, and elect to regard the action of the sovereign as a taking under its right of eminent domain, and demand compensation. *That is what the claimants did in the Gerlach cases. The plaintiffs in this case have not done so, but have and are insisting upon their rights to the use of water consistent with the applicable Federal and State laws.*

The same principle is approved in Great Falls Mfg. Co. v. Attorney General, 1880, 124 U.S. 581–598, 8 S.Ct. 631, 31 L.Ed. 527; Juragua Iron Co. v. United States, 1909, 212 U.S. 297–313, 29 S.Ct. 385, 53 L.Ed. 520; See, also, United States v. Rogers, 8 Cir., 1919, 257 F. 397–399; Snowden v. Ft. Lyon Canal Co., 8 Cir., 1916, 238 F. 495, 498.

Here, there are non-acquiescing plaintiffs who assert that whatever physical invasion there may have been of their property rights, those rights were not acquired by the Government by any lawful exercise of the power of eminent domain. The question is, has there been a *lawful* taking of rights by the power of eminent domain despite the lack of consent of the owners thereof.

As heretofore noted, the defendant officials contended, on Motion to Dismiss in 1950, that the Statutes under which the United States had built Friant Dam and the appurtenant works found their constitutional validity in the power of Congress to regulate navigable rivers and control floods under the Commerce clause of the Constitution, and that as a necessary consequence, the plaintiffs had no rights to either water or damages.

The same matters set forth in the Motion to Dismiss, upon which the above contentions were made, are again raised as separate defenses in the Answers filed by defendant officials. And while the same contention is not spelled out in the briefs filed by the defendants, it is impossible to determine whether or not the defendants have abandoned that position.

Whether they have or have not, the matter was decided adverse to such contentions in the prior decision of this Court—90 F.Supp. 773—to which conclusions therein on the subject the Court now adheres. But if there were any doubt about it, the matter was completely set at rest by the Supreme Court in the Gerlach Live Stock Co. case, 1950, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, which held that Friant Dam and the works here involved were not constructed as an improvement of navigable waters under the Commerce clause, art. 1, § 8, Cl. 3, but that the construction and operation of the Dam and works, and the acquisition of all property and water rights therefor was and is subject to the basic Reclamation Act of 1902, as amended.

Such holding makes inapplicable United States v. Lynah, 1902, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; Hurley v. Kincaid, 1932, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637; and similar cases relied on by defendants which dealt with the exercise of the power of Congress under the Commerce clause in works upon navigable rivers. Such cases involved damage to property which, when acquired or when the improvement was made by the U. S., was always subject to the dominant servitude of the sovereign to regulate navigation or control floods under the commerce clause, United States v. Kansas City Life Ins. Co., 1950, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277. In none of such cases was there applicable an Act of Congress, such as the Reclamation laws with the requirement that private water rights shall be measured by State law and when taken by the U. S. shall be taken by *judicial proceedings in eminent domain.*

It is thus unnecessary to give further consideration to such contentions.

It is asserted by the defendant officials that the United States owns the physical properties known as Friant Dam and its appurtenant works.

As to this, there can be no question.

Owning the Dam and appurtenant works, and thus being in a position of *physical power* to cut off the plaintiffs' water, does not by itself give any right to impound and divert the water. As to this, it is claimed that the United States *owns* the *"fee simple title to all rights to the use of water"* involved in this case, *which rights were taken by the United States through the exercise of its power of eminent domain.*[40]

---

40. The present position of the State of California and the defendant districts is not clear. In their pleadings no such assertion is made, and from time to time they have asserted that the United States derived whatever rights it has to divert and impound the water solely from and under State law. But in the final briefs filed, the briefs in the two Extraordinary Writ proceedings are incorporated by reference. And in the brief filed by the State of California in the 1954 Writ pro-

It is impossible to determine from the briefs and pleadings and evidence just *when or how* such rights are contended by defendants to have been taken. It is thus necessary to explore the question.

The controlling issue is whether formal judicial proceedings are necessary to the acquisition by eminent domain of the rights of these plaintiffs. Sub-issues or included issues are formed by the contentions of the defendants that the enactment of legislation authorizing the Central Valley Project was an *ipso facto* taking; that the impounding and diversion of water was a taking of rights to the use of that water; and that the Secretary made an informal taking by either his Feasibility Report or by a letter purportedly disclosing an exercise of the power. It can readily be seen that each of these contentions is merely another way of saying that formal proceedings were unnecessary. However, each of these will be examined in disposing of the over-riding issue as to whether formal proceedings in condemnation were required.

The basic "Reclamation Act" was adopted in 1902, 32 Stat. 388, now integrated in 43 United States Code Annotated. It has been amended and supplemented many times.[41] The two basic applicable provisions of the Reclamation Act of 1902, Sections 7 and 8, have remained unchanged since their original adoption. And the purpose of Congress not to deviate therefrom, or from the principles set forth therein, has been reasserted many times.[42]

Section 7 and Section 8 of the basic Reclamation Act (now 43 U.S.C.A. §§ 421, 372, and 383) read as follows:

"Sec. 7. That where in carrying out the provisions of this Act it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby *authorized to acquire* the same for the United States by purchase or *by condemnation under judicial process,* and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney-General of the United States upon every application of the Secretary of the Interior, under this Act, *to cause proceedings to be commenced for condemnation* within thirty days from the receipt of the application at the Department of Justice.

"Sec. 8. *That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws,* and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate

---

ceedings in the United States Court of Appeals, the State of California asserted that the United States had acquired the water rights necessary for the project by, among others, the "exercise of its power of eminent domain." The defendant districts, except the South San Joaquin Municipal Utility District, in a concurrent petition to the Court of Appeals at the same time, asserted the United States "has taken" all the water rights.

41. The Supreme Court in United States v. State of Arizona, 295 U.S. 174, at page 181, 55 S.Ct. 666, 79 L.Ed. 1371, collected in Footnote 3, the amendatory and supplemental Acts to that date.

It is to be noted that the Act of June 25, 1910, 36 Stat. 835, 43 U.S.C.A. §§ 400, 413, was there held by the Supreme Court to be an amendment and supplement to the basic Reclamation law.

42. The present Congress in its 1st session, made such requirements in Public 130, Ch. 271, approved July 4, 1955, 43 U.S. C.A. § 421a et seq.; Public 226, Ch. 548, approved August 4, 1955, 43 U.S.C.A. § 321 note; Public 374, Ch. 860, approved August 12, 1955, 69 Stat. 697; and Public 386, Ch. 872, approved August 12, 1955, 69 Stat. 719.

stream or the waters thereof: Provided, That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

The evidence shows conclusively that the plaintiffs have rights to the use of water. The nature, character, and extent of those rights are dealt with elsewhere.

■ The right to the use of water is *property*. It is part and parcel of the land. United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, and cases cited and collected in D.C., 90 F.Supp. 773.

Section 7 of the Reclamation Act, as above noted, requires that when it is necessary to acquire any rights or property, the Secretary of the Interior is *"authorized to acquire the same for the United States by purchase or by condemnation under judicial process"*.[43]

From the text of this section it cannot be denied that the Secretary of the Interior has been granted the discretion to exercise the power of eminent domain on behalf of the United States by appropriate judicial proceedings. But in order to take water rights for a reclamation project it is clear that it must be done in judicial proceedings. Has the Secretary of the Interior taken any *judicial* proceedings to condemn any right to impound or divert the water at Friant Dam? The answer is definitely that neither he nor the United States has done

so. No judicial proceedings of any kind have been taken by the United States or by the Secretary of the Interior at any time, either before or since the filing of this suit, to condemn any rights to impound or divert water at Friant Dam.

■ The contention that Acts of Congress dealing specifically with the Central Valley Project themselves constituted an exercise of the power of eminent domain by Congress, and that by, and upon, the passage of the Acts a "taking" by eminent domain was ipso facto effected is without merit.

Although previous Acts of Congress had made appropriations for the Project, D.C., 90 F.Supp. 791, Appendix A, 1 to 31, the defendants seem to regard Section 2 of the Act of August 26, 1937, 50 Stat. 844–850, as the most important one.[44]

The applicable provisions of the Act of August 26, 1937, so far as here concerned, are "That the entire Central Valley Project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, Fiscal Year 1936 (49 Stat. 1622), is hereby reauthorized * * *; Provided further, That, except as herein otherwise specifically provided,[45] the *provisions of the reclamation law, as amended, shall govern* the repayment of expenditures and *the construction, operation, and maintenance* of the dams, canals, power plants, pumping plants, transmission lines, and incidental works

---

43. This section is substantially the same as 40 U.S.C.A. § 257, which deals generally with eminent domain.

44. The first clause of Section 2 transferred from the Secretary of War to the Secretary of the Interior the work of channelization of the San Joaquin river between Stockton and Mendota for which $12,000,000 had been recommended in the Rivers and Harbors Committee Report No. 35, 73rd Congress. Section 2 exempted such sum from reimbursement under the Reclamation laws. In view of the fact that the channelization was later abandoned and replaced with the Delta-

Mendota canal, the reference in the Act of 1937, two years after the Feasibility Report of 1935, signifies that the plans for the Delta-Mendota canal as a substitute for the channelization mentioned in the Feasibility Report and Report No. 35 were not approved or authorized by the Act of August 26, 1937. That question is not decided here.

45. The only thing in the Act "otherwise provided" was that the $12,000,000 for channelization of the San Joaquin River from Stockton to Mendota was not reimbursable under the Reclamation laws.

deemed necessary to said entire project, and the Secretary of the Interior may enter into repayment contracts, and other necessary contracts, with State agencies, authorities, associations, persons, and corporations, either public or private, including all agencies with which contracts are authorized under the reclamation law, and *may acquire by proceedings in eminent domain,* or otherwise, all lands, rights-of-way, *water rights,* and other property necessary for said purposes".[46]

Both Section 7 of the Reclamation Act, and the Act of August 26, 1937, only *authorize* the Secretary of the Interior to acquire rights by *condemnation by judicial process,* or as stated in the Act of August 26, 1937, by proceedings in eminent domain. *Neither of said Acts nor any of the other Acts of Congress dealing with the Central Valley Project, in and of themselves, take any rights by eminent domain, or indicate any intention of Congress by the mere passage of said Acts to thereby take them, but*

46. Similar re-authorization is contained in almost identical language in Section 2 of the Act of October 17, 1940, 54 Stat. 1198–99. The Act of October 14, 1949, 63 Stat. 852, reauthorized the Central Valley Project as authorized by the Act of Congress of August 26, 1937, 50 Stat. 850, above quoted, to include the American River Development as described in the Act of October 14, 1949. The Act of September 26, 1950, 64 Stat. 1036, reauthorized the Central Valley Project as authorized in the Act of August 26, 1937, 50 Stat. 844–850 and the Act of October 17, 1940, 54 Stat. 1198–99. Both the Act of October 14, 1949, and the Act of September 26, 1950, again require adherence to the provisions of the Reclamation law.

Other Acts of Congress dealing specifically with the Central Valley Project are collected, and the text of the applicable provisions thereof, are set forth in D.C., 90 F.Supp. 773, page 810 et seq., and will not be repeated here except as reference may be necessary in the discussion.

Most of the Acts are appropriation Acts, as distinguished from Authorization Acts, making appropriations in a lump sum to the Bureau of Reclamation for the Central Valley Project, without allocation of sums to particular units. Some of them do so, however. Only one allocates an appropriation to the Delta-Mendota canal, the Act of December 28, 1945, 59 Stat. 632–647, 90 F.Supp. 773, Appendix 29, at page 822; and only three allocate an appropriation to Friant Dam. They are: The Act of June 22, 1936, 49 Stat. 1597–1622, 90 F.Supp. 773, Appendix 10, at page 813, allocating "$6,000,000 * * [to] Friant Reservoir and irrigation facilities therefrom"; the Act of July 12, 1943, 57 Stat. 451, 90 F.Supp. 773, Appendix 25, at page 819, which allocated specific sums to Friant Dam and Reservoir, Madera Canal and Friant-Kern Canal, and also $200,000 for "examinations, surveys, and water rights"; the Act of December 28, 1945, 59 Stat. 632–647, which made an allocation of a specific sum to Friant Dam and Reservoir and to the Friant-Kern Canal. It is noted that only one Act of Congress mentions Madera Canal, and makes an allocation of a specific appropriation to it—July 12, 1943; and only two mention Friant-Kern Canal, and make a specific appropriation to it—the Act of July 12, 1943, and the Act of December 28, 1945.

Other Acts of Congress are: The Act of August 30, 1935, 49 Stat. 1028–38, which dealt only with the Sacramento River; the Act of July 2, 1942, 56 Stat. 506–536, which made a blanket appropriation to the Bureau of Reclamation Central Valley Project; the Act of July 1, 1946, 60 Stat. 348–367, which made appropriations to the Bureau of Reclamation for general purposes and for designated units of the Central Valley Project, not including Friant Dam, Madera Canal, Friant-Kern Canal, or Delta-Mendota Canal; the Act of December 23, 1947, 61 Stat. 941–944, which likewise made appropriations for general purposes and specific units, not including any of those last above mentioned; the Act of October 14, 1949, 63 Stat. 852, and the Act of September 26, 1950, 64 Stat. 1036, each of which dealt with specific units of the Central Valley Project other than those concerned in the instant case.

The Act of October 14, 1949, dealt with Folsom Dam on the American River, and its appurtenant works. The Act of September 26, 1950, dealt with units in "the Sacramento River Basin only." The two last above-mentioned Acts are the only Acts of Congress making specific reference to any reports or bulletins of the State of California, Bulletin 13 and Bulletin 26. Neither of them was offered in evidence or referred to by the parties, and it is hence concluded they have no bearing on the issues in this case.

*leave such rights to be acquired in the future by condemnation proceedings.*

None of the Acts appropriating money to the Central Valley Project or the specific units covered in the different Acts constitute a legislative taking, and they cannot by any conceivable argument be held to be a repeal of the provisions of the basic Reclamation Act or of the Act of August 26, 1937, which require that property necessary for the Project, including *water rights, be acquired by condemnation proceedings unless the same may be acquired by purchase or exchange.*

■ In Danforth v. United States, 1939, 308 U.S. 271,[47] at page 286, 60 S.Ct. 231, at page 237, 84 L.Ed. 240, the Court held against the contention that there was a taking by the mere enactment of legislation, as follows:

"The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail."

The Ninth Circuit recently considered the question and followed the Danforth case. In Thompson v. United States, 9 Cir., 1954, 215 F.2d 744, 745, an action was brought under the Tucker Act for damages, claiming that the U. S. had appropriated funds for the construction of a dam across the Columbia River and had commenced construction, and that when completed the dam would wipe out the ancient fishing rights guaranteed to the plaintiff by an Indian treaty. The Trial Court dismissed on the ground that from the face of the Complaint it did not appear that the plaintiff had as yet suffered any damage. In affirming the Court said:

"Clearly, the judgment must be affirmed. The Tucker Act does not authorize suit against the United States for anticipated damages in advance of an actual taking. As yet there has been no taking of appellant's property rights or any interest therein. There may never be a taking. The commencement of construction does not necessarily mean that it will be completed. The project may be abandoned. The height of the dam may be changed, and it may be that no damage to plaintiff will result even though it be completed in a modified form. Compare Pitt River Power Co. v. United States, 1942, 98 Ct.Cl. 253; Poinsett Lumber & Mfg. Co. v. United States, 91 Ct.Cl. 264; Danforth v. United States, 308 U.S. 271, 284, 286, 60 S.Ct. 231, 84 L.Ed. 240."

See, also, 23 Tracts of Land v. United States, 6 Cir., 1949, 177 F.2d 967.

It is noted that the Act of August 26, 1937, in addition to making the general provisions of the Reclamation laws applicable, reauthorized the Central Valley Project as "heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622)".[48]

47. This case was brought to the attention of the Supreme Court in the Gerlach case by the briefs of the parties. The Supreme Court did not mention it in its decision. Nothing in the Opinion can be said to modify, or overrule it. Hence, it is still the law.

48. The Emergency Relief Appropriations Act of 1935 above mentioned, (the text of the material provisions of which are found in 90 F.Supp. App., at page 813) made appropriation for $350,000,000 for sanitation, prevention of soil erosion, stream pollution, sea coast erosion, reforestation, forestation, flood control, rivers and harbors and miscellaneous projects. Following that Statute, the President, on September 10, 1935, by Executive Order, made $20,000,000 available for the Central Valley Project, $14,000,000 of which was allotted to Friant Reservoir, with other sums allotted to distribution canals from the Reservoir without describing them.

Again on November 16, 1935, by Executive Order, $14,000,000 was allotted to the Reclamation Service for the Central Valley Project. Whether the Order of November 16, 1935, merely transferred to the Reclamation Service the $14,000,000

The Secretary of the Interior, on November 26, 1935, made a report under the Act of June 25, 1910, 36 Stat. 835–836, 43 U.S.C.A. §§ 400, 413, which report is commonly termed the Feasibility Report. It was approved by direct order of the President on December 2, 1935, which approval was held by the Supreme Court, in United States v. State of Arizona, 1935, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371, to be a necessary prerequisite to the commencement of work on any project under the Reclamation laws.

It would seem, therefore, that the *entire Central Valley Project which was authorized by Congress by the Acts of August 26, 1937, October 17, 1940, October 14, 1949 (two years after this suit was commenced), and September 26, 1950, (three years after this suit was commenced), was the Central Valley Project as described in the Feasibility Report.*

Thus, even if it could, by any process of reasoning, be held that such legislation was itself a taking, the extent of the taking would be limited to that contemplated by the Feasibility Report—which, as will be seen, nowhere indicates that these plaintiffs were to be deprived of water.

The Feasibility Report describes in very broad terms, with a minimum of detail, the general project and the separate units.

The Feasibility Report is set forth in full as Appendix "C", 90 F.Supp. at page 823.

The Feasibility Report contains a general description of the Project in which it is pointed out that the Project will provide urgently needed waters for *"existing agricultural, industrial, and municipal developments* in the San Joaquin Valley", and that the works therein described *"will provide an adequate water supply for all purposes,"* and states that the economic values of the Project are of great magnitude, and *"that the Project will bring into production no new agricultural areas,"* but *"will maintain present values* and civilization." Under the heading, "Engineering Features," it has this to say concerning the units of the project in the Southern end of the Valley:

*"San Joaquin Pumping System—* The works for this pumping system will comprise a dam and other works in Sacramento Delta to divert stored water from Kennett Reservoir through a channel into San Joaquin Delta for salinity control, irrigation and other purposes; dredging of existing channels in the San Joaquin Delta; five dams and pumping plants on the San Joaquin River to mouth of Merced River; and four pumping plants and 65 miles of canal on the westerly side of San Joaquin Valley which will deliver water to Mendota Weir on San Joaquin River, elevation 160 feet. These works will be capable of furnishing a substituted supply of 1,-000,000 acre-feet to 285,000 acres of land now irrigated from San Joaquin River.

*"Friant Reservoir*—A dam, 250 feet high, will be constructed on San Joaquin River, which will store 400,-000 acre-feet of water which will permit the diversion of San Joaquin River water southward at elevation 467 feet. One and one-half million acre-feet annually on the average will be available for transmission from the reservoir through the means of the San Joaquin River Pumping System and the purchase of water rights in the San Joaquin River.

*"Friant-Kern Canal*—The Friant-Kern Canal will extend from Friant Reservoir to Kern River, a distance of 157 miles and will be capable of

---

allocated to Friant Reservoir by the Order of September 10, 1935, is not clear, and is immaterial.

The First Deficiency Appropriation Act of 1936, 49 Stat. 1622, made an appropriation of $6,000,000 to the Bureau of Reclamation for "Friant Reservoir and irrigation facilities therefrom".

serving an area of 1,000,000 acres of developed land.

"*Madera Canal*—The Madera Canal, maximum capacity 1500 second-feet, will extend from Friant Reservoir to Chowchilla River, a distance of 35 miles and will be capable of furnishing irrigation water to an area of 140,000 acres." [49]

In the estimated cost of the Project, an item is contained of $8,000,000 for rights-of-way, *water rights,* and general expenses.

While the Feasibility Report also indicates that with the completion of the San Joaquin Pumping System (now known as the Delta-Mendota Canal) the entire flow of the San Joaquin River will be permitted to be *regulated* at Friant Reservoir, it is to be noted, under the description of "Friant Reservoir" that the total amount annually, on the average available for diversion would be one and one-half million acre-feet from the Friant Reservoir by means of the Friant-Kern Canal and Madera Canal, *which water was* to be made available "*through the means of the San Joaquin River Pumping System and the purchase of water rights in the San Joaquin River.*"

The average annual flow of the river, as hereinbefore noted, is approximately 1,800,000 acre-feet. Thus, taking the most extreme view as to what was intended by the Feasibility Report, it is evident that the entire flow of the San Joaquin River was *not* to be diverted at Friant, but that there would be available for down-river use the difference between 1,500,000 and 1,800,000 acre-feet, or approximately 300,000 acre-feet per year below Friant Dam.

*Neither the Feasibility Report nor any Act of Congress indicates an intent to authorize the diversion of all of the water of the river at Friant.*

The enactment of legislation on the basis of the Feasibility Report cannot be twisted into an ipso facto acquisition by eminent domain by Congress as to the rights of these plaintiffs, particularly in view of the repeated provisions in the Act of Congress dealing with the Project requiring that the Reclamation laws must control the activities of the United States and its officials in the construction and operation of the Project.

Thus it is concluded from the terms of the applicable Reclamation laws and legislation authorizing the Central Valley Project, and particularly Friant Dam and appurtenant works that a taking of water rights of plaintiffs was not intended to be accomplished, ipso facto, by the enactment of legislation authorizing the Project as contained in the Feasibility Report, but for that power to be exercised by the Secretary of the Interior there must be formal judicial proceedings in condemnation. Since there have been no such proceedings, this would ordinarily terminate the inquiry. However, defendants have vigorously urged the Gerlach Opinion as militating against these conclusions. Thus a rather extensive examination of that case would seem to be necessary—to show that the Gerlach case is not contrary to these conclusions, but is in many respects the fountain from which they flow.

That case originated in the Court of Claims under the Tucker Act. The claimants were owners of grass lands below Mendota pool and below the lands of the plaintiffs in Rank v. Krug. Their grass lands received water "only from the very crest of the seasonal stage," during those times when the river overflowed its banks and channels,[50] and flooded the grass lands. Because they

---

49. The Feasibility Report has never been amended or modified, and there has been no subsequent Feasibility Report approved by direct order of the President covering either the Friant Dam unit or Delta-Mendota Canal unit as actually constructed.

50. It is to be noted that the Supreme Court held that the ordinary or "natural" flow of the San Joaquin River included the seasonal flood flows. In this respect the Court, without alluding to them, reached the same conclusion as that reached by California Courts concerning

received water from flooding and not from controlled irrigation, they are known as "uncontrolled" grass lands. It was this characteristic of the river in its uncontrolled or flood stage which supplied the waters necessary to the growth of the grass. The claimants brought suit on the ground that they had riparian rights to this seasonal *flooding* and were entitled to be compensated for the deprivation of these rights, regardless of the fact that the flooding entailed a waste of water. The Court of Claims made awards of compensation, and the Government appealed, asserting the claimants were entitled to neither water nor damages.

The Supreme Court, as noted, rejected the theory of the Government that the entire project was constructed under the Commerce power in aid of navigation and the Government's contention that it thus did not have to compensate for the destruction of riparian interests, and held that Congress had instead elected to treat the Friant Project as a Reclamation project, and to recognize the claimants' rights as rights to the use of water under California State law.

The Court pointed out that the Central Valley Project, as originally adopted and as carried out by the Bureau of Reclamation included *replacement* at great expense of all water formerly used for *crop lands* and "controlled" grass lands, and the purchase of marginal pasture lands. The so-called "controlled" grass lands are those on which water is placed under controlled irrigation which does not entail waste of water. It is further stated that: "Moreover, Congress and the water users have been advised that, in prosecution of the work, *existing water rights would be respected*." 339 U.S. at page 740, 70 S.Ct. at page 963.

After pointing out the anomaly of the Government's position in asking the Court to hold that there were no riparian rights attached to the claimants' lands when the Government had already paid huge sums to Miller & Lux for identical and for similar rights, the Court turned to a consideration of the nature of those rights.

The Court took notice of the evolution of California Water law culminating in the 1928 amendment to the California Constitution, art. 14, § 3, making beneficial use a limitation on the exercise of riparian rights. It pointed to the abolition, by the amendment, of "dog-in-the-manger" aspects of common law riparianism whereby a shore proprietor could enforce, by injunction, his bare technical right to have the full flow of the stream, including the flood crest, even though he was getting no substantial benefits from it. Thus, the Court said that:

"Since riparian rights [after the amendment] attach to, and only to, so much of the flow of the San Joaquin as may be put to beneficial use consistently with this clause, claimants can enforce no use of wasteful or unreasonable character."

It is clear that the Court, by such statement, at most held a *wasteful* use was no longer capable of enforcement by injunction, and *not* that an injunction was unavailable to enforce a reasonable, beneficial use. The very statement implies that remedy by injunction was preserved and is available as to reasonable and beneficial uses, and the California law, since 1928, is in accord, as is later set forth.

The Court then proceeded on the assumption, without a specific holding to the effect, that *prodigal* use, inseparable

riparian rights to flood flows, in Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607, certiorari dismissed 275 U.S. 486, 48 S.Ct. 27, 72 L. Ed. 387; Chowchilla Farms, Inc., v. Martin, 219 Cal. 1, 33, 25 P.2d 435; Miller & Lux v. Madera Canal & Irrigation Co., 155 Cal. 59, 99 P. 502, 22 L.R.A.,N.S.,

391; Piper v. Hawley, 179 Cal. 10, 17, 175 P. 417; Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal.2d 489, 569, 570, 45 P.2d 972; Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 107 P. 115, 27 L.R.A.,N.S., 772; Collier v. Merced Irr. Dist., 1931, 213 Cal. 554, 558, 2 P.2d 790.

from claimants' benefits, such as the right to seasonal *flooding*, could no longer be enforced by injunction. It stated that the unavailability of such remedies, as to prodigal use, i. e., wasteful uses, did not extinguish the right and make it non-compensable upon a taking. It held that the right of claimants, prior to the amendment, to compensation was clear, and that the right appeared to survive under California law, and was compensable, even though it was no longer enforceable by injunction because seasonal flooding was not a reasonable, beneficial use under the amendment.

The above is the tenor of the decision.

Much is made by defendants of the statement, 339 U.S. on page 739, 70 S.Ct. on page 963 that "Congress elected to recognize any state-created rights and to take them under its power of eminent domain."

As hereinbefore pointed out, the Central Valley Project of California is a colossal undertaking, or as stated by Justice Jackson—"[A] big bundle of big projects." The gigantic dams envisioned, some of which are built, the tremendous canals and diversions of waters of rivers, with the resulting change of diversion and of underground waters affects millions of acres of land, tens of thousands of farmers, and practically all, if not all, of the cities in the valley which secure their water mostly from wells. The contentions of the defendants, if adopted, that the above statement was a holding by the Supreme Court that the enactment of the authorizing legislation was a taking by eminent domain, would mean that *all* the water rights on all rivers in the Central Valley of California where dams have been built or authorized have already been taken, and are owned by the United States, and all State-created rights to water are wiped out, and all parties, including municipalities, are left only to their remedy by way of compensation in damages; even as among themselves, the water users would have no enforceable rights; the doctrine of water rights as appurtenant to the land would have ceased to exist in this valley. The mere statement of the proposition shows its absurdity. No such intention can be attributed to any Act of Congress, and no such interpretation is justified from any statement in the Gerlach case.

■ Since there was no ipso facto taking of all State-created water rights, could the statement be construed to mean, as also contended by defendants, that whenever and wherever a State-created right to water is invaded or actually interfered with *by the mode of operation of Friant Dam and its appurtenances, such right is thereby taken under the power of eminent domain* even though the exercise of that State-created water right was wholly consistent with, and under State law? That is, as applied to these plaintiffs and their class, did the mere impoundment and diversion of water at Friant constitute a taking of their rights by the exercise of the power of eminent domain?

This contention is equally as unjustifiable as the last above-mentioned. The foregoing untenable result of the acquisition by the U. S. of all water rights in the valley could in this manner be reached by indirection in that it would place in the hands of those who might at any point be operating the Project an unlimited power and discretion to exercise the power of eminent domain at any time without judicial proceedings.[51] To

51. It is urged in that connection that the Gerlach case stands for the proposition that the Supreme Court held that on October 20, 1841, there was an impounding of water which was an exercise of the power of eminent domain for the *entire flow* of the river. This was the date adopted by the Court of Claims in the Gerlach case for the date from which interest was computed. Since this date was not rejected by the Supreme Court, it is argued that there was a recognition by that Court that an exercise of the power of eminent domain occurred by the impounding of waters on October 20, 1941. However, the Court, 339 U.S. at page 755, 70 S.Ct. 955, makes it clear that the use of that date for the allowance of interest was justified, not on the theory that a taking occurred on that

so hold would amount to a judicial repeal of Section 7 of the Reclamation Act.

To take an extreme example: If such an interpretation should be adopted, the contracts with the fifteen irrigation districts would be meaningless; those in charge of the Dam could cut off the flow of water to any one district, and then declare that they had merely exercised the power of eminent domain; the district would be without water, and defenseless, and could at most recover compensation. The power could thus be exercised against any water user, at any time, without notice or opportunity to be heard. This plainly is contrary to the Reclamation laws, to say nothing of due process.

 Instead, the statement in the Opinion makes it clear that where there has been a taking of a wasteful use not enforceable by injunction, it is made pursuant to the eminent domain power, and that the concomitant right of compensation is to be measured under the principles applicable to such a taking.

The plaintiffs in the instant case are seeking to enforce water rights claimed in every respect to be consistent with the overall Congressional and State purpose of beneficial use. Congress has prescribed the procedures to be followed if those rights are to be taken.

 In any event, the Supreme Court has held that the mere impounding and diversion of water by the United States under the Reclamation laws does not vest ownership of the water or water rights in the United States. Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525; State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815, cited in United States v. Gerlach Live Stock Co., 339 U.S. 725, at page 734, 70 S.Ct. 955, 94 L.Ed. 1231.

The State in its brief urged that the Secretary of the Interior was authorized to make, and made, an informal taking of plaintiffs' interests. The case of United States v. Buffalo Pitts Co., 234 U.S. 228, 34 S.Ct. 840, 58 L.Ed. 1290, is re-

date, but because such date was adopted by the Government for the expiration of its protection under the Miller & Lux contracts. Thus, no inference that the Supreme Court found an exercise of the power of eminent domain by the impounding of water, can be drawn from the refusal of the Supreme Court to reject October 20, 1941, as the date for the commencement of interest in that case. Even if such an inference could be made, it would have to be restricted to the facts of, and the lands involved in, the Gerlach case—where seasonal flood waters were concerned. Presumptively, the first waters impounded would be flood waters otherwise wasted. The same reasoning would not be applicable to waters previously put to a reasonable and beneficial use—which continues after 1928 to be a use enforceable in equity. It follows that the Gerlach case cannot be construed as holding that the impounding of water was an exercise of the power of eminent domain as to all rights of plaintiffs to the use of water.

The evidence shows that initial impounding, which began October 20, 1941, ceased on November 11, 1941, at which time there had been impounded only a total of 17,400 acre-feet of water, which

was less than one per cent of the average annual flow of the river of 1,800,000 acre-feet. For this Court to hold that such an impounding constituted a taking by eminent domain of the entire flow of the river at Friant, would not only be contrary to reason, but would fly in the face of cases such as the Danforth case, 1939, 308 U.S. 271, 60 S.Ct. 231, 237, 84 L.Ed. 240, where the Court held that there was not a taking by eminent domain when the work on the levee was commenced or completed, but that the right to compensation would accrue when there was put "upon this land a burden, actually experienced". See, also, United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. As will be seen later, no burden was actually experienced by that impounding, i. e., the plaintiffs continued to receive all the water they formerly had flowing past their lands until long after October 20, 1941. In fact, the flow on occasion was increased. The impounding of water was recommenced in 1944 by a partial closing only of the river outlets, and the plaintiffs in fact, thereafter, continued to receive water past their lands as before, as will hereinafter be discussed.

lied upon. There the Government merely exercised its right under a contract to complete the contract upon default of the Construction Company employed on a reclamation project, and in doing so, it used an engine belonging to a third party but in possession of the defaulting Construction Company. The holding was that, despite such contractual right to complete on default, an implied promise to pay the third party for the use of the engine arose when Congress had conferred authority to acquire property necessary for the particular work, and to pay therefor. The sole issue was liability *vel non* of the United States on implied contract under the Tucker Act. That case is inapplicable in fact and law, and does not militate against the conclusions herein reached.

The Secretary of the Interior quite obviously has construed Section 7 of the Reclamation Act to mean that condemnation proceedings by judicial process, that is to say, suits in condemnation, are necessary for the United States to acquire the water rights involved in this case. This is indicated by the letter of the Acting Secretary of the Interior under date of August 20, 1951, (4 years after this suit was commenced), addressed to the Attorney General, and read into the record on August 21, 1951 (TR. pp. 567 et seq.) wherein it is stated:

"In my opinion it is necessary that the power of eminent domain be used to acquire for public uses the rights in those instances wherein the parties in interest have not contracted with or made deeds to the United States and its predecessors in interest, although such an action should not seek to impair the obligations of any of the contracts for the purchase or adjustment of water rights between the United States and the landowners or water users affected by Friant Dam. Accordingly, you are requested to institute *appropriate proceedings* to acquire the necessary land, easements, rights-of-way, water

rights, or other interests which are in conflict with the proposed plan of operation of the dam, or which *are,* or may become *impinged upon, impaired,* or *taken,* by such plan of operation.

"Other areas than those shown on the enclosed map are potentially involved. An investigation is being made concerning such other areas, at the completion of which, a similar request may be made concerning them."

This letter, written after the decision in the Gerlach cases, plainly shows that the Secretary of the Interior did not on that date regard the rights of plaintiffs to have been taken by eminent domain, and did not regard the Gerlach case as so holding.

In this same connection, it is noteworthy that the Water Project Authority of the State of California, on May 22, 1953, (almost 6 years after this suit was commenced) adopted a Resolution requesting the United States to institute condemnation proceedings to acquire the plaintiffs' water rights necessary for the Project. This was two years after the decision in the Gerlach cases, and plainly, the State of California did not on that date regard the rights of plaintiffs to have been taken by eminent domain.

The date of the Resolution is important in view of the contentions made by the defendants that the letter of the Secretary of the Interior, dated March 30, 1953, introduced in evidence herein, constituted a "taking" by eminent domain. The Resolution was subsequent by almost two months to the letter of the Secretary. Obviously, the State of California did not regard the Secretary's letter of March 30, 1953, as a taking by eminent domain. In fact that letter states that the United States will release all the water to plaintiffs to which they are lawfully entitled under California law. It shows an intention *not* to exercise the power of eminent domain. No condemnation proceedings by judicial process have followed that letter; it was

not a taking by eminent domain as contemplated and required by Sections 7 and 8 of the Reclamation Act.

The Supreme Court in the Gerlach case compares the action of Congress, in providing in the Reclamation Act for full recognition of State-created rights, to the action of Congress dealt with in Ford & Son v. Little Falls Fibre Co., 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483. There, Congress had directed in the Federal Water and Power Act, 16 U.S.C.A. § 791a et seq., that State-created rights be respected, and had given licensees of such projects the power of eminent domain, as has the Secretary of the Interior here. The licensee had been restrained by the State Court from maintaining, on its dam, flash-boards which interfered with riparian rights of the plaintiffs. On certiorari the Supreme Court held that even though these riparian rights might be deemed subordinate to the power of the National Government over navigation, the rights were a proper subject of legislative protection. The Court determined that plaintiffs had vested rights, and upheld the determination that the acts of the licensee constituted, under local State law, an actionable wrong, entitling plaintiffs to *an injunction and damages.* Whether the rights involved were subject to the eminent domain power was not decided. However, the clear implication was that if those rights were subject to that power, the procedure for the exercise of that power by condemnation proceedings must be followed, and, since it was not, the rights were not impaired by the mere grant of that power.

A very similar situation here exists. Congress has indicated an intention to protect State-vested water rights. The power of eminent domain has been granted but no judicial proceedings taken for its exercise. Thus, the Supreme Court in the Gerlach case, by approving the Little Falls case, inferentially indicated that interference with those rights, other than by judicial proceedings in condemnation, is non-compliance with the Congressional mandate contained in Sections 7 and 8 of the Reclamation Act.

Although not in issue here, a statement in Footnote 7, 339 U.S. at page 734, 70 S.Ct. 960, of the Gerlach case casts some doubt on whether the Congressional grant of the power of eminent domain in the Reclamation laws is, in any event, broad enough to permit condemnation of the water rights exercised in a reasonable, beneficial manner under California law. The Court says, after quoting Section 8 of the Reclamation Act, "To the extent it is applicable *this clearly leaves it to the State to say what rights of an appropriator or riparian owner may subsist along with any federal right.*" Without deciding the question, this suggests that the power of eminent domain, aside from acquisition of the project site, was granted only as to water rights which, by State law, were incapable of co-existing with the stated Federal purpose of the project to increase productivity, and at the same time, maintain *"existing agricultural development and existing civilization of a high type"* and *"maintain present values"* by an *"adequate water supply for all purposes."* (Feasibility Report) Deprivation of water to such uses, even by condemnation proceedings might well be contrary to both the project purposes and the State law by which those purposes are measured.

In any event, the Supreme Court in the Gerlach case recognized that crop and "controlled" lands are entitled to *water,* as a reasonable and beneficial use, as distinguished from *damages.*

██ The statement concerning the exercise of the power of eminent domain, appearing as it does in a discussion as to whether Congress intended to exercise its navigation power and take without compensation, cannot be taken out of context and perverted into meaning either, that persons using water in conformity with California law were to be deprived of their equitable remedies and relegated to compensation, or, that the United States could take such water

rights without compliance with Sections 7 and 8 of the Reclamation Act. Such a construction would do violence to the language of the Supreme Court which clearly recognizes a distinction between waste of water and a reasonable beneficial use, and the remedies available in each instance. It held beyond dispute that the Reclamation Law controlled the conduct of the United States and its officials in the construction and operation of Friant Project.

Other isolated statements in the Opinion are taken out of context and urged by the defendants as supporting their contention that the Supreme Court held in the Gerlach case that all water rights of plaintiffs in this case were taken by eminent domain by the United States.

For instance, the defendants emphasize that portion of a sentence which reads as follows: "* * * except for occasional spills, only a dry river bed will cross the plain below the dam."

This clause is found in that part of the Opinion which is describing the general physical features of the whole Central Valley Project, and to illustrate the unreasonableness of the conclusions the defendants seek this Court to draw, it is well to quote that portion of the Opinion which was then describing Friant Dam. 339 U.S. at page 729, 70 S.Ct. at page 957.

"Shasta Dam in the north will produce power for use throughout much of the State and will provide a great reservoir to equalize seasonal flows of the Sacramento. A more dramatic feature of the plan is the water storage and irrigation system at the other end of the valley. There the waters of the San Joaquin will be arrested at Friant, where they would take leave of the mountains, and will be diverted north and south through a system of canals and sold to irrigate more than a million acres of land, some as far as 160 miles away. A cost of refreshing this great expanse of semiarid land is that, except for occasional spills, only a dry river bed will cross the plain below the dam. Here, however, surplus waters from the north are utilized, for through a 150-mile canal Sacramento water is to be pumped to the cultivated lands formerly dependent on the San Joaquin."

The *Court in the Gerlach case* was dealing only with lands *located downstream from Mendota pool*, which would, in fact, be supplied with exchange waters. *It had no reason to, and did not, consider the situation of the present plaintiffs whose lands lie upstream from Mendota pool, and do not and cannot receive exchange water from the Sacramento River.* Thus, the statement cannot be applicable to the rights of these plaintiffs.

That the statement was restricted to the lands there in question is also clear from a statement, 339 U.S. on page 730, 70 S.Ct. on page 958 where the Court said that the bed of the San Joaquin *"along claimants' lands will be parched, and their grass lands will be barren."*

This conclusion is fortified by the other statements in the Opinion that there would be *replacement*, at great cost, *of all water formerly used for crop and "controlled" lands*, i. e., *irrigated* lands.

 It follows that these statements, read in context and with an understanding that the situation of the plaintiffs herein, and the precise details of so much of the Central Valley Project as affects their lands, was not before the Court, no inference is to be drawn that the Court anticipated or countenanced any absolute deprivation of water, by eminent domain or otherwise, to thousands of acres of very productive lands, or the rights of the plaintiffs and their class to the use thereof, involved in this case.

 Neither these plaintiffs and their class nor their rights, nor anyone representing them, were before the Court in the Gerlach cases. Thus any interpretation out of context of statements of the Supreme Court to mean

that Friant Project would impound and take all of plaintiffs' water rights in this case, comes within the rule announced by Chief Justice Marshall in Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 19 U.S. 264, at page 398, 5 L.Ed. 257:

"If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, *when the very point is presented for decision.*"

Furthermore, as herein elsewhere noted, and in D.C., 90 F.Supp. 773, the Department of the Interior has repeatedly stated to Congress and to the world that the plaintiffs herein would not be deprived of water, but that water would flow in the bed of the river to meet their rights. At most, assuming, but not holding that, the Feasibility Report indicated an intention to impound and divert at Friant 1,500,000 acre-feet annually, which was not to be supplied by exchange of Sacramento River water, there would still be approximately 300,-000 acre-feet of San Joaquin River water which would flow past Friant annually. That is certainly not a dry river bed.

■ Before leaving the subject of eminent domain, attention should be given to contentions by the defendants, which again are not set forth with clarity, but which seem to amount to the proposition that statements can be found in several reports and bulletins prepared by the State of California which indicate that ultimately there was an intention to divert all of the flow of the San Joaquin at Friant. Several of these reports were put in evidence. Together they comprise several thousand pages and have hundreds of charts and tables. An examination of them indicates that there are contradictory statements therein concerning the water to be supplied to the plaintiffs in this case. And in none of them can there be found any statement indicating that plaintiffs in this case will have no water. While some of those reports were prepared by the State, under contract with the Bu-

reau of Reclamation, there is nothing in any Act of Congress which shows an intention of Congress to build and operate the units of the Project here involved in accordance with detailed plans contained either in those reports or the plans for the different units of the project set forth in the Central Valley Project Act of California of 1933, Cal.Stat.1933, Chap. 1042, p. 2643, Calif.Water Code, § 11100 et seq. None of those reports which are mentioned in any Act of Congress deal with the area involved here, or with Friant Dam and its diversion works.

The works authorized by Congress in the Feasibility Report, and actually built, are not those described by the California reports and by the California Central Valley Project Act of 1933. For instance, the Delta-Mendota canal is an entirely different physical works than the San Joaquin River Pumping System described in both the Feasibility Report and in the California Central Valley Project Act of 1933, and as contained in the 1943 enactment of the Water Code of California. Again, the Central Valley Project Act of California, 1933, as re-enacted by the legislature in the Water Code of 1943, as well as the California Reports on the Central Valley Project, call for the erection of a power plant at Friant Dam, which for its use would require large quantities of water to be released into the bed of the stream to flow past plaintiffs' lands for their use and to replenish the underground waters. No power plant has ever been built. The Feasibility Report does not provide for a power plant at Friant, and the Dam, as built, is not designed for one to be subsequently built.

Further, the Central Valley Project of California, 1933, and the Water Code of California require that any and all water, water rights, and other property needed for the Central Valley Project must be condemned under the provisions of the laws in this State relating to eminent domain proceedings unless the same can be acquired by purchase or agreement with the owner or owners. Cal.

Stat.1933, p. 2651, Sec. 12, Calif.Water Code, as amended 1943, Secs. 11575, 11580.

The units here involved have been constructed and are operated and maintained entirely by the Federal government through the Bureau of Reclamation, under appropriations made therefor by Acts of Congress to the Bureau of Reclamation.

In summation on this phase, it is the holding of the Court that, as a matter of law, neither the enactment of legislation authorizing the Project or making appropriations therefor, nor the Feasibility Report, nor the letter of the Secretary of the Interior of March 30, 1953, nor the impounding and diversion of water at Friant constituted an exercise of the power of eminent domain so as to amount to an acquisition of whatever rights the plaintiffs here and their class have, but that under applicable Federal statutes, judicial proceedings in condemnation are necessary; and, as a matter of fact, no judicial proceedings have, at any time, been taken as to the rights here in question.

It follows, and the Court holds, that as against the plaintiffs and their class the United States does not own the "fee simple", or any, title to all or any of the rights to the use of water insofar as any such title or right to impound and divert water as against the plaintiffs and their class at Friant Dam depends on the exercise of the power of eminent domain.

Since there has been no acquisition of the water rights of plaintiffs by an exercise of the power of eminent domain, the contentions as to *when* that power was purportedly exercised are immaterial in that the query itself presupposes that there has been, at some time, an exercise of the power of eminent domain.

The Court further concludes that, inasmuch as there has been no acquisition by the United States by eminent domain of whatever water rights plaintiffs herein possess, the impounding and diversion of the water at Friant as to rights of plaintiffs and their class, insofar as it depends on the exercise of the power of eminent domain, is unlawful, and the United States and its officials, in doing so, are acting unlawfully insofar as the rights of plaintiffs and their class are concerned, unless the United States has acquired in some other manner, under the State law of California, rights against the plaintiffs to impound and divert the water; to which question the Court will now address itself.

## XI.

### Water Rights Under California Law—General.

In 1922 Chief Justice Shaw of the California Supreme Court remarked that the reported cases in California contained more decisions on the subject of water rights than any other.

It is not the purpose of the Court in this Opinion, nor is it deemed to be necessary, to discuss the entire history of the California Water law as it has developed through various phases of the settlement and growth of California; [52] but the applicable Federal statutes and the nature of the claims of the various parties make it necessary that there be some general discussion of California law on water rights, their nature, limitation, extent and enforceability.

52. Many California cases discuss such history at length. Particular reference is made to the address of Chief Justice Shaw to the joint session of the California and American Bar Associations in 1922, found as an Appendix in 189 Cal. 779; Lux v. Haggin, 1886, 69 Cal. 255, 4 P. 919, 10 P. 674; Katz v. Walkinshaw, 1903, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236; City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 207 P.2d 17; and United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231; The Fallbrook cases, United States v. Fallbrook Public Utility District, D.C., 101 F.Supp. 298; Id., D.C., 108 F.Supp. 72; Id., D. C., 109 F.Supp. 28; Id., D.C., 110 F. Supp. 767.

The claims of the parties cover almost the entire gamut of rights to the use of water in California; the rights variously asserted among the parties concerning the use of surface and underground waters invoke the doctrines applicable to riparian and overlying owners, as well as the doctrines relating to prescription, prior appropriation, applications to appropriate surplus waters, the intervention of a so-called "public use," the applicability and effect of the so-called "County of Origin" and "Protection of Watershed" Statutes, and the right to change the point of diversion on the San Joaquin river, which latter also involves the effect of the so-called Miller & Lux Purchase and Exchange, and other contracts. Also involved is the question of a "physical solution" as that term has been developed and is used and enforced by the Supreme Court of California, and the power and the duty of the Court to impose a physical solution.

It is well to again emphasize that there are not involved in this case any asserted rights *inter sese* between the plaintiffs, individually or as a class, as against one another, or between the defendants as against one another; but the issue, as drawn from the beginning and maintained throughout the trial, is whether the plaintiffs have common paramount rights to a common source of water as against the defendants' assertions of superior right, and if plaintiffs do have such rights, the appropriate relief therefor.

In approaching the problem of the substantive water law of California, it must be remembered that the primary function of this Court is not to make new law in that field, but to ascertain, from cases decided by the California State Courts, what the law *is* on the particular matter, and to accept and apply it. Only if there is a total absence of California decisions on the precise point or statute will the Court undertake, as it must, to declare the law.

This Court must and will endeavor to resolve the many serious and important questions in this case, either by direct reference to the California cases, or by reasoning from them. It cannot be done in a word. There seems a dearth of State decision on a few questions.

Except as abrogated by statute, constitutional provisions, or as held in the cases to be inapplicable to local conditions, the common law of England relating to riparian and overlying rights is the law of California concerning those rights. Lux v. Haggin, 1886, 69 Cal. 255, 4 P. 919, 10 P. 674; Katz v. Walkinshaw, 141 Cal. 116, 122, 70 P. 663, 74 P. 766, 64 L.R.A. 236; Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 22 P.2d 5. The exceptions are many, and have produced a plethora of decisions and opinions in the reported cases which deal with the almost innumerable varieties of conflicts which were bound to arise, and will still arise in this State, with its variations of climate and stream flow, and the necessities for water for rapidly growing population, industry and agriculture.

The right of a riparian is the right to take water directly from the stream for use on his abutting land. The right is part and parcel of the land. It passes with the title to the land and is not gained by use or lost by disuse. A riparian also has an overlying right to take, by means of wells, groundwater regardless of its source. An overlying owner, whether riparian or not, has the right to take water, regardless of its source, from the ground underneath his land for use on his land which lies within the watershed or basin. The overlying right is analogous to the riparian right in that each is based on ownership of the land and is inseparably annexed to the soil. The overlying right, though the manner of its exercise may be different, is identical in law with the riparian right. These rights are absolute property rights against the world, except that as between riparian owners similarly situated, and as between overlying owners similarly situated, their rights are correlative and common with those in a like situation.

The foregoing propositions of law as to the nature of such rights are so firmly and universally supported by the decisions that citation of authority is superfluous and unnecessary.

The *extent and enforceability* of water rights, riparian, overlying, appropriative and prescriptive, have been the subject of much litigation in California, and are involved in this case.

The terms "appropriator" and "appropriation" are frequently loosely and improperly understood as describing the manner of taking; sometimes as referring to the manner of taking water by wells from the underground, and sometimes to the manner of taking water by storage back of dams and diversion from surface streams.

In the legal and technical sense an appropriator is actually one who takes water, the use of which he did not previously own as part and parcel of land owned by him, whether such taking is from the underground by wells or by surface diversion; one need not appropriate that which he already owns. Thus, an appropriator in the legal sense is one who initially takes water without possessing a property right to take and use such water. As held in City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 925, 207 P.2d 17, the term "appropriation" refers to the taking of water for other than overlying or riparian uses and not merely to the taking of water from a surface stream on public lands for non-riparian purposes. In this Opinion the terms "appropriator" and "appropriation" are used in the legal sense, and not merely to refer to the manner of taking water.

In 1926 the California Supreme Court decided Herminghaus v. Southern California Edison Co., 200 Cal. 81, 252 P. 607.[53] It sustained the right of Herminghaus, whose lands were located along, and were riparian to, the San Joaquin river immediately above Mendota, as against Southern California Edison Company which was going to build a dam for power purposes on the San Joaquin river in the mountains above Friant, to have the full natural flow of the San Joaquin river past her lands unlimited "by any measure of reasonableness" as to use. The full natural flow of the San Joaquin river was held to include the crest of the seasonal flood flows.[54] Following that decision by a few months, the Supreme Court in 1927 decided the case of Fall River Valley Irrigation District v. Mt. Shasta Power Corporation, 202 Cal. 56, 259 P. 444, 56 A.L.R. 264, and there affirmed the doctrine of the Herminghaus case.

Thus, prior to the 1928 Constitutional amendment, a riparian owner was entitled, as against an upstream taking by any method of appropriation for any purpose, to have the full flow of waters of a stream past or through his land, except as diminished by reasonable riparian uses of upstream owners and the exercise of perfected prescriptive appropriative rights. This right existed though a beneficial use could have been made by upstream appropriations without interfering with the riparian owner's beneficial use of waters, present and prospective.

The Court did not in either the Herminghaus case or the Fall River case assay to announce any new doctrine, but followed the doctrine of previous cases. The application of the doctrine throughout California permitted vast quantities of water to flow unused into the sea, which did, in fact, result in waste of water. The necessities for putting *all*

---

53. Subsequent to the decision the Edison Securities Company acquired the Herminghaus properties and water rights.

By a series of contracts in 1944 and 1945, the United States acquired all those rights from the then holders. (Exhibit A-48-A, Cont. No. 175-4-82).

54. Neither the Constitutional amendment nor subsequent cases have changed the doctrine that the full natural or ordinary flow of a river includes the seasonal and cyclic flood flows. See United States v. Gerlach Livestock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, and cases cited in footnote 50, Page 99.

*water* to beneficial use and the prevention of waste resulted in the Constitutional amendment of 1928 modifying the doctrine of those cases insofar as they permitted the enforcement of a flow of water which resulted in waters flowing into the sea, which were in excess of reasonable and beneficial uses.

The California Constitutional amendment of November 6, 1928, art. 14, § 3, since its adoption is thus the point of beginning, in any discussion, of the extent and enforceability of all water rights under California law. Its text is as follows:

"§ 3. *Conservation of water resources; Restriction of riparian rights.* Sec. 3. It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

In 1913 the State adopted the Water Commission Act, Cal.Stats.1913, Ch. 586, in an attempt to bring some order in the law relating to appropriation of water, which was included in the Water Code of 1943 when the State of California codified the law relating to water and water rights. Section 100 of the Water Code [55] and Section 101 of the Water Code [56] are in substantial accord with the declaration of policy contained in

55. "§ 100. Fullest beneficial use of water resources: Prevention of waste or unreasonable use or method: Conservation: Limitation of right. It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water."

56. "§ 101. Attachment of riparian rights to flow of stream or watercourse: Construction. Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this and the next preceding section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing in this or the next preceding section shall be construed as

the Constitutional amendment. Section 103 provided that in the enactment of this Code, "the Legislature does not intend thereby to effect any change in the law relating to water rights." Section 106 provided that it is "the established policy of this State that the use of water for domestic purposes is the highest use of water and the next highest use is for irrigation."

Other sections and provisions of the Water Code are applicable to certain contentions of the parties, and will be discussed as they arise.

The Constitutional amendment of 1928 has been construed many times by the California Supreme Court. It was held in Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 22 P.2d 5, and in Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 1935, 3 Cal.2d 489, 45 P.2d 972, not to be violative of the due-process clause of the Fourteenth Amendment of the United States Constitution. The question of the constitutionality of the 1928 amendment to the California Constitution was not raised in the Gerlach case, although the amendment was construed by the United States Supreme Court. In California-Oregon Power Co. v. Beaver Portland Cement Co., 1935, 295 U.S. 142–159, 55 S.Ct. 725, 79 L.Ed. 1356, and in United States v. Rio Grande Dam & Irrigation Co., 1899, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, the Court held that it is within the power of any State to change the common law rule as to the use of water.

■■■■■■ The Constitutional amendment did not change the law relating to acquisition, ownership, or nature of water rights, but superimposed on all water rights the requirement that all water must be put to a reasonable and beneficial use and none may be wasted.

It may properly be said that, by the Constitutional amendment and the cases construing it, the use of all water in the State became "vested with a public interest," or as sometimes said, a "public use." But the term "public use" as used in connection with water rights has acquired a limited and restricted meaning under the California Constitution, laws, and cases, and is not strictly accurate in describing the use of all water because it is technically applied to a certain type of use which subjects it to regulation by the State, and which may become superior to others.

■■■■■■■ Prior to the Constitutional amendment of 1928, the rule of reasonableness of use as a measure of the water right had been applied by the California Supreme Court as between riparian owners—Pabst v. Finmand, 190 Cal. 124, 211 P. 11; as between owners overlying an underground water supply —Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am. St.Rep. 35; as between appropriators— Natoma Water & Mining Co. v. Hancock, 101 Cal. 42, 31 P. 112, 35 P. 334; as between overlying owners and exporters from an underground basin to nonoverlying lands—Burr v. Maclay Rancho Water Co., 154 Cal. 428, 98 P. 260; and as between riparian owners and overlying owners under the doctrine of common source of supply—Hudson v. Dailey, 156 Cal. 617, 105 P. 748; but the Court, prior to the 1928 amendment, denied its application as between a riparian owner and an appropriator. The Constitutional amendment from its effective date, and as interpreted in the Gin S. Chow case, supra, has enjoined the doctrine of reasonable use as between the riparian and an appropriator. *The limitations and prohibitions of the Constitutional amendment now apply to every water right and every method of diversion.* Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, at page 367, 40 P.2d 486. The effect of the amendment was also to apply the doctrine of reasonable use between overlying owners and appropriators. Tulare Irrigation District v. Lindsay-Strath-

depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled."

more Irrigation District, 1935, 3 Cal.2d 489–524, 45 P.2d 972.

As stated in the Peabody case, 2 Cal.2d at pages 367–368, 40 P.2d at page 491:

"Epitomized, the amendment declares:

"1. The right to the use of water is limited to such water as shall be reasonably required for the beneficial use to be served.

"2. Such right does not extend to the waste of water.

"3. Such right does not extend to unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

"4. Riparian rights attach to, but to no more than so much of the flow as may be required or used consistently with this section of the Constitution.

"The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed. The problem is to apply these rules in the varying circumstances of cases as they arise."

The priority of riparian and overlying rights has thus "been subjected to limitations and regulations prescribed by the Constitution, but it has by no means been abolished." Peabody v. City of Vallejo, supra, 2 Cal.2d at page 368, 40 P.2d at page 492.

The doctrine of inter sese limitation of reasonable and beneficial use as applied prior to the 1928 Constitutional amendment between riparians and as between overlying owners has in this manner been extended and now applies to every right.

 It was held in Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, at page 445, 90 P.2d 537, at page 547, 91 P.2d 105, that the cases of Gin S. Chow v. City of Santa Barbara,[57] Peabody v. City of Vallejo,[58] Tulare Irrigation District v. Lindsay-Strathmore Irrigation District,[59] and City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439,[60] established that, by the Constitutional amendment, the right to use the waters of rivers and streams of the State has been limited to a reasonable and beneficial use; that the riparian and overlying owner has a *prior and paramount right to the full flow of the stream or its equivalent undiminished in quantity and unimpaired in quality; that the riparian and overlying owner is safeguarded in this right by the Constitutional amendment;* that the Constitutional provision that " 'riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section' * * * clearly means that when the law has *guaranteed* to the riparian owner the use of the waters of the stream to the full extent to which he may put the same for all present and prospective useful and beneficial purposes, and has made available to him the means of protecting the rights so guaranteed, he has received the full measure of benefit and protection to which he is entitled, and can claim no more."

We are here dealing with various types of vested rights in relation to subsequent claims of appropriation and subsequent applications to appropriate, and the discussion is to be so interpreted; that is to say, none of the claimed rights of defendants to impound and divert water at Friant are based upon any claimed riparian or overlying right.

 The procedure for appropriation of surplus water prescribed by the California Water Code, Section 1200 et seq., is limited to surface streams and to subterranean streams which flow through a *known* channel, *if the channel can be*

57. Involving riparian and overlying owners versus appropriators.

58. Involving riparian owners versus appropriators.

59. Involving riparian and overlying versus riparian and overlying.

60. Involving overlying appropriator versus surface appropriator.

*defined.* No such procedure is or ever has been prescribed or required for those who take water by means of wells from underground percolating waters or underground basins and apply it to other than overlying uses. Gould v. Eaton, 1896, 111 Cal. 639, 644, 44 P. 319. And the permit and licensing provisions of the Water Code, by the terms thereof, do not apply thereto. City of Pasadena v. City of Alhambra, supra, 33 Cal.2d at page 934, 207 P.2d 17.

Any taking of water, whether from a live stream or from wells, which is not in the exercise of an overlying or riparian right, is an appropriation of water.

▆▆▆▆▆ Appropriations subsequent in point of time to prior vested rights of whatever nature, are of two types. They are sometimes referred to as either proper or wrongful. A proper appropriation may be made *only of excess or surplus* waters which are defined as "any water not needed for the reasonable beneficial uses of those having prior rights." [61] And this is so whether the appropriation be from the underground—City of Pasadena v. City of Alhambra, supra, 33 Cal. 2d at page 925, 207 P.2d 17—or from waters of surface streams subject to the permit and licensing system of the Water Code. Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 40 P.2d 486; Stevinson Water Dist. v. Roduner, 1950, 36 Cal.2d 264–270, 223 P.2d 209. This *surplus* is subject to appropriation upon application and permit under the California Water Code, but prescriptive rights are not acquired against the lower riparian owner, overlying owner, or other vested prior right by the appropriation of this excess or surplus. City of Pasadena v. City of Alhambra, supra; City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, 142 P.2d 289; Orchard v. Cecil F. White Ranches, 1950, 97 Cal.App.2d 35, 217 P.2d 143.

▆▆▆▆▆ A wrongful appropriation is one of non-surplus waters, and against a downstream riparian or overlying owner is a trespass—unless and until the right to such use ripens by prescription. Fall River Valley Irrigation District v. Mt. Shasta Power Corp., 1927, 202 Cal. 56, 70, 259 P. 444, 56 A.L.R. 264. As stated in City of Pasadena v. City of Alhambra, supra, 33 Cal.2d at page 926, 207 P.2d at page 29: "Accordingly, an appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile

61. While Section 1201 of the California Water Code states what waters of surface streams are subject to appropriation, and Section 1202 declares what waters of such streams are unappropriated, the above terse definition is the one generally accepted by the cases, and in fact is an epitomization of those code sections, which read as follows: "§ 1201. [Public water of State]. All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code. "§ 1202. [Unappropriated water]. The following are hereby declared to constitute unappropriated water: "(a) All water which has never been appropriated. "(b) All water appropriated prior to December 19, 1914, which has not been in process, from the date of the initial act of appropriation, of being put, with due diligence in proportion to the magnitude of the work necessary properly to utilize it for the purpose of the appropriation, or which has not been put, or which has ceased to be put to some useful or beneficial purpose. "(c) All water appropriated pursuant to the Water Commission Act or this code which has ceased to be put to the useful or beneficial purpose for which it was appropriated, or which has been or may be or may have been appropriated and is not or has not been in the process of being put, from the date of the initial act of appropriation, to the useful or beneficial purpose for which it was appropriated, with due diligence in proportion to the magnitude of the work necessary properly to utilize it for the purpose of the appropriation. "(d) Water which having been appropriated or used flows back into a stream, lake or other body of water."

and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right."

Thus the problem, as between the vested riparian or overlying right and the subsequent appropriator is to determine whether the waters sought to be appropriated are in excess of, or surplus to, the prior vested rights of the riparian and overlying owner to such water as is needed for his reasonable and beneficial uses. A hasty reading of the California cases suggests some confusion in that respect, but, taking them case by case on their particular facts, they show a pattern of decision from which a rule or standard has been developed by the Supreme Court of California for the determination of that problem, which gives full effect to the purposes and protections of the 1928 amendment.

■ A riparian and overlying owner cannot lose his right to a lower appropriator by prescription. San Joaquin & Kings River Canal & Irrigation Co. v. Worswick (Miller & Lux v. Worswick), 1922, 187 Cal. 674, 203 P. 999, certiorari denied 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797.

■ But it is the doctrine of City of Pasadena v. City of Alhambra, supra, and cases there cited, that even though a riparian and overlying right is not gained by use or lost by disuse, it may nevertheless be lost to an upper appropriator under the doctrine of prescription, if there is an actual, and not merely a threatened, invasion of the lower riparian and overlying owners' rights by the taking of water which the lower riparian or overlying owner needs for his *present* beneficial uses, if such taking is actual, open, notorious, hostile and adverse, continuous and uninterrupted for the statutory period of five years, and under claim of right. The protection to the lower riparian and overlying owner for his present needs is in self-help by the actual taking from the wrongful appropriator of the water needed by the riparian or overlying owner before the

five year period—City of Pasadena v. City of Alhambra, supra, 33 Cal.2d at page 931, 207 P.2d 17—(a procedure manifestly impossible in this instance with the dam in the possession of the United States and under armed guard), or by seeking the aid of the Courts as here, in a form of declaratory judgment and injunction, or physical solution as soon as it becomes apparent from the stream or well levels, or the actual loss of water, or other conduct or threats, that he will be injured in his right. Peabody v. City of Vallejo, supra, and City of Lodi v. East Bay Municipal Utility District, supra.

■ City of Pasadena v. City of Alhambra, supra, is also authority for the proposition that a municipality or water district furnishing water to the inhabitants for domestic uses and owning overlying land may acquire an appropriative or prescriptive right to take underground water for domestic and municipal uses in both the overlying area and beyond.

■ As against a subsequent appropriator, the riparian and overlying owner has a paramount right to that flow of the water necessary for his reasonable beneficial uses, both present and prospective. Thus, though he can no longer compel the full flow of a stream through his property if the amount of that flow exceeds his needs for beneficial uses, he is entitled to so much of the flow, *all, if necessary, or its equivalent,* as is required for his beneficial uses. Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, at page 445, 90 P.2d 537, 91 P.2d 105; Gin S. Chow v. City of Santa Barbara, supra; Peabody v. City of Vallejo, supra; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra; City of Lodi v. East Bay Municipal Utility District, supra.

■ What constitutes reasonable beneficial use or unreasonable use of water is a question of fact for judicial determination in the varying circumstances as they arise. And this is so

**112**

whether the right under consideration is riparian, overlying, appropriative, or prescriptive. Gin S. Chow v. City of Santa Barbara, supra; Meridian, Ltd. v. City and County of San Francisco, supra; Peabody v. City of Vallejo, supra; Turner v. James Canal Co., 1909, 155 Cal. 82, 99 P. 520, 22 L.R.A.,N.S., 401; Callison v. Mt. Shasta Power Co., 1923, 123 Cal. App. 247, 11 P.2d 60; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 178 P.2d 844.

It necessarily follows that what is surplus, excess or unappropriated water, or what is a waste of water, are also questions of fact for judicial determination, as surplus or excess water can exist only if there are no prior vested rights to the reasonable and beneficial use of it. Gin S. Chow v. City of Santa Barbara, supra, 217 Cal. at page 698, 22 P.2d 5; Matthiessen v. Montecito County Water District, 1933, 217 Cal. 788, 22 P.2d 19.

Although a riparian owner is protected as to present and prospective beneficial uses, the amount of water which he is entitled to have flow through or past his land at a given point in time is to be measured by his *then present* needs for reasonable and beneficial uses. City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, 142 P.2d 289; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 1935, 3 Cal.2d 489, 525, 45 P.2d 972; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 81 P.2d 533; City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 207 P.2d 17. His protection as to prospective needs is found in the doctrine that prescriptive rights are not acquired by taking or appropriation of surplus waters. City of Pasadena v. City of Alhambra, supra; Orchard v. Cecil F. White Ranches, 1950, 97 Cal.App.2d 35, 217 P.2d 143; City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, 142 P.2d 289.

The changing crop pattern forced by increases in population and economic conditions may make a riparian or overlying owner's land *adaptable 10 years from now*, five years beyond the period of prescription, to the raising of crops which require 6 acre-feet of water per year, whereas the land may now be growing crops which require only 2 acre-feet per year. If the present crops require only 2 acre-feet per year all above that is surplus and may be presently appropriated and no prescriptive right can ripen against it; the farmer cannot know today what economic or population conditions will require a change of crop pattern to which his land *may* be adaptable; he may not know today that the fruit which he is growing will have no market 10 years from now, and at the same time he may not know that rice with its excessive demands for water will be the only crop which will have a market and which he can grow, or that his land may be adaptable to grow potatoes in winter and cotton in the summer, or several crops of truck gardening in a year. Grapes are giving way in some instances to alfalfa, a thirstier crop, but one in increasing use because of the demands of the growing population for dairy products, with an immediate market.

It is stated in Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 1935, 3 Cal.2d 489, at page 525, 45 P.2d 972, that as to prospective beneficial uses of the riparian owners, the judgment or decree should declare such prospective uses paramount to any right of the appropriator in order to protect the riparian owner from losing his rights by prescription.

Inasmuch as it is the established law that prescriptive rights can accrue only as to non-surplus water—Fall River Valley Irrigation District v. Mt. Shasta Power Company, 202 Cal. 70, 259 P. 444, 56 A.L.R. 264; City of Pasadena v. City of Alhambra, supra, 33 Cal.2d at page 926, 207 P.2d 17—the above statement in Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra;

would at first seem to indicate that the difference between water *presently* needed and that *which may in the future* be needed by a riparian or overlying owner for his reasonable and beneficial uses is non-surplus water. However, it is clear from the later cases—City of Los Angeles v. City of Glendale, supra, and City of Pasadena v. City of Alhambra, supra —that all water *above that presently needed by* the riparian and overlying owner is excess or surplus water, and may be appropriated, but no prescriptive right can accrue under such appropriation against the *future* reasonable and beneficial needs of the riparian and overlying owner. If there could be any doubt that such was the holding in City of Pasadena v. City of Alhambra, supra, it is dispelled by the dissent in that case where, 33 Cal.2d at page 944, 207 P.2d at page 39 the dissenting judge, in objecting to the decision of the majority stated: "Under the present rule, an appropriator may use water, incur obligations, etc., and then, later, when the riparian [or overlying] owner desires to use the water, have his rights taken from him." This statement is made by the dissenting judge in concluding his objections to the majority holding that a prescriptive right cannot be acquired in water not presently needed by the riparian or overlying owner, and that the riparian or overlying owner need not seek a declaratory judgment within the prescriptive period in order that water may be available to him in the future when he needs it.

In City of Los Angeles v. City of Glendale, supra, 23 Cal.2d at page 75, 142 P.2d 289, the Court pointed out that the Constitutional amendment destroyed the right of the riparian or overlying owner to object to the use of water not presently needed.

The pronouncements in the last above-cited cases that prescriptive rights are not acquired by the taking of surplus waters, seem to be in recognition of the fact that the giving by the Constitutional amendment of a right to appropriate, in derogation of the previous common law right of the riparian owner to have the full flow of the stream, left in the riparian owner a somewhat flexible right variable according to his needs, and that, as to the difference between present needs and prospective beneficial needs, the use by the upstream appropriator was either permissive or non-invasive as to the paramount riparian rights. This is eminently reasonable because any other doctrine would lead to excessive litigation in that a riparian or overlying owner would otherwise have to institute suit each time there was an attempted appropriation in order to protect his right to prospective beneficial use against loss by prescription.

The modification of the rights of riparian and overlying owners from an absolute right at all times to a flexible right dependent upon his needs, has thus resulted in a concomitant modification of the doctrine of prescription. Both rights have yielded under the cases to the Constitutional command of beneficial uses of all the waters of the State at all times.

Since a lower or overlying riparian owner is limited to water needed for reasonable beneficial use, and is protected against prescription by an appropriator of water in excess of, or surplus to, his present needs, the rule has evolved that mere proof of diminution of the flow of a stream by an upstream diversion will entitle the riparian owner or the overlying owner to an injunction only if it appears that after diversion there does not remain sufficient water to satisfy his reasonable demands for beneficial use; and, if the flow of water is not sufficient, he may compel the full natural flow of the river, if needed, *or its equivalent,* to meet those demands. The equivalent may be a *physical solution,* if one is possible, which subject is hereafter more fully discussed. Meridian, Ltd. v. City and County of San Francisco, supra, 13 Cal.2d at page 446, 90 P.2d 537, 91 P.2d 105.

Although it is a question of fact in each case as to what is a reasonable beneficial use, it has long been established that uses for domestic pur-

poses, irrigation, and municipal purposes, and storage for such purposes, are beneficial uses. It was held in Meridian, Ltd. v. City and County of San Francisco, supra, that storage for purposes of flood control, equalization and stabilization of flow, and future use, are beneficial uses, but that such right is subordinate to beneficial uses made in the exercise of riparian, overlying, and prior appropriative rights, and may be exercised only upon surplus waters pursuant to appropriations lawfully and properly made.

In the protection afforded to underground waters against an appropriator, the decisions recognize no difference in the rights of an overlying owner regardless of the manner by which the waters reach the underground, whether by percolating through gravel beds and beyond the land of the overlying owner—City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439—or by forming an underground basin or lake—City of Pasadena v. City of Alhambra, supra. In this respect the proposition announced in Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, at page 279, 107 P. 115, 27 L.R.A.,N.S., 772, to the effect that the rights are equally protected, has not been modified or overruled. The only respect in which that case was modified in City of Lodi v. East Bay Municipal Utility District was to apply the doctrine of reasonable use, of the 1928 Constitutional amendment. The Lodi case requires a court to impose a physical solution, if one is possible, instead of permitting the enforcement of the right by injunction to a full flow of the river to force a small quantity of water into the adjacent underground.

Prior to 1928 one having vested rights was entitled to an injunction to compel the full flow of the river, and could not be compelled to accept a conditional injunction by way of a physical solution which would provide him with water and at the same time prevent waste.

The Statements in City of Lodi v. East Bay Municipal Utility District, Peabody v. City of Vallejo, and Rancho Santa Margarita v. Vail that one who has a vested right to take groundwater may not compel the full flow of a stream to force a relatively small quantity of water into the underground, must be read in light of the holdings in those cases that such overlying or riparian owner was nevertheless entitled to the full flow or to a *physical solution* which *would give him the equivalent of the full flow of the stream "undiminished in quantity and unimpaired in quality."* Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, at page 445, 90 P.2d 537, at page 547, 91 P.2d 105; Gin S. Chow v. City of Santa Barbara, supra; Hillside Water Co. v. City of Los Angeles, 10 Cal.2d 677, 76 P.2d 681; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 3 Cal.2d 489, 45 P.2d 972.

Taking a single example, in City of Lodi v. East Bay Municipal Utility District supra, it was determined that although the takers from the underground did not have the right to the full flow, there was an obligation on the diverter to either maintain natural conditions to allow percolation or, at his expense, to supply water directly to the City, or work out some other physical solution in event of a dangerous lowering of the groundwater table.

It is of course a question of fact to be determined from all the evidence as to the amount of water which percolates from a stream, as well as the course and direction thereof.

Keeping in mind that we are not dealing here with rights *inter sese* between either riparian, overlying owners, or appropriators, it is well to state the rules as succinctly as possible, as evolved by the California cases, interpreting and applying the 1928 Constitutional amendment insofar as they are applicable in this case.[62] They are these:

---

62. The facts of this case do not require any discussion of the law relating to loss of rights by an appropriator when he ceases to put the water to reasonable

1. Reasonable and beneficial uses of water by reasonable methods of diversion and use are limitations equally applicable at all times, to all water rights, whether riparian, overlying, appropriative, prescriptive, or claimed public use;

2. The right of a riparian or overlying owner to all water necessary for the reasonable and beneficial uses to which his land is now or may be adaptable in the future is paramount to the right of any subsequent or inferior appropriator;

3. The water necessary for such uses may require the full natural flow of the stream, or its equivalent, by way of a physical solution;

4. Such rights of the riparian or overlying owner are enforceable by injunction or decree only as to his then present needs;

5. Water in excess of such then present needs is excess or surplus water, and is subject to appropriation until, and only until, the prior riparian or overlying owner needs the water for his then beneficial and reasonable uses, at which time the riparian or overlying owner is entitled, as against the appropriator, to enforce such use by injunction or decree;

6. The appropriator of such surplus or excess water can acquire no right by prescription to such surplus against the prior riparian or overlying owner, and the riparian or overlying owner need not bring suit within the prescriptive period of five years to protect that right;

7. Prescriptive rights can be acquired against a prior riparian or overlying owner by an appropriator who takes the water presently needed by the riparian or overlying owner, if the taking is an actual taking, not merely a threatened one, and if it is open, notorious, hostile and adverse, continuous and uninterrupted for a period of five years, and under claim of right;

8. Such prescriptive right can be prevented by the filing of a suit by the riparian or overlying owner, or "self-help"

(actual taking of water used by the appropriator) within five years.

It is thus seen from the cases that under the California Constitutional amendment of 1928 making all rights to the use of water subject at all times to reasonable and beneficial uses by reasonable methods of diversion and use, that a right to a fixed and given quantity of water in the flow of any stream cannot be permanently established against the world, regardless of the claim of right or method of taking the water. While the Constitutional amendment thus results in uncertainty as to any permanent measureable quantity of water to which any right may be entitled, it does result in the certainty, born of necessity, that waste of water will be minimized, and that the maximum amount of water will be available for beneficial uses.

With these general observations the Court will now turn to the discussion of specific claimed rights of the various parties.

## XII.

### California Water Rights of Plaintiffs.

 From the facts disclosed by the evidence, it is clear, under the California law, that:

1. The plaintiffs and members of their class lying within the alluvial cone of the San Joaquin river had vested rights, riparian, overlying, appropriative and/or prescriptive to the full natural flow of the San Joaquin river for surface diversion as it flowed between Friant and Gravelly Ford, and for charging, recharging and replenishing the underground waters within the alluvial cone of the San Joaquin river as it flowed between Friant and Mendota; as will later appear, the precise nature of the right attaching to each individual parcel of land is immaterial.

2. These rights were vested for many years, at and prior to the time of the commencement of the Friant project or

and beneficial uses by reasonable methods of diversion and use. See Water Code,

Sections 1240 and 1241, and former Civil Code Section 1411.

any of the events leading up to it, and at and prior to the adoption of the 1928 Constitutional amendment, and at and prior to any legislation by the State of California and the United States, and at and prior to the time of filing any of the applications to appropriate water now held by the United States, and at and prior to the assignment of those applications to the United States, and at and prior to the execution of the Purchase and Exchange contracts and other contracts; and at and prior to filing the within suit;

3. No legislation adopted by the State of California or by the United States deprived the plaintiffs or the members of their class of those rights in any degree, or indicated any intention to do so, and no engineering or other reports on the Central Valley Project, or any statements therein by either the State of California or the United States deprived them of those rights in any degree;

4. The 1928 Constitutional amendment safeguarded those rights and did not destroy them, but limited them to such portion of the natural flow of the San Joaquin river, all, if necessary, or its equivalent,[63] required to satisfy the demands for reasonable and beneficial uses by reasonable methods of diversion and use to which the land is presently or in the future may be adaptable, not only for surface diversion but for the purpose of recharging and replenishing the underground supply;

5. The impounding and diversion of water at Friant, as threatened shortly before this suit was filed, and as since carried out by defendants, and proposed to be carried out in the future, did not and does not and will not permit sufficient water to flow down the river to satisfy the lawful rights of the plaintiffs and their class as above set forth;

6. Those rights were at the time of the filing of this suit, and hence are now, paramount and superior to any rights of the defendants, or any of them, and the impoundment and diversion of water at Friant as threatened, carried out, and proposed, will be an impingement upon, and an injury to those rights, and thus unlawful as to those rights, *unless,* prior to the filing of this action (a) the defendants acquired superior rights by affirmative action, or (b) the plaintiffs and their class lost those rights by inaction, to which questions the court now turns.

## XIII.

### California Water Rights of Defendants.

The affirmative action upon which defendants rely is not clearly stated, but depends either upon rights under (a) the so-called Miller and Lux Purchase and Exchange contracts and other contracts, which raises the question of (b), the right to change the point of diversion; (c) the assigned applications to appropriate; or (d) prescription by the actual building of the dam and works and the ensuing impounding and diversion of water.

The asserted inaction of plaintiffs, upon which defendants rely, is claimed (e) laches, (f) estoppel, and (g) intervention of public use.

In dealing with each of the contentions of the defendants it is only necessary to determine in each instance whether the United States acquired any water rights superior to the vested rights of the plaintiffs and their class. If superior rights were acquired, it would follow that plaintiffs and their class could not object to any encroachment upon their needs to water. If no superior water rights were acquired by the United States, it follows that the vested water rights of the plaintiffs and their class are paramount and are entitled to that protection which a Court of equity is empowered to provide. The precise extent of that protection to which paramount vested rights are entitled in the case of an encroachment by inferior rights will be dealt with under the heading "Physical Solution."

---

63. The quantity of water thus needed will be dealt with under the heading "Physical Solution."

Turning to the rights claimed by defendants to exist on the basis of affirmative action by them, the Court will consider first the so-called Purchase and Exchange contracts.

### XIII.

(a) Purchase & Exchange Contracts.

(b) Change of Point of Diversion.

The phrase "Purchase and Exchange Contracts" refers to a number of contracts whereby the United States purchased water rights in some instances, and in other instances also agreed to give water in exchange for that purchased.

Copies of some of the contracts are collected in Exhibit A–48–A, and data concerning the others is also included therein.

Those relinquishing their water rights to the United States may be referred to as the "grantors." In essence, the grantors fall into two groups with relation to the location of their property: The *first* group consists of a number of riparian owners interspersed along the San Joaquin river between Friant and Mendota; these grantors contractually relinquished their riparian rights to the United States without conveying their lands; the *second* group, which is emphasized by the defendants as being of greater importance, consists essentially of appropriators of water and riparian owners downstream from the lands of plaintiffs; by contract they also relinquished to the United States their water rights of whatever character without conveying their lands.

More specifically, the *first* group covers about a hundred contracts which were made beginning in 1944 and continued after the commencement of this action, whereby the owners of riparian rights *upstream from Mendota,* severing their water rights from their land, relinquished those rights to the United States without transferring their land.

Included in this group are the Edison Securities contract,[64] and the Madera Irrigation District contract only insofar as its riparian rights are concerned, as well as other contracts concerning those riparian lands which had so-called Miller and Lux Reservations.

The *second* group involves land owners or appropriators mostly at or *downstream from Mendota,* although some involved diversions at and between Gravelly Ford and Mendota. As to the plaintiffs and their class, the same principles of law apply whether the diversion was below Gravelly Ford or Mendota. The two principal contracts in this group are the so-called Miller and Lux Purchase contract and the Miller and Lux Exchange contract.[65] Inasmuch as what is said concerning the rights between plaintiffs and their class and the defendants, arising out of the Miller and Lux contracts, applies equally to the other contracts, the other court will not be described.

These two contracts were dated July 27, 1939. The contracts were between the United States and Miller & Lux, Inc. and the Gravelly-Ford Canal Company, Inc., but were consented to by the Canal Companies controlled by Miller and Lux, namely, the San Joaquin and Kings River Canal & Irrigation Company, Inc., the San Luis Canal Company, the Firebaugh Canal Company, and the Columbia Canal Company, all of whom may be regarded as grantors. Under the Purchase contract, in substance, the United States agreed to pay the sum of $2,450,000 for the right, as against the grantors and as against the lands of the grantors specifically described, to divert, store, and use by means of Friant dam "all the waters of the San Joaquin river measured at Whitehouse gauging station, as they would flow in the absence of operations by the United States, *in excess* of the aggregate 24-hour mean flows in cubic feet per second as specified in the sched-

64. Covering the Herminghaus lands, the riparian rights to which were adjudicated in Herminghaus v. Southern California Edison Co., supra.

65. Described in United States v. Gerlach Live Stock Co., 339 U.S. 725, at page 742, 70 S.Ct. 955, 94 L.Ed. 1231, as a "strange transaction."

ules set out in the contract, which ranged from a minimum of a release of 400 second-feet in January, to a maximum of 2,475 second-feet during July of each year.[66] Under the Exchange contract, in substance, the grantors agreed that when, and only when, the United States supplied substitute water below Whitehouse gauging station at Mendota pool in the quantity equal to that set forth in the schedules above referred to in the Purchase contract, the United States could store and divert the waters of the San Joaquin river at Friant, insofar as the grantors only were concerned. The substitute waters were to be furnished from the Sacramento river by way of what is now the Delta-Mendota canal. Miller and Lux retained their riparian and appropriative rights to San Joaquin water in the amount set forth in said schedules, which is in excess of 1,000,000 acre-feet per year. These contracts together provide in substance that in exchange for the waters of the San Joaquin river formerly used or purveyed by the grantors, the United States paid approximately $2,500,000 under the *Purchase contract* and agreed, by the *Exchange contract,* to furnish water to the grantors, from the Sacramento river by way of what is now the Delta-Mendota canal, to empty into the Mendota pool to supply the uses for water to the lands formerly served by all of the Canal Companies which theretofore took water from the San Joaquin river either above Mendota or at Mendota; that is to say, the San Joaquin river waters which the grantors had the right to take, either above or below Mendota, and to use below Mendota, were to be exchanged at Mendota for Sacramento river waters. If at any time the exchange water from the Sacramento river is not furnished at Mendota, the grantors in the Miller and Lux contracts have the right to receive that flow set forth in Footnote 66, ante, from the San Joaquin by releases from Friant dam.

The question is: what rights, *if any,* were acquired by the United States *as against the plaintiffs* and their class, by those contracts?

As to the rights acquired from the *first group,* riparian owners along the San Joaquin river who contractually relinquished their rights to the United States, the law is well settled in California.

 The effect of a grant of riparian rights as separate from the land is simply to convey the grantor's right to the use of water on his own riparian land, and to estop the grantor to complain against any use of water the grantee may make to the injury of such riparian right. The "estate or interest acquired" by the grantee consists of a

---

66. The schedule for measurements at Whitehouse in second-feet, decreased, by the upstream diversions of the Miller and Lux Canal Companies, as set forth in the contract, is as follows:

| Month | : Schedule 1 : | Schedule 2 |
|---|---|---|
| January | : 372 : | 28 plus Chowchilla Canal Water Right (a) |
| February | : 495 : | 40 ditto |
| March | : 1,242 : | 68 ditto |
| April | : 1,837 : | 113 ditto |
| May | : 2,144 : | 141 ditto |
| June | : 2,291 : | 159 ditto |
| July | : 2,316 : | 159 ditto |
| August | : 2,099 : | 111 ditto |
| September | : 1,267 : | 68 ditto |
| October | : 620 : | 40 ditto |
| November | : 445 : | 40 ditto |
| December | : 372 : | 28 ditto |

(a) The Chowchilla right is described in full in the contract; it varies between 60 and 120 second-feet.

waiver of any right of the riparian grantor to insist on his riparian interests. The purchaser merely buys the riparian's right to object to the purchaser's use. The one riparian owner or any number less than all cannot by grant extinguish or diminish the riparian rights attaching to the land of other non-consenting riparian owners, and the conveyance does not in any manner affect their rights. Spring Valley Water Co. v. County of Alameda, 88 Cal.App. 157, at pages 164–169, 263 P. 318; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 911, 178 P.2d 844; Mt. Shasta Power Co. v. McArthur, 1930, 109 Cal.App. 171, 192, 292 P. 549; California Pastoral & Ag. Co. v. Madera Canal & Irrigation Co., 1914, 167 Cal. 78, 86, 138 P. 718.

 Riparian rights, being part and parcel of the land to which they attach, must be exercised and the use must be made only on the parcel of land to which the rights attach; and such rights cannot by transfer be made to attach to any other parcel of land. Parker v. Swett, 1922, 188 Cal. 474, 485, 205 P. 1065. And when a riparian right is severed from the land to which it is attached by transfer, it cannot thereafter be classed as a riparian right. Spring Valley Water Co. v. County of Alameda, 1927, 88 Cal.App. 157, 263 P. 318. It follows that when a change in the point of diversion of water is made, or attempted to be made, to land other than that to which the riparian right formerly attached, then the law governing the right to divert is the law relating to appropriation of water, and not the law relating to riparian rights.

These principles of law apply with equal force to whatever *riparian rights* were transferred by those in both the first and second group.

 The delineation of California law leads immediately to the conclusion that, by the contracts for the transfer to the United States of the riparian rights, the United States acquired no rights against the plaintiffs, who, as in-dicated, possess riparian, overlying, appropriative and prescriptive rights to the full natural flow of the San Joaquin river, if needed. The United States acquired only a right to invoke the doctrine of estoppel against the lands and their owners covered by those contracts. It did not by those contracts acquire the right, *as against plaintiffs and their class,* to impound and divert any water at Friant.

 A further consideration of the *second group* of contracts exemplified by the Miller and Lux contracts, commences with an examination of the case of San Joaquin & Kings River Canal Co. v. Worswick, and Miller & Lux, Inc., v. Worswick, decided in 1922—187 Cal. 674, 203 P. 999, certiorari denied 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797. It is of especial significance in that both Miller & Lux, Inc. and the San Joaquin & Kings River Canal Company were grantors in the Purchase and Exchange contracts, and *the rights adjudicated in that case were among those transferred to the United States by such contracts.*

In the above-mentioned case, the plaintiffs San Joaquin & Kings River Canal Company and Miller and Lux were downstream appropriators, and Worswick and others, the defendants, were upper riparian owners of land situated on the San Joaquin river between Mendota and Friant, as are the plaintiffs here.

Among other contentions upon which the plaintiffs relied in that case was the assertion that at the time of the appropriation of water, the lands of the riparian defendants were public lands, as were the lands of plaintiffs, and that plaintiffs' appropriations, being prior to the acquisition of the lands by defendants, they, the defendants, had no right to divert or use the water on their riparian lands. The decision of the question turned on whether or not the lands of the plaintiffs, Miller & Lux and the Canal Company, were public lands at the time of their appropriation of water. The Court affirmed the doctrine recognized by the California decisions that water rights acquired by an appropria-

tion or diversion on *private land* which lay downstream from an upper riparian or diverter are not superior to the riparian rights pertaining to any land above the place of diversion; and also affirmed the doctrine of previous cases that where a diversion is made by an appropriator on land then belonging to the United States, the right of the appropriator to the water thereby taken is superior to the riparian rights of a subsequent purchaser from the United States of riparian land lying above the point of diversion. But the Court held that the lands of Miller and Lux and the Canal Company were not public lands at the time of their appropriation and diversion of water, but were private lands, and hence, they acquired no right by appropriation, prescriptive or otherwise, and could acquire no right, prescriptive or otherwise against the upper riparian owners.

■ The general rule applicable here, affirmed in that case, and since, is as follows: A riparian proprietor's right to object to any use or diversion of water ceases when the water has flowed past his boundary, hence, any diversion below his land, regardless of how long continued or what may be the nature of the claim of right, whether riparian or appropriative, is not an invasion of the upper riparian's rights, and thus is not and cannot be a hostile or adverse use which may ripen into prescription. San Joaquin & Kings River Canal Co. v. Worswick (Miller & Lux v. Worswick), 1922, 187 Cal. 674, 203 P. 999, certiorari denied 258 U.S. 625, 683, 684, 42 S.Ct. 382, 66 L.Ed. 797, cited with approval after the 1928 amendment; Akin v. Spencer, 1937, 21 Cal.App.2d 325, 69 P.2d 430, hearing denied by California Supreme Court; Peake v. Harris, 1920, 48 Cal. App. 363, at pages 381–382, 192 P. 310, Opinion of Supreme Court on hearing; Hargrave v. Cook, 1895, 108 Cal. 72, 77, 41 P. 18, 30 L.R.A. 390.

■ It is well established that while an appropriator of water may change the place of diversion when the rights of others are not adversely af-

fected thereby, the place of diversion cannot be changed to an entirely different tract when to do so will adversely affect the rights of intervening owners. City of San Bernardino v. City of Riverside, 1921, 186 Cal. 7, 198 P. 784; Scott v. Fruit Growers Supply Co., 1927, 202 Cal. 47, 258 P. 1095; City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439. The provisions in the Water Code relating to change of point of diversion, by an appropriator of either surplus or nonsurplus water, Sections 1701–1706 inclusive, are in accord with the holdings of the above cases.

■ Applying the above rules to the *second group,* i. e., those owning rights downstream from plaintiffs, and who, as grantors, contracted with the United States, it is apparent that such grantors had no riparian rights superior to plaintiffs and their class, and acquired no appropriative or prescriptive rights of appropriation against plaintiffs and their class as upstream owners of vested water rights, by the downstream use or appropriation of water. It is true that insofar as the downstream users may have been exercising riparian and overlying rights, the doctrine of correlative rights gave the right to each owner to enforce reasonable, beneficial use by upstream owners, but this same doctrine now applies to all water rights. However, this right to enforce reasonable beneficial use between similarly situated riparian and overlying owners gave no superior position to downstream rights but left them in the inferior position of being entitled to only that water which reached them after the reasonable beneficial uses to which those above desired to apply the water, were satisfied.

Thus, at the time of the contracts, the downstream users, whether riparian or appropriative, and howsoever acquired, had only rights inferior to the plaintiffs and their class.

Not only were the downstream rights inferior in this respect, but under the cases above cited and the California

Codes,[67] the downstream users who were grantors to the United States could not have changed the point of diversion to Friant to the detriment of the intervening vested rights of the plaintiffs.

It is axiomatic that the users downstream from the plaintiffs could not create in the United States, by the contractual relinquishment of their rights to the United States, any higher right than they themselves possessed and could exercise.

It follows that the United States, by the Purchase and Exchange contracts, and the other contracts above described, acquired no water rights superior to plaintiffs, and acquired no right to divert and impound water at Friant to the detriment of the plaintiffs and their class as owners of vested rights between Friant and Mendota.

### XIII.

#### (c) Applications to Appropriate Held by the United States.

Various applications to appropriate water were filed under the California Water Code, and were assigned to the United States in 1939. Two were previously held by the Madera Irrigation District—No. 234 filed January 19, 1916, designating Friant as the place of diversion, and No. 1465 filed September 26, 1919, designating Friant on the San Joaquin, and Henrietta on Fine Gold Creek as the place of diversion.[68] Miller and Lux filed six applications, No. 5817 to No. 5822 inclusive, in February, 1928, designating various places of diversion, both above Mendota and below. Two were filed by the Department of Finance of the State of California, No. 5638 on July 30, 1927, designating Friant as the place of diversion, and No. 9369 on August 2, 1938, designating Friant and Temperance Flat (above Friant) as the place of diversion. The United States amended all applications on December 20, 1951 (three years after this suit began), seeking to change the point of diversion to Friant dam on all of them, except various alternate points of diversion were designated in the Miller and Lux assigned applications.[69]

None of the applications have been pursued to permit. And, although some had been pending for more than 30 years, no hearings were called by the State until seven years after this action had been pending.

---

67. California Civil Code § 1412 until its repeal in 1943, and California Water Code, §§ 1701–1706 inclusive since 1943.

68. By a contract made in May, 1939, the Madera Irrigation District transferred to the United States the property comprising the Friant dam site as well as certain gravel lands lying below Friant, and also whatever rights it had to the use of water in the river, giving to the United States, as against said District only, the right to impound, store and divert the water. The contract specifically covered an assignment of applications to appropriate water—Applications No. 234 filed January 19, 1916, No. 1465 filed September 26, 1919, and No. 2792 filed March 31, 1922. In a final judgment in case No. 25729 of the Superior Court, in and for the County of Fresno, known as the Haynes decree, Miller & Lux was adjudicated to have the right of the entire flow of the river delivered to them as against any rights claimed by the Madera Irrigation District in Applications Nos. 234 and 1465. That decree also provided that as against the riparian rights of Miller & Lux, the right of the Madera Irrigation District by virtue of said applications was to divert only the extraordinary or unusual flow of the waters in the river which were defined to be a flow in excess of 20,000 cubic feet per second at any time, or in excess of 3,000,000 acre-feet in any one year as the river would flow in its natural condition unaffected by storage by the Power Companies or by the diversions up the river.

69. In addition to the applications, there was assigned to the United States by Miller and Lux the permit and license issued on Application No. 23 to Panoche Water Association for diversion of a small amount of water in the vicinity of or below Mendota. What is said concerning the change of point of diversion under the heading "Purchase and Exchange Contracts" is applicable to this license and permit.

The total amount of water sought to be appropriated in the aggregate by the applications exceeds 4,210,000 acre-feet per annum, as against the average annual flow of 1,800,000 acre-feet per annum, and the highest recorded flow since 1908 of 3,560,000 acre-feet which was in 1911.

The California Water Commission Act as adopted in 1913, Cal.Stats.1913, p. 1012, and as variously amended thereafter, was codified in 1943 as part of the California Water Code.

The portion of the Water Code relating to applications to appropriate water is Part 2 of Division 2 of the Water Code, Sections 1200 to 1801 inclusive.

The Water Commission Act and the Water Code relating to appropriation of appropriable, i. e., surplus waters, was introduced into the law to bring some orderly procedure to the matter of appropriation of waters, which was originally accomplished by merely taking them, and later by the posting of a notice followed by the actual taking and use of water. Bloss v. Rahilly, 1940, 16 Cal.2d 70, 75, 104 P.2d 1049.

The general scheme of Part 2 of Division 2 of the Water Code provides for the filing of an application to appropriate, the giving of a notice of hearing, the holding of a hearing, the granting of the permit, to be followed by construction of diversion works, and upon the completion of diversion works, to be followed by a license from the State of California.

It was held in Crane v. Stevinson, 1936, 5 Cal.2d 387 at page 391, 54 P.2d 1100, at page 1102, that acquisition by appropriation of waters subject to appropriation, i. e., surplus water, "is regulated by the provisions of that law."

By Section 1200 it is provided that the provisions of the Water Code, relating to applications to appropriate water, apply only to surface water and subterannean streams ' flowing through known and definite channels, and not to underground percolating waters.

Gould v. Eaton, supra; City of Pasadena v. City of Alhambra, supra, and by Sections 1201–1202 only surplus water in such streams is subject to appropriation in the manner provided for by the Code.

Section 1225 of the Water Code, § 1c of the Water Commission Act, in 1936, at the time of the decision in Crane v. Stevinson, supra, provides as follows: "No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division." Section 1380 provides for the issuance of a permit upon approval of an application, after hearing and notice; Section 1375 declares as a prerequisite to the issuance of a permit that it must appear, inter alia, that there is unappropriated water available to supply applicant; Section 1381 provides that "The issuance of a permit gives the right to take and use water only to the extent and for the purpose allowed in the permit"; Section 1390 provides that the permit is effective for such time as water is actually appropriated and put to beneficial use, but no longer; Section 1395 requires that construction work upon any project shall begin within the time provided in the permit, which time shall be not less than 60 days from the date of the permit, but may be extended; Section 1396 requires the prosecution of the work with due diligence; Section 1410 is important in connection with the general scheme of the Code that a permit shall be issued before work is commenced, in that it provides that if work is not commenced, prosecuted and completed, or water appropriated to beneficial use as contemplated in the permit, the permit may be revoked after a hearing, and the water made subject to further appropriation; Section 1455 provides that the issuance of a permit continues in effect the priority of a right as of the date of the application, and "gives the right to take and use the amount of water specified in the permit until the issuance or the refusal of issuance of a license for the use of the water"; Chapter 9, Sec-

tions 1600–1677 inclusive, relates to the issuance of licenses upon completion of the project, and provides that such licenses shall be under the terms and conditions of Division 2, and shall be effective only so long as the water is appropriated and put to a useful and beneficial purpose, but no longer; that chapter also provides for revocation of licenses; Chapter 10, Division 2, §§ 1700–1706, deals with the change of point of diversion, and permits such change if the change will not operate to the injury of any legal user of the water involved.

While the plaintiffs assert that the assignments made by the Department of Finance of the State of California in 1939 to the United States are contrary to the California Constitution and laws in that they purport to transfer to the United States "all right, title and interest in and to the water" covered by them, it is not necessary to reach that question here, but it will be treated hereafter under the heading "Watershed and County of Origin Statutes."

The query is: Did the United States, by the assigned-applications to appropriate water, acquire any right to take water at Friant superior to the rights of the plaintiffs and members of their class?

 It is clear from the sections of the Water Code above mentioned that the mere filing of the applications and their assignment, and the amendment of such applications filed by the United States, did not vest in the United States any right to appropriate, i. e., impound and divert, water at Friant, either surplus or non-surplus. City of San Bernardino v. City of Riverside, 186 Cal. 7, 138 P. 997 at pages 13–14, 198 P. 784; Palmer v. Railroad Commission etc., 167 Cal. 163, 172.

To hold that by the mere filing of applications, or the assignment thereof, to the United States, or the amendments thereto by the United States, a right was acquired to appropriate, impound and divert water at Friant would be to entirely disregard the provisions of the Water Code, which are clear, absolute and positive that "No right to appropriate or use water * * * shall be * * * acquired" (S. 1225), except upon the compliance with the provisions of the Code, and that the issuance of a permit gives the right to take and use water, Sections 1455 and 1381. Not only would such a holding be in complete disregard of the specific provisions of the Water Code, but to hold that one who is in a position of power may, by the filing of an application, the building of a dam, and the impounding and diversion of water, thereby acquire rights to the whole flow of a stream in derogation of all lower rights, would be to completely ignore the Constitutional amendment and the Water Code, and the long preceding history of legislation substituting orderly procedure and law for the doctrine which previously obtained in California that "might is the only protection. 'The good old rule Sufficeth them, the simple plan, That they should take who have the power, And they should keep who can.'" Katz v. Walkinshaw, 1903, 141 Cal. 116, at page 128, 70 P. 663, 74 P. 766, at page 769, 64 L.R.A. 236.

The United States is now actively pursuing these applications, the hearing on which was enjoined until the final decision of this suit. If the United States were the owner of the "fee title" to the water or its use, or otherwise had the right to impound and divert at Friant, there would be no need to file applications or secure permits to appropriate water.

The simple fact that the amount sought to be appropriated annually as surplus water, viz.: 4,210,000 acre-feet, is 2,410,000 acre-feet more than the average flow, and 650,000 acre-feet more than the highest flow ever recorded, is sufficient in itself to show how impossible it is, under any contemplation of the applicable law, to hold that the mere filing of the applications, or their assignment and amendment, without more, gave a vested right to impound and divert the entire flow of the river. If the

mere filing of the applications gave a vested right to the flow of the water claimed therein, against downstream riparian and overlying owners, then all downstream rights were thereby extinguished because more water is claimed as surplus than ever flowed in the river. If the filing of the applications gave a vested right to an amount less than that claimed, then all lower rights were endangered, as none could tell whose right was to be appropriated, or the amount thereof. If such vesting of right by filing the applications were to occur, there would have been no need in the United States to make the payment to the Miller & Lux Canal Companies of the sum of $2,450,000 on the Purchase and Exchange contracts, or to expend approximately $70,000,000 in building the Delta-Mendota canal to furnish Sacramento river water to downstream owners below Mendota, in exchange for San Joaquin river water, or to make other payments to downstream owners on the San Joaquin river above Mendota. If the rights were acquired by the filing of the applications in derogation of the rights of these plaintiffs and their class, then they were in derogation of all other downstream owners, and there would have been no need to pay anybody any money.

Another thing which shows that the filing of the applications vested no rights is the fact that the applications as filed and as amended by the United States in 1951, were by their text and terms "subject to existing rights" or "subject to vested rights."

■ Even if applications to appropriate water might under some conceivable theory of law be held to give a right to appropriate water, the provisions of the Water Code and the cases heretofore adverted to, limit any right of appropriation under the Water Code to surplus waters. As appears from the evidence and cases above mentioned in the general discussion, the plaintiffs and their class as riparian and overlying owners, have vested rights to all of the water that can be put to a reasonable

and beneficial use by reasonable methods of diversion for which their land is or may be adaptable, and to all of the flow of the stream if necessary, or its equivalent, which rights are paramount to any right of the appropriator. These rights, under the evidence, existed long prior to the filing of any of the applications.

As noted in the discussion of general California water law, the water required to satisfy the present needs for beneficial uses of the plaintiffs and their class as riparian and overlying owners, is not surplus and cannot be appropriated under the Water Code, Sections 1200 to 1801 inclusive. If water is not presently needed, it may be appropriated as surplus water, under those sections of the Water Code, until the riparian and overlying owner needs it for his reasonable and beneficial uses, at which time it ceases to be surplus water, and can no longer be appropriated. Thus no right to appropriate water needed by the plaintiffs for either present or prospective uses could vest by the filing of the applications to appropriate water, or by their assignment or their amendment or the granting of permits and licenses thereon.

■ A riparian owner has a present vested right before the appropriation begins, and his right cannot be divested by filing notices of intention to appropriate, or applications to appropriate, Turner v. East Side Canal & Irrigation Co., 1915, 169 Cal. 652, 147 P. 579, or the granting of permits to appropriate.

■ The ultimate conclusion regarding these applications to appropriate is that neither the bare applications nor the assignment thereof to the United States, nor the amendment thereof by the United States, gave any right to appropriate any water at Friant; that the right to appropriate any water under the statutory scheme depends on compliance with the Statutes and the granting of a permit; that there has been no compliance with the Statutes, and no

permits have been issued on the applications to appropriate at Friant; that even upon compliance with the statutory procedure and obtaining of permits to appropriate, only surplus waters can be appropriated under the Water Code, and no prescriptive right can attach thereto; that water presently needed for prior vested rights is not surplus; that even by a full compliance with the statutory procedure for appropriation of surplus waters in a stream, and the granting of permits and licenses, whatever rights are thereby acquired are subject to the prior vested rights of plaintiffs and their class to all of the water presently or prospectively needed for useful and beneficial purposes to which their land is or may be adaptable in the future, by reasonable methods of diversion and use.

Further discussion of the applications to appropriate water will be had under the headings "Public Use," "Watershed and County of Origin Statutes," and "City of Fresno."

## XIII.

### (d) Prescription.

Since the United States did not acquire any water rights superior to plaintiffs and their class by the applications to appropriate surplus water, did the United States by the impounding and diversion of water at Friant acquire any prescriptive rights against the plaintiffs?

In the determination of that question, several principles of California law, as set forth above, must be recalled.

First, a prescriptive right is acquired only where the use by the appropriator is actual, open and notorious, hostile and adverse to the riparian owner, continuous and uninterrupted for the five year prescriptive period, and under claim of right.

Second, since 1928 an appropriation of surplus waters is not a trespass on the rights of a lower riparian, and thus cannot be adverse or hostile, and cannot ripen into a prescriptive right.

Third, an appropriation of non-surplus waters, i. e., waters needed by the riparian or overlying owner, is a trespass, and wrongful, and may result in a prescriptive right as against the riparian or overlying owner.

Fourth, a lower riparian is protected as to both present and prospective water needs for reasonable beneficial uses, but the existence of surplus subject to a proper appropriation is determined with reference to his present needs, and all water above those needs is surplus at that time; when the amount of water needed by him increases, the additional water needed by him ceases to be surplus, and, if not released to him upon demand, the retention of that additional water is a trespass; but since that additional water continues to be surplus until it is needed by him, no prescriptive right can stem from its use until that time by the upper appropriator.

It is common sense that there is no invasion of the rights of a riparian owner, pumping directly from the river, until that water presently needed by him for his reasonable beneficial uses fails to come down the river in useable quantity.

It is likewise common sense that the rights of an overlying owner are invaded by an appropriator of waters from the source supplying the underground when the water level of the wells of the overlying owner drops in a manner indicating that the drop is due to a failure of supply. When this occurs his rights are invaded though he may still obtain water by further depleting any available underground reserve.

This common sense view is taken by the California cases which hold that there must be an act of invasion of a plaintiff's rights to commence the running of the prescriptive period. City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 207 P.2d 17; City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, 142 P.2d 289; Morgan v. Walker, 1933, 217 Cal. 607, 20 P.2d 660; Pabst v. Finmand, 1922, 190 Cal. 124,

129, 211 P. 11; Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 140 P.2d 798;[70] Faulkner v. Rondoni, 1894, 104 Cal. 140, 37 P. 883; Lakeside Ditch Co. v. Crane, 1889, 80 Cal. 181, 22 P. 76; Alta Land & Water Co. v. Hancock, 1890, 85 Cal. 219, 24 P. 645, 20 Am.St.Rep. 217; Hargrave v. Cook, 1895, 108 Cal. 72, 41 P. 18, 30 L.R.A. 390; City of San Diego v. Cuyamaca Water Co., 1930, 209 Cal. 105, 287 P. 475.

Under California law, the prescriptive period is interrupted by the filing of a suit which is pursued to judgment.

■■■ Suit having been filed September 25, 1947, the prescriptive period began five years before this—September 25, 1942—so the crucial question of fact is whether or not throughout that period there was any actual invasion, by impounding, storage and diversion of water in Millerton Lake back of Friant dam, of the rights of plaintiffs and their class to all of the water that could then be put to beneficial uses.

While the letter to the plaintiffs, [Exhibit 162] from Boke, stated that it is "claimed by some" that the storage of water occurring in 1941 was the date of the beginning of the prescriptive uses, the position of the defendants in that respect is not now clear. In any event, the impounding of 17,400 acre-feet of water back of the dam below the river outlets in 1941, being less than one per cent of the total flow of the river for that year, (2,607,000 acre-feet) did not, under the California cases, constitute an invasion of the rights of plaintiffs to water flowing in the river for their needs for beneficial uses. Especially is this so in view of the fact that no water at all was impounded in Millerton lake back of Friant dam from 1941 to 1944.

Prior to the beginning date for the prescriptive right to commence, viz.: September 27, 1942, there was no impounding of any water needed by plaintiffs and their class. Beginning in February, 1944, storage was made through June and again in October, November and December, but in the months of July, August, September and October, 1944, 219,790 more acre-feet of water was released downstream from Millerton lake through the outlets in Friant dam than flowed into Millerton lake. Only for a few days during April through September, 1944, was the flow of the river less than 2,000 second-feet, and many days it was more. In 1945 the same pattern was repeated except that the flow of the river at one time

70. The rule stated in the cases of Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 140 P.2d 798, and Seneca Consol. Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 287 P. 93, 70 A.L.R. 210, that seasonal and periodic storage of waters is adverse to the rights of lower owners of vested rights, and may thus ripen into a prescriptive right to store, must be read against facts in those cases showing that pre-1928 law was applicable, and that prescriptive right had accrued before the 1928 amendment. At that date all appropriations of a part of the natural flow of a stream were adverse to lower riparians, and could ripen into a prescriptive right. Since 1928 only an appropriation of non-surplus is adverse and can have this result. The doctrine applicable to storage begun since 1928 is set forth in Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, at pages 445–452, 90 P.2d 537. On page 451, of 13 Cal.2d on page 550 of 90 P.2d, the Court states that waters of a river "in excess of the needs of lower riparian owners and prior appropriators for all reasonably useful and beneficial purposes *have been released by the constitutional amendment of 1928 for storage and other beneficial uses* * * *, and that the injunctive or other processes of the court are not available to the lower riparian owners or appropriators to prevent the storage of such excess waters." This is in effect a statement that there is no invasion of lower vested rights by the storage of surplus since 1928. It follows that no inference is to be drawn from pre-1928 law that periodic storage is, since 1928, *ipso facto* adverse as to the entire flow of the river, but the proper conclusion is that set forth in 1939 in Meridian, Ltd. v. City and County of San Francisco, supra, concerning post-1928 facts and law.

was as high as 6,540 second-feet in May, and for a period of 30 days from April 20th to May 20th the flow exceeded 5,000 second feet. Many days throughout 1945 more water was released from Millerton lake through Friant than flowed into Millerton lake, and again in the months of July, August, September and October more water was released from Millerton lake through Friant than flowed into Millerton lake.

In 1946 the pattern was again repeated with flows exceeding 6,000 second-feet for a number of days in May, but with more water being released from Millerton lake through Friant than flowed into Millerton lake in July, August, September and October.

In 1947 the same pattern was again repeated. Many individual days considerably more water was released from Millerton lake than flowed into it, and except for a few days during the months of April through September was there a flow of less than 2,000 second-feet, and for a considerable number of days there was a much larger flow. In April, June, July, August, September and October larger flows were released from Millerton lake through Friant than flowed into Millerton lake.

Thus the flow of the river past Friant was in fact increased within the prescriptive period, although the pattern of the flow of the river past Friant was generally the same as during the five previous years since the power dams were built upstream from Friant in 1932.

It is important to note in that connection that all during the prescriptive period large flows occurred, up to as high as 6,000 second-feet, which performed the function of flushing the river of fines and algae which would fill the openings of the aquifers, and which large flows, with their force and volume, under all of the evidence in the case, contributed to the replenishment of the underground water in the area involved in this case. As one of defendants' witnesses put it—The large flows in the river acted as a water dam, and forced water out through the aquifers and adjacent permeable material—and all witnesses conceded that the greater the wetted perimeter, the greater the percolation.

While the letter of July 15, 1947, from Boke, constituted a threat to take plaintiffs' water, it was not until long after the trial started that the defendants proposed, in satisfaction of plaintiffs' rights, to release down the river only 48,400 acre-feet of water per year.

■ The evidence conclusively shows that on or prior to September 25, 1942, no water then needed for the actual and beneficial uses of the plaintiffs had been actually impounded or diverted; and that after the impounding began there was, nevertheless, sufficient water that flowed in the river past Friant dam to meet the then present needs of the plaintiffs and their class for beneficial uses, both for those pumping directly from the river and for those pumping from the underground; and that the flow of water needed by plaintiffs and their class for their reasonable beneficial uses was not impeded until after this suit was filed. Only water which was surplus as to the plaintiffs' then present needs was impounded prior to the time this suit was filed, and since the 1928 Constitutional amendment, the plaintiffs could not object to any impounding of surplus. City of Los Angeles v. City of Glendale, supra, 23 Cal. 2d at page 75, 142 P.2d 289. Consequently, the prescriptive period as to the non-surplus waters had not begun to run when suit was filed, and no prescriptive rights were acquired.

■ This would be ample to dispose of the claim of prescription, but there are buttressing reasons why no prescriptive rights were obtained against these plaintiffs and their class.

The plaintiffs and their class herein were assured continuously and repeatedly that their water rights would not be taken, that they would have plenty of water, and in fact, that the flow of it

would be increased—D.C., 90 F.Supp. 773. And, as above noted, during the summers of 1944, 1945, 1946 and 1947, more water was released from Millerton lake into the river channel through Friant than flowed into it. The case of Pyramid Land & Stock Co. v. Scott, 1921, 51 Cal.App. 634, 197 P. 398, is direct authority for the proposition that where there are such assurances, there can be no hostile use under claim of right. Furthermore, the letter of the Secretary of the Interior, dated March 30, 1953, states that the United States "will release from Friant Reservoir into the bed of the river a sufficient quantity of water (1) to meet all valid legal requirements for the reasonable and beneficial use of water, both surface and underground, by reasonable methods of diversion and reasonable methods of use in that area."

■ If a prescriptive right could be acquired against a downstream riparian or overlying owner, insofar as a surface stream is concerned, by the mere construction of a dam and the impounding and diversion of waters, surplus or non-surplus, then in order to protect the right to reasonable and beneficial uses of which his land presently is, or may be, adaptable, every riparian and overlying owner in the whole Central Valley whose lands lay below any of the dams which have been built[71] would have to, or would have had to, bring a suit within the period of five years from the date the first drop of water was impounded to protect the use to which not only his land is presently adaptable, but also to which it may be adaptable in 10 or 20 years. Or stated another way, every riparian and overlying owner, covering millions of acres of land in the whole Central Valley, depending on the surface streams where dams have been built for more than five years, who has not filed a suit, would have lost his right to water uses, and the language of the Constitution, that he has the right to all

water to which his land may be adaptable for reasonable and beneficial uses, would be meaningless, as well as the holding of the many California cases decided since 1928 to the effect that the rights of lower riparian and overlying owners, supplied on the surface or by replenishment of the underground, are paramount and protected by the Constitutional amendment.

The conclusion is inescapable, on the law and on the evidence, that no prescriptive rights were acquired by the United States or any defendant or the State of California against the downstream vested rights of the plaintiffs.

Nearly every element necessary to satisfy the doctrine is missing on the facts of this case.

## XIII.

### (e) Laches.

### (f) Estoppel.

Although some of the elements of laches and estoppel are involved in the doctrine of the intervention of a public use, which will be hereinafter discussed, the defenses of laches and estoppel have also been asserted aside from that doctrine, and will be briefly discussed.

■ It has been said that the doctrine of laches is based on estoppel. Maguire v. Hibernia S. & L. Society, 1944, 23 Cal.2d 719, at page 736, 146 P.2d 673, 151 A.L.R. 1062. And it is also sometimes said that laches constitutes quasi-estoppel. It appears, however, from the cases that there is a distinction. The existence of either or both laches and estoppel is a question of fact.

■ Laches is a neglect or failure on the part of a party in the assertion of a right, continuing for an unreasonable and unexplained length of time, under circumstances permitting diligence, resulting in a disadvantage to the other party. 30 C.J.S., Equity, § 112, p. 520; 18 Cal.Jur.2d 201–202, and cases there cited.

71. Shasta and Keswick dams on the Sacramento; Friant on the San Joaquin; Pine Flat on the Kings; and Isabella on the Kern.

The essential elements of estoppel are false statements, or concealments, or conduct amounting thereto, with reference to a transaction, made by one who has actual or virtual knowledge of the facts to another who is ignorant of the truth, with the intention, resulting in consummation, that the other would act to his detriment on such false statements, or concealments, or equivalent conduct. 18 Cal.Jur.2d 406; City of San Diego v. Cuyamaca Water Co., 209 Cal. 105, 287 P. 475.

As said in Safway Steel Products Co. v. Lefever, 1953, 117 Cal.App.2d 489, at page 491, 256 P.2d 32, at page 33: " 'In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury.' "

It has been said that there must be some degree of turpitude in the conduct of a party before a court of equity will stop him from assertion of his title—the effect of the estoppel being to forfeit his property and transfer its enjoyment to another. City of San Diego v. Cuyamaca Water Co., supra, 209 Cal. at page 142, 287 P. 475; Biddle Boggs v. Merced Mining Co., 14 Cal. 279, 368.

In Stevens v. Oakdale Irrigation District, 1939, 13 Cal.2d 343, 90 P.2d 58, 63, it was argued that plaintiffs were estopped against the defendants. The court said as to that: "The most that can be said on behalf of plaintiffs is that defendant, with knowledge of plaintiffs' construction of diversion works, stood silent. But in the absence of other essential elements neither expenditures by plaintiffs, defendant's knowledge thereof, nor its silence are sufficient to establish an estoppel. There is no showing whatsoever of any degree of turpitude in the conduct of defendant which would estop it from assertion of its title before a court of equity. See Biddle Boggs v. Merced Mining Co., 14 Cal. 279, 367 et seq.; Dougherty v. Creary, 30 Cal. 290, 291, 89 Am.Dec. 116; Stockman v. Riverside L. & I. Co., 64 Cal. 57, 28 P. 116; Verdugo Cañon Water Co. v. Verdugo, 152 Cal. 655, 674, 93 P. 1021; Kinney on Irrigation and Water Rights, 2d ed., vol. 2, p. 2034 et seq.; Wiel, Water Rights in the Western States, secs. 593, 594, 3d ed., vol. 1." There has been no showing of turpitude on the part of plaintiffs and their class.

Estoppel is a harsh doctrine and the law does not favor it.

Stevinson v. San Joaquin & Kings River Canal & Irrigation Co., 1912, 162 Cal. 141, 121 P. 398, was an action by a lower riparian proprietor on the San Joaquin river to enjoin the unlawful diversion of water, and the Court held that laches could not be imputed to the plaintiff so as to defeat his right to injunction merely by his failure to object to the construction of diversion works of the defendant after he acquired knowledge thereof, where there was nothing further in the evidence to show that the plaintiff had actual or imputed knowledge that the works under construction would divert water to which the plaintiff was entitled, and where plaintiff was assured while such works were being constructed that his water would not be taken.

In Empire West Side Irrigation District v. Stratford Irrigation District, 1937, 10 Cal.2d 376, 382, 74 P.2d 248, the Court refused to find an estoppel by reason of the inactivity of the defendants during the construction by plaintiffs of a siphon, reputedly to carry the water in issue, when that siphon was constructed on a right-of-way belonging to the plaintiffs, and no invasion of the rights of defendants thereby resulted; and when no cause of action arose to the defendants, and none of the water in issue was ever transported by the siphon prior to commencement of the action.

And in Logan v. Guichard, 1911, 159 Cal. 592, 114 P. 989, the Court applied

the same reasoning against a claimed estoppel. In that case it was held that although the party against whom the estoppel was asserted had stood by and allowed the other party, without objection, to construct a dam and flume to supply the inhabitants of a village with water, such conduct could not amount to an estoppel when the party sought to be estopped did not know and had no reason to suspect that any intended diversion by those constructing the dam would be made of any water to which he was entitled.

In Verdugo Cañon Water Co. v. Verdugo, 1908, 152 Cal. 655, 93 P. 1021, the Court held that the party estopped must always intend, or must at least be so situated that he should be held to have expected, that the other party shall act, and the other party must, by words, conduct, or silence of the first party, be induced or be led to do what he would not otherwise have done; and the mere fact that persons expended money in sinking wells upon their land with the knowledge of the plaintiff and without objection by them, created no estoppel. The mere passive acquiescence where one is under no duty to speak does not raise estoppel.

And in Miller & Lux v. Madera Canal & Irrigation Co., 1909, 155 Cal. 59, 99 P. 502, 22 L.R.A.,N.S., 391, the Court held that plaintiff in that case was not estopped by the expenditure of money by the defendant in the construction of a reservoir when plaintiff was ignorant of any intent by the construction thereof to take water to which the plaintiff was lawfully entitled.

Although the plaintiffs knew that the defendants were building Friant dam, the Madera canal and the Friant-Kern canal for the purpose of impounding and diverting water of the San Joaquin river, that fact did not and does not justify the invocation of either laches or estoppel against them, particularly in view of the repeated representations made by the defendants that the plaintiffs' water rights would be respected, and, in fact, the useable quantities of water would be increased, and were in fact increased at seasons after the building of the dam and before filing suit.

By no conceivable construction of the evidence can it be said that the United States constructed the dam in reliance upon the failure of the plaintiffs to bring an action for the assertion of their rights. Nor are any of the other elements of either laches or estoppel present.

It is unnecessary to repeat here the conclusions on these points set forth in D.C., 90 F.Supp. 773, or to repeat the facts referred to in the discussion concerning prescription, and elsewhere in this discussion. It may be added that there was no actual invasion of the rights of the plaintiffs and their class until after suit was filed, and such invasion was threatened only shortly before suit was filed. The plaintiffs and their class were not called upon to anticipate that the basic Reclamation Act and Water law of the State would not be obeyed in recognition of their water rights. Moreover, the letter of the Secretary of the Interior, of March 30, 1953, assures plaintiffs their lawful rights to water under California law will be fulfilled. And it must be remembered that no objection could be made to the impounding of surplus water.

The plaintiffs and their class were not guilty of laches and were not estopped.

## XIII.

### (g) Public Use.

It is asserted by some of the defendants that a public use intervened against the rights of the plaintiffs and their class by the construction of the Friant project, and that they are consequently precluded from obtaining any sort of equitable relief which will give them water, but are relegated to damages, if they have any remedy at all.

The position of counsel for defendant officials on this subject is contained in the brief where it is contended that

"* * * the laws of California * * * preclude the entry of an injunction, where, as here, rights to the use of water have been taken for public purpose through the exercise of eminent domain." The authority cited for this proposition is Collier v. Merced Irrigation District, 1931, 213 Cal. 554, 2 P.2d 790, more fully discussed hereinafter.

The position of the State of California and the defendant districts joining in the State's brief is substantially the same.

■ As will be seen from the California cases and law hereinafter discussed, the defense of the intervention of a public use can only be asserted under the California law by one capable of condemning property under the power of eminent domain.

■ The State does not own the dam and diversion works, and is not in possession or control of the water; it cannot raise the question of public use as it is in no position to exercise the power of eminent domain against the rights of the plaintiffs. The defendant districts cannot raise the question, as they cannot exercise the power of eminent domain against the plaintiffs' rights in this case for the same reason, and for the further reason that they do not take water directly from the plaintiffs and their class, but only indirectly through the United States. A customer of a purveyor of water does not have such a direct interest as will permit the customer to raise the question of intervention of a public use. Allen v. California Water & Telephone Co., 1949, 31 Cal.2d 104, 109, 187 P.2d 393. The defendant officials could not be subjected to a judgment for inverse condemnation.[72] Hence, the only party defendant to this action which would, or may, have the power of eminent domain against the water rights of these plaintiffs,[73]

and which could be obligated to pay any judgment in condemnation, and the only defendant in actual control and possession of the dam and works, is the United States, and the United States has not pleaded the intervention of a public use as to the rights of the plaintiffs and their class. On the contrary, the Secretary of the Interior, as noted, has declared that plaintiffs and their class will receive water to which they are lawfully entitled.

The case was not tried by the parties on the theory of inverse condemnation[74] but was tried by all parties as an equity suit to ascertain and declare the rights of the plaintiffs and their class to that flow of water to which they were and are lawfully entitled under California law, and to enforce the right to such flow of water by a physical solution if one is possible.

■ Thus, to hold that the so-called doctrine of intervention of a public use applies in this case would be to compel the United States to pay for property which it has not in fact condemned, and which it has not, by any pleading in this case, sought to condemn, and which, from the reports to Congress—D.C., 90 F.Supp. 773—and by the letter of the Secretary of the Interior, of March 30, 1953, is not desired to be taken at all by the United States, and would be to compel the plaintiffs to accept money where water is sought. A sale would be forced on parties, all of which are unwilling.

It has previously been determined in this case that there has never been a proper exercise of the power of eminent domain in the manner specifically required by the Federal Reclamation laws. And, insofar as the contention of the defendants that a public use has intervened may be predicated on a purported exercise of the power of eminent domain

---

72. To be distinguished from a judgment for damages in tort.

73. A question not decided herein.

74. The plaintiffs may be entitled to both water and damages under the California cases, a question not necessary for decision at this time.

as to the water rights of the plaintiffs and their class, that contention is clearly untenable.

The position taken by the Secretary of the Interior in his letter of March 30, 1953, and the defendant officials in their pleadings is that the water rights of these plaintiffs and their class will be respected and that they will be furnished all the water to which they are legally entitled under the California law. It would, therefore, seem to be the position of the Secretary of the Interior, the official ultimately charged under the Federal statutes with the administration of reclamation projects, such as the instant one, that no public use as against the rights of these plaintiffs and their class has intervened on behalf of the United States. Ordinarily that would end the matter. But in view of the contentions of the various parties in their various and conflicting briefs, and the default of the United States, an examination will be made of the question as to whether or not a public use attached to the rights of the plaintiffs and members of their class prior to the filing of the within action, so as to preclude injunctive relief, with or without a physical solution, and relegate them to damages only.

The term "public use" as commonly understood, and in its larger sense, conveys the idea that the thing or service is dedicated and is available to the public generally for their use, participation and enjoyment, or that the particular property involved has been acquired, or money expended in the acquisition of property for the common public good. In that sense, the construction of dams, canals and the like by the United States with public funds is for the common good of all the people of the United States, and in its broadest sense is for a public use.

The term "public use," however, as used in the California Constitution and laws, and as construed by the California cases with relation to water rights, has been given a much more restricted application. It is not to be confused with the term "public advantage" which means "anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, contributes to the general welfare". Gravelly Ford Canal Co. v. Pope & Talbot Land Co., 1918, 36 Cal.App. 556, 565, 178 P. 150, 153, hearing denied by Supreme Court.

In this decision the Court is bound to apply the term as applied and construed in the California law and cases.

Whether or not property has been dedicated to a public use, or a public use has intervened as against a private right, has been the subject of much litigation finding its way into the reported cases of California.

Much of the litigation involving water rights was concerned with whether or not a public use had attached under Article XIV of the California Constitution [75] and its implementing legislation such as Section 2701 of the Public Utilities Code,[76] so as to subject the pur-

75. Art. XIV, § 1. "Public use; state and local regulations; rates

"Section 1. The use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law; * * *."

(The remainder of the Section contains self-executing provisions concerning the fixing of rates for water sup-

plied to any city and county, or city or town, or the inhabitants thereof).

76. "§ 2701. Water companies as public utilities: Control and regulation thereof.

"Any person, firm, or corporation, their lessees, trustees, receivers or trustees appointed by any court whatsoever, owning, controlling, operating, or managing any water system within this State, who sells, leases, rents, or delivers water to any person, firm, corporation, municipality, or any other political subdivision of the

veyor of water to regulation as to rates and services by what was formerly the Railroad Commission of the State of California, but what is now the Public Utilities Commission or by cities, towns, and municipalities.

Other cases involve the much narrower question as to the alleged attachment, or intervention, of a public use so as to prevent a prior vested water right from securing specific relief by way of injunction enforcing a flow of water, and instead, relegating the owner of that right to damages.

That is the narrow question here. The California cases on this question have given an even more restricted meaning to the term public use than the cases which involve the question as to whether the purveyor of water was subject to regulation as a public utility.

The California cases involving the application and interpretation of Article XIV, Sections 1 and 2, and their implementing Acts of the legislature of California, lay down certain principles for the ascertainment of whether or not there has been a dedication to, or intervention or attachment of, a public use against water rights. Insofar as applicable, these principles will be adverted to in the discussion which follows.

■ The reason behind the doctrine of intervention of a public use is stated in City of Pasadena v. City of Alhambra, supra, 33 Cal.2d at page 920, 207 P.2d at page 25, as follows: "This rule has its foundation chiefly in the inconvenience to the public if service is interrupted by the issuance of an injunction to restrain the use." It is stated in Burr v. Maclay Rancho Water Co., 160 Cal. 268, 280, 116 P. 715, 721 and quoted with approval in Miller & Lux, Inc., v. Enterprise Canal & Land Co., 169 Cal. 415, 426, 147 P. 567, that: "The rule concerning the establishment of

public service with property of another taken without previous compensation has for its basis chiefly the inconvenience to the public if the service is interrupted by the issuance of an injunction to restrain the use." In Conaway v. Yolo Water & Power Co., 204 Cal. 125, 132, 266 P. 944, 947, 58 A.L.R. 674, it is stated that: "The theory of the rule * * * is that *after* property is taken for a public use by a public service corporation and *has been devoted to that purpose*, the public thereby and thereupon acquires rights in such public use * * *." In Miller & Lux, Inc., v. Enterprise Canal Co., supra [169 Cal. 415, 147 P. 573], it is further stated: "That where a person has suffered property belonging to him and under his control to be taken and devoted to a public use by one engaged in administering such use, *and the matter has gone on so far that the beneficiaries thereof rely on its continuance and adjust their affairs accordingly, such owner having knowledge thereof and making no objection or protest, this conduct will be regarded by the courts as a dedication by such owner of the property to the particular public use, and he cannot thereafter interrupt nor prevent the same,* his only remedy being to seek compensation for the property he has thus allowed to be taken * * *." See also Barton v. Riverside Water Co., 155 Cal. 509, 515, 101 P. 790, 23 L.R.A.,N.S., 331; Reed v. Oakdale Irrigation District, 1920, 46 Cal.App. 139, 142, 188 P. 832.

■ As previously indicated, care must be taken to avoid confusion in the term "public use." The term "use," when used with reference to an exercise of the power of eminent domain, refers to the future intended purpose or use for which private property may be taken. The purpose or use to which the property is *intended* to be *thereafter* devoted

State, whether under contract or otherwise, is a public utility, and is subject to the provisions of Part 1 of Division 1 and to the jurisdiction, control, and regulation of the commission, except as otherwise provided in this chapter."

(The exceptions do not appear to be applicable to the facts in the within case).

must be public before the taking is authorized.

The term "use" as involved in the doctrine of intervention of a public use, refers to the actual *use at and before the time suit was filed*, as distinguished from a future intended use, of the property for a purpose beneficial to the public. It connotes not an intended future devotion to the public service but an actual previous devotion to the public service.

In those cases where the Court has referred to the doctrine of intervention of a public use as the basis of its decision, the facts show that public service had not only actually commenced, before the filing of the suit for injunctive relief, but had continued to the point of dependence thereon.

It follows that where a suit for injunctive relief is brought *prior* to the actual service to the public, the objecting private owner can prevail unless he is estopped, has waived his rights, or is guilty of laches. In other words, when the public could not have come to depend on a service which has not actually been furnished, the interests of the public in the continuance of that service which they have not yet received, cannot be jeopardized. In such case it is solely a question of the relative rights of the governmental agency or utility, and the prior vested water right, and the doctrine of the intervention of a public use has no application. In the absence of conduct amounting to estoppel or laches, the California cases hold that injunctive relief should issue as a matter of course,[77] and the governmental agency would have an option to either supply water, (which it has said it will

do in this case), or condemn the private property (which it has not done in this case), and the public would have suffered no inconvenience.

The contentions of the defendants that where facilities are in the process of construction a public use intervenes as to all the water which the facilities are in good faith intended to divert, is directly contrary to the holding of the Supreme Court of California in Turner v. East Side Canal Co., 1915, 169 Cal. 652, at page 657, 147 P. 579, at page 582, where the Court said: "There is no merit in the argument that when a person appropriates water to a public use he not only begins his adverse possession of the water he actually takes and puts to such use, but that he also at once institutes an effectual adverse claim to all that he in good faith intends to take or use in the future." See also Thompson v. United States, 9 Cir., 1954, 215 F.2d 744.

Each California case read against its own facts shows that public service had not only actually commenced, but in most cases had continued for a considerable period of time prior to suit.

It is noticeable too that in those cases which discussed the *possibility* of the intervention of a public use before public service had actually begun, there have been facts showing estoppel or laches. It is conceivable that, in a proper case, there could be laches or an estoppel before the commencement of a public service. Miller & Lux, Inc., v. James, 1919, 180 Cal. 38, 51, 179 P. 174. To apply either of those doctrines before the actual commencement of public service on the basis that a public use had intervened, would be misleading and im-

---

77. In Tulare Irrigation District v. Lindsay-Strathmore etc., 1935, 3 Cal.2d 489, at page 533, 45 P.2d 972, at page 990, the Court stated: " * * * as was held in the Peabody case, and reaffirmed earlier in this opinion, the riparian as against an appropriator, has two major rights: (1) In the event a public use has not attached, and in the absence of a condemnation suit, he is entitled to an injunc-

tion to protect his prior right to the amount of water he presently needs for reasonable beneficial purposes; and (2) he is entitled to a judicial declaration of his prior right to whatever quantity he may in the future need for such uses." See also Beals v. City of Los Angeles, 1943, 23 Cal.2d 381, 387, 388, 144 P.2d 839.

proper. The California cases must be read carefully to avoid this mis-designation of doctrines, as they have applied the doctrine of intervention of a public use *only* where public service had actually commenced *before suit,* and the public had come to rely and depend thereon.

This was the situation in Collier v. Merced Irrigation District, supra, which will hereafter be considered in greater detail. It is sufficient at this time to point out that public service had commenced, as to a part of the flow of the stream there involved, long prior to the time suit was filed. The point in issue was whether plaintiff could enjoin diversions to public service of additional water, as to which, *permits for diversion* had been issued *six years* previously, without any objection being made by plaintiff. It was held that under the circumstances of that case, plaintiff could not obtain injunctive relief to prevent the increased diversions, but was relegated to damages instead.

In the later case of Eden Township Water District v. City of Hayward, 1933, 218 Cal. 634, 24 P.2d 492, 495, the main question involved was the measure of the prescriptive right acquired by the City of Hayward by pumping from the underground for distribution to the inhabitants of the City. The City sought to sustain the judgment of the trial court, which defined their annual prescriptive right by the maximum pumped in any one day, by invoking the doctrine of intervention of a public use. It is clear that in that case, as in the Collier case, public service had commenced at the time of suit, and the question was again the extent to which the public use attached. In disposing of the question, the Court stated: "Lastly, respondent insists that if a prescriptive right to the extent claimed cannot be sustained, nevertheless it may claim that a public use has intervened as to the amount of water fixed by the judgment, and for that reason an injunction must be denied and the individual landowners of plaintiff district relegated to a suit at law for damages suffered by this taking for public use. In this behalf we are likewise at a loss to see how respondent may claim the intervention of a public use in more water than it has *actually taken and beneficially used of said waters.* It is true that the capacity of its system of pumps has been enlarged at a considerable expense to carry the amount of 864,000 gallons per day, but the court expressly found that said city never intended to claim beyond 828,000 gallons per day nor any amount in excess of the reasonable requirements of said city. This amount it has had. These facts distinguish the instant case from Collier v. Merced Irrigation District, 213 Cal. 554, 2 P.2d 790." See also City of Coronado v. City of San Diego, 1941, 48 Cal. App.2d 160, 119 P.2d 359; and Turner v. East Side Canal & Irrigation Co., 1915, 169 Cal. 652, 147 P. 579.

Thus the Court in that case limited the amount to which a public use attached to that actually taken and used in the past, even though public service had long been established.

In Newport v. Temescal Water Co., 1906, 149 Cal. 531, 87 P. 372, 6 L.R.A., N.S., 1098, the defendant water company had for a period of three years been supplying the inhabitants of the town of Corona with water when suit was filed to enjoin further diversions by pumping; in Barton v. Riverside Water Co., supra, the water had been furnished to a community for domestic and municipal use outside the basin for nine years before suit for injunctive relief was commenced; in Miller & Lux, Inc., v. Enterprise Canal & Land Co., 169 Cal. 415, 147 P. 567, it was stipulated that the plaintiff Canal Company had for five years prior to the commencement of the action diverted and furnished water to thousands of acres of land owned by many persons, and to villages which had grown up along the canal. The period of furnishing of water to the public was actually much longer than five years, in some instances 25 years; in Hillside Water Co. v. City of Los Angeles, 10 Cal.2d 677, 76 P.2d 681, the defendant

City had for over a year prior to suit been extracting and furnishing water for domestic use of its population; in Conaway v. Yolo Water & Power Co., 204 Cal. 125, 266 P. 944, 58 A.L.R. 674, defendant Utility had for approximately five years diverted waters for distribution and sale to the public; in Reed v. Oakdale Irrigation District, 1920, 46 Cal.App. 139, 188 P. 832, service to the public had existed for about three years, and the doctrine is expressly applied on the basis of acquiescence in the inauguration of a public use carried on for some period of time. The Court states this as an element of the doctrine, 46 Cal.App. at page 142, 188 P. 832; in Holmes v. Snow Mountain Water & Power Co., 36 Cal. App. 394, 397, 172 P. 178, water and power had been furnished to thousands of people over a period of four years before suit was commenced; in Martin v. Western States Gas & Electric Co., 8 Cal.App.2d 226, 228, 47 P.2d 522, suit was commenced on November 8, 1928, to enjoin an enlarged diversion consummated January 27, 1924, by the diversion in canals of 85 second-feet greater than had previously been diverted. Thus the water had been devoted to public service for nearly five years when suit was commenced; in Peckwith v. Lavezzola, 50 Cal.App.2d 211, 122 P.2d 678, the devotion of water to public service had existed for eight years at the time suit was commenced; in Katz v. Walkinshaw, supra, 141 Cal. on page 138, 70 P. at page 664, it is stated: "that defendant is diverting the water for sale". Though neither the facts nor the law concerning public use were fully developed in that case, it is clearly indicated that the Court was dealing with a public service existing prior to suit; in Peabody v. City of Vallejo, supra, water had been distributed to inhabitants of the city for some five months at the time suit was commenced—(the court nevertheless required a physical solution); In Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra, 3 Cal.2d at page 533, 45 P.2d 972, water had been pumped from the land in question and had been supplied to those within an irrigation district for over two years but the court held no public use had intervened as to others; in Lamb v. California Water & Telephone Co., 21 Cal. 2d 33, 41, 129 P.2d 371, where the defendant had contracted in 1888 to perpetually furnish water at a fixed rate to a lower riparian owner, and the question of the validity of that contract turned on whether the defendant was a public utility, the Court held that a finding that defendant had begun actual service prior to the contract was not contrary to the evidence, and in fact, the contract itself disclosed that use of the water by the water company preceded the contract since it recognized that the water of the riparian owner had "already" been diverted by the company.

Aside from the public policy theory for denying injunctive relief where a public use has in fact attached, if the facts show an implied dedication to the public use by laches or an estoppel against the prior owner, it can be held on that basis that the prior owner's right to prohibitory relief is cut off. In such case the Court is really applying the equitable doctrine of implied dedication by estoppel, though it may be doing so in a situation where a public use has in fact attached.

█ Where the facts do not show an implied dedication by estoppel, the Court is required to determine whether the public policy against inconvenient interruption of a water service on which the public has come to depend before suit, is offended. The doctrine of intervention of a public use is applicable *only* if one of the two theories, public policy or implied dedication, is satisfied by the facts of the particular case.

█ The cases do not present the doctrine of intervention of a public use as an absolute bar to injunctive relief, but rather indicate that prohibitory injunctive relief should be granted only if it appears that no other relief is adequate. Thus it is at most indicated that a Court should be reluctant to grant a

prohibitory injunction where a public use has in fact intervened prior to suit.

The Court may, if justice requires, refuse injunctive relief to the private owner, and relegate him to damages if a physical solution is not possible to preserve the rights of the parties. It is clear that the Court is not bound to do so, but that the matter is one depending on the particular facts.

If a physical solution can be worked out which will supply the reasonable and beneficial needs of the prior right, and permit the reasonable and beneficial uses of water in excess of those needs by an appropriator for a public use, it is possible that there may be no damage to the prior right.

The facts in this case disclose that suit was filed in 1947, prior to the time any substantial diversions had been made for use by the defendant Irrigation Districts. In fact, all of the contracts, except one, for the supplying of water to those districts, were made from two to four years after the suit was filed. And the factual reports or letters of justification indicating feasibility of the contracts were all made long after this suit was filed in 1947.[78] This indicates that there was no existing water service on which the public, assuming the contracting districts can be so characterized,[79] had come to depend. Hence, no public use had attached against the rights of plaintiffs and their class. This being so, it would appear that the right of plaintiffs to injunctive relief depends on whether, aside from the doctrine of intervention of a public use, they are estopped or have been guilty of laches on the facts. And they have not as hereinbefore indicated. However, some of the cases purporting to apply the doctrine of intervention of public use on the theory of implied dedication by estoppel will be examined to show that the doctrine as there applied is inapplicable on the facts of this case.

Considering the question of implied dedication by estoppel, it must be kept in mind that since 1928 a lower

---

78. From the evidence it appears that the dates of the contracts between the United States and the 15 Irrigation District defendants, together with the date of the factual report upon the feasibility of furnishing water to such districts, as well as the initial water delivery date, are as set forth in the following table:

| | Contract | | Factual Report | | 1st del. of Water |
|---|---|---|---|---|---|
| Delano-Earlimart | : 8/11/51 : | : | June 1950 | : | 3/ 1/52 |
| Exeter | : 11/ 8/50 : | : | Jan. 1950 | : | 3/23/51 |
| Ivanhoe | : 9/23/50 : | : | Apr. 1949 | : | 3/20/50 |
| Lindmore | : 2/29/49 : | : | June 1948 | : | 5/19/50 |
| Lindsay-Strathmore | : 8/ 5/48 : | : | Jan. 1950 | : | 7/ 9/49 |
| Lower Tule | : 5/ 1/51 : | : | Aug. 1950 | : | 3/ 1/52 |
| Orange Cove | : 5/20/49 : | : | Aug. & Sept. 1947 | : | 7/ 9/49 |
| Porterville | : 1/28/52 : | : | July 1950 | : | 3/ 1/52 |
| Saucelito | : 2/13/51 : | : | June 1950 | : | 3/24/51 |
| S.S.J.M.U.D. | : 10/18/45 : | : | Feb. & Mar. 1948 | : | 3/31/51 |
| Stone Corrall | : 12/13/50 : | : | Jan. 1950 | : | 3/27/51 |
| Terra Bella | : 10/12/50 : | : | Jan. 1950 | : | 4/13/51 |
| Tulare | : 10/18/50 : | : | Feb. 1949 | : | 3/19/51 |
| Chowchilla | : 7/ 5/50 : | : | Mar. 1950 | : | 3/22/51 |
| Madera | : 5/14/51 : | : | Mar. 1950 | : | 3/ 1/52 |

79. There is authority that they are not. Thayer v. California Development Co., 1912, 164 Cal. 117, 128 P. 21; Allen v. Railroad Commission etc., 1918, 179 Cal. 68, 175 P. 466, 8 A.L.R. 249; Marin Water & Power Co. v. Town of Sausalito, 1914, 168 Cal. 587, 143 P. 767.

riparian or overlying owner has no right to object to any upstream appropriation of surplus waters—a right which he did possess prior to 1928. It follows as a matter of course that since 1928, the failure to object to the construction of works for an upstream appropriation cannot be construed as either active or passive acquiescence in the taking of water needed by the plaintiffs and their class, as owners of downstream vested rights. This absence of any right to object to the upstream appropriation of water not needed by plaintiffs and their class, i. e., surplus waters, and the consequent absence of a right to sue to abate or prevent such diversions, under the case of Miller & Lux, Inc., v. Enterprise Canal Co., supra, indicates that a public use could not intervene until non-surplus water is taken. It is stated in that case, after a detailed discussion of public use cases, that [169 Cal. 415, 147 P. 573]: "It is to be observed that in all of the above cases the public use involved an interference with the property rights of a private owner *sufficient to give such owner an immediate right of action to abate or prevent the same. * * * This right in the owner to enjoin the public use before it had become established appears to have constituted an important factor in the statement of the doctrine in all of the above cases.*" See also Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra, where it was held that the doctrine did not apply to those riparian owners who filed suit in 1916 before their rights were affected by appropriations in 1918, but that it did apply as to those who did not become parties until 1920, two years after appropriations to the public service; and see Miller & Lux, Inc., v. Worswick, supra.

■■■■ Under the Constitutional amendment of 1928 the riparian right is protected only to the extent that water is needed for the beneficial uses, present and prospective, of the riparian lands, and there is no right to object to the upstream appropriation of water not presently needed, i. e., surplus. If an up-stream appropriation and diversion of only surplus waters could result in the intervention of a public use as to all the waters of a stream, including water needed by the lower riparian lands, all protection would be taken from the riparian right. It would no longer be an enforceable right. If the appropriation and use of surplus would automatically bring into play the doctrine of intervention of a public use of the entire stream flow, the riparian owner could never object. He would be precluded from objecting to the initial taking by the prevailing rules as to surplus water and he would be precluded by the doctrine of intervention of a public use from obtaining relief, other than damages, when the amount of water actually taken invaded his present needs for reasonable beneficial uses. It is not conceivable that the 1928 amendment was intended to, in this manner, destroy the riparian right. Nor is it conceivable that all need for condemnation proceedings was to be eliminated. Yet these are the results which must follow if the doctrine can apply where there is a taking of only surplus water prior to suit. The Gin S. Chow case, supra, has held that the 1928 amendment was not an exercise of the power of eminent domain, and to apply the doctrine of intervention of a public use as to all the waters of a stream where the taking prior to suit was of only surplus waters would be contrary to this declaration by the Supreme Court of California. The real impact of such a holding would be deferred until a period of drought or relative water shortage. At that time the downstream owner of a vested right would suddenly find himself absolutely without water and with no means of obtaining any. It is conceivable that he might even face the bar of the statute of limitations as to his claim for damages. Furthermore, if the downstream area to be supplied was large, as here, and the upstream appropriator was a utility with limited resources, it could mean ruin for the utility faced with tremendous damage claims.

It is concluded, from all the declarations in the California cases as to the nature of the riparian right preserved by the 1928 Constitutional amendment, that a taking of only surplus waters does not bring into play the doctrine of intervention of a public use as to a prior vested water right. The Court does not indicate or intend to indicate any right to take surplus waters by defendants, or that any surplus was lawfully taken.

It is to be observed that if a public use attached at Friant as to the waters of the San Joaquin river, it also attached by the building of Shasta dam and Keswick dam on the Sacramento river, Pine Flat dam on the Kings river, and Isabella dam on the Kern river. It is hardly conceivable that thus all water rights on the Sacramento, Kings, and Kern rivers have been relegated to damages and must take such water as the government official in control of such dams and works determines in his sole judgment what each prior water right on those rivers may need or have. Or, stated another way, if the doctrine of the intervention of a public use were applied, the government would be subjected to suits to the extent of the value of all the water rights in the entire Central Valley, which would run into colossal and prodigious sums of money; a situation clearly not contemplated by any Act of Congress or California law; and just as clearly not contemplated by the Secretary of the Interior who asserts the recognition of the water rights of plaintiffs and their class, and is pursuing applications under the California Water Code to appropriate only surplus water in excess of those rights.

The case of Collier v. Merced Irrigation District, supra, has already been adverted to and its inapplicability to the present case pointed out in one respect, but in view of the fact that there are several reasons why the Collier case is inapplicable in the instant matter, and in view of the reliance placed by the parties upon that case, it is well to set forth the facts and discuss the case further.

In the Collier case the predecessor of the defendant district filed applications with the State of California in 1919 for permits to construct a dam on the Merced river for the dual purpose of impounding water for power and diverting it for irrigation to non-riparian lands. The permits were granted in 1922. The plaintiff was a downstream riparian owner of 527.86 acres of land, and the defendant was a public corporation irrigation district owning or serving approximately 189,000 acres of land. The plaintiff had used the full flow of the Merced river as a riparian except for a prior preferential right in the defendant district to divert 1,600 cubic feet per second for use on non-riparian lands of the district. Under the terms of the permits the amount to be diverted by the defendant district for non-riparian uses was increased from 1,600 cubic feet per second to 2,125 cubic feet per second. After the granting of the permit, construction work was commenced, and the dam was completed prior to April 1, 1926. The storage of water immediately commenced, but not to the full capacity of the reservoir in 1926. In 1927 the storage slightly exceeded the full capacity of the reservoir. In 1928 the district was continuing to impound the water until suit was filed on March 7, 1928, *six years* after granting the permit, to enjoin any diversions in excess of that previously appropriated. It was conceded by the plaintiff that a public use had attached to the amount of water which had in fact been taken from the reservoir in the past year, but it was contended that a public use had not attached to the full amount of water covered by the permits, the permits allowing the impounding and diversion of 850,000 acre-feet, whereas approximately only 300,000 acre-feet had been impounded in the previous year. The Court disposed of this contention by stating [213 Cal. 554, 2 P.2d 793]: "As above pointed out, with full actual knowledge for a period of *five years* or more of the specific intention of respondent, *as disclosed*

*by the several state and national permits,* and with knowledge of the effect the works might have upon the stream and consequently upon his riparian right, appellant permitted an outlay, at great cost, for the construction of this dam, power house and diversion works, without protest, and it is not unreasonable to hold that respondent thereby put itself in charge of a public use, as to all that portion of the stream covered by its expressed and known intention within the capacity of the reservoir. The closing of the stream by the dam under these circumstances should allow the use of the reservoir to its capacity during any one season up to the limit of respondent's permits. It utilized during the years 1926–1928 practically the whole yield of the stream, and it is but a fair construction of the effect of its action to say that it secured the right to take all the yield up to its claim of 850,000 acre-feet, and that appellant, by his *inaction, waived* his right to equitable relief."

From the foregoing statements of the court it is apparent beyond dispute that the actual basis of the decision was estoppel or waiver, doctrines which can operate independently of the intervention of a public use as well as simultaneously therewith. Furthermore, the Court found laches disclosed on the face of the complaint and sustained by the evidence. 213 Cal. at page 564, 2 P.2d 790.

The Court in the Collier case placed great emphasis on the fact that permits had been granted, both State and Federal, designating the total amount of water which the permittee was entitled to divert, without any protest or objection being made by the plaintiff. The plaintiff was entitled under the Statutes to notice and right to object at the hearings on the applications. And the Court held that plaintiff, by such permits, had full and accurate knowledge of the ultimate extent of diversions to be made, and could not, after over five years of silence from the date of the granting of such permits, object to the consummation of the additional diversions.

Similar circumstances are singularly absent here.

In this case eleven applications which had been filed between 1916 and 1938, were assigned to the United States in 1939. Not only were no permits ever granted, but none of them were brought on for hearing before this suit was filed in 1947. In fact, none of them were noticed for hearing until the day the evidence closed in this case—December 31, 1954—seven years after this suit was filed, 15 years after the applications were assigned to the United States, and from 16 to 38 years after the applications were filed. The United States proceeded to the erection and construction of the dam without any permit or license from the State, and during the intervening eight years from the time the applications were assigned to the United States to the time suit was commenced in 1947, the plaintiffs and their class were continually and repeatedly assured that they would receive water in accordance with their lawful rights under California law. D.C., 90 F.Supp. 797. Had the United States, after the assignment to it of the applications, proceeded to hearing and secured permits before the filing of this suit, defining and stating the amount of water which it would be entitled to divert, then there might be a partial parallel to the Collier case.

With the constant and repeated assurances given to the plaintiffs and their class in the instant case that they would receive water and in fact the amount available would be increased, and the fact that the flow was increased in seasons, the plaintiffs would not have been justified in filing suit prior to the letter from Boke dated July 15, 1947 (Pltfs. Ex. 162). They then proceeded, as promptly as was physically possible thereafter, to prepare and file this suit which was done on September 25, 1947. In view of these facts, the plaintiffs and their class exercised the diligence which is required to prevent the intervention of a public use as to their rights to water. Conaway v. Yolo Water & Power

Co., etc., 1928, 204 Cal. 125, at page 131, 266 P. 944, 58 A.L.R. 674.

Furthermore, in the Collier case, it is significant that of the total flow of 2,125 cubic feet per second allowed by the permit 1,600 cubic feet per second had been utilized and diverted for many years prior thereto, and devoted to a public use. During the two years previous to the filing of the suit practically the whole flow of the stream had been impounded and diverted by filling and refilling the reservoir.

No such similar situation is present here. In the instant case diversion of water commenced into the Madera canal in 1944—three years before the commencement of this suit. Such diversions did not in fact impinge upon the water received by the plaintiffs because, as elsewhere herein noted, the flow of the stream was increased during certain periods of the year to a greater amount than had flowed during the same periods in previous years of comparable total flow. And no diversions were made to the Friant-Kern canal until 1949—two years after this suit was commenced, and none of the contracts for diversion of water by way of the Friant-Kern canal were made until 1951—four years after this suit was commenced, except the contract with the South San Joaquin Municipal Utility District. The total diversions into the Madera canal prior to the filing of this suit, between the years 1944 and 1947, inclusive, was 458,146 acre-feet against the total flow of the river for those years of 6,709,000 acre-feet, or an average of 114,536 acre-feet per year, as against the average flow of the river for those years of 1,519,750 acre-feet.

It is clear that the diversions into the Madera canal prior to this suit were not in satisfaction of the right of any district to receive water under a contract with the United States to deliver water. The first diversion through the Madera canal in satisfaction of any of the contracts to supply water did (Footnote 78, 142 F.Supp. 137) not occur until 1951—four years after suit was filed.

Thus there could not possibly have been any reliance on the slight diversions.

And even if the diversions into Madera canal prior to the filing of this suit should suffice as a furnishing of water to the point of reliance, a conclusion untenable under the evidence, a public use under the cases hereinbefore discussed could attach to no more than the amount actually furnished and beneficially used, an amount which did not impair the vested rights of plaintiffs. Eden Township Water District v. City of Hayward, supra.

Furthermore, in the Collier case, by stipulation of the defendant, there was incorporated into the judgment a requirement that there be available to the plaintiff and his land during the irrigation season, such amount of water as was reasonably required by the plaintiff by reasonable methods of diversion, to the extent and quantity of 18 cubic feet per second, which was not to be diminished by any prior riparian users, and which the Court found was sufficient to meet the needs of plaintiff's 527.86 acres of land for water at all times. *He in effect had a physical solution, and was held to be also entitled to damages. Thus, even though it was there held that a public use had intervened on the basis of an estoppel, the doctrine was invoked only as to water above that needed by plaintiff, which, under the law as it now exists would be surplus waters.* Furthermore, the dam in the Collier case was completed in 1926—two years before the Constitutional amendment of 1928—and the plaintiff was then entitled to bring suit to compel the whole flow of the river, surplus and nonsurplus. That right to compel the flow of surplus water was taken away by the 1928 amendment, as hereinbefore shown. Hence, the same case could not arise since 1928 because of the absence of any right to object to the appropriation of surplus waters—a right that existed in 1926 when the dam in the Collier case was built.

Another thing should be mentioned, which distinguishes the Collier case from

this case. In that case the defendant irrigation district, under Art. XIV, Sec. 1, of the Cal. Court; was, 'subject to the regulation and control of the State in the manner to be prescribed by law', which could include regulations as to rates and services. Whether that is true in the instant case is not decided, but in any event, the United States has not submitted to regulation as to rates and service by the State of California.

Still another material factual difference is found in the fact that in the Collier case it was the defendant Irrigation District which constructed the dam and was the direct supplier of water to the individual members of the public. Under the cases all water actually appropriated by such corporate defendant was devoted to the public use in the sense that it was supplied by the appropriator to all within the District as a matter of right, and not merely on the basis of private contracts made selectively and at the will of the supplier. The government is in an entirely different position. It has entered into private contracts to furnish water to corporate districts, and has not undertaken a duty to supply the public generally with water.

By the California cases when a use is a public use, then every member of the public in the service area similarly situated may enforce by mandamus or other proceedings his right to water service, Fellows v. City of Los Angeles, 1907, 151 Cal. 52, 90 P. 137, or may compel the delivery to him of his proportionate share of the water. Butte County Water Users' Ass'n v. Railroad Commission, etc., 1921, 185 Cal. 218, 196 P. 265; California Public Utilities Code, Section 2711.

The "potential service area" shown in Maps 214–212–37 accompanying the amended applications of the United States to appropriate water at Friant—Exhibit A–46–A—covers 4,986,000 acres of land which includes all of the counties of Madera, Fresno, Tulare, Kern, and parts of other counties, or "any 900,000 acres during a single year."

Considering next the public policy basis for the doctrine, the Court in the Hillside case, supra, did not rest its conclusions that a public use had attached, on implied dedication by estoppel, but on weighing the equities from the facts in that case, applied the doctrine of public use because to do otherwise would interrupt a service of water to the public which had come to rely thereon before the filing of the suit. The facts there were that the owners of 640 acres of land having *"an abundant and perpetual supply of water for surface irrigation"* were not entitled to have their underground waters maintained by injunction against the City of Los Angeles which owned 90,000 acres overlying the same underground pool from which it pumped water into its aqueduct for use by the population of Los Angeles. No such facts are present here—the plaintiffs and their class have no other source from which they can secure the water which is taken from them by impoundment and diversion at Friant. Some members of plaintiffs' class can secure water from the Fresno Irrigation District as surface water for irrigation, but the evidence shows that such water does not percolate sufficiently to supply the water to deep wells which secure their water from the aquifers of the San Joaquin river. Moreover, within the area of the San Joaquin cone, are the rights of the City of Fresno and numerous Public Water Districts furnishing water by deep wells from the underground for municipal uses, just as much as the municipal uses of the City of Los Angeles—which uses are by the Water Code, Section 106, declared to be the highest and best uses [80] and are public uses. In the Hillside case it was not necessary to make a physical solution as to the 640 acres because the plaintiffs had an abundant and perpetual

80. In City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P. 2d 439, the court refused to apply the doctrine of intervention of a Public use, and indicated a doubt that it could be applied against a City.

surface supply. But that case supports the conclusion that where it is necessary to supply water to those having prior right, and a physical solution can be had, that remedy should be applied instead of relegating them to damages. This is evident from the requirement therein that a physical solution was feasible and should be made as to remaining respondents in that case other than the overlying owners of the 640 acres.

In Peabody v. City of Vallejo, supra, a suit by riparian owners to enjoin upstream appropriations and diversions by the City, the Court points out, 2 Cal.2d at page 378, 40 P.2d 486, that the doctrine of intervention of a public use has sometimes been said by the court to be based on waiver and estoppel, and at other times it has been said to be based on public policy. It then declares, 2 Cal. 2d at page 379, 40 P.2d at page 497, that: "There is little doubt that the application of the doctrine may be invoked on either ground when public use has attached prior to the commencement of the action and depending on the circumstances of the case." The dam from which the water supply of the defendant City was received was completed in December, 1925—ten months before suit was filed on October 13, 1926. The answer of the City alleged that water impounded prior to May 1, 1926, was then being distributed for public purposes to the inhabitants of the City. The court found as a fact that a public use had intervened more than five months prior to the commencement of the suit, and held as a matter of law that the allegation in the city's answer of distribution of water to its inhabitants and the necessity for continuance of such distribution, was sufficient to raise the issue of public use.

It would thus appear from the Peabody case that the underlying reason for the doctrine, avoidance of inconvenient interruption of a public service, was present prior to suit, as were facts showing estoppel and waiver. The Court does not declare on which basis it rested its decision. In any event, after hold-

ing that a public use had intervened, it concluded, 2 Cal.2d at page 383, 40 P.2d 486, that the Court below should make a physical solution, if possible, and that plaintiffs were then entitled to damages for injury, if any, remaining after a physical solution.

The inapplicability of the doctrine on the facts in this case is further demonstrated by the latest expression thereon by the Supreme Court of California in the case of City of Pasadena v. City of Alhambra, supra.

In that case the Court refused to invoke the doctrine in favor of either the City of Pasadena or the City of Alhambra against the private user, California-Michigan Water Company, and stated as follows, 33 Cal.2d at page 920, 207 P.2d at page 25: "Appellant further contends that it cannot be enjoined since the water which it produces is devoted to a public use. Reliance is placed upon cases holding that when a public use has attached, inverse condemnation proceedings may be invoked and compensation in lieu of a prohibitory injunction is preferred in most circumstances. See Hillside Water Co. v. City of Los Angeles, 10 Cal.2d 677, 688, 76 P.2d 681; Peabody v. City of Vallejo, 2 Cal.2d 351, 377–380, 40 P.2d 486; Newport v. Temescal Water Co., 149 Cal. 531, 538, 87 P. 372, 6 L.R.A.,N.S., 1098. This rule has its foundation chiefly in the inconvenience to the public if service is interrupted by the issuance of an injunction to restrain the use, Miller & Lux, Inc., v. San Joaquin Light & Power Co., 8 Cal.2d 427, 436, 65 P.2d 1289; Burr v. Maclay Rancho Water Co., 160 Cal. 268, 280, 116 P. 715, and has no application to the problem which confronts us here. The purpose of this litigation is the protection of the interests of both public and private users by preventing further depletion of the water supply. Excepting appellant, all parties, public as well as private, have consented to be enjoined to effect this purpose. *There is nothing in the record to indicate that the public interest would be better served by depriving private users of their pumping*

*rights and compensating them therefor. If this were done they would have to purchase their water from municipalities or public utilities which take water from the same underground area, and the total supply available to the public would not be increased. Moreover, it would be exceedingly difficult to fix the monetary loss of each private party and then apportion it among the numerous public users. In these circumstances, the trial court was justified in concluding that the rule against enjoining public utilities was not applicable."* City of Pasadena v. City of Alhambra, 33 Cal.2d 908, 920–921, 207 P.2d 17, 25.

When the Court weighs the hardships and conveniences, it finds that here all of the contracts with the irrigation districts, except one, were made long after this suit was started. Thus there was no substantial existing public service which could be interrupted by any injunction. Also, the protection of the rights of the plaintiffs and their class by a conditional injunction by way of a physical solution, in that flow of water needed for their vested rights, will not interrupt the flow of water to the contracting Irrigation Districts, and will not diminish them in any substantial degree. There would not result that inconvenience to the public which would be encountered if an attempt were being made to prohibit entirely the diversion of waters at Friant.

There is nothing in the record here to indicate that the public interest would be better served by depriving plaintiffs of their water, and compensating them therefor, and requiring them in turn to purchase that water from the facility serving the area in which their lands are located. As in the Pasadena case, it would be exceedingly difficult, if not impossible, to fix the monetary loss of each plaintiff, or each member of the class who, in such event, would have to bring an individual suit.

Furthermore, the class acreage here affected by the diversions, including those taking directly from the river as well as from wells, includes cities, towns, villages, and seven domestic water districts within the class area furnishing water for what the California Water Code declares, Section 106, to be the highest and best use. There is not such disparity of acreage or populace to be served as was present in the Hillside case, supra, or the Collier case, supra, and there is no substitute water supply at hand for what is proposed to be taken. It is clear that hardships and inconveniences would result to the inhabitants of this vast area, whether depending on water directly from the river or on wells replenished in whole or in part by the San Joaquin river, if their water supply should be cut off and diverted to others who, only since this suit was commenced, have received any substantial amounts of water from the project works, and who had not, at the time suit was filed, and have not since, developed the same dependence on that supply as have the class plaintiffs through several prior decades of use. It is also clear that such hardships and inconveniences would far outweigh any hardships or inconveniences which might be suffered by the United States or any defendant district, all of which in fact receive water which is only supplemental to that which they already had and still have.

The public policy foundation for an application of the doctrine in such a manner as to relegate plaintiffs to damage is wholly absent.

Though it has been determined that the facts of this case show neither waiver, nor laches, nor an implied dedication by estoppel, and that the public policy basis for the doctrine of intervention of a public use is wholly absent and that plaintiffs and their class are thus not relegated to damages, there are still other principles militating against the applicability of the doctrine of the intervention of a public use in this case against the rights of the plaintiffs and their class.

The cases of Thayer v. California Development Co., post, Leavitt v. Lassen Irrigation Co., post, and Allen v. Railroad Commission, etc., post, deal with

the question of *when* there is dedication to the public use *by a supplier of water*, and further illustrate the inapplicability of the doctrine of the intervention of a public use against the rights of plaintiffs and their class.

■ In Thayer v. California Development Co., 1912, 164 Cal. 117, 128 P. 21, the plaintiff, a private landowner, brought a mandamus proceeding to compel the defendant, the California Development Company, to deliver water to her land for farming, at the same rate charged by the Company, under separate contracts to other farmers in the vicinity of her land. It was contended that the Company by its acts had dedicated its property to a public use, and that defendant being within the area of the lands to be served by the Company was entitled to the water on the same basis as others. The Court held there that the act of acquisition (appropriation) of water, and dedication, are distinct from each other, 164 Cal. at page 126, 128 P. at page 21, and appropriation of water is not *ipso facto* a dedication or an appropriation to a public use; that the additional act of dedication is as necessary to the creation of a public use in a water right as it would be if the right were acquired by conveyance; the test of dedication of public uses in that case was whether or not some acts or declarations of the Development Company indicated their intention to dedicate or devote it to a public use. The Court held there had not been any such dedication because the Development Company had at all times retained the right to say who should have the water, "upon what terms, selling to one and refusing to sell to another at will".[81] 164 Cal. at page 128, 128 P. at page 25. And again, 164 Cal. at page 132, 128 P. at page 27 the Court stated: "It appears, therefore, that the Development Company has always, either directly or through the auxiliary companies, selected the persons to whom it would sell and distribute the water and fixed its own prices." The

Court further held that by such method of picking customers and fixing prices by contract, the Development Company was not subject to the provisions of Article XIV, Sections 1 and 2, of the California Constitution, declaring that the use of all water for sale or distribution is a public use and subject to regulation in the manner to be prescribed by law, which "was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users." 164 Cal. at page 134, 128 P. at page 28.

In Leavitt v. Lassen Irrigation Co., 1909, 157 Cal. 82, 106 P. 404, 29 L.R.A., N.S., 213, the court held that the appropriator had in fact made a dedication to a public use in that he had offered to distribute water to such members of the public as would apply therefor and pay the legal charge for the service, and having done so as to all of the water, he could not thereafter divert a portion thereof to a private diverter, and thus destroy the public use or "public trust" as the Court stated. Further, 157 Cal. at page 89, 106 P. at page 407: "The fundamental and all-important proposition then is this: That a public service water company which is appropriating water under the Constitution of 1879, for purposes of rental, distribution, and sale, cannot confer upon a consumer any preferential right to the use of any part of its water. * * * He was but the purveyor of this public use, the agent in the execution of this public trust." 157 Cal. at page 89, 106 P. at page 407.

In Allen v. Railroad Commission, etc., 1918, 179 Cal. 68, 175 P. 466, 8 A.L.R. 249, certiorari denied 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797, the Water Company deeming itself a public utility under the Act of 1913, California Public Utilities Code, Sections 2701 et seq., applied to the Railroad Commission for an order fixing rates to be charged for the distribution of water. The users holding private contracts with the Company objected. The Railroad Commission held

---

81. That is what the United States is doing here.

for the Water Company, but the Supreme Court, on review, annulled the order of the Railroad Commission. The Court again affirmed the fact that the act of appropriation and dedication as announced in the Thayer case, supra, are distinct from each other. It held that Article XIV of the Constitution, 179 Cal. at page 84, 175 P. at page 472: "Must be understood to apply to cases where one has appropriated water generally, for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts of purchase and sale." And 179 Cal. at page 85, 175 P. at page 473: " 'To hold that property has been dedicated to a public use is "not a trivial thing" [citing cases] and such dedication is never presumed "without evidence of unequivocal intention." (Niles v. City of Los Angeles, 125 Cal. 572, 58 P. 190).' " It further affirmed the doctrine in the Thayer case, 179 Cal. at page 87, 175 P. at page 473: "That the sale in gross by a Water Company of water to a mutual Water Company was not a dedication of such waters to public use."; and of Marin Water & Power Co. v. Town of Sausalito, 168 Cal. 587, 143 P. 767: "That a sale and delivery of water by a water company to a municipality owning its own water system, to be sold by the municipality to its inhabitants, was not a dedication of such water so sold in gross to a public use so that the gross rates were subject to municipal regulation." 179 Cal. at page 88, 175 P. at page 474: "Public use, then, means the use by the public and by every individual member of it, as a legal right",

and further, 179 Cal. at page 89, 175 P. at page 474: "It is not the use which the consumer makes of the commodity which constitutes the test * * *. ' "It is the duty which the purveyor or producer has undertaken to perform on behalf of and so owes to the public generally, or to any defined portion of it, as the purveyor of a commodity or as an agency in the performance of a service, which stamps the purveyor or the agency as being a public service utility." ' " The Court held that by virtue of the private contracts there had been no dedication to a public use.

While the Court does not base its decision on this ground, when the principles set forth in the above cases are applied to the facts in this case, it is difficult to see how the doctrine of the intervention of a public use can be urged so as to preclude the plaintiffs and their class from securing water. The United States is making contracts with whom it chooses for service of water at prices it fixes; the sales, or services, are for water "in gross" to the districts which in turn service it to their members or customers, as was done by the mutual Water Company in the Thayer case, supra, and by the municipality in the Marin case, supra. Neither the government nor the State, nor any of the districts for that matter, have regarded the sales of service made by the contracts to be subject to regulation as to rates and service by the California Public Utilities Commission as required by the California Constitution, Article XIV, and law, where a public use is claimed.[82]

82. While the Federal Reclamation laws make the United States subject to the water laws of the State, they also contain elaborate provisions concerning the terms of contracts, which the Secretary of the Interior is authorized to make, for the furnishing of water by the United States from any reclamation project. Act of August 4, 1939, 53 Stat. 1187, 43 U.S.C.A. § 485. All of the contracts with the Irrigation Districts are, from the evidence, made under Section 9(e) of said Act, 43 U.S.C.A. 485h(e), which permits the Secretary, "in lieu" of making contracts for the return of construc-

tion costs over 40 years, to make service, or so-called "utility" contracts covering the annual operation costs, with "consideration" to be given to the construction costs connected with the particular works involved. It is not necessary to a decision of this case to construe those sections or to determine whether or not the United States is subject to regulation by the Public Utilities Commission of the State of California as to rates and service in connection with water furnished or agreed to be furnished from Friant dam and diversion

■ Further doubt as to the availability of the doctrine of intervention of a public use in this case, even if there had been a well-established water service on which the public had come to depend, is created by statements in the Meridian case: "It was undoubtedly the purpose of the proponents of the amendment of 1928 to make it possible to marshal the water resources of the state and make them available for the constantly increasing needs of all of its people. In according to that great purpose its proper significance it is necessary and appropriate to declare, as inherent in the plan, that the storage of water for the purposes of flood control, equalization and stabilization of the flow and future use, is included within the beneficial uses to which the waters of the rivers and streams of the state may be put within the intent of the constitutional amendment. *But such right of storage must necessarily be subordinate to all beneficial uses on the stream made in the exercise of riparian and prior appropriative rights. And the right of storage may be exercised only pursuant to appropriations lawfully made."* Meridian, Ltd. v. City and County of San Francisco, 13 Cal.2d 424, at pages 449–450, 90 P.2d 537, at page 549, 91 P.2d 105.

These statements, when considered with the fact that the impounding and diversion of water by the government were not preceded by the obtaining of permits in compliance with the statutory procedure, indicate that storage without such compliance is unauthorized.[83] In each of the California water rights cases in which the doctrine of the intervention of a public use has been allowed to prevail as to stream appropriations, the appropriations were lawfully made, i. e., under permits properly obtained prior to diversion and suit.

As stated in Meridian, Ltd. v. City and County of San Francisco, supra, the right of storage can be exercised only as to appropriations lawfully made, and

works. The contracts are not offered as of right to any district or user which or who may be capable of being served by either Madera or Friant-Kern canal.

It was pointed out in Fresno Canal & Irrigation Co. v. Park, 1900, 129 Cal. 437, 444, 62 P. 87, that the main purpose of the self-executing provisions of Article XIV, Section 1, of the California Constitution requiring the fixing of rates by municipalities or counties, was to remedy the evil that one having a monopoly on a water supply would, by exorbitant charges, oppress a large number of users who would be compelled to have water constantly for domestic or municipal uses.

The legislature extended this purpose to all those furnishing water to users when it implemented those provisions of Article XIV, Section 1, which were not self-executing, by enacting the Statutes which are now in the California Public Utilities Code or Water Code covering other purveyors of water.

The concept of public use as discussed in cases in construing Article XIV, Section 1 of the California Constitution, and its implementing legislation, is, that when a public use has, as a matter of fact, intervened or attached, water shall not only be available to all those in the service area on equal terms as a matter of legal right, Allen v. Railroad Commission etc., supra, but also that the public interest requires that rates and terms of service shall be fixed by a public body after hearing with the right of judicial review. Or as stated in Contra Costa Water Co. v. City of Oakland, 1911, 159 Cal. 323, at page 333, 113 P. 668, at page 673: " 'As was said in Spring Valley Water Co. v. [City and County of] San Francisco, 9 Cir., 165 F. 676, this provision of our Constitution is justified and sustained by the well-settled principle enunciated in Munn v. [State of] Illinois, 94 U.S. 113, 126, 24 L.Ed. 77, that where one devotes his property to a public use, "he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created, * * * so long as he maintains the use. * * * When private property is devoted to public use, it is subject to public regulation." If the right to regulate exists, the right to establish the reasonable compensation for services as one of the means of regulation is implied.' "

83. Section 1052 of the California Water Code declares that the diversion of water without prior compliance with the Water Code is a trespass.

thus it would be in complete disregard of the Water Code and the Meridian case to hold that public use can intervene when the appropriations are made without even colorable compliance with the procedure prescribed as prerequisite to the exercise of any right of storage. A storage without right could not equitably be held to destroy prior vested rights— especially where, as here, they were never actually encroached upon until aftter filing of suit to prevent the encroachment.[84]

■■■■ As heretofore noted, the requirements of the 1928 Constitutional amendment as to reasonable and beneficial use apply to every use including public use, and guarantee the reasonable and beneficial uses of prior vested rights.

In recognition of the paramount importance to the use of water, the Courts of California have worked out as an equitable doctrine the only means whereby there can be a reconciliation of prior rights to the use of water which may come into conflict with a later public use so as to give each the water needed for their present beneficial uses. That means is called a "physical solution" which it is the duty of the Court to impose, if one is possible, which will give full effect to the 1928 amendment by providing water for the prior right for its present reasonable and beneficial uses and will at the same time permit water which is surplus to, or in excess of, such present right to be devoted to reasonable and beneficial uses. As stated in Peabody v. City of Vallejo, 2 Cal.2d 351, at

---

84. While the principles upon which the Court bases its conclusion are amply set forth throughout the body of the Opinion, it would not be amiss to make a general summary statement of California law as established by the cases on the doctrine of public use. They are:

The attachment of a public use requires a dedication to that use, i. e., if one has a lawful right to appropriate and divert water, he may, by conduct, make it available and purvey it to the public, and when he does so, he is said to have dedicated that portion so made available to a public use. One may dedicate all or only a portion of the flow of a stream or appropriative rights which he has or claims, to a public use: Inasmuch as an appropriation of water may be made for a private use, it follows that the act of acquisition of the lawful right to appropriate water is distinct from the act of attachment of, or dedication to, a public use, and must precede it: If one lawfully owning a right to appropriate water so dedicates it to a public use, and in doing so invades a prior water right, the owner of the prior right is said to have consented to such dedication to a public use if by his conduct he has waived his right to object so as to justify the invocation of the equitable doctrines of laches or estoppel, in which event, the prior right is not destroyed, and he may be, but not necessarily, relegated to a recovery of damages: If there has been no waiver by the owner of the prior right so as to warrant the invocation of the doctrine

of laches or estoppel, and if (1) the purveyor of water to the public lawfully owns a right to appropriate water, and (2) if such purveyor has the power of eminent domain under Article I, Section 14 of the California Constitution, and (3) if before filing of the suit by the prior right, (4) such purveyor has in fact actually devoted the water to the use of the public, or that portion to be served (a) on equal terms of service and rates, and (b) not by selecting and choosing whom he shall serve and whom he shall not by entering into separate contracts with each, (c) and members of the public in the service area may demand and enforce such service as a matter of right, and (5) if the general public so served who may demand such service from the purveyor as a matter of right have come to depend upon such service by actual delivery of the water to them prior to the filing of suit by the prior right, and (6) if the prior right is of such nature that the inconvenience to be suffered by its owner is relatively small compared to the inconvenience which would be suffered by depriving the public of the water actually used by them and upon which they have come to depend prior to suit, then it may be said that upon considerations of public policy, a public use has intervened against the owner of the prior right to the extent that he may be, but is not necessarily, compelled to accept damages by way of inverse or reverse condemnation in lieu of an unconditional injunction compelling delivery of water to him in satisfaction of his prior right.

page 383, 40 P.2d 486, at page 499: "That if a physical solution be ascertainable, the court has the power to make and should make reasonable regulations for the use of the water by the respective parties, provided they be adequate to protect the one having the paramount right in the substantial enjoyment thereof and to prevent its ultimate destruction, and in this connection the court has the power to and should reserve unto itself the right to change and modify its orders and decree as occasion may demand, either on its own motion or on motion of any party." •

 The Court concludes that a public use has not intervened against the rights of plaintiffs and their class so as to relegate them to damages. And as will shortly appear, a physical solution is possible which will protect them in their rights, and still give full effect to the Constitutional requirement of the fullest use of all water at all times for reasonable and beneficial purposes.

## XIV.

### Watershed and County of Origin Statutes.

Whatever other principles exist which protect the plaintiffs and their class in their rights to water, it is urged by their counsel that the so-called County and Watershed of Origin Statutes of California protect and preserve their vested right to water presently and prospectively needed for their reasonable and beneficial uses against any taking of water out of the Counties of Fresno and Madera by the defendants under any claim or color of right whatsoever.

The so-called Watershed of Origin Statute first appeared as a matter of legislation by the adoption of the 1933 Central Valley Project Act, Cal.Stat. 1933, Chap. 1042, Section 11, page 2650. The material portions of that section are now codified in the 1943 California Water Code, and are Sections 11460 and 11463. They protect (1) "a watershed or area wherein water originates," and (2) "an area immediately adjacent thereto which can conveniently be supplied with water", in the prior right of such areas, "to all of the water reasonably required to adequately supply the beneficial needs ‑of the watershed, area, or any of the inhabitants or property owners therein." [85] Section 10505,[86] known as the "County of Origin" Statute, was added by Chapter 537 of the California Statutes of 1933, as an additional clause to the re-enactment that year of the Statute first enacted in 1927, Cal.Stats. 1927, Ch. 286, which permitted the Department of Finance of the State of California to file applications for unappropriated water.

Prior to the 1928 Constitutional amendment, riparian lands within the watershed were protected against any diversion for non-riparian uses, and

85. "§ 11460. Deprival of prior right to water to supply watershed area. In the construction and operation by the authority of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the authority directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein."

"§ 11463. Exchange of water between watersheds or areas. In the construction and operation by the authority of any project under the provisions of this part, no exchange of the water of any watershed or area for the water of any other watershed or area may be made by the authority unless the water requirements of the watershed or area in which the exchange is made are first and at all times met and satisfied to the extent that the requirements would have been met were the exchange not made, and no right to the use of water shall be gained or lost by reason of any such exchange."

86. "§ 10505. Restrictions. No priority under this part shall be released nor assignment made of any appropriation that will, in the judgment of the Department of Finance, deprive the county in which the appropriated water originates of any such water necessary for the development of the county."

their owners could compel the full flow of the river. To a great extent all persons and lands within the watershed were incidentally protected by this rule. By the 1928 Constitutional amendment, the surplus or excess over that needed for the reasonable beneficial uses of the riparian and overlying owners within the watershed was released for appropriation and diversion.

 Sections 11460, 11463 and 10505 are in keeping with the provisions and the policy of the 1928 amendment which permits and requires reasonable and beneficial use, and which also protects the vested water rights of the riparian and overlying owners for present and prospective beneficial uses to which the lands are or may be adaptable;[87] and they extend by statute the protection given to riparian and overlying owners by the 1928 amendment to all the inhabitants and property owners of the County in water which may be necessary for the development of the County, and which protection they only incidentally and indirectly received prior to 1928.

 While these statutes were the first expression of public policy by the legislature on the subject, the doctrine of protection of the watershed of origin has been consistently applied by the California Courts in the protection of riparian and overlying rights in recognition of the facts that the natural advantages of a surface or underground water supply was the principal reason for the settlement and development of the counties and watersheds where water originates. Bathgate v. Irvine, 1899, 126 Cal. 135, 143, 58 P. 442; Burr v. Maclay Rancho Water Co., 1908, 154 Cal. 428, 436, 98 P. 260; quoted with approval Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 370, 371, 40 P.2d 486; Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 279, 107 P. 115, 27 L.R.A.,N.S., 772; Moreno Mutual Irrigation Co. v. Beaumont, etc., 1949, 94 Cal.App.2d 766, 779, 211 P.2d 928.

None of these sections have received judicial construction by the Appellate Courts of California or, so far as known, by any Superior Court of California.

The Attorney General of California, however, has construed them. In Opinion 53/298 filed January 6, 1955 [25 Ops.Cal.Atty.Gen. 8], the Attorney General handed down an opinion which held, among other things, that the provisions of Sections 11460 and 11463 are imposed upon any agency of the State of California or the United States by virtue of the Statute, regardless of their inclusion or omission in any permit issued by the State Engineer of California.

In that conclusion, the Court agrees.

 From a literal reading of the Sections, they would appear to apply only to the Water Project Authority of California which did not build and does not operate Friant Project. The United States did build it and does operate it, but it does so under the Federal Reclamation laws making the State law applicable. As the Attorney General points out in his Opinion, Sections 11460 and 11463 of the Water Code are part of the substantive law of water rights of California, and are thus binding on the United States. He further points out that the Secretary of the Interior, the official charged with the administration of the Reclamation laws, has repeatedly recognized the applicability of them to the operations of the United States.[88]

---

87. Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 90 P.2d 537, 91 P.2d 105, and other cases cited under heading No. XI et seq. "Water Rights under California Law."

88. The Opinion says, among other things: "A number of their official utterances are collected in a letter to Congressman Clair Engle from the Regional Director, U.S. Bureau of Reclamation, dated November 15, 1948—(printed in Cong.Record, Feb. 21, 1949, 81st Cong., Vol. 95, p. A–961). Likewise the 'Comprehensive Departmental Report on the Development of the Water and Related Resources of the Central Valley Basin,' submitted to Congress by the Department of the Interior (Aug. 1949, Senate Doc. 113, 81st Cong.,

Furthermore, all doubt as to whether or not Sections 11460 and 11463 were part of the substantive law of California and intended to apply to operation of the project by the United States, was removed by the enactment in 1951 of Section 11128 of the California Water Code, which reads as follows "§ 11128. *Limitations of §§ 11460, 11463: Application.* The limitations prescribed in Sections 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part."

It is clear that Sections 11460 and 11463 apply to the operations of the United States at Friant, and that any diversions of the San Joaquin river waters out of the counties of Fresno and Madera are subject to the prior right of plaintiffs and their class to all the water reasonably required to adequately supply their needs for reasonable and beneficial uses to which their land is now or may be adaptable in the future by reasonable methods of diversion.

In 1927 the Legislature enacted Chapter 286 of the Statutes of California which permitted the Department of Finance to file applications for the appropriation of water. The Statute was amended from time to time, and as so amended was codified in 1943 as Sections 10500, 10504 and 10505 of the California Water Code.

Section 10500 [89] authorizes the filing of applications to appropriate water which in the judgment of the Department of Finance may be required in the development and completion of a whole or any part of a general or coordinated plan for the development of water resources, and specifically makes the provisions of Part 2 of Division 2, Sections 1200 to 1801, of the Water Code applicable to such applications; Section 10504 [90] permits the assignments of such applications to, among others, "the United States of America or any of its departments or agencies", when the assignment is not in conflict with the general or coordinated plan of development; Section 10505 provides that no assignment shall be made of any such appropriation that will, in the judgment of

1st Sess., pp. 39, 64–65, 104, 121–122, 125), makes numerous references to protection of counties and watersheds of origin." See also D.C., 90 F.Supp. 773, and Exhibit 136 therein, pp. 64–65.

89. "§ 10500. Making and filing of applications by Department of Finance: Procedure: Priority. The Department of Finance shall make and file applications for any water which in its judgment is or may be required in the development and completion of the whole or any part of a general or coordinated plan looking toward the development, utilization, or conservation of the water resources of the State.

"Any application filed pursuant to this part shall be made and filed pursuant to Part 2 of Division 2 of this code and the rules and regulations of the State Engineer relating to the appropriation of water insofar as applicable thereto.

"Applications filed pursuant to this part shall have priority, as of the date of filing, over any application made and filed subsequent thereto. Until October 1, 1955, or such later date as may be prescribed by further legislative enactment, the statutory requirements of said Part 2 of Division 2 relating to diligence shall not apply to applications filed under this part, except as otherwise provided in Section 10504."

90. "§ 10504. Release or assignment; 'Assignee.' The Department of Finance may release from priority or assign any portion of any appropriation filed by it under this part when the release or assignment is for the purpose of development not in conflict with such general or coordinated plan. The assignee of any such application, whether heretofore or hereafter assigned, is subject to all the requirements of diligence as provided in Part 2 of Division 2 of this code. 'Assignee' as used herein includes, but is not limited to, state agencies, commissions and departments, and the United States of America or any of its departments or agencies."

the Department of Finance, deprive the County in which the appropriated water originates, of any such water necessary for the development of the County.

Applications Nos. 5637 and 5638 were both filed on July 30, 1927, by the Department of Finance, and Application No. 9639 was filed August 2, 1938.[91] As heretofore noted, no permits were ever granted thereon, none of them have ever come on for hearing, or were set for hearing until the day the evidence in this case concluded, on December 31, 1954.

On the 30th day of September, 1939, the Department of Finance assigned said three above-numbered applications to the United States of America. The full text of the assignment appears as part of Exhibit A-48-A. The assignment, after reciting the filing of the applications, the authorization contained in the Act of 1927, as amended, and that the United States was then engaged in the construction of the Central Valley Project, finds that the applications and such appropriations of water as were thereby made, and all right, title and interest therein and thereto, and all right, title and interest in and to water is for the purpose of development not in conflict with any general or coordinated plan looking toward the development, utilization and conservation of water resources of the State of California, but is in furtherance thereof, and "that the said assignment in the form and substance hereinafter made of the aforesaid applications will not in the judgment of the State Department of Finance deprive any county in which said appropriated water originates of any such water necessary for the development of such County." It then provides, that the State Department of Finance "does hereby transfer, assign, and set over to the United States of America, to be exercised by and through its Bureau of Reclamation for the use and benefit of said Central Valley Project of California, all its right, title and interest to the aforesaid applications Nos. 5637, 5638 and 9369, and such appropriations of the water of said river as were made thereby, and all right, title and interest in and to the water and the use of water covered thereby or initiated thereunder."

▉ It is the contention of plaintiffs' counsel that insofar as such as-

---

91. Applications Nos. 5637 and 5638 were both filed on July 30, 1927. Each pertained to the waters of the San Joaquin river "located in Madera and Fresno" counties, and the point of diversion specified in each was Temperance Flat which is above Friant, and in each, the height of the dam was stated to be 595 feet.

In Application No. 5637 it was stated that the amount of water desired to be appropriated "without storage" was 4,500 cubic feet per second, to be diverted from January 1st to December 31st of each season, and that it was desired that 1,210,000 acre-feet between the same dates of each year was desired for diversion to be temporarily stored, and that "the use to which the water is to be applied is Power Generation," and that the water would be returned to the river at the power house at the dam site.

In Application No. 5638 it was stated that the amount desired to be diverted without storage was 5,000 cubic feet per second, and that 1,210,000 acre-feet was desired to be temporarily stored and later diverted to be collected between January 1st and December 31st of each year; "The use to which the water is to be applied is irrigation, domestic and flood control."

Application No. 9639 was filed August 2, 1938. It specified 2,000,000 acre-feet to be collected between January 1st and December 31st each year to be tempoarily stored and later diverted for use for irrigation, domestic and flood control. The points of diversion were both Temperance Flat and Friant, but the details as to dam and diversion works would be supplied "later," but would have a capacity of 20,000,000 acre-feet, although the area to be irrigated was said to be "900,000 acres on the floor of the San Joaquin valley."

The opening paragraph of each of the applications is as follows: "Department of Finance of the State of California of Sacramento, County of Sacramento, State of California, does hereby make application for a permit to appropriate the following described unappropriated waters of the State of California *Subject To Existing Rights*."

signment attempted to transfer "all right, title and interest in and to the water," such assignments are void as being in contravention of the Constitution of California.

It is unnecessary to reach the question of the constitutionality of any statute of California for the reason that, from the terms of the statutes the Department of Finance could not acquire the "right, title and interest in and to the water," and hence could not transfer it. The Department was authorized to file applications to appropriate water, which could give no right until a permit should be granted by the State Engineer, and as seen from the discussion elsewhere, the permit grants only a right to the use of water so long as it is being beneficially and reasonably used by reasonable methods of diversion and use. The assignments by the Department of Finance to the United States were thus ineffectual to transfer anything except the right to pursue the applications to permit, under the terms and conditions of the Water Code of California.

The Attorney General in Opinion No. 53/298 [25 Ops.Cal.Atty.Gen. 8] hereinbefore adverted to, expresses the opinion that Section 10505 "properly construed and applied" does not violate Article XIV, Section 3 of the California Constitution.

■ . While serious doubts are immediately suggested as to the constitutionality of the provisions vesting in the Department of Finance, the power of determination as to whether or not any assignment will deprive a County of origin of the water necessary for the development of that County, without notice to, or hearing of said County of origin, or any of its inhabitants, in view of Article VI, Section 1, Article XIV, Sections 1 and 3, and Article I, Section 14, as well as the due process clause of the California Constitution,[92] it is not necessary to reach or decide that question

because, properly construing and applying Sections 10500, 10504 and 10505, and considering them in connection with all other applicable provisions of California law as heretofore discussed, the constitutional question does not arise for several reasons: (1) the assignment to the United States can create no greater right than was possessed by the Department of Finance by the filing of the applications; (2) neither the applications nor permits granted on them could cover or affect any rights to water needed by plaintiffs and their class for their reasonable and beneficial uses, but only water which might be surplus thereto or in excess of those needs; (3) the applications were specifically made "subject to existing rights" which, of course, includes the existing rights of plaintiffs and their class hereinbefore discussed; (4) as heretofore seen under the heading "Applications to Appropriate Water," and as contended by counsel for the California Division of Water Resources, no right can vest under an application until a permit has been granted—and no permits have been granted; (5) any permits which may be granted by the State Engineer upon said applications are subject to the provisions of Sections 11460 and 11463 whether contained in the permit or not.

■ The watershed of the San Joaquin river is located entirely in the counties of Fresno and Madera. The thread of the river between Friant and Mendota forms the boundary line between Fresno and Madera counties. The areas of Madera and Chowchilla Irrigation Districts served by the Madera canal are located entirely in Madera County; but the area of all the irrigation districts served by the Friant-Kern canal are located in counties other than either Madera or Fresno. Hence the Watershed and County of Origin Statutes would, by themselves, be no bar to the diversions made to the Madera and Chow-

---

92. Tulare Water Co. v. State Water Commission, 1921, 187 Cal. 533, 202 P. 874; Temescal Water Co. v. Department of Public Works, 1955, 44 Cal.2d 90, 280 P. 2d 1.

**154**

chilla Irrigation Districts insofar as the rights of the plaintiffs and their class are concerned; but in addition to all the other reasons herein in this Opinion set forth, they do act to protect the plaintiffs and their class in their rights to water for their reasonable and beneficial uses insofar as diversions are made to the districts served by the Friant-Kern canal. The lands of the plaintiffs and their class are not only located in the area immediately adjacent to the river, which can be conveniently supplied by water from the river, but the plaintiffs and their class are "inhabitants and property owners therein," as are also the City of Fresno and its inhabitants, and Tranquillity Irrigation District and its water users.

The Opinion of the Attorney General, No. 54/159 [25 Ops.Cal.Atty.Gen. 32] deals with the application of Sections 10500 and 10505 insofar as proposed assignments are to be made concerning applications filed on the Feather river. That Opinion does not apply to the instant fact situation, and it is necessary only to say that no statements contained therein are controlling or applicable to the assignments involved in the instant case.

## XV.

### Class Action.

The question as to whether or not this is a class action under Federal Rules of Civil Procedure, rule 23, was raised on the Motions to Dismiss and was decided adversely to the defendants.

Some defendants have again, by special defenses in their answers, raised the same question.

Rule 23 reads as follows:

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

In the Opinion on the Motion to Dismiss reported in 90 F.Supp. 773, 804 et seq., this Court held against defendants' contention but did not then make a determination as to whether or not the "character of the right" sought to be enforced came under subdivision (1), (2), or (3) of Paragraph (a) of Rule 23, Federal Rules of Civil Procedure.[93]

93. It is sometimes said that if the character of the right comes within subdivision (1), it is a "true" class action, if subdivision (2) a "hybrid," and if subdivision (3) a "spurious" one. The Court prefers, however, not to use those terms as there is nothing in the Rules or in the history of them, or in the predecessor of Rule 23, which was old Equity Rule 38, which indicates such a distinction.

As noted by Mr. Justice Clark in Dickinson v. Burnham, 2 Cir., 1952, 197 F.2d 973, at page 979, certiorari denied 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678: "These labels should not be pressed so far as to obscure the original meaning and purpose of the rule itself."

While some of the cases indicate that the binding effect of a decree under Rule 23 depends on whether the community of interest or right sought to be enforced comes under subdivision (1), (2), or (3) of Rule 23(a), and while there is no dispute that in a case properly within Rule 23(a) (1) the decree binds absent members, it would seem that the true test of whether absent parties are bound is whether they were adequately represented. If they have been adequately represented (virtually present), they have in substance received their day in court, and

■ The "character of the right" sought to be enforced is to be determined according to the laws of the State of California.

It is to be recalled that the Court has found from all of the evidence in the case that all of the land lying within the alluvial cone lines of the San Joaquin river described as the "Lee" lines have as a common source of supply the waters of the San Joaquin river as it flowed before the construction of the Friant project and works.

■ Although it has been stated many times, it is again necessary to repeat, that this suit is not a case where the water users, either riparian or overlying, are seeking to enforce any separate or several rights among themselves or against one another, or to have a given amount of water declared and adjudicated to be the right for use on a specified tract of land. The Complaint was predicated, the Pre-trial Order formed, and the case tried, upon the basis that the character of the right sought to be enforced is a common right to water from a common source of supply, namely, the San Joaquin river, and that there was but one act of taking that common source of supply, viz.: the impoundment and diversion of the water back of Friant dam.

In addition to the authorities referred to in D.C., 90 F.Supp. 773 to the effect that the character of the right sought to be enforced is a common one, there are numerous other California cases to the same effect.

As early as 1889 the Supreme Court of California in Lytle Creek Water Co. v. Perdeu, 65 Cal. 447, 4 P. 426, 430, held that the several appropriators of all of the water of a stream were either tenants in common or joint tenants of the water, because no one of them could certainly state which part of the waters was his own, and further held that one could sue for all, stating: "Whether joint appropriators, holding the estate as joint tenants or tenants in common, the same is the result. *Each can recover the whole, or take the necessary steps to protect the whole against the acts of a wrongdoer.*"

In Hudson v. Dailey, 1909, 156 Cal. 617, 105 P. 748, the Court held that there was no rational ground for any distinction between overlying and riparian owners as a class when the source of supply was common to both.

In Seneca Consolidated Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, at page 220, 287 P. 93, at page 98, 70 A.L.R. 210, the Court said: "Indeed, the riparian right is in its nature a tenancy in common and not a separate or severable estate."

In Churchill v. Lauer, 1890, 84 Cal. 233–236 et seq., 24 P. 107, 108, the

---

due process—the ultimate test—would appear to be satisfied as to all the class whether the character of the right is described in subdivisions (1), (2), or (3). Hence, the decree should be res judicata.

If there is not adequacy of representation, it is difficult to see how there can be a class action. Paragraph (a) of the Rule makes adequacy of representation an absolute prerequisite to a class suit, regardless of the character of the right or community of interest sought to be enforced. Where this element is not satisfied, it would appear that there is no class suit, though the parties present may have been properly joined under Rule 20(a) relating to permissive joinder. If any part of Rule 23 is deemed a mere permissive joinder device, then Rule 20(a) is superfluous. As was said in Supreme Tribe of Ben-Hur v. Cauble,

1921, 255 U.S. 356, 41 S.Ct. 338, 342, 65 L.Ed. 673: "If the federal courts are to have the jurisdiction in class suits to which they are obviously entitled, the decree when rendered must bind all of the class properly represented." If they are not so bound, it is difficult to see how the suit could qualify as a class suit under Rule 23.

Either Rule 23 is inconsistent within itself by calling for adequacy of representation and yet permitting a suit thereunder which does not culminate in a binding decree despite satisfaction of due process, or the Rule is consistent and permits as class suits only those in which the decree will bind absent parties virtually present. The latter appears to be the more reasonable and logical construction.

Court had the following to say: "We think that the plaintiffs had a right to join in the action. There is an exception, at least in equity cases, to the general rule as to joinder. This is stated by Story as follows: 'Another exception to the general doctrine respecting multifariousness and misjoinder, which has already been alluded to, is where the parties, either plaintiffs or defendants, have one common interest touching the matter of the bill, *although they claim under distinct titles, and have independent interests.* The cases respecting rights of common, where all the commoners may join, *or one may sue or be sued for all,* of parishioners to establish a general *modus,* or of a parson to establish a general right of tithes against parishioners, and others of a like nature, already stated under another head, fully exemplify the doctrine; for in all of them there is a common interest centering in the point in issue in the cause.' Story, Eq. Pl., § 285. And this exception has been held to cover cases like the present. In Ballou v. Inhabitants of Hopkinton, 4 Gray, Mass., [324] 328, it was held that the owners of different mills may join in a bill in equity to enjoin a stranger from letting off water from a reservoir which they had erected to collect the waters of a stream for the purpose of supplying their several mills. And Shaw, C. J., delivering the opinion, said: 'Although the plaintiffs are several owners of separate and distinct mills injured by the alleged stoppage, diversion, and waste of the water of Mill river, and to recover damages for which each owner must bring his several action at law to obtain a remedy for his particular injury, *yet they have a joint and common right in the natural flow of the stream,* and in the reservoir by which its power is increased, *and a joint interest in the remedy which equity alone can afford, in maintaining a regular flow of the water of the reservoir at suitable and proper times, so as best to subserve the equal rights of them all.* The remedy in equity, therefore, would, by one decree in one suit, prevent a multiplicity of actions.' In the foregoing case the plaintiffs had increased the flow of the stream by collecting its waters in a reservoir. The decision, however, did not proceed upon this circumstance, but was put upon the ground of the common right 'in the natural flow of the stream.' The same principle was laid down in Reid v. Gifford, Hopk. Ch. 419. There several proprietors of separate and distinct lands and mills, supplied by a natural watercourse, were allowed to join in an application for an injunction to prevent the defendants from diverting the water by means of a canal above the plaintiffs' property; and Chancellor Sandford said: 'The rights of the several complainants to their respective lands are indeed distinct, *but the grievance in question is a common injury to all the complainants.* The water, in its natural descent from the lake, becomes the property of each of the complainants successively. All the complainants thus have right in the same subject, and the nature of the case forms a community of interests in the complainants.' "[94]

---

94. Reference is made to the following additional California cases:

"All riparian owners of a water course have a common right therein". Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 911, 178 P.2d 844, 851.

"The rights of all landowners over a common basin, saturated strata, or underground reservoir, are coequal or correlative". O'Leary v. Herbert, 1936, 5 Cal.2d 416, 423, 55 P.2d 834, 838; Verdugo Canyon Water Co. v. Verdugo, 152 Cal. 655, 667, 93 P. 1021.

"There is no rational ground for any distinction between such percolating waters and the waters in the gravels immediately beneath and directly supporting the surface flow, and no reason for applying a different rule to the two classes, with respect to such rights, if, indeed, the two classes can be distinguished at all. *Such waters, together with the surface stream supplied by them, should be considered a common supply, in which all who by their natural situation have access to it have a common right,* and of which they may

■ Here the "grievance in question" is the common injury to all the plaintiffs and to all the members of their class by the impoundment and diversion of water at Friant.

The character of the right sought to be enforced is the common interest, not only of each of the plaintiffs, but of all of the riparian and overlying landowners within the alluvial cone to have an assured flow of water necessary to meet the minimum needs of the area.

Clearly, under California law, the "character of the right" sought to be enforced in this case is a "common" right of each and all the riparian and overlying owners on the alluvial cone of the San Joaquin river under the terms of subdivision (1) of Rule 23(a), Federal Rules of Civil Procedure, and not a "several" right under either subdivision (2) or subdivision (3) of that Rule.

■ Two other elements are necessary to sustain a class action, viz.: the parties must be so numerous as to make it impracticable to bring them all before the court; and those who are parties must fairly insure the adequate representation of all who are not parties but who are in the class.

■ The first of the above requirements is obviously met as there are many hundreds of owners of property along the river and within the boundary lines of the alluvial cone.

■ When the second requirement is met by adequacy of representation, then due process is accorded to those who are not named as parties, and the decree is res judicata as to them. The fulfillment of the requirement of due process by adequacy of representation is the prime requisite of a class action. Smith v. Swormstedt, 1853, 16 How. 288, 57 U.S. 288, 301–303, 14 L. Ed. 942; Hansberry v. Lee, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22. In the latter case, the Court pointed out

each make a reasonable use upon the land so situated, taking it either from the surface flow, or directly from the percolations beneath their lands. The natural rights of these defendants and the plaintiff in this common supply of water would therefore be coequal, except as to quantity, and correlative." Hudson v. Dailey, 1909, 156 Cal. 617, 628, 105 P. 748, 753.

"As between overlying owners, the rights are correlative and are referred to as belonging to all in common". Orchard v. Cecil F. White Ranches, Inc., 1950, 97 Cal.App.2d 35, 42, 217 P.2d 143, 148.

"The common-law rule, as interpreted in this country, is that the right to the waters of the steam, with certain exceptions, not material here, belongs to the riparian proprietors in common and equally". Charnock v. Higuerra, 1896, 111 Cal. 473, 479, 44 P. 171, 172, 32 L.R.A. 190; Miller & Lux, Inc. v. Enterprise Canal & Land Co., 1915, 169 Cal. 415, 440, 147 P. 567.

"In my judgment, the rights of the respective parties originated in a riparian source, are held by them in common, and invest each with equal rights to the use and enjoyment of the water of the stream." Anaheim Water Co. v. Semi-Tropic Water Co., 1883, 64 Cal. 185, 197, 30 P. 623, 627, concurrence of McKee, J.

" 'The water of a stream belongs by a sort of common right to the several riparian owners along the stream' ". Herminghaus v. Southern California Edison Co., 1926, 200 Cal. 81, 97, 252 P. 607, 614, quoting from Anaheim Union Water Co. v. Fuller, 150 Cal. 327, 88 P. 978, 11 L.R.A.,N.S., 1062.

"Under the doctrine established in Katz v. Walkinshaw [141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236] [* * *], and subsequent cases of similar effect, the existence of a *common supply* of water in a state of percolation of such a character that the taking from one overlying tract will subsequently diminish the quantity available in another overlying tract gives correlative *rights in* the common supply and creates *a right in one such landowner* to prevent another from taking the water to distant lands not overlying the common supply". Burr v. Maclay Rancho Water Co., 160 Cal. 268, 273, 116 P. 715, 718.

"We may be guided by the general principle that each of the riparian owners on the stream is entitled to exercise his usufructuary right in the waters of the stream in common with all of the other riparian owners so as to make the most beneficial use of his land, limited, only by what is reasonable, having due regard to the common right of the other riparian owners." Cowell v. Armstrong, 1930, 210 Cal. 218, 226, 290 P. 1036, 1039.

that there is adequacy of representation where some members of a class represent other members in a litigation where the *sole and common interest of the class in litigation is either to assert a common right or enforce a common obligation.* That is precisely the situation here. That test was not met in Hansberry v. Lee, supra, where the facts were so dissimilar from this case that there is no occasion to review them. See also Mullaney v. Anderson, 1952, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458.

▮▮▮▮▮▮ The conclusions of this Court on the Motions to Dismiss, that the requirements for adequacy of representation were then met, are abundantly supported by the evidence in the case and are adhered to. No reason can be conceived as to how any property owners,[95] whether riparian or overlying, prescriptive or appropriative, using water for agricultural, domestic, or municipal purposes within the alluvial cone of the San Joaquin river could have an interest in the flow of the water of that river which would be different from, or adverse to, an assured flow of water to meet the needs of the area, under California Law and the Federal Reclamation Acts, for water, which is the relief sought by the plaintiffs on behalf of themselves and their class in this case. For an interest to exist which would be adverse to the interest of the plaintiffs, one would have to suppose that there was a property owner in the area of the alluvial cone who desired that his source of supply of water for agricultural, domestic, or municipal uses be cut off.

Moreover, every type of water right within the area taking or using water for agricultural, domestic, or municipal purposes is, and has been, represented throughout the proceedings.

▮▮▮▮ It is to be remembered that the advantages of a class action device, when the tests of adequacy of representation are met, is not only that the members of the class are saved the cost and trouble of filing or defending separate suits, or of all joining or being joined as parties in one suit, but the opposing party is entitled to the advantage of being free from the harassment of litigation in the future involving the same obligation and right. The opposing parties in this instance are the United States, the defendant officials, and the defendant districts.

▮▮▮ The contention of the defendants, as expressed by the Attorney General of the United States, that the interests of the plaintiffs and each of the users within the alluvial cone of the San Joaquin river are adverse to one another, and that this cannot be a class action, is without foundation. The argument is to the effect that some plaintiffs take water directly from the river, others both from the river and from wells, and others from the underground only, and that some rights may be appropriative or prescriptive, and that hence all interests are adverse to one another. The argument confuses the method of taking water with the character of the right sought to be enforced, which is to prevent interference with the common source of supply to all of such uses. The community of interest, in the common source of supply, as seen from the California cases, does not depend upon the nature of the water right; nor does it depend on the particular manner in which the prior right has, in the past, been exercised.

▮▮▮▮ Where, as here, there is a common source of supply to the owners of all rights, and that common source is invaded or threatened, there is no reason in law or logic why any one or another nature of right cannot stand in judgment for all others, whether ripa-

---

95. On the Motion to Dismiss, the Complaint was held to be insufficient to state a cause of action for rights to the use of water for recreational purposes, the replenishment of sand and gravel pits, and maintenance of fish life. The complaint has not been amended in that respect, no evidence with relation to such matters was introduced, and no holding herein is concerned therewith.

rian, overlying, appropriative, or prescriptive, in a class action to protect that source of supply which is common to all of them. As to the common source and the common act of invasion of that source, their interests are identical—although as between themselves they may be different in amount, or different in quality, i. e., prescriptive, appropriative, or the like.

It is the conclusion of the Court that the within action is a class action, and meets all the requirements of Rule 23 (a) (1) of the Federal Rules of Civil Procedure.

 The rights of those whose property lies within the alluvial cone line of the San Joaquin river, and who have filed disclaimers, sold to, or settled their rights with the Government, or recovered judgments in the Court of Claims, cannot be affected by the within holding.[96] They are estopped from enforcing rights *to water* contrary to their sale or contract, and those who have recovered damages in the Court of Claims for their entire water right would likewise be estopped from attempting thereafter to secure *water*. Such interests are not adverse to the interests of the plaintiffs so as to destroy the character of this suit as a class action for two reasons. In the first place, a settlement or a sale or a suit presupposes a right to water from the common source, which is what the plaintiffs seek to establish here. In the second place, if there has been a sale of, or settlement, or recovery of judgment for, an *entire right* by a member of the class, then that person no longer owns an enforceable right, and that being so, he can have no interest adverse to plaintiffs and their class. That is not to say that damages may or may not be recovered for injury actually sustained prior to the effectuation of a physical solution which would in fact satisfy the prior right to water needed for the reasonable and beneficial uses of

such prior right under the 1928 Constitutional amendment.

 The contention that because several of the named plaintiffs have filed Tucker Act suits for past damages their interests are so adverse to the remainder of the class as to prevent virtual and adequate representation of the class by them, is without merit, for the same reasons.

### XVI.

### Election of Remedies—Tucker Act.

 The contention that the plaintiffs who have filed Tucker Act, 28 U.S. C.A. §§ 1346, 1402, 1491 et seq.[97] suits for past damages, made an election of remedies, and are barred from receiving equitable relief, was disposed of in D.C., 90 F.Supp. 773. In addition to what was stated therein and hereinbefore in relation to those matters, it should be added that the Tucker Act suits were filed after the within suit was filed, and the Supreme Court has held that there is no inconsistency in seeking damages for past action after seeking an injunction for the enforcement of a right and the prevention of future damages. In Brady v. Daly, 2 Cir., 83 F. 1007; Id., 175 U.S. 148, 20 S.Ct. 62, 44 L.Ed. 109, the plaintiff sued in equity for an injunction to prevent performance of a play which he asserted infringed his work of art. The injunction was issued. Thereafter, the plaintiff sued for damages under R.S. § 4966. Damages were awarded and an appeal taken. The Court held that there was no accounting for the profits in the equity action and no election of remedies. Upon appeal, Brady v. Daly, 175 U.S. 148, 20 S.Ct. 62, 67, 44 L.Ed. 109, the Supreme Court held that the plaintiff by first proceeding in equity for an injunction and incidentally for profits, did not make an election to recover profits which barred him either from obtaining an injunction or a subsequent action for damages. The court pointed out that

---

96. Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App. 2d 900, 911, 178 P.2d 844.

97. All proceedings in those cases were stayed after the Motions to dismiss were filed, until the conclusion of this suit.

the injunction was sought on the ground that plaintiff's damages could not be accurately ascertained or computed and that there was "no election of an inconsistent remedy by the plaintiff in the action which would bar him from·the maintenance of this action for the recovery of damages".

 Under the Tucker Act, suit can only be filed for damages which have occurred prior to suit. "The Tucker Act does not authorize suit against the United States for anticipated damages in advance of an actual taking", Thompson v. United States, 9 Cir., 1954, 215 F.2d 744, 745. As hereinbefore pointed out that case settled the matter in this Circuit that the making of appropriations for the building of a dam and the commencement of the construction of the dam do not constitute acts which, in and of themselves, cause damage to an owner of a water right. The·court further said in that case: "There may never be a taking. The commencement of construction does not necessarily mean that it will be completed. The project may be abandoned. The height of the dam may be changed, and it may be that no damage to plaintiff will result even though it be completed in a modified form."

The only damages the plaintiffs and members of their class could recover at the time of filing the within suit would have been for loss of use of water, or invasion of their vested right, by the actual taking of water before that date. As seen from what has heretofore been said, the plaintiffs and their class could not object—i. e., be damaged—by the taking of water they did not need; and prior to suit and after the defendants commenced the impounding of water, there was not only the natural flow in the river, but at times the natural flow was increased over what it would have been had the dam not been there.

## XVII.

### Inadequacy of Remedy at Law.

 In addition to what is said in D.C., 90 F.Supp. 773 in holding against the contention of defendants that plaintiffs have a plain, speedy, and adequate remedy at law by way of suits for damages under the Tucker Act, it should be added that the millions of words of evidence and the hundreds of exhibits in this case demonstrate beyond peradventure not only the ultimate difficulty of ascertainment of the amount of damages which might result from the taking, wholly or partially, of a water right, but also, the difficulty of ascertainment of the time when the injury from such taking might occur. There is still another uncertainty—damage may result to crops in one year and not in another. Certainly there would be nothing either plain, or speedy, or adequate in refusing injunctive relief and relegating the plaintiffs and all the members of their class to damages. The Supreme Court in United States v. Dickinson, 1947, 331 U.S. 745, 748–749, 67 S.Ct. 1382, 91 L. Ed. 1789, recognizes the uncertainties inherent in trying to fix damages resulting from the construction of a dam. See also Danforth v. United States, 1939, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240; Thompson v. United States, 9 Cir., 1954, 215 F.2d 744.

As was said in Walla Walla Water Co. v. City of Walla Walla, 1898, 172 U.S. 1, at page 12, 19 S.Ct. 77, at page 82, 43 L.Ed. 341: "What the measure of such damage was, would be exceedingly difficult of ascertainment, and would depend largely upon the question of whether the value of the plaintiff's plant was destroyed, or merely impaired. It would be impossible to say what would be the damage incurred at any particular moment, since such damage might be more or less dependent upon whether the competition of the city should ultimately destroy, or only interfere with, the business of the plaintiff.

 "This court has repeatedly declared in affirmance of the generally accepted proposition that the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administra-

tion, as the remedy in equity. Boyce's Executors v. Grundy, 3 Pet. 210, 215 [7 L.Ed. 655]; Insurance Co. v. Bailey, 13 Wall. 616, 621 [20 L.Ed. 501]; Kilbourn v. Sunderland, 130 U.S. 505, 514, 9 S.Ct. 594 [32 L.Ed. 1005]; Tyler v. Savage, 143 U.S. 79, 95, 12 S.Ct. 340 [36 L.Ed. 82].

"Where irreparable injury is threatened, or the damage be of such a nature that it cannot be adequately compensated by an action at law, *or is such as, from its continuance, to occasion a constantly recurring grievance, the party is not ousted of his remedy by injunction.*" (Emphasis supplied.)

Clearly the remedies at law of the plaintiffs and their class are so uncertain and inadequate that this court is more than justified, under the evidence, in invoking its equity powers in their fullest scope.

## XVIII.

Physical Solution—Form of Judgment.

From what has heretofore been said, it is clear that this Court is required, under the law and the evidence, to make a declaratory judgment to the effect that the rights of the plaintiffs and their class which, without repeating them here, are as set forth under the heading "California Water Rights of Plaintiffs," and are paramount and superior to all claims of right of the United States and all the other defendants, and that, that portion of the flow of the San Joaquin river at Friant which is not necessary to satisfy those rights is, from time to time surplus water, subject to appropriation under the terms of the California Constitution and Laws.

From all the evidence it is clear that unless this court, in the exercise of its equity powers, gives injunctive relief to protect such rights, the damage to the plaintiffs and their class will be great, immediate, and irreparable. From what has been said, it is also apparent that their damage will be continuing and recurring from year to year and season to season, which alone is sufficient to invoke the injunctive processes of a court of equity. As stated in Walla Walla Water Co. v. City of Walla Walla, 1898, 172 U.S. 1, at page 12, 19 S.Ct. 77, at page 82: "Where * * * the damage * * * is such as, from its continuance, to occasion a constantly recurring grievance, the party is not ousted of his remedy by injunction."

The plaintiffs and their class are "if necessary * * * entitled to the full natural flow of the stream or its equivalent undiminished in quantity and unimpaired in quality", Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P.2d 537, 547, 91 P.2d 105, to satisfy their prior and paramount rights to water for reasonable and beneficial uses by reasonable methods of diversion and use to which their land is presently, or in the future may be, adaptable, not only for surface diversion between Friant and Gravelly Ford, but for recharging and replenishing the underground between Friant and Mendota. If such water is not made available to them, they and each of them will suffer great, immediate and irreparable injury.

The problem is to determine the amount of water necessary to satisfy those rights, and that, in turn, brings the court to the consideration of the form of decree for the enforcement of them.

This court is an equity court. Its powers and responsibilities in that respect are as broad as the powers and responsibilities of equity.

In exercising those powers, this court in a water rights case is to be guided by the exercise of the equity powers by the State Courts of California in similar cases.

Here, the full scope of the equity powers of the court is to be recognized and applied, not only by virtue of the provisions of Section 8 of the basic Reclamation Law, but as well by the very broad grant of jurisdiction contained in S. 18, 43 U.S.C.A. § 666, which makes

the United States subject to the judgments, orders and decrees of this court in the same manner and to the same extent as a private individual under like circumstances.

The California courts, confronted with the command of the 1928 Constitutional amendment that water should not be wasted, and also with the guaranties of that amendment that existing water rights be preserved to the extent of their present and prospective reasonable and beneficial uses, evolved a type of decree which for the sake of convenience is called a "physical solution."

In essence, such decree is but the conditional injunctive decree of a court of equity. Such decrees in California water rights cases are characteristic examples of the preservation by equity courts of the elements of flexibility and expansiveness so that new remedies may be invented or old ones modified in order to meet the requirements of every case and to satisfy the needs of every progressive social condition. Union Pacific Railroad Co. v. Chicago, Rock Island & Pacific Railroad Co., 1895, 163 U.S. 564, 601, 16 S.Ct. 1173, 41 L.Ed. 265.

Decrees of physical solution requiring the expenditure of money and making physical changes have been made by the federal courts, and since the approval of such a decree by the Supreme Court in Montezuma Canal Co. v. Smithville Canal Co., 1910, 218 U.S. 371, 31 S.Ct. 67, 54 L.Ed. 1074, the power and duty of an equity court to do so does not seem to have been questioned in the higher courts. In that case the District Court of the Territory of Arizona, in a decree determining the rights of appropriators, appointed a water commissioner, and required a physical solution by giving him the power to: "direct the placing of proper gates, *dams* or other means for the control of the water of said river at the heads of the canals or other points on the banks of said canals as he may direct, at the expense of the parties hereto interested herein, and to make such rules and regulations as he may deem proper and expedient, to be observed by the parties hereto, for the distribution and use of said water." [98]

The court while remanding the case for further proceedings in connection with a question of res judicata, nevertheless held that the decree appointing the water master with the powers indicated, "did not transcend the bounds of judicial authority." See also the Ninth Circuit cases of: Gila Valley Irrigation District v. United States, 1941, 118 F.2d 507; and Vineyard Land & Stock Co. v. Twin Falls Salmon River Land & Water Co., 1917, 245 F. 9, at page 29.

In State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, at page 616, 65 S.Ct. 1332, at page 1350, 89 L.Ed. 1815, the court said: "There is some suggestion that if we undertake an apportionment of the waters of this interstate river, we embark upon an enterprise involving administrative functions beyond our province. * * * But the efforts at settlement in this case have failed. A genuine controversy exists. The gravity and importance of the case are apparent. The difficulties of drafting and enforcing a decree are no justification for us to refuse to perform the important function entrusted to us by the Constitution."

The problems in a case such as this are pretty well summed up in Union Mill & Mining Co. v. Dangberg, C.C.D.Nev.1897, 81 F. 73, at page 119, where the court said: "The difficulty in arriving at a proper decree is apparent. The power of regulating or controlling the amount of rain or snow is beyond the jurisdiction of courts. No decree can be framed, which is based either upon riparian rights or of appropriation, or of both, which overlooks the uncertainty of the season, or the necessities

---

98. The full text of the decree is set forth in footnote "1" at page 378 et seq.

of the various litigants, so as to meet the demands of justice and of right. It would be unjust and inequitable to compel the farmers in the valley to allow the water to run down to the mills when the quantity of water was wholly insufficient, to enable the complainant to run its mills with water power. There must be a beneficial use before any protection can be invoked. No provisions should be contained in the decree which would result in depriving one party of the use of the water when the other party could make no beneficial use of it. This would amount to a destruction, instead of a protection, of the rights of the parties. In the appropriation of water, there cannot be any 'dog in the manger' business by either party, to interfere with the rights of others, when no beneficial use of the water is or can be made by the party causing such interference. The same rules govern riparian rights. No riparian proprietor can dam up or withhold the use of the water of a river simply because the river is on his land, or so use it as to prevent its flowing down the channel to others having an equal right thereto, and entitled to an equal and beneficial use thereof, when such use could be made of the water except for such wrongful acts. A practical view ought to be taken of all the conditions, surroundings, and situations. The rights of all parties must be protected by the decree. The difficulty of enforcing it without the necessity of bringing independent suits should be avoided, if possible. Certainty in its terms, positiveness in its requirements, justice in its conclusions, will materially aid in the accomplishment of such a purpose. No theory is complete or practically efficient which does not recognize two distinct sources and objects of the equity jurisdiction, namely, the primary rights, estates, and interests which equity jurisprudence creates and protects, and remedies which it confers. Complainant would be compelled to resort to numerous actions in order to obtain complete redress, or be subject to numerous actions by its adversary party, unless the court of equity interferes and decides the whole matter, and gives final relief by one decree. 'The fundamental principle of equity in relation to judgments is that the court shall determine and adjust the rights and liabilities concerning or connected with the subject-matter of all the parties to the suit, and shall grant the particular remedy appropriate in amount and nature to each of those entitled to any relief, and against each of those who are liable, and finally shall so frame its decree as to bar all future claims of any party before it which may arise from the subject-matter, and which are within the scope of the present adjudication.' 1 Pom.Eq.Jur. § 115. These requirements of the law could readily be complied with by this court in a suit brought for the purpose of establishing the rights of all the parties, unhampered by any former decrees."

This court, in its order of August 29, 1951, required the plaintiffs, the defendant officials and the State of California to each submit its plan of physical solution,[99] which was done in December, 1951, prior to the commencement of the trial.

The matter of a physical solution becomes a practical problem

99. The text of that portion of the Order is as follows:

"12. Plaintiffs, the State of California, and the defendant officials of the Bureau of Reclamation are directed on or before December 15, 1951, to prepare and serve upon counsel of record for each party hereto their respective plans for a physical solution of the problem of supplying water for irrigation and domestic purposes (a) to lands heretofore supplied by pumping directly from the San Joaquin River between Friant Dam and Gravelly Ford, (b) to lands heretofore supplied by pumping from wells in the San Joaquin River bottoms, and (c) to lands neighboring the river in Madera County and Fresno County together with such explanatory matter as may in their respective views be necessary for comprehension of such plans."

which will vary with each case. That practical problem is best stated by the question—how can the utmost beneficial use be made of the waters of the particular stream without invading prior vested water rights? If those prior vested water rights can be preserved and satisfied by giving them the water to which they are entitled, and at the same time waste can be prevented by reasonable changes in natural physical characteristics, then, under the California decisions, the court may solve that problem by the use of its injunctive powers, conditioned upon making those physical changes. The parties seeking to make an appropriation or to take water, in derogation of prior vested rights, can be enjoined from taking water until those physical changes are made. The efforts of the courts of California in imposing conditional decrees of injunction requiring a physical solution have been to, as near as possible, satisfy the prior vested right whether riparian or overlying, and at the same time make available, for appropriation and reasonable and beneficial use elsewhere, all water in excess of that required to satisfy those prior vested rights.

Since the 1928 Constitutional amendment, the Supreme Court of California has required or approved conditional injunctions requiring physical solutions in the following cases: Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 380, 40 P.2d 486; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 1935, 3 Cal.2d 489, 575, 45 P.2d 972; City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 341, 60 P.2d 439; Reclamation District No. 833 v. Quigley, 1937, 8 Cal.2d 183–188, 64 P.2d 399; Hillside Water Co. v. City of Los Angeles, 1938, 10 Cal.2d 677, 688, 76 P.2d 681; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 558, 81 P.2d 533; Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, at page 496, 90 P.2d 537, 91 P.2d 105, on petition for rehearing; City of Pasadena v. City of Alhambra, 1949, 33 Cal. 2d 908, 915, 936, 207 P.2d 17; Allen v. California Water & Telephone Co., 1946, 29 Cal.2d 466, 484, 176 P.2d 8.

 The California cases establish that prior to 1928 the owner of a prior vested right could not be compelled to submit to a physical solution, but since the 1928 amendment, that is not the law. It is not only within the power, but it is also the duty, of the trial court to suggest on its own motion a physical solution if none satisfactory to it has been offered by the parties. And the court possesses the power to enforce such solution regardless of whether the parties agree. City of Lodi v. East Bay Municipal Utility District, supra, 7 Cal.2d at page 341, 60 P.2d 439; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra, 3 Cal.2d at page 574, 45 P.2d 972; Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at page 559, 81 P.2d 533. In arriving at a physical solution, each case "must turn on its own facts, and the power of the court extends to working out a fair and just solution, if one can be worked out, of those facts." Rancho Santa Margarita v. Vail, supra, 11 Cal. 2d at pages 560–561, 81 P.2d at page 563. The prior vested right cannot be compelled to incur any material expense in connection with the physical changes necessary to a solution, but those expenses must be borne by the one desiring to appropriate. City of Lodi v. East Bay Municipal Utility District, supra, 7 Cal.2d at page 341, 60 P.2d 439; Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at page 561, 81 P.2d 533; Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, supra, 3 Cal.2d at page 574, 45 P.2d 972. The physical solution must protect the one having the superior right and prevent the ultimate destruction of that right. Peabody v. City of Vallejo, supra. The cases all hold that the court should retain jurisdiction to modify its decree as occasion may demand, either on its own motion or on motion of any party. Thus the decree must be sufficiently flexible

to permit changes needed to continually insure the utmost beneficial use of water in the stream.

City of Lodi v. East Bay Municipal Utility District, supra, 7 Cal.2d at page 344, 60 P.2d at page 452, illustrates that the decree of physical solution is but a conditional injunction. There, the operations of the defendant district were reducing the underground supply on which the City depended. A decree entailing huge releases of water to preserve percolation was entered by the trial court. After holding that this decree entailed a waste of water and that a physical solution should have been sought, the Supreme Court directed that: "The decree should then be reframed to provide that the duty rests upon the District to maintain the levels of the plaintiff's wells above the danger level so fixed by the trial court; that, in the event the levels of the wells reach the danger point, the duty be cast upon the District to supply water to the city, or to raise the levels of the wells above the danger mark; *and, if the District does not comply with this order within a reasonable time, then the injunction decree already framed, or upon a proper showing as modified by the court under its continuing jurisdiction, shall go into effect.*" [100] See also Rancho Santa Margarita v. Vail, supra, 11 Cal.2d at page 561, 81 P.2d 533.

The physical characteristics involved in this case are clearly such that the "equivalent" of the "full natural flow of the stream * * * undiminished in quantity and unimpaired in quality" can be provided by a reasonable physical solution which will satisfy the prior vested rights of the plaintiffs and their class and, at the same time, make available by far the greater portion of the flow of the stream for other reason-

---

100. The court further stated, 7 Cal.2d at pages 344–345, 60 P.2d at page 452: "The trial court should by its judgment preserve its continuing jurisdiction to change or modify its orders and decree as occasion may require.

"Such a decree would adequately meet the requirements of the Constitution by preventing an unreasonable waste of the waters of the stream, and at the same time would adequately protect the prior rights of the city of Lodi. It would afford to the city a continuance of its water supply, the same, for all practical purposes, as if natural conditions were required to persist. If its wells go down to the danger level, it would immediately obtain water from the District at the later's expense, or the injunction decree by means of which the underground levels will be artificially maintained would go into effect. It would accord to the District the right, and place upon it the duty, of working out a physical solution unhampered by a rigid decree which, with changing conditions and new methods of conservation constantly being developed, may not only operate inequitably but might actually encourage waste. *It would place upon the District the duty at its expense to maintain the underground water levels and, if the District fails to do so, or fails to supply water directly to the city of Lodi, the decree pro-* *vides for compulsory releases so as to maintain natural conditions.* Such a decree would say to the District: You should maintain the water levels so as not to cause substantial damage to the city, and you may do this in any way best suited to your needs, or, if you do not maintain those levels, you should supplement the city's supply to the extent of the deficiency caused by your operations by the furnishing of water by artificial means and at your expense. *If you do not do these things, you are subject to an injunction compelling releases to maintain natural conditions.* Such a decree would undoubtedly prevent a multiplicity of suits. It would fix the rights of the prior appropriator and would determine the effect of the subsequent appropriator's diversions. Since there is no immediate danger to the prior appropriator, it would fix the danger levels of the prior appropriator's wells, and when that level is reached, upon a showing to that effect, it would require the subsequent appropriator either by direct delivery of water or by compulsory releases to supply the prior appropriator's needs. Such a decree would permit the full use of all available waters, guarantee to the prior appropriator full protection, and would do this without unduly restraining the operations of the subsequent appropriator."

able and beneficial uses under applications to appropriate water, if such applications are pursued to permit.

The lands which are to be served by a physical solution are well defined. They are the lands within the alluvial cone lines (the "Lee" lines) of the San Joaquin river between Friant and Mendota. In the full natural flow of the river after the power dams were completed in 1928, large quantities of water percolated into the underground (though the precise amount thereof cannot be ascertained), and the water level in the river was maintained at a sufficient height and of a sufficient depth to permit surface diversion by pumping directly from the river. One of the defendants' expert witnesses who had spent many years on the river testified that the quantity percolating between Friant and Mendota was in excess of 200,000 acre-feet a year. All of the experts agreed that the greater the "wetted perimeter" of the river (i. e., the greater the volume and the higher the level of the surface of the water flowing between the banks of the river), the greater the percolation, although some of the same witnesses who so agreed, insisted that so long as there was any water at all in the river, there was a maximum percolation—a conclusion not justified by the evidence in any respect.

*To secure as near as possible the "equivalent" of the natural flow, it is necessary that a physical solution, in order to provide percolation, should maintain the level of the water in the river at a sufficient height between the banks to intersect the aquifers fed by the river, and that there be a sufficient flow to prevent the fines and algae from clogging up and making impervious the entrance to such aquifers, and to provide such velocity and volume of water that will force water into the aquifers. The surface diverters' rights would be satisfied by the maintenance of sufficient water at suitable levels to permit their river pumps to operate as they have in the past.*

When these conditions are satisfied by physical changes along the stream, and the amount of water passing the lowest point of the affected lands is fixed at a reasonable quantity, the water rights of owners of land in the alluvial cone—so far as water is contributed by the San Joaquin river—are satisfied and protected, and, at the same time, there is no waste of water.

 In the Opinion denying the Motion to Dismiss, 90 F.Supp. 773, at page 803, this court stated that one of the requirements of working out a physical solution was the determination of the total amount of water which each plaintiff and each member of the class had vested in each separate parcel of land for reasonable and beneficial uses.

A further examination of the California cases convinces this court such a requirement is not necessary. In fact, since the 1928 amendment, the California courts have progressively been reaching the point of rejection of the idea in any decree of fixing a definite amount of water measurable in second-feet, acre-feet, or miner-inches to any particular parcel of land.

In City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439, the physical solution that was required was a decree that would be so framed as to put the duty on the defendant Municipal Utility District to maintain the water level in plaintiff's wells above a certain point.

In Stevinson Water District v. Roduner, 1950, 36 Cal.2d 264, 223 P.2d 209, the objection was made to the decree that there was a fatal uncertainty in the injunction because it did not define the extent of plaintiff's superior right in terms of units of flow. This contention was rejected by the Supreme Court which pointed out the difficulty in fixing any precise amount of water which may be the due of any particular parcel of land because of the unpredictable fluctuations in the quantity of water available from year to year and season

to season. It may be added that it is just as difficult to predict the precise amount which may be needed to satisfy the reasonable and beneficial uses from year to year on the part of the owners of the prior vested rights in this case. Certain types of crops require more water than others; and when the less thirsty crop is planted, less water can be used. To fix a given quantity of water in terms of unit of flow to be delivered as of right to any particular parcel of land would result either in waste of water, or failure to protect the prior right, both of which are contrary to the requirement of the 1928 amendment to the Constitution. To illustrate, suppose the court should fix as a unit of flow 4 acre-feet for a particular parcel of land, but that during a given year only 2½ acre-feet were used, the rest would be wasted; conversely, if 2½ acre-feet were fixed, and 4 acre-feet were needed, the prior right would not be protected. This also illustrates the irreparable and recurring nature of the injury resulting to plaintiffs and their class from the impounding and diversion at Friant.

It is not necessary, even if it were possible, to determine in this case the precise quantity of water which each parcel of land needs at any given point in time.

▉▉ The purposes to be accomplished by a physical solution in this case can best be met by requiring ponding dams as hereafter described and a measured minimum unit of flow at the lowest check point to be established on the river below Friant, and not by any measured unit of flow required to be released from Friant dam, or any measured unit of flow to be delivered to any particular parcel of property, or by requiring such flow in the river as will maintain a certain water level in certain wells—such as the wells of the City of Fresno. Any one of the latter methods would entail the waste of water, whereas the former would not. If the minimum flow at the lowest check point is exceeded, it is an indication that more water is being released than is required to satisfy both the percolation and surface diversions between Friant and the lowest check point. If, on the other hand, the flow at the lowest check point is less than the minimum, then it would indicate that not enough water is being released to satisfy those intervening demands. The greatest water conservation can thus be promoted, and protection at the same time given to the prior uses of water. The plans of physical solution submitted by each, the plaintiffs, the defendant officials, and the State of California, all recognize that such method of measurement at the lowest check point is the only way to accomplish a physical solution in this case, as that is the method of measurement provided in each although the plans differ widely in other respects.

The State and the Attorney General of the United States refer to the State's plan of physical solution and that submitted by the Bureau Officials as being substantially the same. They are not.

The State's plan,[101] without all the details, calls for some channelization in the river bed and the construction of five, and possibly six, permanent dams to be constructed by driving sheet piling across the river at substantially the same locations as dams numbered 1, 2, 3 and 4 of plaintiffs' plan, and the fifth dam to be located below Herndon at the same point as indicated by plaintiffs' dam numbered 8, with a possible sixth dam at mile 25.6 below Friant.[102] Its estimated initial cost is $240,000, with annual maintenance of from $6,000 to $7,-000.

The Bureau officials' plan[103] of physical solution, without all the details, calls for some channel realignment and recti-

101. Exhibit "Cal. H and Cal. H-1."

102. The chief witness for the State, while on the witness stand, equivocated as to the number of dams. The court must, therefore, regard the written plan submitted by the State as its plan.

103. Exhibit Defts' "B".

fication, the substitution of wells in a number of instances for river pumps, initial modification of a number of pumps, one "permanent" barrier equipped with a control gate at the head of Rank Island on the west channel, and "check dams" on the south side of Rank Island. Otherwise, the plan submitted by the officials calls for the installation of no dams, although the principal government witness admitted that check dams might be required where plaintiffs' recommended dams numbered 2, 3, 4, 5 and 8 are located, and possibly at other locations, which would cost from $37,000 to $79,000 each. In view of the indefiniteness of the government's plan, no overall installation cost is available. The maintenance cost under the government's proposed plan was estimated to be from $12,000 to $13,000, per year.[104]

In City of Lodi v. East Bay Municipal Utility District, supra, the court, 7 Cal. 2d at page 344, 60 P.2d at page 452, required a physical solution which "would afford to the city a continuance of its water supply, the same, for all practical purposes, as if natural conditions were required to persist."

Neither the plan of the State nor the plan of the defendant officials makes any pretense of simulating the natural conditions of flow of the river which was at the annual average rate of approximately 2,500 second-feet.

The plaintiffs' plan proposes the construction of 14 dams at specific locations, with a required flow which would permit 10 second-feet to flow over the lowest downstream dam after satisfying all intervening uses. The State's plan and the plan of the Bureau officials each call for the maintenance of only that flow of water in the river which will provide a minimum flow of 5 second-feet at Gravelly Ford.

The first dam downstream from Friant under plaintiffs' plan is approximately 6½ miles below Friant dam. The locations of plaintiffs' dams numbered 1, 2, 3, 4, and 8 are in the same locations as dams proposed by the State. The locations of the other dams are designated

---

104. The Secretary of the Interior, in his letter of March 23, 1953, stated, inter alia, as follows:

"The impoundment of water in Friant Reservoir for diversion into the Friant-Kern and Madera canals necessarily alters the regimen of the San Joaquin river between Friant dam and the head of the Gravelly Ford canal, some 37 miles downstream. Rank v. Krug involves rights or claims of rights, under California law, to the use of water in an area affecting or affected by the flow of the river. The uncontrollable phenomena of natural forces affecting plant growth and groundwater movement, plus the unpredictable man-made diversion from the river and groundwater bodies in immediate contact with the river, make it impossible to forecast the day-to-day depletion demands upon the stream-flow below Friant dam. The Department of the Interior nevertheless proposes to operate Friant dam and reservoir in such a manner as to provide a continuous flow of water in the bed of the river sufficient, at all times, to satisfy the natural depletions and all valid rights, under California law, to the use of water of the San Joaquin river originating above the Gravelly Ford canal.

"More specifically, the Department will release from Friant reservoir into the bed of the river a sufficient quantity of water (1) *to meet all valid legal requirements for the reasonable and beneficial use of water, both surface and underground, by reasonable methods of diversion and reasonable methods of use in that area,* and (2) to provide, in addition thereto, a continuous live stream flowing at a rate of not less than five cubic feet per second at specified control points throughout the Friant-to-Gravelly Ford area, the last one to be at a point approximately one-half mile below the head of the Gravelly Ford canal.

"In addition to the maintenance of this flow and in aid of its availability for reasonable and beneficial use, the Department will perform channel rectification work, modify pump installations, substitute, or compensate landowners for the substitution of, wells and necessarily incident equipment for existing river pump installations, and, *if necessary, construct check dams,* all to such extent as may be necessary to insure the attainment of the objective this Department is committed."

by number on the various Exhibits—Defendants' A–9–A–1, No. 118, and Plaintiffs' Plan of Physical Solution, Exhibits 89 and 89–A. The dams proposed to be constructed under plaintiffs' plan call for the construction of a type of "collapsible" dam which has been successfully used for many years by the Pacific Gas and Electric Company on the Feather river. Each dam would consist of earth or rock rip-rap levees on each side of the river, with a section in the middle which would be collapsible; that is, the collapsible portion in the middle would have gates made of treated timber planks permanently attached to rails so that with the use of Gantry cranes they can be raised to create ponding, or lowered to permit flood flows, or flushing or scouring releases. The plan contemplates that the gates will be in ponding position except when necessary to lower them for flood releases or flushing or scouring releases not over three times in each year. The purpose of such flushing or scouring releases is to flush and scour the bed of the river of fines and algae and marine growth which would prevent seepage and percolation. It is estimated that such scouring releases would be of large volume but for short duration, not to exceed 24 hours, in order to give the force and velocity necessary to do not only the scouring, but also to force additional waters into the underground.

The estimated initial cost of the installation of all 14 dams called for in plaintiffs' plan of physical solution, including the purchase of the Gantry cranes for operation of the flood gates, is $1,124,536, and the annual cost of operation is estimated to be approximately $4,000.

The amount of water required to be released from Friant dam to operate the plan of defendant officials was estimated by the defendants' chief expert, Mr. Hill, to be 60,000 acre-feet of water per year, although in documents and tables, allowance was made for only 48,400 acre-feet per year. The amount of water required to operate the State's plan of physical solution was estimated to be about the same as that required by the Bureau of Reclamation plan. The same expert witness of the defendants estimated that plaintiffs' plan of physical solution with all 14 dams built, could be operated with 70,000 acre-feet of water per year, although Mr. Lee, plaintiffs' chief expert, estimated that the amount of water required to operate plaintiffs' plan of physical solution would be slightly in excess of 200,000 acre-feet per year, including 20,000 acre-feet total for the three short scouring and flushing releases. Plaintiffs' Exhibit No. 116 has the details of proposed releases and uses to which the water would be put, i. e., percolation, river pumping, evaporation, transpiration, and the like.

While the average annual flow of the river was at the rate of approximately 2,500 second-feet past plaintiffs' lands prior to the Friant project, plaintiffs' plan of physical solution is designed to simulate a flow of the river at the rate of only 2,000 second-feet. That is to say, if all 14 of the dams were to be built, then the water will be at that level and of that depth in the river bed, which in a natural state of flow would occur when the river was flowing at the rate of 2,000 second-feet—or, in short, the equivalent of the natural flow of the river at 2,000 second-feet.

The plans of both the State of California and the defendant officials are each based on three postulates which are contrary to the evidence in the case; first, that the river does not contribute by percolation to the alluvial cone beyond the bluffs of the river; second, that so long as a live stream of five second-feet is flowing in the river, without ponding dams, collapsible or otherwise, all the contribution is made to the underground water which the river made as it flowed in a state of nature; and, third, that a live stream of five second-feet will permit the river pumps to operate.

It would serve no useful purpose to here review all the evidence in that respect, but illustrative of some of the evidence contrary to such contentions is the testimony of two witnesses, one

called by the defendant officials, and the other a responsible employee of the United States Bureau of Reclamation. The witness Barnes who had spent many years on the river as an employee of the Madera Irrigation District, was called by defendant officials, and testified that the loss by percolation from the San Joaquin river between Friant and Mendota before the operation of the project, was 211,000 acre-feet per year, or 292 second-feet continuously. According to the testimony of Eugene L. Christian, Central Valley Project Watermaster of the United States Bureau of Reclamation, the unmeasured losses from seepage, evaporation, transpiration, and percolation, not including river pumpers, between Friant and Mendota, with an average flow of the river of 2,500 second-feet, was 213 second-feet, which is in excess of 155,000 acre-feet per year. This witness also testified that with 200 second-feet released from Friant, only three second-feet percolated, whereas if 3,000 second-feet were released, 258 second-feet would percolate between Friant and Mendota.[105]

All of the evidence in the case, when considered together, not only strongly bears out the above conclusions, but just as strongly bears out the admissions made by all the expert witnesses, regardless of who produced them, that the greater the wetted perimeter of the river banks, the greater the percolation. It also bears out the conclusion that there is substantial percolation from the river beyond the bluffs, particularly to the south or Fresno side of the river.

Neither the plan submitted by the State nor the one submitted by the defendant officials makes provision for the sustaining or replenishing such underground water supply, and neither will accomplish that result.

The claim that the plan submitted by the State and the one submitted by defendant officials will provide enough water to permit the river pumps to operate with a flow of five second-feet past the downstream boundary of each parcel of land and at Gravelly Ford is overwhelmingly refuted by the evidence.

The permanent dams, called for in the State's plan, and tentatively in the government's plan, will neither permit percolation nor provide water for the river pumps. The permanent dams will not permit percolation because the fine material which will be deposited together with algae and marine growth, would stop up the entrance to the aquifers by an impervious material, and prevent percolation, even to the immediate bottom lands. The permanent dams will not provide water for the river pumpers for the reason that in only a few years the ponds formed by them will be completely filled with silt and alluvial material, as admitted by the defendants' witnesses.

In the case of Heilbron v. Fowler Switch Canal Co., 1888, 75 Cal. 426, 17 P. 535, 537, the defendant had construc-

105. The loss by percolation between Friant and Mendota compared to various releases from Friant Dam, as testified to by Mr. Christian, is shown in the following table in cubic feet per second:

| Release from Friant | Percolation |
|---|---|
| 200 | 3 |
| 300 | 12 |
| 400 | 21 |
| 500 | 30 |
| 1000 | 76 |
| 1500 | 122 |
| 2000 | 167 |
| 2500 | 213 |
| 3000 | 258 |

ted a dam and head gate and a canal for the diversion of water, and asserting that the water was worth little to the plaintiffs and much to the defendants, argued that no injunction should be issued because the defendant "had instructed its head-gate keeper that, whenever the water was low in the river, and there could be any cause of complaint by any one, or it would make any appreciable difference in the quantity of water in the river, he was not to take water, but to shut down his gate, and only take water when it would make no appreciable difference in the quantity flowing in the river." *That is much the position of the defendants in this case. But as to that, the court said, 75 Cal. at page 432, 17 P. at page 538: "And certainly it would be a poor protection to the plaintiffs to have to depend upon the keeper of the head-gate of defendant to take only a proportionate amount of water, or to take water only when it could be done without injury to plaintiffs."*

Neither the plan submitted by the State nor the one submitted by the defendant officials is such a physical solution as would provide water in satisfaction of the prior rights of plaintiffs and their class and at the same time conserve water and prevent its waste, both of which are required to be done by the Constitution and Laws of the State of California.

From the evidence in the case, it is quite clear that, on the whole, the plaintiffs' plan of physical solution will most nearly abide the California Constitutional requirement of conservation of water, by reasonable and beneficial uses of all water, the prevention of waste, and guarantee the protection of prior vested rights such as belong to the plaintiffs and their class here. And the court so holds.

If, as defendants contend, there is but slight percolation into the underground, (a contention not borne out by the defendants' own evidence), then but a slight amount of water would be required to satisfy this percolation, and clearly, none would be wasted. The required releases would be correspondingly reduced. If, as the evidence shows, there is substantial percolation, the legal rights of underground users will be satisfied, as they must be, and as the Secretary of the Interior has stated they will be.

The court, however, is not satisfied that there should be 14 dams built at this time. All of the parties agreed to one thing which is quite obvious—that there are drastic hydrological changes taking place and will take place by reason of the alteration of the regime of natural conditions of the rivers by the construction of the Central Valley and Friant projects. And while such fact is certainly no reason for making these plaintiffs and their class suffer the loss of water during the experimental or changing period, it is of sufficient consequence that the court is justified in using caution in the extent of the physical solution imposed if, in the meanwhile, the rights of plaintiffs and their class can be protected.

Before proceeding further, some additional observations should be made concerning the evidence of contribution to groundwater by the San Joaquin river. In doing so, the court is taking into consideration all the evidence in the whole case, and after carefully weighing it, bases its conclusions on the preponderance of the whole evidence.

Upstream from the general area of Herndon, especially to the south of the river, percolation beyond the bluffs occurs principally in the confined aquifers formed by former beds of the river; in that area the aquifers do not have their point of contact with the water of the river at right angles to the river, but upstream from where water is produced by wells, and such aquifers follow the general southwesterly direction of the present bed of the river; such aquifers are confined, but not absolutely so, and the depth to them from the surface increases as the distance from the river increases so that in the vicinity of the City of Fresno, they are the aquifers from which water is produced from the

deep wells in that area; the wells in the area upstream from Herndon produce from aquifers at various depths; overlying such deep aquifers is a shallow water table which is caused by drainage of ephemeral creeks having their source in the foothills, by rainfall, by the application of water on lands served by the Fresno Irrigation District, as well as by some percolation from the San Joaquin river; very little water in the shallow water table seeps to and enters the deep confined aquifers which are supplied and replenished by the San Joaquin river.

In the area of the alluvial cone below an approximate point between the 225 and the 250 foot surface contour elevations—(the vicinity of Biola)—the type of the deep-lying aquifers changes from those formed by former beds of the river to aquifers which exist more or less in layers, with impervious strata above the aquifers, caused, no doubt, by the fact that the alluvial material composing them was laid down in a lake or body of water instead of on land. Such aquifers do extend westerly to the limits of the alluvial cone of the San Joaquin river, and underlie the greater portion, if not all, of the area of the Tranquillity Irrigation District; such aquifers have their head or intake in the vicinity of the area between the 225 and the 250 foot surface contour elevations, and dams built above those elevations, with a sufficient flow of the river, would supply and replenish such aquifers. The contribution from the San Joaquin river to the shallow or free water table in the area downstream from those surface elevations is greater than it is in the area upstream from those elevations, but there is little draft upon that upper water table in the lower area, and the water is of poorer quality than that from the deep aquifers. To supply that upper water table, the dams downstream from the general vicinity of Skaggs Bridge would cause ponds with large surface areas which, in turn, would result in a large amount of evaporation, which is a form of waste to be avoided as much as possible, and at the same time protect the prior vested rights.

In the early part of 1953, after one of several inspections of the river in company with counsel, the court suggested that in view of ponding operations conducted by Sand and Gravel Companies operating at a few places in the bed of the river, the functions which might be performed by building collapsible dams in the same places were possibly being performed at this time at a few places, by those operations. But none of the parties saw fit to introduce any evidence in relation to such matters, or advise the court of their views as to whether or not dams could be dispensed with while such sand and gravel operations, with consequent ponding, continue in the bed of the river.

While the court would be justified, under the evidence, in directing a judgment for conditional injunction requiring all 14 dams proposed by the plaintiffs, nevertheless, in view of all the foregoing and the fact that under the California cases this court must retain continuing jurisdiction for the purposes of making modifications or additions to the judgment, or further orders, as experience may require,—Meridian, Ltd. v. City and County of San Francisco, supra, 13 Cal. 2d at page 496, 90 P.2d 537, 91 P.2d 105; City of Lodi v. East Bay Municipal Utility District, supra, 7 Cal.2d at page 347, 60 P.2d 439; State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, at page 671, 65 S.Ct. 1332, 89 L.Ed. 1815 —it appears to the court that water would be physically available to supply the rights of plaintiffs and their class, regardless of the nature of taking, or whether the water table is free or confined, and regardless of the nature of the aquifers, if at this time either five or six dams of the type proposed by plaintiffs were constructed above Herndon, and either one or two such dams were constructed below Herndon and above Skaggs Bridge, with sufficient water released from Friant to have a constant minimum flow of five second-feet over

the lowest downstream dam and at Gravelly Ford, and with three or less scouring releases each year. The river bed in the vicinity of Friant is at elevation 400 feet above sea level; at Gravelly Ford it is 190 feet, a 210 foot drop in the 37 meandering miles of the river. At Mendota the elevation of the river bed is 160 feet. With large flood flows of the river in its natural state of from 6,000 to 10,000 or more second-feet, the force and pressure of that volume of water put considerable water into the adjacent underground regardless of the nature of the aquifers. The flushing flows proposed by the plaintiffs, while not of the quantity which prevailed in the stream before the operation of Friant, are in such reasonable amounts as will, in addition to the flushing and scouring purposes, force water into the underground. Experience may demonstrate that the releases required for flood purposes in the ordinary operation of the dam may be larger than the plaintiffs propose for the three scouring releases, or may demonstrate that the amounts could be less.

During the trial, the defendants refused to concede any merit at all to the plaintiffs' plan of physical solution. It was suggested, however, by the defendants' witness, Mr. Hill, that if the government were to build collapsible dams of the general type proposed by the plaintiffs, he would recommend some differences in design and construction. The same witness also suggested the possible necessity for some dams at some of the same locations proposed by the plaintiffs. The parties now have the views of the court concerning the extent, area, and nature of percolation of water from the San Joaquin river, and the general plan of physical solution. The general plan herein suggested would no doubt require some channel rectification and realignment below the lowest dam, and might require the change-over from river pumps to wells below the lowest dam. While there did not seem to be much difference of opinion as to the possible locations of several of the dams, it is quite possible that in light of the views herein expressed, the parties may desire to suggest different locations and more desirable designs.

Before directing a conditional decree requiring a specific number of dams at specific locations, the court would like the views of the various parties, expressed evidentiary-wise, as to such matters. Undoubtedly there are engineering details and other matters of location and the like which may be agreed upon in light of the general plan of physical solution indicated herein. Accordingly, the matter will be set down for further hearing on such limited subjects only, to which the parties may appear and present evidence if they so desire. If not, the court will proceed to a conclusion on the evidence before it, and require what it considers the proper number and location of dams of the type proposed by the plaintiffs.

If all 14 dams were constructed as proposed by plaintiffs, the total initial cost would be less than one-fifth of one percent of the amount expended to date on the Central Valley Project. The cost of the eight dams indicated herein, if eight are required after further hearing, would be about half that, or about one-tenth of one percent of the total amount expended to date on the Central Valley Project. The expenditure of that amount of money—which would ultimately be charged to, and paid by, water users of the defendant districts, as the matter now appears—is certainly not unreasonable.

This is particularly so in view of several other facts. It must be remembered that the water taken by way of Madera and Friant-Kern canals to the Irrigation Districts served by each of those canals is supplemental to the water supply which they already have. And a part of the plan of taking water from the San Joaquin river by way of these canals is to divert the water and put it upon lands of the Irrigation Districts other than during the crop growing season, with the idea that it will percolate to the underground and make a reserve to be taken

by wells during dry years. However, the testimony of the government witness in this respect does not bear out this assumption. The lands served by the Irrigation Districts with water from Friant-Kern canal are at a comparatively high elevation to the lands in the floor of the valley. Water placed upon the lands in the districts will percolate some, but after doing so, according to the testimony of the witness, will flow on beyond the boundary of the Irrigation Districts into the area of the valley where water is being taken by pumps, and thus the water taken from the plaintiffs here, and put upon the lands of the defendant Districts, would ultimately find its way to pumps of irrigators who would pay nothing at all for it. Furthermore, the Delta-Mendota canal was built at a cost of between $60,000,000 and $80,000,000 to bring water from the Sacramento river and put it upon the lands below Mendota in order that water which has flowed past and watered plaintiffs' lands from time immemorial might be stored and diverted at Friant for the benefit of defendant districts.

The government in its brief argues that, inasmuch as the plaintiffs' plan of physical solution is not included in the Feasibility report, to decree a physical solution would be in contravention of the Acts of Congress. There is nothing to that point. The Acts of Congress require compliance with the basic Reclamation Act, which in turn, requires compliance with the laws of the State of California. And under the laws of the State of California, the plaintiffs are entitled to a declaratory judgment of their rights, and an injunction enforcing them, conditioned upon a reasonable physical solution. The Feasibility report is not intended to be a minute engineering set of specifications and blueprints, making no allowance for changes which are trivial, such as here, compared to the whole project.

As a matter of fact, many features have been constructed which are different than set forth in the Feasibility report; the dam is 320 feet high instead of 250; the storage capacity is 520,000 acre-feet instead of 400,000 acre-feet; the San Joaquin river pumping system was not constructed at all, but the Delta-Mendota canal. And none of the changes are found in any amendment or supplement to the Feasibility report. All of which, according to plaintiffs' counsel, renders the operation of the Friant project illegal; but the court expresses no opinion on that contended ground of illegality, as it is not necessary to do so.

Furthermore, the Secretary of the Interior stated in the letter of March 23, 1953 (FN 104, page 217), that the Department of the Interior will "if necessary, construct check dams," and this statement was made without being limited to the plan of physical solution proposed by the defendant officials. This statement of the Secretary of the Interior also indicates that no additional appropriations will be required to be secured from Congress for the construction of such check dams. Moreover, Congress having required by repeated enactments of the provisions of the Reclamation Acts making State laws control as to water rights, and the law of California requiring a physical solution at the expense of an appropriator or would-be appropriator, it is not to be presumed that Congress will not exercise good faith, and will fail to make appropriations if any such are necessary. Great Falls Mfg. Co. v. Attorney General, 1888, 124 U.S. 581, at page 599, 8 S.Ct. 631, 31 L.Ed. 527; Gibbons v. United States, 1868, 8 Wall. 269, 274, 19 L.Ed. 453.

A decree of physical solution which will provide all the lands in the alluvial cone with all the water needed at any given point of time for their reasonable and beneficial uses by reasonable methods of diversion and use, provides all the protection to which the water rights within that area are entitled under California law, which law permits continuing jurisdiction of the court to take care of future needs measured by the same standards. When such a decree is effectuated, there is thereafter no right on the part of anyone in the

area so protected by the physical solution, to object to the impoundment and diversion of water not needed to satisfy such physical solution.[106] Under principles of California water law, the effectuation of such a decree will thereafter as effectively bind those for whose benefit the decree is made, as does the entry of the decree under the principles of virtual representation.

A decree of the character herein indicated would certainly "have a tendency to promote peace, protect the rights of all parties, prevent further and unnecessary litigation, and substantially reach the ends of justice, without any material injury to either of the respective parties. The endless complications that have arisen in this case, the exigencies and necessities of the parties, as well as the number of parties involved, justify this court in adopting this rule." Union Mill & Mining Co. v. Dangberg, C.C.D.Nev. 1897, 81 F. 73, at page 121.

### XIX.

### Injunctive Relief Against United States.

The plaintiffs being entitled to a declaratory judgment of their rights as against the defendants, including the United States, it is urged that a decree of injunction will not run against the United States under the terms of the waiver of sovereign immunity contained in 43 U.S.C.A. § 666.

Water rights are invariably adjudicated in equitable proceedings, whether by way of suit to quiet title, which is a development of the bill of peace, or by declaratory relief, or otherwise. Extraordinary writs, which act in personam, are usually the only means of enforcement of the decrees of equity. Writs of injunction are invariably the means of enforcement of decrees in equity in water rights cases.

■ Consent to sue the United States at law for damages involving water rights has existed since the passage of the Tucker Act in 1887, 24 Stat. 505, and, if such damages sounded in tort, since the Tort Claims Act of 1946, 60 Stat. 842. The only sovereign immunity which had not been waived in relation to water rights prior to the passage of Section 666 of Title 43 United States Code Annotated, was the immunity of the United States in equity suits to equity decrees, with the traditional power of injunction to enforce them.

If there could have been any possible doubt about the intention of Congress to make the United States amenable to the decrees usually entered in equity suits in water rights litigation, it is dispelled by the plain language of the statute, especially that portion which states: *"The United States,* when a party * * *shall be subject to the judgments, orders, and decrees of the court having jurisdiction,* and may obtain review thereof, *in the same manner and to the same extent as a private individual under like circumstances".*

It could not be doubted that if a private person or privately owned corporation had built the Friant project and works, he or it could be subjected to the injunctive processes for the enforcement of the decrees of a court of equity. Furthermore, an injunction against the United States as a sovereign is no different than the injunctions which have in the past been framed by the Supreme Court against sovereign states, of which State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589–616 et seq., 65 S.Ct. 1332, 89 L.Ed 1815, is an example.

■ Of course, the United States is a sovereign union of sovereign states; and it exercises its governmental powers through three departments, the executive, the legislative and the judicial; and of course, an injunctive decree will not operate upon either the judicial or the legislative branches of the government, but will expend itself upon the United States as the United States acts, through those officials in the executive depart-

106. ' See heading "California Water Rights."

ment, in depriving the plaintiffs and their class of water.

It must also be recalled that the statute gave consent to sue the United States, not only in a suit for the adjudication of water rights, but also in a suit for the administration of such rights. Suits in California are for both purposes, as is this one. How an effective judgment for either adjudication or administration of water rights can be made without compulsory or prohibitory orders of some kind has not been suggested by counsel, and quite a few years at the bar have revealed none to the author of this opinion.

 To hold that the statute gave no power of enforcement for any judgment, decree, or order, by the use of injunctive process, would be to make the statute a dead letter.

## XX.

### Tranquillity Irrigation District.

Tranquillity filed a Complaint in Intervention. As finally amended and supplemented, it is in three separately stated causes of action. The first cause of action claims underground percolating rights from the San Joaquin river; the second, an adjudicated right of 12 percent of the entire natural flow of the river, measured at Whitehouse gauging station, in excess of 1,360 second-feet as said river would in the course of nature flow down the San Joaquin river past said Whitehouse gauging station; and the third is for declaratory relief.

The first cause of action, in the Complaint in Intervention, corresponds to the cause of action in the original Complaint filed in this action, to which Tranquillity, by amendment, became a named plaintiff. Tranquillity, being a corporation, binds all its members as such named plaintiff even though, as hereinbefore held, its members are bound in so far as they are members of the class. Under the evidence and the law, as heretofore indicated, the percolating water rights of

Tranquillity and its members, involved in its first cause of action in the Complaint in Intervention, are covered by what has heretofore been said as to the rights of plaintiffs and their class, and will be protected by the decree of physical solution to be formed as indicated, on plaintiffs' complaint as amended and supplemented.

What has heretofore been said with relation to the various questions of jurisdiction, and water rights under California law, and other matters, applies with equal force to the second and third causes of action of Tranquillity.

 The second cause of action of Tranquillity, for a declaratory judgment to the effect that it is entitled to 12 percent of the entire natural flow of the San Joaquin river in excess of 1,360 second-feet at Whitehouse, is based, not only on final adjudication to that effect by the California courts, but also on a contract (Exhibit No. 271) dated the 1st day of May, 1933, whereby that right is acknowledged and agreed to by Miller and Lux and its subsidiaries which were parties to the Purchase and Exchange contracts with the United States. The burdens of such adjudications and of the contract of May 1, 1933, were necessarily accepted by the United States when it entered into the Miller and Lux Purchase and Exchange contracts.

Tranquillity is entitled to a judgment declaring its rights, as alleged in its second cause of action, to 12 percent in excess of 1,360 second-feet of the full natural flow at Whitehouse, and will be irreparably injured if it does not receive that amount of water. The water for supplying that right can be provided by a physical solution by supplying the water from the Delta-Mendota canal more consistently with the provisions of the 1928 California Constitutional amendment for reasonable and beneficial uses and California Law than by requiring the full and entire natural flow of the river past Whitehouse in order to supply the 12 percent in excess of 1,360

second-foot flow.[107] The method of calculating the amount of water as testified to by the defendant Sullivan is the proper one, under the decrees and the 1933 contract, except that no deduction should be made from the full natural flow for evaporation from Millerton lake.

The third cause of action is also for declaratory relief, but the only relief to which Tranquillity would be entitled under it, which is not otherwise covered, is a declaratory judgment that under the County of Origin law and Watershed of Origin law of California, Tranquillity is entitled to the water it needs from the San Joaquin river before any is diverted into the Friant-Kern canal for use beyond the watershed and county of origin, and an injunction enforcing such right. From what has heretofore been said under the heading "Watershed and County of Origin Statutes," the contentions of Tranquillity in this respect are clearly right, and it is unnecessary to repeat them. It is also unnecessary to repeat the provisions of the Feasibility Report, or the many other reports to Congress by the Department of the Interior, wherein assurances were given that needed water would not be taken from developed areas to carry out the Central Valley Project.

Tranquillity was a developed area for many years prior to the conception of the Central Valley Project, and all of the water which it uses and has used is, and has been, put to reasonable and beneficial uses by reasonable methods of diversion and use.

Tranquillity is entitled to a declaratory decree to the effect that it is entitled, as a matter of prior right, at the cost of not more than Class I water, to all of the water reasonably required to supply its reasonable and beneficial needs, before the defendants, or any of them, are entitled to take any water of the San Joaquin river out of the watershed or county of origin by way of the Friant-Kern canal.

Here, again, difficulties arise in the formulation of any decree for any definite amount of water. In addition to the difficulty of drawing any decree which is flexible enough to comply with the Constitutional amendment of 1928, and at the same time rigid enough to protect the rights of Tranquillity, complexities arise when the source of supply of water for Tranquillity is considered. In the past, it has taken water from deep wells—the decree of physical solution is intended to protect that supply. Its other source of supply has been the Fresno Slough, which is riparian to the San Joaquin river and also riparian to the Kings river. Turner v. James Canal Co., 1909, 155 Cal. 82, at page 91, 99 P. 520, 22 L.R.A.,N.S., 401; Miller & Lux v. Enterprise Canal & Land Co., 1915, 169 Cal. 415, 421, 147 P. 567; Herminghaus v. Southern California Edison Co., 1926, 200 Cal. 81, at page 92, 252 P. 607. In some years in the past it has taken more water from the San Joaquin river than from the Kings, and in other years it has taken more from the Kings river. It has rights of some nature in the Kings river water, but those rights were not litigated herein. In the past several years it has received water from the Delta-Mendota canal by temporary contract with the Bureau of Reclamation. Pine Flat dam has now been built on the Kings river and only comparatively recently has been put in operation. Whether Tranquillity's rights to Kings river water, with Pine Flat dam in operation, will produce a sufficient amount of water in the future that the District will not need water from the Delta-Mendota canal, in addition to its 12 percent above-mentioned, is not clear from the evidence.

The estimate of the demand for, and the amount of, water available from Friant for all purposes are made in the early part of the year. It is understood that such estimates are likewise made as to the probable demands and capabilities of fulfilling them from the Kings river.

107. Whether Tranquillity's rights are entirely riparian, or partly riparian and partly prescriptive, is immaterial in view of the conclusions herein reached.

That being so, the decree in this respect can be flexible, and still protect the District's rights under the Watershed and County of Origin Statutes, as well as be in compliance with the Feasibility report, the various Acts of Congress, and the California Constitution and Laws, if it provides substantially as follows: When it appears, at the time of the estimate of each year's supply from the San Joaquin and from Kings river, that the total sum of water which will be supplied by the 12 percent in excess of 1,360 second-feet of the San Joaquin (measured at Whitehouse) added to the sum which is estimated to be supplied by the Kings river, added to the sum which is estimated to be supplied by the wells of Tranquillity, is not sufficient to meet the reasonable demands for crops of the crop pattern of the preceding year, on the basis of the needs for each crop as testified to by the witness, Lee, then Tranquillity will be entitled to have the defendants enjoined and restrained from taking, by way of the Friant-Kern canal, out of the watershed and county of origin, that amount of water which, in addition to the three sources of water above-described, would be required to satisfy the above-described needs for such crops, unless and until the defendants make available to Tranquillity for the current year substitute water, by way of the Delta-Mendota canal or otherwise, of the same quality as its present water supply, and at a rate not to exceed that then currently charged for Class I water for irrigation from Millerton lake.

### XXI.

#### City of Fresno.

(a)—Complaint in Intervention.

(b)—Ancillary Proceedings.

While the Complaint in Intervention of the City of Fresno, as finally amended and supplemented, is in three causes of action, there are only two basic sets of rights asserted, viz.:

First, the vested rights of the City of Fresno to have its underground water supply sustained and replenished by the San Joaquin river; and

Second, such litigable rights, if any, as derive to the City of Fresno from its filed applications to appropriate surplus water of the San Joaquin river at Friant dam as against the United States as the present holder of assigned applications to appropriate surplus water of the San Joaquin river. This set of rights will be called "application" rights, for the sake of convenience.

The first set of rights is the subject of the first cause of action of the Complaint in Intervention, and declaratory relief as to such rights is sought, along with other relief, in the first and third causes of action in the Complaint in Intervention. Such rights are the overlying rights of the City of Fresno, and appropriative-prescriptive rights to the use of underground water. What was said with relation to the rights of plaintiffs and their class is equally applicable to all such rights of the City of Fresno. They are vested property rights to the use of water. Such rights are entitled to invoke judicial protection as soon as irreparable injury is threatened or as soon as they are actually invaded. As heretofore noted, these vested rights to water to which the City of Fresno was and is entitled, have been invaded by the defendants by impounding and diverting water at Friant, as hereinbefore set forth. It is hence unnecessary to treat further that set of rights as they will be protected by the decree of injunction conditioned upon the physical solution which the Court has indicated should be made in this case.

It follows that what is hereafter said as to the exhaustion of administrative remedies in connection with applications to appropriate water has no application to any of the riparian, overlying, or appropriative-prescriptive rights of plaintiffs and their class, including the City of Fresno, which rights exist independent of any rights which may be derived from applications to appropriate water

filed under the statutory procedure set forth in the Water Code of California.

The asserted "application" rights are described in the second cause of action of the Complaint in Intervention of the City of Fresno, and declaratory relief as to such rights is sought therein and in the third cause of action of the Complaint in Intervention.

■■■ By the applications to appropriate water, the City of Fresno is not seeking the protection of a vested property right such as its prescriptive, or appropriative, or overlying right, but is seeking to obtain a future right to the use of water, as is the United States by the applications which have been assigned to it. The conflict is solely one of priority of right under the law of California.

Applications by various organizations and entities to appropriate water at Friant have been on file with the State for many years. All, except those filed by the City of Fresno and one filed by the Fresno Irrigation District, have been assigned to the United States. Pertinent data as to all of them are set forth in Footnote 108.

108. Applications held by the United States

| Application Number | Year Filed | Name of Applicant | Date Assgd. to U.S. | Date Appln. amend. by U.S. |
|---|---|---|---|---|
| 23 | 1915 | Panoche (a) | 1939 | 12/20/51 |
| 234 | 1916 | Madera | 1939 | 12/20/51 |
| 1465 | 1919 | Madera | 1939 | 12/20/51 |
| 2792 | 1922 | Madera (b) | 1939 | |
| 5637 | 1927 | Dept. Finance (c) | 1939 | |
| 5638 | 1927 | Dept. Finance (d) | 1939 | 12/20/51 |
| 5817 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 5818 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 5819 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 5820 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 5821 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 5822 | 1928 | Miller & Lux | 1939 | 12/20/51 |
| 9639 | 1938 | Dept. Finance (e) | 1939 | 12/20/51 |
| 10750 | 1944 | United States | | 6/21/51 |

Applications filed by the City of Fresno

6771—8/20/1930
6772—8/20/1930
7134—12/5/1931
7135—12/5/1931

Fresno Irrigation District

6773—6/15/1930

(a) The application of Panoche was followed by a permit and license which was owned by Miller and Lux. It concerned a comparatively small amount of water in the vicinity of or below Mendota.

(b). This was an application by Madera Irrigation District to store and divert water for power purposes. The United States has filed no amendment to that application.

(c) This application by the Department of Finance of the State of California was to store and divert water for power purposes at Temperance Flat, above Friant. No application to amend it has been made by the United States.

(d) This application was for irrigation, et cetera, but the point of storage and diversion was Temperance Flat. In the applications to amend filed by the United States, the point of storage and diversion was changed to Friant.

(e) This application designated both. Temperance Flat and Friant as the points of diversion, which is sought to be changed to Friant only by the applications to amend filed by the United States.

Although the applications of all parties had been pending since from 1916 to 1938, as heretofore noted, no hearing was ever called or set by the State on them until December 31, 1954—from 16 to 38 years after the applications were filed.[109]

*Notwithstanding the requirements of the Federal Reclamation laws and the repeated assurances to Congress, and generally, that it would abide and respect California laws, the United States proceeded to build the dam and canals, store, divert and sell water of the San Joaquin river at and from Friant, without any permit or license to do so as required by the State laws. It constructed the Friant project, and conducted the operations thereof as if it were the absolute owner of the water and the right to use it—which it is not, and has never been.*

*Neither the United States nor the City of Fresno nor the Fresno Irrigation District have any rights to impound or divert water from the San Joaquin river at Friant under the California Water law until a permit is granted. Without obtaining such permits to appropriate water, an applicant cannot acquire valid rights to appropriate water of the San Joaquin river.*[110]

At the time the Court granted the Motion of the City of Fresno to file its Complaint in Intervention containing the cause of action concerning the relative priority of its applications to appropriate water as against those held by the United States, it was settled by the following cases that applicants to appropriate water had a litigable interest as to their relative priority, and could maintain an independent suit therefor before the granting of the permit or the hearing on an application:[111] Inyo Consolidated Water Co. v. Jess, 1911, 161 Cal. 516, 119 P. 934; Merritt v. City of Los Angeles, 1912, 162 Cal. 47, 120 P. 1064; Tulare Water Co. v. State Water Commission, 187 Cal. 533, 202 P. 874; Yuba River Power Co. v. Nevada Irrigation District, 1929, 207 Cal. 521, 279 P. 128; East Bay Municipal Utility District v. Department of Public Works, 1934, 1 Cal.2d 476, 35 P.2d 1027.

As heretofore noted, the evidence closed on December 31, 1954, and it was not until February 15, 1955, that the Supreme Court of California handed down its decision in Temescal Water Co. v. Department of Public Works, 44 Cal. 2d 90, 280 P.2d 1, wherein a different rule was announced than had theretofore prevailed as set forth in the above-mentioned cases.

Inyo Consolidated Water Co. v. Jess, supra and Merritt v. City of Los Angeles, supra, were decided before the State Water Commission Act of 1913.[112] Tulare Water Co. v. State Water Commission, supra, in 1921, was the first case which gave consideration to the 1913 Water Commission Act, and held certain sections of it void as an unconstitutional attempt by the Legislature to confer judicial powers upon a State Commission. It did not hold the whole Water Commission Act of 1913 unconstitutional, but did hold that the issuance of a permit upon the filing of an application was purely a ministerial act and enforceable by mandamus. Yuba

109. The hearings set did not cover applications No. 2792 of Madera for power purposes, No. 5637 of the State of California for power purposes at Temperance Flat, or No. 10750 of the United States, which appears to relate to diversions at Mendota.

110. See heading "Applications to Appropriate held by the United States," ante, page 121.

111. As noted heretofore, the motion to intervene was first denied in January, 1952, but after the defendants introduced in evidence as part of their case the applications to appropriate water, which had been assigned to the United States, the motions of both Tranquillity and the City of Fresno to intervene were renewed, and granted on May 7, 1953, by oral opinion [TR. 20236].

112. Cal.Stat.1913, page 1012, as amended since that date, it is now incorporated in the Water Code in various sections, generally Sections 1200 et seq.

River Power Co. v. Nevada Irrigation District, supra, 1929, was the first case to reach the Supreme Court of California between two contesting applicants to appropriate water after the passage of the Water Commission Act. There, the Court followed its previous decision in Tulare Water Co. v. State Water Commission, supra, that the issuance of a permit was purely ministerial, and held that the question of whether or not there was water subject to appropriation is a judicial question, as well as holding, 207 Cal. at page 528, 279 P. at page 131, that "Priority among permittees is also a judicial question, whatever the stage of operations thereunder." East Bay Water Co. v. Department of Public Works, supra, 1934, 1 Cal.2d at page 481, 35 P.2d at page 1029, also approved the holding that issuance of a permit was purely ministerial and not reviewable by a court proceeding, and held that the State Agency "may not arbitrarily refuse the granting of the permit, but may be compelled by mandamus to issue it".

▆▆▆▆▆▆ In the Temescal case, supra [44 Cal.2d 90, 280 P.2d 7], the Court did not expressly overrule the foregoing cases but reached a different conclusion as a result of the "cumulative effect of the statutory changes", not considered in any of the above-mentioned cases. The necessary effect of the decision in the Temescal case is to hold that all five of the above-mentioned cases are inapplicable under presently existing law, insofar as they held that the granting of a permit to appropriate water upon the filing of an application was purely a ministerial act. "When the reason for the rule ceases, so does the rule" is an axiom which must still prevail in the logic of the law. The reason for the rule in the Yuba River case, and similar cases, that priority among applicants to appropriate water could be litigated even before the issuance of a permit was that the granting of a permit by the State Engineer was a ministerial act not subject to judicial review, and the only way applicants could have their rights and priorities adjudicated was by an independent suit between them, either before or after the granting of a permit. The reason for the rule has ceased to exist by the holding in the Temescal case that the action of the State Engineer is not purely ministerial, but is the action of a State-wide agency involving a measure of discretion, which may culminate in an order which is subject to judicial review de novo under the provisions of Section 1094.5 of the California Code of Civil Procedure, and the further holding that the procedure set up in the Water Code for hearing applications, must be exhausted before that judicial review will lie.

▆▆▆▆ Under the Temescal case, it is ultimately a judicial question as to whether or not facts exist which are prerequisite to the issuance of a permit, such as priorities of time, availability of surplus water, and the like, and judicial determination of those questions may be secured by appropriate review proceedings under California Code of Civil Procedure, Section 1094.5. The determination by the State Engineer as to the availability of surplus water, or other facts, concludes no right to a permit, but is a necessary determination of administrative facts which must be made by him before acting upon applications to appropriate water. Temescal Water Co. v. Department of Public Works, 44 Cal.2d 90, at page 103, 280 P.2d 1.

▆▆▆▆ It would also appear from that decision that the Court adopted the approach taken in the Tulare case that "What is unappropriated water is a constantly fluctuating question, depending upon the seasonal flow of the stream, the annual rainfall, the forfeiture of prior appropriations, and default in the use of riparian rights", 187 Cal. 537, 202 P. 876, and stated that "A judicial determination as to existing and appropriative and riparian rights rests upon then present uses which may be quite different at a later time, and a determination as to the future availability of

water necessarily can be only an estimate." This makes it clear that, in addition to the review procedure provided by Section 1094.5 of the California Code of Civil Procedure, at any time in the future after the issuance of a permit, an independent judicial proceeding can be brought not only to enjoin an actual invasion of a prior right, but also to determine relative priority between those having permits to appropriate when there is insufficient water to supply all those holding permits, or when there arises a question as to the then beneficial and reasonable use, or questions as to the highest and best uses of water.

 Counsel for the City of Fresno argues that the delay of the State Engineer in calling the hearing on the applications to appropriate water for almost 40 years after the first application was filed, and for more than seven years after this suit was filed, amounts to a denial of the administrative process, and entitles the City of Fresno to the declaratory judgment of this Court as to the amount of unappropriated water in the San Joaquin river at Friant and the priority as between applicants and the amount to which each is entitled, and to enforce the same by appropriate process. This contention is based on the line of cases of which Smith v. Illinois Bell Telephone Co., 1926, 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747, is typical. They are not applicable here *insofar as the applications to appropriate water are concerned.* As in that and similar cases where the rule of that case was applied, there was an actual taking of property of the plaintiff as a result of the failure to conduct the administrative proceedings, whereas here, neither the City of Fresno nor the United States has any property right as a result of the applications until a permit is actually granted. Furthermore, the State Engineer, as well as all the parties filing and holding applications, seem to regard all applications as valid and "in good standing" until a hearing is had and permit granted or denied; and no applicant is under the

duty of attempting to force a hearing by a mandamus proceeding, or otherwise, and loses no rights by virtue of the failure to press for hearing. This seems to be a reasonable policy as there is no provision in the California law requiring a hearing in any set time. In fact, Section 1450 of the California Water Code indicates that an applicant is under no necessity to press for a hearing on an application, as it provides that any application properly made has priority of the date of filing it "until such application is approved or rejected." Furthermore, that policy is consistent with the requirements of the 1928 Constitutional amendment that all water shall at all times be put to a reasonable and beneficial use, and with the provisions of the Water Code, and the decisions of the California Supreme Court that only surplus water can be appropriated under the Water Code, and that water may become surplus by non-use. Thus one may file an application to appropriate water when there is no appropriable water, in the expectation, or the hope, that in the future such water may be available for appropriation, and when it is available, then will be plenty of time to hold a hearing, secure a permit, and make the financial commitments necessary to take advantage of the appropriation by the building of dams, et cetera.

 It is also contended by counsel for the City of Fresno that the City is entitled to the relief it asks on its applications to appropriate water, and to have the hearings before the State Engineer permanently enjoined on the asserted ground that the hearings will be a "sham." One basis for this assertion is that an employee of the State Engineer testified in this case adversely to the contentions of the City of Fresno. This Court rejects the opinion testimony of that witness. It is not for this Court to presume that the hearing officers and the State Engineer will not faithfully discharge their duties. Specifically this Court will not presume that the State Engineer will not exercise his own judg-

ment, regardless of the opinions of an employee.

■ The other basis for this assertion by the City of Fresno is likewise not sufficient. It is grounded on contentions made by the Attorney General of California in the briefs, and from time to time during the trial, to the effect that the United States has authority to, and has taken, all the water which is necessary to operate Friant project. This does not appear to be the position of the attorneys for the State Engineer in the Division of Water Resources, and, as seen from what has heretofore been said, this contention is without merit. It appears to be the position of the State Engineer and the Attorneys in the California Division of Water Resources that, as this Court holds, the United States has no right to impound or divert water by appropriation until a permit is issued. And while the Attorney General of California apparently has the right and duty to appear in court in lawsuits wherein the State of California is a party, it does not appear that he has any control over the State Engineer in the exercise of that official's duties with relation to hearing and acting on applications to appropriate water. The State Engineer is bound under the law to act impartially, and this Court must presume that he will do so. Quite evidently the United States does not regard that it has acquired the rights to use the water of the San Joaquin river at Friant for project purposes, as urged by the California Attorney General, as it has filed amended applications to appropriate water, and is apparently prepared to pursue them to a conclusion. At the argument on the ancillary proceedings for the injunction *pendente lite* against the State Engineer, the Attorney General of California seemed to indicate a change of position, but just how far the change goes is not clear. That is not the first time that has occurred in this case. In any event, the position of the Attorney General, whether shifting or not, is not sufficient grounds to sustain the contention of the City of Fresno in this respect.

The Court concludes that under the Temescal case, the City of Fresno is not entitled in this proceeding to have a declaratory judgment on its second cause of action as to the administrative facts, Section 1375, California Water Code, required to be found by the State Engineer as a prerequisite to the issuance of a permit on the applications to appropriate water made by the City of Fresno and those now held by the United States.

■ Under the Temescal case, action by the State Engineer on those facts, as well as any discretionary decision made by him, which is claimed to be in error or an abuse of discretion, may be determined judicially by review de novo under California Code of Civil Procedure, Section 1094.5.

It follows from the foregoing that the injunction *pendente lite* issued in the ancillary proceedings brought by the City of Fresno and Tranquillity against the State Engineer and others, will be dissolved upon the entry of judgment in this case.

■ While the City of Fresno is not entitled, prior to action by the State Engineer, to have a declaratory adjudication of the administrative facts, upon which the State Engineer must act, such as those above-mentioned, *it is nevertheless entitled, as between it and the United States, to a declaration of any rights which may exist under California law aside from any administrative facts or procedure, and irrespective of whether or not either the United States or the City of Fresno receives a permit to appropriate water, and irrespective of the terms and conditions of any permit.*

All the applications now held by the United States are "subject to existing rights," as are all the applications of the City of Fresno. Any permits which will be issued will be subject to existing rights. It is the policy of the State Engineer not to delineate those rights, if indeed he would have the power to do so

184

under Tulare Water Co. v. State Water Commission, 187 Cal. 533, 202 P. 874, which held that judicial power could not be delegated to such non-judicial official or body, and which holding was not overturned by the Temescal case.

 The query then is: Does the City of Fresno have any existing rights other than those elsewhere in this opinion set forth?

The United States can acquire rights to divert water by appropriation at Friant only under a permit. That is true also of the City of Fresno. But the City of Fresno, being a municipality furnishing water for domestic and municipal uses to its inhabitants, and being in the Watershed and County of Origin, is in a preferred position under the California Constitution and laws, to either the United States or any of the defendant districts. This is so by the terms of the Watershed and County of Origin Statutes and also by virtue of the Statutes of California declaring use of water for domestic and municipal purposes to be the highest and best use.

What is said under the heading "Watershed and County of Origin Statutes" is fully applicable here, and need not be repeated. The City of Fresno is in the County of origin and the Watershed of origin of the San Joaquin river. The Legislature in 1951 added Section 11128, specifically making the County and Watershed of Origin Statutes applicable to federally constructed units of the Central Valley Project.

The City of Fresno does furnish water to its inhabitants for domestic and municipal purposes, by its municipally owned water system.

The provisions of the Water Code declare the general State policy in Section 106 [113] that the use of water for domestic purposes is the highest and best use, and in Section 106.5 [114] that the rights of municipalities are to be protected to the extent necessary for existing and future uses. These are not sections which regulate only administrative action which might be taken by the State Engineer on applications to appropriate water, such as Section 1460 et seq. They are substantive law. Whether or not Section 1460 et seq. are abided by the State Engineer in the granting of a permit is not for this Court to say in advance, but may be determined upon review under California Code of Civil Procedure, Section 1094.5.

*However, the general State policy set forth in the Watershed and County of Origin Statutes and the Statutes declaring domestic and municipal uses to be the highest and best uses, while binding upon the State Engineer, are nevertheless propositions of substantive law which govern the rights and obligations of the United States in its operation of Friant dam and diversionary works, regardless of the granting or denial of any permit, or any conditions which may be placed therein.*

 Under the evidence the City of Fresno is in pressing present need of an additional supply of water for domestic and municipal purposes; it is reaching the critical point. *The United States and the defendant districts have no right to divert water at Friant which is presently needed by the City of Fresno for its domestic and municipal purposes and the City of Fresno is entitled*

113. "§ 106. * * * It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation."

114. "§ 106.5. * * * It is hereby declared to be the established policy of this State that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest ex-

tent necessary for existing and future uses, but that no municipality shall acquire or hold any right to waste water, or to use water for other than municipal purposes, or to prevent the appropriation and application of water in excess of its reasonable and existing needs to useful purposes by others subject to the rights of the municipality to apply such water to municipal uses as and when necessity therefor exists."

to a declaratory judgment to that effect. But, under the evidence, the City of Fresno has not, as yet, enabled itself to receive any water from Friant; and, until it is in a position to take the water at a delivery point, it is entitled only to a declaration of its rights, but no decree to enforce them. The City of Fresno has constructed no diversionary or conduit works, and no reservoirs. While not presently in a position to enforce its rights, it is the conclusion of the Court that it is entitled to a declaratory judgment that its rights for domestic and municipal purposes are superior to any right of the United States to divert water beyond the watershed or county of origin, or of the defendant districts. If, as, and when the City of Fresno is in a position to take and receive the water, it will then be sufficient time to enforce that right by an appropriate decree under the provisions of Section 2202 of Title 28 United States Code.

*The City of Fresno lies in a position of great natural advantage insofar as water is concerned; it is but a short distance from two rivers, the San Joaquin and the Kings, with a combined average annual flow of approximately 3,000,000 acre-feet. And yet, it is now in the anomalous position of being short of water to supply its inhabitants for the highest and best use, with the United States astride both rivers with gigantic dams exporting water to irrigation districts in counties and watersheds other than the San Joaquin and Kings, which water it used not as primary supply, but as a supplemental supply for irrigation and agricultural purposes, declared by California law to be secondary to the highest and best uses of municipalities for domestic purposes. Moreover, the water which is supplied to those districts by the Friant-Kern canal which, as heretofore stated, is not consumed by transpiration or evaporation, after percolating into the ground would seep to lands which are of lower elevation than the districts, and which lands pay no charge at all for this replenishment to their groundwater.*

In the face of this great natural advantage and the advantages in the substantive law of California heretofore referred to, the City of Fresno finds itself confronted with a demand from the United States for the payment of $10 per acre-foot for water for domestic and municipal uses, while the United States is charging only $3.50 per acre-foot for Class I water (firm supply), and $1.50 per acre-foot for Class II water (that which is in addition to Class I water) to Irrigation Districts. In 1952, 1,343,000 acre-feet of Class II water was sold for $1.50 per acre-foot; in 1953, 309,000 acre-feet, and in 1954, 350,000 acre-feet. On the assumed operation of the project for 58 years, there would be 680,000 acre-feet of Class II water on the average per year, at $1.50 per acre-foot to replenish groundwater; *but $10 per acre-foot is demanded to furnish drinking water and for other domestic uses.*

If the United States can compel the City of Fresno to pay whatever charges it chooses, then it can do the same thing to every other City in California (and in the United States for that matter), after it has erected a dam and impounded the water of rivers adjacent to or near Cities, upon which the civilization and economy and the future of such Cities are founded.

The City of Fresno is entitled to a declaratory judgment that any charge for water which may be made by the United States should be reasonable. Reasonableness, in light of the facts and the Federal Reclamation Act and the Statutes of California, requires that such charges should be no more than the Irrigation Districts are charged from time to time for Class I water.

This is also consistent with the reports made by the Secretary of the Interior to Congress (Exhibit 136, at page 39) where it is stated that the County of Origin Statute of California is complied with, and only "surplus" water will be exported elsewhere.

The Federal Reclamation laws, the Constitution and the Statutes of Cali-

fornia were not intended to be "only a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." [115]

It is believed that the opinions and conclusions expressed herein prevent them from becoming just that.

The matters and issues raised by the parties, which are not specifically dealt with in this Opinion, are either unnecessary to decide or are disposed of by what is said.

The Clerk will put the within matter on the calendar for March 12, 1956, at 10 o'clock a. m., for the setting of a date when the parties may put on additional evidence which as indicated under the heading "Physical Solution" will be limited to the number and location of the dams on the river.

115. Edwards v. People of State of California, 1941, 314 U.S. 160, at page 186, 62 S.Ct. 164, at page 172, 86 L.Ed. 119.

## Appendix "A"

### Index of Cases Cited

Akin v. Spencer, 1937, 21 Cal.App.2d 325, 69 P.2d 430
Allen v. California W. & T. Co., 1946, 29 Cal.2d 466, 176 P.2d 8
Allen v. California W. & T. Co., 1949, 31 Cal.2d 104, 187 P.2d 393
Allen v. Railroad Commission etc., 1918, 179 Cal. 68, 175 P. 466, certiorari
 denied 249 U.S. 601, 39 S.Ct. 259
Alta Land & Water Co. v. Hancock, 1890, 85 Cal. 219, 24 P. 645
American Fire & Cas. Ins. Co. v. Finn, 1950, 341 U.S. 6, 71 S.Ct. 534
Ames v. State of Kansas, 1884, 111 U.S. 449, 4 S.Ct. 437
Anaheim Union Water Co. v. Fuller, 1907, 150 Cal. 327, 88 P. 978
Anaheim Water Co. v. Semi-Tropic Water Co., 1883, 64 Cal. 185, 30 P. 623
Baggs v. Martin, 1900, 179 U.S. 206, 21 S.Ct. 109
Ballou v. Inhabitants of Hopkinton, Mass.1855, 4 Gray 324, 328
Barney v. City of Baltimore, 1867, 6 Wall. 280, 73 U.S. 280
Barton v. Riverside Water Co., 1909, 155 Cal. 509, 101 P. 790
Bathgate v. Irvine, 1899, 126 Cal. 135, 58 P. 442
Beals v. City of Los Angeles, 1943, 23 Cal.2d 381, 144 P.2d 839
Beatty v. United States, 8 Cir., 1951, 191 F.2d 317
Biddle Boggs v. Merced Mining Co., 1859, 14 Cal. 279
Bloss v. Rahilly, 1940, 16 Cal.2d 70, 104 P.2d 1049
Bors v. Preston, 1884, 111 U.S. 252, 4 S.Ct. 407
Bowers, Inc., v. New York & Albany Lighterage Co., 1927, 273 U.S. 346,
 47 S.Ct. 389
Bowles v. Strickland, 5 Cir., 1945, 151 F.2d 419
Boyce's Executors v. Grundy, 1830, 3 Pet. 210, 28 U.S. 210
Brady v. Daly, 2 Cir., 1899, 83 F. 1007; 175 U.S. 148, 20 S.Ct. 62
Burr v. Maclay Rancho Water Co., 1908, 154 Cal. 428, 98 P. 260
Burr v. Maclay Rancho Water Co., 1911, 160 Cal. 268, 116 P. 715
Butte County Water Users' Ass'n v. Railroad Commission etc., 1921, 185 Cal.
 218, 196 P. 265
Cabot, Inc., v. Binney & Smith Co., D.C.N.J.1942, 46 F.Supp. 346
California Pastoral & Agricultural Co. v. Madera, etc., Co., 1914, 167 Cal. 78,
 138 P. 718
California-Oregon Power Co. v. Beaver Portland Cement Co., 1935, 295 U.S.
 142, 55 S.Ct. 725
Callanan, Petition of, D.C.E.D.Mich.1931, 51 F.2d 1067
Callison v. Mt. Shasta Power Co., 1923, 123 Cal.App. 247, 11 P.2d 60
Canadian Aviator, Ltd. v. United States, 1945, 324 U.S. 215, 65 S.Ct. 639
Carlsbad Mutual Water Co. v. San Luis Rey Devel. Co., 1947, 78 Cal.App.2d
 900, 178 P.2d 844
Cary v. Curtis, 1945, 3 How. 236, 44 U.S. 236
Chalmers Chemical Co. v. Chadeloid Chemical Co., D.C.W.Va.1909,
 175 F. 995
Charnock v. Higuerra, 1896, 111 Cal. 473, 44 P. 171
Chow, Gin S. v. City of Santa Barbara, 1933, 217 Cal. 673, 22 P.2d 5
Chowchilla Farms, Inc., v. Martin, 1933, 219 Cal. 1, 25 P.2d 435

Churchill v. Lauer, 1890, 84 Cal. 233, 24 P. 107

City of Coronado v. City of San Diego, 1941, 48 Cal.App.2d 160,
119 P.2d 359

City of Lodi v. East Bay M. U. Dist., 1936, 7 Cal.2d 316, 60 P.2d 439

City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, 142 P.2d 289

City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 207 P.2d 17

City of San Bernardino v. City of Riverside, 1921, 186 Cal. 7, 198 P. 784

City of San Diego v. Cuyamaca Water Co., 1930, 209 Cal. 105, 287 P. 475

City of Walla Walla v. Walla Walla Water Co., 1898, 172 U.S. 1, 19 S.Ct. 77

Clark v. Barnard, 1883, 108 U.S. 436, 2 S.Ct. 878

Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 19 U.S. 264

Collett, Ex parte, 1949, 337 U.S. 55, 69 S.Ct. 944

Collier v. Merced Irr. Dist., 1931, 213 Cal. 554, 2 P.2d 790

Commercial Cas. Ins. Co. v. Lawhead, 4 Cir., 1933, 62 F.2d 928, certiorari
denied 289 U.S. 731, 53 S.Ct. 527

Conaway v. Yolo Water & Power Co., 1928, 204 Cal. 125, 266 P. 944

Connett v. City of Jerseyville, 7 Cir., 1938, 96 F.2d 392

Conrad Inv. Co. v. United States, 9 Cir., 1908, 161 F. 829

Contra Costa Water Co. v. City of Oakland, 1911, 159 Cal. 323, 113 P. 668

Cooper v. Reynolds, 1870, 10 Wall. 308, 77 U.S. 308

Cowell v. Armstrong, 1930, 210 Cal. 218, 290 P. 1036

Crane v. Stevinson, 1936, 5 Cal.2d 387, 54 P.2d 1100

Cummings v. City of Chicago, 1903, 188 U.S. 410, 23 S.Ct. 472

Curtis v. North American Indian, Inc., 9 Cir., 1922, 277 F. 909

Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956

Danforth v. United States, 1939, 308 U.S. 271, 60 S.Ct. 231

Dargel v. Henderson, Em.App.1952, 200 F.2d 564

Dickinson v. Burnham, 2 Cir., 1952, 197 F.2d 973, certiorari denied 344 U.S.
875, 73 S.Ct. 16'

Dougherty v. Creary, 1866, 30 Cal. 290

East Bay M. U. Dist. v. Department of Public Works, 1934, 1 Cal.2d 476,
35 P.2d 1027

Eden Township Water District v. City of Hayward, 1933, 218 Cal. 634,
24 P.2d 492

Empire West Side Irr. Dist. v. Stratford Irr. Dist., 1937, 10 Cal.2d 376,
74 P.2d 248

Fallbrook cases, D.C., 101 F.Supp. 298; 108 F.Supp. 72; 109 F.Supp.
28; 110 F.Supp. 767

Fall River Valley Irr. Dist. v. Mt. Shasta Power Corp., 1927, 202 Cal. 56,
259 P. 444

Faulkner v. Rondoni, 1894, 104 Cal. 140, 37 P. 883

Federal Housing Administration v. Burr, 1940, 309 U.S. 242, 60 S.Ct. 488

Federal Reserve Bank etc. v. Kalin, 4 Cir., 1935, 77 F.2d 50

Fellows v. City of Los Angeles, 1907, 151 Cal. 52, 90 P. 137

Ford & Son v. Little Falls Fibre Co., 1929, 280 U.S. 369, 50 S.Ct. 140

French v. Gapen, 1881, 105 U.S. 509

French v. Hay, 1847, 22 Wall. 238, 89 U.S. 238

Fresno Canal & Irr. Co. v. Park, 1900, 129 Cal. 437, 62 P. 87

Galbreath v. Metropolitan Trust Co., 10 Cir., 1943, 134 F.2d 569

Gardner v. State of New Jersey, 1947, 329 U.S. 565, 67 S.Ct. 467

Gibbons v. United States, 1868, 8 Wall. 269, 75 U.S. 269

Gila Valley Irr. Dist. v. United States, 9 Cir., 1941, 118 F.2d 507

Gold-Washing & Water Co. v. Keyes, 1877, 96 U.S. 199

Goldwyn v. United Artists Corp., 3 Cir., 1940, 113 F.2d 703

Gould v. Eaton, 1896, 111 Cal. 639, 44 P. 319

Gravelly Ford Canal Co. v. Pope, etc., 1918, 36 Cal.App. 556, 178 P. 150

Great Falls Mfg. Co. v. Attorney General, 1880, 124 U.S. 581, 8 S.Ct. 631

Great Northern R. Co. v. Alexander, etc., 1918, 246 U.S. 276, 38 S.Ct. 237

Gunter v. Atlantic Coast Line Co., 1906, 200 U.S. 273, 26 S.Ct. 252

Hamlin v. Toledo, St. L. & K. C. R. Co., 6 Cir., 1897, 78 F. 664

Hans v. State of Louisiana, 1890, 134 U.S. 1, 10 S.Ct. 504

Hansberry v. Lee, 1940, 311 U.S. 32, 61 S.Ct. 115

Hargrave v. Cook, 1895, 108 Cal. 72, 41 P. 18

Heilbron v. Fowler Switch Canal Co., 1888, 75 Cal. 426, 17 P. 535

Helene Curtis Industries v. Sales Affiliates, D.C.S.D.N.Y.1952, 105 F.Supp. 886, 2 Cir., 199 F.2d 732

Herminghaus v. Southern California Edison Co., 1927, 200 Cal. 81, 252 P. 607, certiorari dismissed 275 U.S. 486, 48 S.Ct. 27

Hillside Water Co. v. City of Los Angeles, 1938, 10 Cal.2d 677, 76 P.2d 681

Holmes v. Snow Mountain W. & P. Co., 1918, 36 Cal.App. 394, 172 P. 178

Home Loan Bank Board v. Mallonee, 9 Cir., 1952, 196 F.2d 336, certiorari denied 345 U.S. 952, 73 S.Ct. 863

Houston & Texas Central R. Co. v. State of Texas, 1899, 177 U.S. 66, 20 S.Ct. 545

Hudson v. Dailey, 1909, 156 Cal. 617, 105 P. 748

Hurley v. Kincaid, 1932, 285 U.S. 95, 52 S.Ct. 267

Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412.

Insurance Co. v. Bailey, 1871, 13 Wall. 616, 80 U.S. 616

Inyo Consolidated Water Co. v. Jess, 1911, 161 Cal. 516, 119 P. 934

Juragua Iron Co. v. United States, 1909, 212 U.S. 297, 29 S.Ct. 385

Katz v. Walkinshaw, 1903, 141 Cal. 116, 70 P. 663, 74 P. 766

Keifer v. Reconstruction Finance Corp., 1939, 306 U.S. 381, 59 S.Ct. 516

Kilbourn v. Sunderland, 1889, 130 U.S. 505, 9 S.Ct. 594

Lakeside Ditch Co. v. Crane, 1889, 80 Cal. 181, 22 P. 76

Lamb v. California W. & T. Co., 1942, 21 Cal.2d 33, 129 P.2d 371

Larson v. Domestic & Foreign Commerce Corp., 1948, 337 U.S. 682, 69 S.Ct. 1457

Leavitt v. Lassen Irr. Co., 1909, 157 Cal. 82, 106 P. 404

Lewis v. Darling, 1853, 16 How. 1, 57 U.S. 1

Link v. Receivers of Seaboard Airline Ry. Co., 4 Cir., 1934, 73 F.2d 149.

Logan v. Guichard, 1911, 159 Cal. 592, 114 P. 989

Lux v. Haggin, 1886, 69 Cal. 255, 4 P. 919, 10 P. 674

Lytle Creek Water Co. v. Perdew, 1884, 65 Cal. 447, 4 P. 426

Magruder v. Belle Forche Valley Water Users Assn., 8th Cir., 1914, 219 F. 72, 81.

Maguire v. Hibernia Sav. & Loan Society, 1944, 23 Cal.2d 719, 146 P.2d 673

Marin W. & P. Co. v. Town of Sausalito, 1914, 168 Cal. 587, 143 P. 767

Martin v. Western States G. & E. Co., 1935, 8 Cal.App.2d 226, 47 P.2d 522

Matthiessen v. Montecito County Water District, 1933, 217 Cal. 788, 22 P.2d 19

Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 90 P.2d 537, 91 P.2d 105

Merritt v. City of Los Angeles, 1912, 162 Cal. 47, 120 P. 1064

Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 107 P. 115

Miller v. Robertson, 1924, 266 U.S. 243, 45 S.Ct. 73

Miller & Lux, Inc., v. Enterprise C. & L. Co., 1915, 169 Cal. 415, 147 P. 567

Miller & Lux, Inc., v. James, 1919, 180 Cal. 38, 179 P. 174

Miller & Lux, Inc., v. Madera C. & I. Co., 1909, 155 Cal. 59, 99 P. 502

Miller & Lux, Inc., v. San Joaquin L. & P. Corp., 1937, 8 Cal.2d 427, 65 P.2d 1289

Miller & Lux v. Worswick, 1922, 187 Cal. 674, 203 P. 999, certiorari denied 258 U.S. 625, 42 S.Ct. 382

Monroe v. United Carbon Co., 5 Cir., 1952, 196 F.2d 455

Montezuma Canal Co. v. Smithville Canal Co., 1910, 218 U.S. 371, 31 S.Ct. 67

Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 140 P.2d 798

Moreno Mutual Irr. Co. v. Beaumont Irr. District, 1949, 94 Cal.App.2d 766, 211 P.2d 928

Morgan v. Walker, 1933, 217 Cal. 607, 20 P.2d 660

Mt. Shasta Power Co. v. McArthur, 1930, 109 Cal.App. 171, 292 P. 549

Mullaney v. Anderson, 1952, 342 U.S. 415, 72 S.Ct. 428

Munn v. State of Illinois, 1876, 94 U.S. 113

Nampa & Meridian Irr. Dist. v. Bond, 1925, 268 U.S. 50, 45 S.Ct. 383

Natoma Water & Mining Co. v. Hancock, 1894, 101 Cal. 42, 31 P. 112, 35 P. 334

N. L. R. B. v. Pittsburgh S. S. Co., 1951, 340 U.S. 498, 71 S.Ct. 453

New Orleans, M. & T. R. Co. v. State of Mississippi, 1880, 102 U.S. 135

Newport v. Temescal Water Co., 1906, 149 Cal. 531, 87 P. 372

Niles v. City of Los Angeles, 1899, 125 Cal. 572, 58 P. 190

Noonan v. Caledonia Gold Mining Co., 1887, 121 U.S. 393, 7 S.Ct. 911

O'Leary v. Herbert, 1936, 5 Cal.2d 416, 55 P.2d 834

Orchard v. Cecil F. White Ranches, 1950, 97 Cal.App.2d 35, 217 P.2d 143

Osborn v. President, etc., of Bank of United States, 1824, 9 Wheat. 738, 22 U.S. 738

Pabst v. Finmand, 1922, 190 Cal. 124, 211 P. 11

Pacific Live Stock Co. v. Hanley, 9 Cir., 1912, 200 F. 468

Pacific Live Stock Co. v. Lewis, 1916, 241 U.S. 440, 36 S.Ct. 637

Palmer v. Railroad Commission, etc., 1914, 167 Cal. 163, 138 P. 997

Parker v. Swett, 1922, 188 Cal. 474, 205 P. 1065

Patton v. Brady, 1902, 184 U.S. 608, 22 S.Ct. 493

Payette-Boise Water Users v. Cole, D.C., Idaho 1919, 263 F. 734

Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 40 P.2d 486

Peake v. Harris, 1920, 48 Cal.App. 363, 192 P. 310

Peckwith v. Lavezzola, 1942, 50 Cal.App.2d 211, 122 P.2d 678

People v. Birch Securities, 1948, 86 Cal.App.2d 703, 196 P.2d 143, certiorari denied 336 U.S. 936, 69 S.Ct. 745

People v. Oakland Water Front Co., 1897, 118 Cal. 234, 50 P. 305

People of Puerto Rico v. Ramos, 1914, 232 U.S. 627, 34 S.Ct. 461

People of State of California v. United States, 9 Cir., 1950, 180 F.2d 596, certiorari denied 340 U.S. 826, 71 S.Ct. 61

Piccard v. Sperry Corporation, D.C.N.Y.1941, 36 F.Supp. 1006, affirmed 2 Cir., 120 F.2d 328

Pierce v. Superior Court of Los Angeles County, 1934, 1 Cal.2d 759, 37 P.2d 453

Piper v. Hawley, 1918, 179 Cal. 10, 175 P. 417

Pitt River Power Co. v. United States, 1942, 98 Ct.Cl. 253

Poinsett Lbr. & Mfg. Co. v. United States, 91 Ct.Cl. 264

Postal Telegraph Cable Co. v. State of Alabama, 1894, 155 U.S. 482, 15 S.Ct. 192

Pyramid Land Co. v. Scott, 1921, 51 Cal.App. 634, 197 P. 398

Raabe, Glissman & Co., Inc., In re, D.C.N.Y.1947, 71 F.Supp. 678

Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 81 P.2d 533

Rank v. Krug, D.C., 1950, 90 F.Supp. 773

Rank v. Krug, D.C., 1954, 16 F.R.D. 310

Reclamation District etc. v. Quigley, 1937, 8 Cal.2d 183, 64 P.2d 399

Rector v. United States, 8 Cir., 1927, 20 F.2d 845

Reid v. Gifford, Hopk. Ch. 419

Reed v. Oakdale Irrigation District, 1920, 46 Cal.App. 139, 188 P. 832

Safway Steel Products, Inc. v. Lefever, 1953, 117 Cal.App.2d 489, 256 P.2d 32

San Joaquin & Kings River Canal & Irrigation Co. v. Worswick, 1922, 187 Cal. 674, 203 P. 999, certiorari denied 258 U.S. 625, 42 S.Ct. 382

Scott v. Fruit Growers Supply Co., 1927, 202 Cal. 47, 258 P. 1095

Seneca C. G. M. Co. v. Great Western Power Co., 1930, 209 Cal. 206, 287 P. 93

Shapira v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375

Shields v. Barrow, 1854, 17 How. 129, 58 U.S. 129

Silves River, In re, D.C.Or.1912, 199 F. 495

Smith v. Swormstedt, 1853, 16 How. 288, 57 U.S. 288

Smith v. Illinois Bell Telephone Co., 1926, 270 U.S. 587, 46 S.Ct. 408

Snowden v. Ft. Lyon Canal Co., 8 Cir., 1916, 238 F. 495

Spring Valley Water Co. v. Alameda County, 1927, 88 Cal.App. 157, 263 P. 318

Spring Valley Water Co. v. City and County of San Francisco, 9 Cir., 1904, 165 F. 676

Standard Acc. Ins. Co. v. Miller, 7 Cir., 1948, 170 F.2d 495

Starin v. City of New York, 1883, 115 U.S. 248, 6 S.Ct. 28

Stark v. Payne, D.C.Mont.1921, 271 F. 477

State of California v. United States District Court, 9 Cir., 1954, 213 F.2d 818

State of Minnesota v. Northern Securities Co., 1902, 184 U.S. 199, 22 S.Ct. 308

State of Minnesota v. Northern Securities Co., 1904, 194 U.S. 48, 24 S.Ct. 598

State of Minnesota v. United States, 8 Cir., 1942, 125 F.2d 636

State of Minnesota v. United States, 8 Cir., 1939, 95 F.2d 468, affirmed 305 U.S. 382, 59 S.Ct. 292

State of Missouri v. Fiske, 1933, 290 U.S. 18, 54 S.Ct. 18

State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 65 S.Ct. 1332

State of Tennessee v. Davis, 1879, 100 U.S. 257

State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421

Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962

Stevens v. Oakdale Irrigation District, 1939, 13 Cal.2d 343, 90 P.2d 58

Stevinson v. San Joaquin & Kings River Canal & Irr. Co., 1912, 162 Cal. 141, 121 P. 398

Stevinson Water District v. Roduner, 1950, 36 Cal.2d 264, 223 P.2d 209

Stockman v. Riverside Land & Irr. Co., 1883, 64 Cal. 57, 28 P. 116

Supreme Tribe of Ben-Hur v. Cauble, 1921, 255 U.S. 356, 41 S.Ct. 338

Swift v. Black Panther Oil & Gas Co., 8 Cir., 1917, 244 F. 20

Temescal Water Co. v. Department of Public Works, 1955, 44 Cal.2d 90, 280 P.2d 1

Thayer v. California Development Co., 1912, 164 Cal. 117, 128 P. 21

Thompson v. United States, 9 Cir., 1954, 215 F.2d 744

Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 1935, 3 Cal.2d 489, 45 P.2d 972

Tulare Water Co. v. State Water Commission, 1921, 187 Cal. 533, 202 P. 874

Turner v. East Side Canal & Irr. Co., 1915, 169 Cal. 652, 147 P. 579

Turner v. James Canal Co., 1909, 155 Cal. 82, 99 P. 520

Twenty-three (23) Tracts of Land v. United States, 6 Cir., 1949, 177 F.2d 967

Tyler v. Savage, 1892, 143 U.S. 79, 12 S.Ct. 340

Union Mill & Mining Co. v. Dangberg, 9 Cir., 1897, 81 F. 73

Union Pacific Ry. Co. v. Chicago Rock Island & Pacific Ry. Co., 1896, 163 U.S. 564, 16 S.Ct. 1173

United States v. Aetna Cas. & Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207

United States v. Angle, et al—No. 30 Equity, (N.D.Calif.)

United States v. State of Arizona, 1935, 295 U.S. 174, 55 S.Ct. 666

United States v. Association of American Railroads, D.C.Neb.1945, 4 F.R.D. 510

United States v. Buffalo Pitts Co., 1914, 234 U.S. 228, 34 S.Ct. 840

United States v. State of California, 1936, 297 U.S. 175, 56 S.Ct. 421

U. S. v. Coachella Valley etc., D.C.Cal., 1953, 111 F.Supp. 172

United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382

United States v. Gas & Oil Development Co., D.C.W.D.Wash.1954, 126 F.Supp. 840

United States v. Geisler, 7 Cir., 1949, 174 F.2d 992, certiorari denied 338 U.S. 861, 70 S.Ct. 103

United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 70 S.Ct. 955

United States v. Great Falls Mfg. Co., 1884, 112 U.S. 645, 5 S.Ct. 306

United States v. Hooe, 1805, 3 Cranch 73, 7 U.S. 73

United States v. Kansas City Ins. Co., 1950, 339 U.S. 799, 70 S.Ct. 885

United States v. Louisiana, State of 1887, 123 U.S. 32, 8 S.Ct. 17

United States v. Lynah, 1902, 188 U.S. 445, 23 S.Ct. 349

United States v. McGowan, D.C.Wash.1931, 2 F.Supp. 426, affirmed 9 Cir., 62 F.2d 955, 290 U.S. 592, 54 S.Ct. 95

United States v. "Old Settlers," 1893, 148 U.S. 427, 13 S.Ct. 650

United States v. Reynolds, 3 Cir., 1951, 192 F.2d 987, certiorari granted 343 U.S. 918, 72 S.Ct. 678, reversed 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727

United States v. Rio Grande Dam & Irr. Co., 1898, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136

United States v. Rogers, 8 Cir., 1919, 257 F. 397

United States v. Shaw, 1940, 309 U.S. 495, 60 S.Ct. 659

United States v. Sherwood, 1941, 312 U.S. 584, 61 S.Ct. 767

United States v. United States District Court, 9 Cir., 1954, 206 F.2d 303

United States v. Yellow Cab Co., 1951, 340 U.S. 543, 71 S.Ct. 399

Upshur County v. Rich, 1890, 135 U.S. 467, 10 S.Ct. 651

Verdugo Canon Water Co. v. Verdugo, 1908, 152 Cal. 655, 93 P. 1021

Vineyard Land & Stock Co. v. Twin Falls S. R. L. & W. Co., 9 Cir., 1917 245 F. 9

Weston v. City Council etc., 1820, 2 Pet. 449, 27 U.S. 449

White-Smith Music Pub. Co. v. Apollo Co., 1908, 209 U.S. 1, 28 S.Ct. 319

Woods Bros. Const. Co. v. Yankton County, S.D., 8 Cir., 1931, 54 F.2d 304

Yuba River Power Co. v. Nevada Irr. District, 1929, 207 Cal. 521, 279 P. 128

## Appendix "B"

United States District Court
Southern District of California
Northern Division

Filed
Jan. 22, 1952

| | |
|---|---|
| EVERETT G. RANK, et al., *Plaintiffs,* v. JULIUS A. KRUG, as Secretary of the Interior, et al., *Defendants.* | No. 685-ND Civil Order |

A second pretrial conference having been held on January 15, 16 and 17, 1952, at Los Angeles, California, the Honorable Peirson M. Hall, District Judge, presiding, and all parties who have appeared herein being represented by their respective counsel, and plaintiffs having filed, in response to Paragraph 4 of the Order made herein December 20th, 1951, a map entitled, "Outline Map San Joaquin River Bottoms and Lands Neighboring the River in Madera and Fresno Counties," and said map having been introduced and marked "Plaintiffs' Exhibit 1–52–1," and a written statement setting out the method and character of proof as to certain matters, which statement was introduced and marked "Plaintiffs' Exhibit 1–52–2," and intervener State of California having presented a written statement and map entitled "Data on Lands Along San Joaquin River from Friant to Gravelly Ford Canal, Formerly Owned by Miller and Lux, Inc., Sold With Various Clauses of Water Rights Exceptions and Reservations in the Deeds and Land Sale Contracts," and said statement and map having been introduced and marked "Intervener's Exhibit 1–52–A," and the motions of City of Fresno, a municipal corporation, Tranquillity Irrigation District, an irrigation district, and Emil Schramm; for leave to file their respective complaints in intervention having been made and argued, and good cause appearing therefor,

Now, Therefore, It Is Ordered:

1. That said motions of City of Fresno, Tranquillity Irrigation District and Emil Schramm are ordered off calendar, to be re-set for further hearing upon notice and upon further order of the Court;

2. That pursuant to stipulation of the parties, Intervener's Exhibit 1–52–A is accepted as evidence of the matters which it purports to show, subject to exception, amendment or amplification pursuant to written statement filed by any party hereto on or before March 3, 1952;

3. That the trial of said cause will commence at Fresno, California, on January 29, 1952, and will thereafter continue on Tuesday, Wednesday, Thursday and Friday of each week, subject to such further order as the Court may make.

4. That said trial will be limited to and relate to the issues framed by the pleadings relating to claims of plaintiffs, and the class which they claim to represent having riparian rights or surface

diversion rights to take water from the main channel of the San Joaquin River only between Friant Dam and Gravelly Ford, and the claims of plaintiffs and the class which they claim to represent as to underground waters received from the main channel only of the San Joaquin River above its junction with Fresno Slough by the lands lying within the exterior limits of the lands described in Exhibit "C" of the Amendment to the Complaint filed July 26, 1951, or within the limits of the so-called alluvial cone or cones shown on Plaintiffs' Exhibit 1–52–1, whichever of said limits are farthest from the main channel of the San Joaquin River.

5. It is recognized that in the trial of a suit presenting legal and factual questions as complicated and varied as this one, other questions and issues and things not now capable of being foreseen or defined may arise and may be necessary to be decided; so the within Order is intended to be a general one and is not intended to be either all-inclusive or all-exclusive, except that any and all issues which are or are attempted to be raised by the pleadings herein on the following general subjects will not be tried at said trial commencing January 29, 1952, but are reserved for such later consideration, if any, by the Court as may be required in the interest of justice, viz.:

(a)–1. Claims to riparian or surface water rights on that stretch of the main channel of the San Joaquin River below the place called Gravelly Ford;

2. Claims relating to waters, whether surface or underground, of or from Fresno Slough;

(b) Claims relating to waters for commercial recreational uses;

(c) Claims relating to waters for sand or gravel pits;

(d) Claims relating to assessment of past damages;

(e) All claims raised or attempted to be raised by the pleadings herein or by the proposed complaints in intervention of the City of Fresno, Tranquillity Irrigation District and Emil Schramm, other than those set forth in Paragraph 4 of the within Order;

(f) Claims relative to water for industrial uses.

The within Order is made and the trial now set to commence on January 29, 1952, will be had without prejudice to a further determination as to whether or not any of the foregoing claims present issues in, or properly triable in, this case.

6. That counsel for each party or group of parties hereto shall file and serve not later than January 29, 1952, a statement in the nature of an opening statement of such parties' legal position as to the issues to be tried on January 29, 1952, which statement shall be supported by such authorities as counsel may deem applicable.

7. The order of proof at the trial will be:

(1) Evidence going to the determination of the area of lands to be included in the classes of rights mentioned in Paragraph 4 hereof;

(2) Evidence showing lands covered by either waivers of water rights or the water rights relating thereto now reposed for any reason in the United States;

(3) Evidence relating to plans for physical solution.

On Further Hearings as to Physical Solution.

[July 11, 1956.]

On March 12, 1956, upon hearing and after notice to all counsel and parties, the Court fixed May 22, 1956, at Fresno, as the time and place for further hearings concerning a physical solution as indicated in the Opinion filed February 7, 1956. A hearing in the nature of pretrial, under Rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A., was had on May 14, 1956, at Los Angeles, pursuant to an Order dated April 17, 1956, which, inter alia, provided:

"It Is Further Hereby Ordered and Directed that each of you shall,

on or before the close of business on the 9th day of May, 1956, serve by mail, or personally, each of the other above named attorneys and officials of the United States Bureau of Reclamation, and file with the above entitled court, a written statement showing: (1) the persons or parties to the within action for whom you are appearing; (2) the names of the witnesses which you expect to call at the hearing now set for May 22, 1956; (3) an estimate of the length of time required for the production of evidence expected to be produced by you; and (4) such plans, modification, or amendment, or substitution of plans for the physical solution proposed by the plaintiffs, which you may have which shall show the number, type, and location of collapsible check dams and the engineering details therefor, and/or such other physical work as is, or may be, proposed or deemed necessary to accomplish the general plan of physical solution indicated by the Court in the Opinion filed February 7, 1956."

A copy of that Order, as well as each Order fixing the hearings for March 12, 1956, and for May 22, 1956, was mailed to all counsel of record, and to: Herbert Brownell, Jr., The Attorney General of the United States; J. Lee Rankin, Assistant Attorney General of the United States, Office of Legal Counsel; Wm. H. Veeder, Special Assistant to the Attorney General of the United States; Laughlin E. Waters, United States Attorney, Southern District of California, Los Angeles, California; as well as to the following defendant officials of the United States: Clyde Spencer, Supervising Engineer, California Projects, U. S. Bureau of Reclamation, Regional Director of the U. S. Bureau of Reclamation, Region 2, U. S. Bureau of Reclamation, % U. S. Bureau of Reclamation, Sacramento, California; Martin Blote, Watermaster, U. S. Bureau of Reclamation, and Superintendent of Operations of the Central Valley Project, U. S. Bureau of Rec-

lamation, % U. S. Bureau of Reclamation, Sacramento, California; and Edwin F. Sullivan, Operations Supervisor, U. S. Bureau of Reclamation, % U. S. Bureau of Reclamation, Fresno, California.

Neither the Attorney General of the United States, nor any Assistant or Special Assistant Attorney General of the United States, nor the United States Attorney, nor any Assistant United States Attorney, nor any of said defendant officials filed any statement in response to, or in compliance with, said Order, or any statement at all on behalf, or in the name, of the United States or said defendant United States officials or any of them; nor did they or any of them or any one else appear at any of the hearings on March 12, 1956, May 14, 1956, or May 22, 1956, for or on behalf of, or in the name of, the United States, or said defendant United States officials, or any of them.

Most of the defendant Districts filed statements in response to said Order of April 17, 1956, as did the intervenor, State of California, and the officials of the State of California who are defendants in the ancillary proceedings. All such statements indicated that no evidence would be offered at the hearing on May 22, 1956. The defendant Districts in their statements generally suggested that the number of dams to be constructed be held to a minimum and be constructed in the most economical manner.

The plaintiffs, and the plaintiff in intervention City of Fresno, and the plaintiff in intervention Tranquillity Irrigation District filed a written statement in response to said Order indicating that additional testimony would be produced.

At the hearing on May 22, 1956, no evidence was offered by any one except the plaintiffs. Their counsel put on evidence from which it appears that the water levels in the wells in the easterly end of the alluvial cone of the San Joaquin river and within the "Lee" lines had dropped as much as 100 feet since 1952 after the impoundment and diversion of water into both the Madera and Friant-

Kern canals, and that some wells, after deepening to bedrock, would only produce a portion of the quantity of water in gallons per minute which they had produced before. The evidence also showed that since 1952, crops and fruit trees had to be, and were, abandoned in that area because of the inability to produce water from wells which had theretofore produced sufficient water for crop and domestic uses, and that unless the water tables were restored, or a substitute water supply found, continuing and progressive abandonment of crops and orchards would result from lack of water.

The defendant Clyde E. Spencer was called to the witness stand by the plaintiffs, but his testimony was limited principally to confirming his duties and those of defendants Martin Blote and Edwin F. Sullivan to be as heretofore indicated by the Court in its Opinion filed February 7, 1956.

The defendant Edwin F. Sullivan was called to the witness stand by plaintiffs, and produced general statistical data concerning the flows of the San Joaquin and Kings rivers.

Plaintiffs also called to the witness stand Mr. Leland Hill, the principal expert of the defendants at the main trial of the case, who stated on the witness stand that on the basis of the conclusions set forth in the Court's Opinion filed February 7, 1956, he had no suggestions for changing the plaintiffs' plan of physical solution except that he did not, under any circumstances, feel that Dams No. 13 and No. 14 were necessary or useful, and that Dam No. 12 should be moved downstream about one-half river-mile so that, in addition to performing its functions as part of plaintiffs' plan of physical solution, it could

also act as a weir to divert water into the Gravelly Ford canal, if, as and when the United States was required to do so.

The testimony of Mr. Hill on the main trial of the case suggested that if the government were to build the collapsible dams of the type proposed by the plaintiffs, there would likely be some differences in design and construction, but when asked on the May 22, 1956, hearings if he had any suggestions in that respect, he said that he had none.[116]

In the Opinion of February 7, 1956, and by the Order of April 17, 1956, the Court invited all of the defendants and those who might have any objection to plaintiffs' plan of physical solution to suggest modifications, but no suggested modifications, either as to number, type, or location of any dams were proposed by any of the parties, except the testimony of Mr. Hill as above referred to.

In the Opinion filed February 7, 1956, the Court, while indicating general approval of plaintiffs' plan of physical solution, suggested that all of the fourteen dams, as finally proposed in plaintiffs' amended plan of physical solution, should not be required at the present time as a conditional physical solution, and also indicated that, pending observation of the hydrological changes resulting in the area involved as a consequence of the alteration of the natural regimen of the river by the construction of Friant dam and the diversion of water, less than twelve dams, as originally proposed in plaintiffs' plan of physical solution, should be required at this time as a conditional physical solution "if, in the meanwhile, the rights of plaintiffs and their class can be protected."

▮▮▮ From a further consideration of all of the evidence in the case, the

---

116. The Court, desiring to again view the proposed dam sites, requested that plaintiffs' principal expert, Mr. Charles H. Lee, and Mr. Leland Hill, the principal expert for the defendants, accompany the Court to the area for the purpose of aiding the Court in finding the precise location on the ground of the various dam sites, and again inspecting and viewing the sites of the dams on the ground. All counsel consented, and the inspection trip down the river was made by the Court with said engineers on May 24, 1956. No additional evidence was taken on the trip. All dam sites except Nos. 13 and 14 of plaintiffs' plan were again inspected and viewed by the Court.

Court concludes that the rights of all parties will be best protected and served, reasonable and beneficial use by reasonable methods of diversion and use will be accomplished, and the Constitution and Laws, both of California and the United States, will be complied with by, and that the present minimum requirements for the protection of the rights of plaintiffs and their class require, a decree of injunction prohibiting the impoundment and diversion of waters of the San Joaquin river at Friant, except upon condition that the defendants, at their cost, shall provide a physical solution by the construction of a minimum of ten dams of the height, nature, and type of construction as proposed by the plaintiffs, and located as follows, viz.: Dams Nos. 1, 2, 3, 5, 7, 9, 10 and 11 to be at the sites proposed by plaintiffs; Dam No. 4 to be moved approximately one river-mile downstream from the site proposed by the plaintiffs; Dam No. 12 to be moved downstream to a point approximately one-half of a river-mile below the take-off of Gravelly Ford canal, and Dams No. 4 and No. 12 each raised to sufficient height that they will provide the same upstream impounding as if built at the site proposed by plaintiffs; the physical solution to further provide for the release of sufficient water from Friant as will permit a continuous flow of five cubic feet per second over the last downstream dam, and also for flushing releases as indicated in plaintiffs' plan of physical solution.

Dams Nos. 6 and 8, as proposed by the plaintiffs, are not now required for the reason that rock and gravel operations in the river bed, in the vicinity of each one, now result in the ponding of water. The ponding is not to the same extent as would occur if Dams Nos. 6 and 8 were built, but is sufficient to warrant the Court, in the exercise of caution, to refrain from ordering their construction at this time. If experience develops that the ponding resulting from the rock and gravel operations, together with the other requirements of the physical solution ordered, are not sufficient to satisfy the physical requirements for water for river pumpers or percolation, that will be sufficient time for the Court to give further consideration to their construction.

Dams Nos. 13 and 14 were proposed by plaintiffs to be downstream from Dam No. 12 at Gravelly Ford. The nature of the aquifers changes in the vicinity between Skaggs bridge and Gravelly Ford so that below the latter point on the river, from the present evidence in the case, the water percolating as a result of Dams Nos. 13 and 14 would not reach the aquifers in any substantial amount so as to supply the wells in that area. Whatever water would reach such wells as a result of Dams Nos. 13 and 14, would be more than offset by evaporation losses because of the flat nature of the banks and the shallowness of the water back of the dams, so that it would be an unreasonable method of diversion and use to presently require the construction of Dams Nos. 13 and 14 as part of the physical solution.

■■■ It is to be remembered that, under California law, there will be an open decree in this case, which will permit the equity powers of the court to be later invoked, if warranted under the facts.

■■■ The operation of the physical solution may require the services of some one in the nature of a Watermaster, such as was approved by the Supreme Court in Montezuma Canal Co. v. Smithville Canal Company, 1910, 218 U.S. 371, 31 S.Ct. 67, 54 L.Ed. 1074. But such designation need not be made now as the only variations from year to year in the operation of the plan will be in the date and amounts of scouring releases, and the time of raising the dam gates in the spring for ponding purposes, and lowering them in the fall or winter for flood release purposes. This can be more economically done, and with little inconvenience, if, after the dams are completed, a hearing is held, on motion of any party, and an order made on such matters in the spring of each year be-

fore the irrigation season begins. By that time, the record of releases from Friant for flood or other purposes for the past winter will be available, to aid in determining the time and quantity of scouring releases, if any. Information concerning estimated water supply for the ensuing season will also be available, as will the crop plantings and pattern. Such hearing would probably take no more than one day, or even less. If such procedure should, in the future, prove too cumbersome, it will be time enough then to give consideration to the appointment of a Watermaster. Or it is possible that time may demonstrate the need for the formation of a Water District in connection with the operation of the physical solution.

The ponding created as a result of the dams will occur in the bed of the river, and will not raise the water above the level which would take place at a flow of 2,000 cubic feet per second. None of the dams so ordered will raise the water to such height as would cause any flooding or water logging of any lands whatsoever.

This plan will require a minimum of water, and will stabilize and define, as near as can be done at the present time, the rights of all the parties.

■ Counsel for the plaintiffs, at the hearing, urged that the radical changes in underground water in the easterly end of the alluvial cone, as above indicated, warranted the Court in requiring as a part of a physical solution the furnishing of a given quantity of water from the Friant-Kern canal, measured in acre-feet, directly to a small area of specifically described lands in the Garfield area. The evidence shows radical changes and a lowering in underground water throughout the San Joaquin cone resulting from the impoundment and diversion of water at Friant, and causing a great impingement upon prior vested rights. But the Court is of the view that, as a matter of law in this class action, an order for a physical solution should not be made in terms of delivery of a measured quantity of water to specifically described lands within the alluvial cone unless it is incidental to, and a consequence of, the satisfaction of the common rights to water from a common source, of all of the members of the class. The last above mentioned claim of the lands in the Garfield area is not of such incidental and consequential nature.

In addition to the authorities cited in the Opinion filed February 7, 1956, reference is made to the following cases to support the power of this Court to issue judgment in accordance with that Opinion and this Memorandum, to wit: Magruder v. Belle Forche Valley Water Users' Association, 8 Cir., 1914, 219 F. 72, at page 81; Nampa & Meridian Irr. Dist. v. Bond, 1925, 268 U.S. 50, 45 S.Ct. 383, 69 L.Ed. 843; Payette-Boise Water Users' Association v. Cole, D.C.Idaho 1919, 263 F. 734; United States v. Coachelle Valley, etc., D.C., 111 F.Supp. 172.